```
                    BEFORE THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .
                                   .  Case Number 21-cr-116-1
            Plaintiff,             .
                                   .
       vs.                         .
                                   .
WILLIAM MCCALL CALHOUN, JR.,       .  March 8, 2021
                                   .  3:12 p.m.
            Defendant.             .
- - - - - - - - - - - - - - - - -
```

                    TRANSCRIPT OF MOTION HEARING, VOLUME II
                  BEFORE THE HONORABLE DABNEY L. FRIEDRICH
                       UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the United States:        ADAM ALEXANDER, AUSA
                              United States Attorney's Office
                              222 West Seventh Avenue
                              Anchorage, Alaska 99501


For the Defendant:            JESSICA SHERMAN-STOLTZ, ESQ.
                              Sherman-Stoltz Law Group, PLLC
                              P.O. Box 69
                              Gum Spring, Virginia 23065




Official Court Reporter:      SARA A. WICK, RPR, CRR
                              333 Constitution Avenue Northwest
                              U.S. Courthouse, Room 4704-B
                              Washington, D.C. 20001
                              202-354-3284


Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(All participants present via video conference.)

THE COURTROOM DEPUTY:  Your Honor, we are in Criminal Action 21-116-1, the United States of America versus William Calhoun, Jr.

If I can have the parties identify themselves for the record, beginning with the United States.

MR. ALEXANDER:  Adam Alexander for the United States, Your Honor.

THE COURT:  Good afternoon, Mr. Alexander.

MS. SHERMAN-STOLTZ:  Jessica Sherman-Stoltz, Your Honor, for the defendant.

THE COURT:  Good afternoon, Ms. Sherman-Stoltz and Mr. Calhoun.

Do we also have Pretrial Services on the line?

PRETRIAL SERVICES OFFICER:  Yes, Your Honor. Christine Schuck with Pretrial Services.

THE COURT:  Thank you, Ms. Schuck, for joining us.

This is a continuation of the March 5th hearing, and for the record, this hearing is being conducted by video conference pursuant to the Chief Judge's standing order relating to the pandemic.

Ms. Sherman-Stoltz, I assume Mr. Calhoun continues to agree to proceed in this way by video?

MS. SHERMAN-STOLTZ:  He does, Your Honor.

1          THE COURT:  All right.  I do find it is in the

2     interest to do so.

3          I have reviewed the parties' supplemental filings.

4          And Mr. Alexander, thank you for the videos that you sent.

5     Unfortunately, due to problems with my computer programming

6     here, I have been unable to open the two videos, but I will do

7     so immediately after this hearing.  Could you just describe for

8     me again what they show.

9          MR. ALEXANDER:  Yes, Your Honor.  Just briefly and by

10    way as a proffer to the Court, those were the remaining digital

11    exhibits that had been submitted to the magistrate in the Middle

12    District of Georgia during Mr. Calhoun's initial preliminary

13    examination and detention hearing in that case.

14         They are referred to, just for the record, in Exhibit 3 to

15    the government's present opposition to the motion for

16    reconsideration of detention filed last week.  And what was

17    provided, Your Honor, is referred to in that exhibit as

18    Exhibit 35 and 34, brief snippets of activity within the Capitol

19    that were captured -- that purport to depict Mr. Calhoun and his

20    activity.  They were captured from other social media accounts.

21         There is as well included in the government's supplementary

22    filing from this past Sunday screen captures from Capitol Police

23    surveillance footage from within the Capitol that appear

24    similar -- or to locate Mr. Calhoun similarly to what is

25    depicted in those brief videos.

1         THE COURT:  All right.  Thank you also for providing

2    me with a copy of the government's detention motion in the

3    Middle District of Georgia.  I did not have a copy of that, and

4    it wasn't clear to me before I saw that that you are actually

5    proceeding to seek detention under 3142(f)(2)(B) as well as (A).

6    Your supplemental filing makes clear that the government is not

7    proceeding under the crime of violence provision or any of the

8    other categories of offenses listed in 3142(f)(1).

9       Correct?

10         MR. ALEXANDER:  That's correct, Your Honor.

11         THE COURT:  So you are not arguing that the

12    obstruction or the other charged offenses constitute a crime of

13    violence?

14         MR. ALEXANDER:  No, Your Honor.

15         THE COURT:  Okay.  So under (f)(2), there are two

16    bases for the government to seek detention or for the judicial

17    officer on his or her own motion.  And those two bases involve,

18    first of all under (f)(2)(A), a serious risk that the defendant

19    will flee or, (f)(2)(B), a serious risk that the defendant will

20    obstruct or attempt to obstruct justice or threaten, injure, or

21    intimidate or attempt to threaten, injure, or intimidate a

22    prospective witness or juror.

23       You are proceeding under both, Mr. Alexander.  I want to

24    focus first on the obstruction piece because I don't think you

25    really addressed this threshold issue that I think I have to

1    decide first.

2        As far as I can tell in your briefing or your argument, I

3    don't know that you've walked me through your argument that

4    supports the conclusion that the evidence shows by a

5    preponderance -- you agree it's a preponderance of evidence

6    standard?

7        MR. ALEXANDER:  Your Honor, I thought it was

8    preponderance for the risk of flight and clear and convincing

9    for Subsection (B), but I'm happy to be corrected on that point.

10       THE COURT:  Oh, okay.  I'm not sure.  I'm asking.  You

11   think it is clear and convincing for Subsection (B)?

12       MR. ALEXANDER:  That's my understanding, Your Honor,

13   yes, that it's clear and convincing for Subsection (B) and

14   preponderance for risk of flight under Subsection (A).

15       THE COURT:  All right.  So it is the government's

16   position that in order for me to even begin to consider the

17   3142(g) factors, the four factors that I consider in making a

18   determination of whether detention is appropriate, the

19   government has to show by clear and convincing evidence that

20   there is a serious risk that Mr. Calhoun will obstruct or

21   attempt to obstruct justice.

22       That's in the future; right?

23       MR. ALEXANDER:  That's correct, Your Honor.  I

24   don't -- I'm not sure about the order of operations there.  I

25   think the Court can safely analyze the 3142(g) factors in

1    arriving at a decision as to whether or not the government has

2    met its burden under 3142(f)(2)(A) or (B).  Sorry.

3        THE COURT:  All right.  I'm not so sure, and that's

4    what I was probing with my supplemental minute order this

5    weekend.  I'm not so sure, as I read the Bail Reform Act, that I

6    don't have to make a threshold determination as to whether I can

7    hold a hearing either under (f)(1), which you're not proceeding

8    under, we've already covered that, or under (f)(2) before I then

9    begin to consider the factors to be considered under 3142(g).

10        Do you have any authority that suggests that I don't have

11    to make that initial threshold determination before I start

12    weighing the 3142(g) factors?

13        MR. ALEXANDER:  Your Honor, at the moment, I don't

14    have any other authority other than what was briefed yesterday.

15    I appreciate the Court giving me the opportunity to do so.  I'm

16    happy to proceed in argument that there is a basis for the Court

17    to make that threshold determination before proceeding on the

18    3142(g) factors.

19        THE COURT:  All right.  Let me share with you -- and I

20    will give both sides -- this is an interesting issue.  I'm

21    interested in both sides' position on this and any authority

22    either side can offer.  I'm not looking for briefing.  I've got

23    the issue keyed up.  I'm just looking for case law to answer

24    this question.

25        I will share with you, in *U.S. v. Byrd*, 969 F.2d 106 at

1    109, a Fifth Circuit case, it says the defendant's threat to the

2    safety of other persons or the community standing alone will not

3    justify pretrial detention.  That's not really on point there.

4        But in *U.S. v. Singleton*, the D.C. Circuit explained

5    pretrial detention is only permissible in cases involving

6    enumerated offenses or if the defendant is likely to flee or is

7    likely to obstruct justice.

8        Does that suggest that I can't even reach the 3142(g)

9    factors before I make a determination that detention is

10   appropriate under one of these seven categories of offenses?

11   That's the question I have.

12       Ms. Sherman-Stoltz, do you have a position on this?  Do you

13   have any authority one way or the other?

14           MS. SHERMAN-STOLTZ:  I'm actually reading right now,

15   Your Honor.  I'm seeing if I can find any authority on it.

16       Your Honor is suggesting, just to make sure I clearly

17   understand, that in order to proceed even assessing the 3142(g),

18   just the different factors outlined under 3142(g), your question

19   is whether or not you have to proceed with a hearing under the

20   3142(f)(2)(A) or (B) as far as --

21           THE COURT:  Or in (f)(1), but in this case, the

22   government is not proceeding under any of those categories of

23   offenses.  So as I read 3142(f) entitled "detention hearing,"

24   the judicial officer shall hold a hearing in any of these

25   situations, and I don't think a judicial officer can detain

1    without initially holding a hearing.

2        So I think that another way of saying this is, a judicial

3    officer should first hold a hearing and then, second, detain if

4    any of these categories are met, assuming as it weighs the

5    3142(g) factors detention is appropriate.  But it seems to me

6    there's a threshold determination I need to make before I start

7    weighing those factors.

8        But neither side has briefed it, and I'm interested -- I

9    assume this is coming up in other cases in this district.

10       Do you know, Mr. Alexander?

11           MR. ALEXANDER:  Your Honor, I have consulted with

12   management over the weekend in D.C., and I'm not aware of this

13   particular -- at least we did not discuss this particular

14   procedural posture arising.  I think that there is a basis, and

15   I'm happy to argue it if that would be constructive for the

16   Court, to find that there has been a threshold showing

17   sufficient to merit further analysis of the 3142(g).

18           THE COURT:  Yes, I would like to hear that.

19       But back to your point on the standard that I need to

20   apply, Mr. Alexander, I think to hold on dangerous grounds, I

21   need to find clear and convincing evidence that he is a danger

22   to the community.  I agree with you there.

23       But for the threshold issue, I'm also wondering whether the

24   standard isn't a preponderance.  So if you could also focus on

25   that as well.

1    So there are two questions:  Does the Court need to make a

2    threshold determination under 3142(f), either subpart (1) or

3    (2), and we are proceeding here under subpart (2), either (A) or

4    (B), before it weighs the factors under 3142(g)?

5    And second, what is the standard that the Court applies in

6    determining whether the threshold is met?  I think it's a

7    preponderance of the evidence, but I am interested in your

8    position on that.

9    MR. ALEXANDER:  I apologize, Your Honor.  The Court

10   cited to a case earlier.  Was there a District of Columbia case

11   that the Court --

12   THE COURT:  It's not directly on point, but pretrial

13   detention -- it's the *Singleton* case, 182 F.3d 7.  And bear with

14   me just a moment, and I may have -- let me see if there's

15   another case.

16   MR. ALEXANDER:  Your Honor, may I briefly address the

17   Court's question in the interim, or should I --

18   THE COURT:  Sure, you may.

19   MR. ALEXANDER:  Your Honor, I tried over the past week

20   or so to read as many of the district court cases in the circuit

21   regarding the procedural posture that we are in here.  I have

22   not seen -- and again, I'm happy to be corrected, and I am not

23   pretending to make a magisterial assessment here, but I have not

24   seen a discussion on review of the failure of the magistrate or

25   other judicial officer to make the threshold -- the adequate

threshold determination to trigger under 3142(f)(2)(A) or (B) a
subsequent reasoned analysis of the 3142(g) factors.

Where there is negative treatment as far as I can tell is
when the district court fails altogether to make a required --
quoting now from the *Nwokoro* case, 651 F.3d 108, a 2011 District
of Columbia Circuit Court of Appeals opinion reversing order of
detention precisely because the district court failed to make a
required assessment at all or to adequately memorialize a
determination on the written or oral record of findings of fact
or stated reasons for detention pursuant to 3142(i) upon which
meaningful appellate review could be conducted.  And as a
result, the reviewing court was not apprised why the district
court had concluded on the record that the government had met
its burden that the defendant posed either a serious risk of
flight and that no condition or combination of conditions could
reasonably assure the appearance.

My admittedly superficial understanding from reviewing
these cases or at least the cases that I have reviewed is that I
think that there is discretion for the reviewing court, whether
or not it's the initial magistrate at the detention review or,
as the Court has pointed out here, the district court exercising
its powers for de novo review under 3145 to undertake a holistic
assessment of the necessary facts in determining whether or not
the government has met its burden.

I'm not sure that the statutory obligation is that there

is -- or I have not seen any good faith case law that would

support the conclusion that the district court is barred from

undertaking an analysis of the conditions of release or that the

matters that are being litigated before having met a threshold

under 3142(f)(2).

THE COURT:  Let me share with you some other cases.

Unfortunately, it does not -- at least we haven't found that the

D.C. Circuit has addressed this issue head on.  But there is

that *Singleton* case I mentioned.

In addition, there's *United States v. Munchel*, 2021 WL

620236.  So this is a recent case in this district, I'm not sure

which judge, but noting that the government may seek pretrial

detention because the defendant was charged with using a

dangerous weapon while committing a felony offense.  So it met

one of the categories in 3142(f)(1), not addressing the issue

head on.

But other courts I do think hold that the government has to

show by a preponderance of evidence that the case falls into one

of those seven categories.  And for that proposition, I would

also cite:  *United States v. Watkins*, 940 F.3d 152 at 158.

That's a Second Circuit case.  *U.S. v. Hollingberry*, 2020 WL

2771773.  That's a District of Arizona case.  *U.S. v.

Fanyo-Patchou*, 426 F.Supp.3d 779, a Western District of

Washington case, 2019.  *United States v. Villatoro-Ventura*, 330

F.Supp.3d 1118.  That's a Northern District of Iowa case.

1    So it does make sense to me that the government does need

2    to make at least some showing that the case is one that's

3    authorized by the Bail Reform Act.  The government clearly can't

4    use the Bail Reform Act to seek detention on any case based on

5    like some free-ranging determination of dangerousness.  I think

6    the Act carefully limits the circumstances under which detention

7    may be sought to the most serious of crimes.

8    And so I think that these seven categories are an effort to

9    cabin the government's or the Court's, for that matter, ability

10   to detain someone.  That's how I read the statute, but I want to

11   give you all a chance to brief it.  Sorry if I didn't make this

12   clear over the weekend, but this is -- I am struggling whether I

13   have to make that threshold determination.

14   But Mr. Alexander, I would assume you would argue even if

15   that is true, that the government has met its burden if not by a

16   preponderance of evidence here, in your view by clear and

17   convincing evidence.

18   So if you can walk me through, you know, keeping in mind

19   that the standard is a serious risk that the defendant will

20   obstruct or attempt to obstruct justice or threaten, injure,

21   intimidate or attempt to threaten, injure, or intimidate a

22   prospective witness or juror.  I read that to mean not just a

23   general obstruction crime, but something tied to this judicial

24   proceeding.

25   And again, if you have authority that suggests I should be

1    reading it more broadly, I invite you to share that as well.

2    But I don't -- it makes sense to me that it is talking about a

3    situation where a defendant may attempt to obstruct justice in

4    this criminal case as opposed to some future legislative

5    proceeding or something of the like.

6        So if that's true, if I'm correct, what is the government's

7    evidence that shows that by a preponderance of the evidence?

8        MR. ALEXANDER:  Yes, Your Honor.  I'm happy to address

9    that.  And I'd very much appreciate, if appropriate, the ability

10   to further brief just that very narrow question of the threshold

11   determination and what, if any, standard applies to even trigger

12   further review pursuant to 3142(f)(2)(A) and (B).

13       THE COURT:  But at this point, Mr. Alexander, I am

14   anxious to rule one way or the other.  So I am going to give you

15   all until -- you can submit briefing later tonight, but to the

16   extent you all have any cases, I don't need the briefing.  I

17   need the cases.  And I would ask for that no later than -- it's

18   3:30 now -- 6:00 p.m. tonight.  It looks like if there is

19   already some analysis in the government's database, that you can

20   at least give the cases.  I don't want to wait for tomorrow for

21   more briefing.  I feel like I need to resolve this promptly.

22       MR. ALEXANDER:  Understood, Your Honor.  After this

23   hearing, I will reach out to my colleagues in D.C. and see if

24   there is any supplemental authority we can cite that may be of

25   assistance to the Court.  If not, I will just file a notice

1    within the same time frame saying we don't have anything further

2    to cite.

3              THE COURT:  All right.

4              MR. ALEXANDER:  Just for the purposes of argument now,

5    I will proceed with permission of the Court.

6              THE COURT:  Yes.

7              MR. ALEXANDER:  So Your Honor, I would begin,

8    obviously again as discussed at the previous hearing, the Court

9    here is not in any way bound by the findings of the magistrate

10   court at the initial hearing, the January 21st preliminary

11   examination and detention hearing.  By the same token, it does

12   appear that should the Court wish to give any of those findings

13   weight, that is equally within the Court's discretion here.

14        It is worth, I think, touching briefly on the nature of the

15   testimony and the exhibits that were introduced during that

16   proceeding.  Those consisted of Government's Exhibit 2, which is

17   2-1 through 2-35A, as further supplemented statements by

18   Mr. Calhoun prior to the January 6 events, during the January 6

19   events, and then following the January 6 events in the form of

20   the *Atlanta Journal-Constitution* article and the interview he

21   gave there.

22        I think it's worth noting just as an aside that some of

23   what appear to be Mr. Calhoun's profile pictures for the Parler

24   posts predating the incidents at the Capitol on January 6 appear

25   to be, based on his own testimony, either the same or similar to

the photograph that he provided to the journalist at the *Atlanta Journal-Constitution*.

Obviously, the Rules of Evidence don't apply to detention hearings to the extent that the Court rules that we have a basis to proceed today, but there is certainly overwhelming circumstantial evidence authenticating Mr. Calhoun's social media posts that were the subject of that initial detention review hearing and certainly by way of his own admissions during our March 5th hearing.

Those -- as the magistrate court found, those comments represent an escalating pattern of violent threats and that escalating pattern of violent threats occurring within the context of Mr. Calhoun's plan to engage in the activities at the Capitol.

THE COURT:  Mr. Alexander, on the threats, can we break those down?  So none of these are charged as criminal threats, as criminal offenses; right?

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  Is it the government's position that it could -- granted, it doesn't have to, but is it your position that any of these threats would constitute a state or federal offense?

MR. ALEXANDER:  Your Honor, I think that that would undertake a separate -- that would require a separate analysis to determine whether or not we had probable cause to charge an

1     independent 875 case for these threats.  These are certainly

2     similar to cases that have been charged previously, at least in

3     the District of Alaska and elsewhere, and I am speaking

4     specifically, and again, Mr. Calhoun because he is an attorney,

5     he is careful in some cases to couch his language, but in

6     general, there is references to violent retribution against

7     perceived political opponents.

8          I'm referring now to Government's Exhibits 2-11 and 12, 13,

9     14, 15.  "War is coming.  It's the only way to deal with our

10    domestic Communist problem.  Ruthlessness is in order.  Harsh

11    examples have to be made.  This can be over soon enough."

12         A strange comment but one including the language, "For my

13    part, I will be slinging enough hot lead to stack you commies up

14    like cord wood."

15         Another comment, "We're loading AR-15 magazines and getting

16    range time in.  I can do head shots at 200 meters, an

17    accomplishment in and of itself.  He had no clue what's coming."

18         Your Honor, in the context of the fact that Mr. Calhoun was

19    charged under 1512(c)(2) with obstruction of an official

20    proceeding, it would certainly be the government's perspective

21    and argument that his state of mind during the time leading up

22    to the events that are charged in the indictment are relevant

23    and would be, I would submit, admissible evidence at his trial

24    and as such could certainly be considered by the Court here.

25         These events didn't occur in a vacuum, and when determining

what Mr. McCall -- what Mr. Calhoun's state of mind was on
January 6th, it is certainly necessary to consider the events
leading up to that date, and those events -- those comments,
rather, and his statements regarding his perspective and his
beliefs are fairly unambiguous.

It's also important, Your Honor, I think, to consider some
of the sum and substance of his testimony on March 5th.  And
this speaks directly again to the government's concern both
under (f)(2)(A) and (f)(2)(B), but Mr. Calhoun -- again, I want
to caveat my comments by saying I do not have a formal
transcript.  So I am speaking from my notes.  And again, I'm
happy to be corrected either by the Court or Ms. Sherman-Stoltz.

But in reviewing my notes, Mr. Calhoun made repeated
comments to the effect that he believed he was a victim of
cyberstalking, that there were members of the community that
were out to get him, his beliefs that are consistent with his
social media posts that Black Lives Matter or Antifa were going
to come to his community in Georgia to loot, thus requiring
violent confrontation, all of which is part and parcel with the
government's concern, or certainly informs the government's
concern that Mr. Calhoun is exhibiting characteristics of
paranoid delusion that certainly increases both the risk to
members of the community and specifically people that
Mr. Calhoun apparently believes are plotting against him or
cyberstalking him or cooperating with law enforcement in the

1    case against him, all of which was referenced in his own

2    testimony.

3        That is an extremely serious concern.  Mr. Calhoun

4    testified under oath that he is a political prisoner.

5    Mr. Calhoun believed himself to be persecuted on the basis of

6    his political beliefs, demonstrating a pretty remarkable

7    dissociation, particularly for an attorney, from the facts of

8    the events.  The undisputed facts on January 6, Mr. Calhoun

9    pushed himself past law enforcement and battled law enforcement

10   in the Capitol and did exactly what he posted he did.

11       That is 5 and -- I apologize, Your Honor.  There's that

12   lengthy narrative that Mr. Calhoun provided that was at the

13   Government's Exhibit 2-5 and 2-6, where he writes, "There was a

14   last police barricade inside, and we packed it right up to

15   them."  And that was, Your Honor, that crypt area, as far as we

16   can tell, and included the video and screen shot of a violent

17   and aggressive crowd pushing themselves past police officers.

18              THE COURT:  Again, I haven't seen the video, and I am

19   going to watch it.  Does that video show him actually pushing?

20              MR. ALEXANDER:  Not pushing a police officer, no.  It

21   shows him --

22              THE COURT:  What does it show him doing?  He is a part

23   of a large crowd?

24              MR. ALEXANDER:  That's correct.

25              THE COURT:  Is he pushing on the backs of people in

1    front of him?

2        MR. ALEXANDER:  Your Honor, it's a densely packed

3    crowd.  Part of the video -- and this is also included in the

4    government's submission on Sunday, is a screen capture of when

5    Mr. Calhoun turns around in that crowd that was previously

6    obscured by a exhibit sticker in the exhibit, that same exhibit

7    that was provided to the Georgia court, but in the government's

8    supplementary detention memo on March 6th, if the Court looks at

9    page 6, Your Honor -- actually, the bottom of page 5 is a larger

10   picture, fish-eyed view of the crypt as the crowd is pushing

11   past law enforcement.

12       The top of page 6 is a screen capture that was previously

13   introduced that shows Mr. Calhoun briefly having turned around

14   in a distinctive hat looking at the camera as a part of a crowd

15   that I think can be fairly characterized as aggressive.

16       Below that, there's a screen capture, a still image dated

17   January 6 at 2:28:28 p.m. showing a crowd pushing past law

18   enforcement in a corridor.  Approximately 30 seconds later,

19   Mr. Calhoun can be seen as a part of that crowd continuing

20   forward after law enforcement has retreated.

21       And then there is another still image dated the same day,

22   January 6, at 2:41:45, showing Mr. Calhoun, as he said and as is

23   depicted in his social media posts, in the Capitol Rotunda.

24       All of that is proffered just by way of clarifying again

25   that Mr. Calhoun's statements in his social media posts are more

than mere puffery or exaggeration or some sort of harmless journalism.  They are a real kind of moment-by-moment narration of his activities within the Capitol and his state of mind.

And that's extremely troubling in the context of both his prior violent statements on social media.  It pledges to political violence that understandably Mr. Calhoun is now arguing it's just purely rhetorical, but I think there's certainly a basis to find that Mr. Calhoun meant what he said prior to the Capitol riots and what he said during the Capitol riots.

That's the Exhibits 4 and 5, where he talks about overrunning the last police barricade, that the momentum caused a bad crush, carried the vanguard through several smaller doors and down halls.  And that's exactly, I think, Your Honor, what we see in the photographs on page 6 in the government's supplementary briefing from this Sunday.

And then Mr. Calhoun says, "We stormed the stairs through the Rotunda admiring the amazing artwork."  Again, that's depicted and that's, I believe, an accurate narration of the events.

He is talking about law enforcement has retreated to the perimeter.  Mr. Calhoun did make a dismissive comment in his testimony before the Court as well on this past Friday, also cited in the government's briefing as well, where he said the police had ran off.  They had ran off, or had been run off as a

result of the conduct of people like Mr. Calhoun.  And that's, I think, a serious consideration to the Court.

There are individuals who did just kind of aimlessly wander into the Capitol at some point and wander out.  And by and large, those are individuals who are only charged with the relevant misdemeanors.

Mr. Calhoun's conduct is considerably more serious because Mr. Calhoun stated that he occupied the Capitol and shut down the government to shut down their stolen election shenanigans. I'm quoting from Government Exhibit 6 here.  He says he was there.  He said, "Today we brought our government to its knees with no weapons and now we're all going to go back armed for war."  That is a serious concern.

I understand that Mr. Calhoun testified that he took his firearms to his sister's house for safekeeping while law enforcement was looking for him.  Again, the magistrate's order found that Mr. Calhoun was evading law enforcement.

THE COURT:  I want to get to that in a minute.  But let's stay first with the basis of the threat or obstruction basis that the government is advancing.

All your points, Mr. Alexander, on the events of that day and the extent to which Mr. Calhoun himself was violent, you're not -- again, you're not proceeding under (f)(1) in arguing that the felony offense, the obstruction offense charged is a crime of violence either under the categorical approach or relying on

the residual clause or whatever.  So you're not making that
argument.

So the sole argument you're making with respect to anything
close to dangerousness is this one relating to threats.  And if
you focus on these threats individually, you said a number of
extremely offensive and concerning statements he made.

But are they specific, and are they imminent, suggest an
imminent threat such that they would be a threat as opposed to,
you know, First Amendment speech?  That's my question.  Did he
cross the line with regard to any of the statements, and if so,
which one?

MR. ALEXANDER:  Yes, Your Honor.  And I think the
Court -- I think it's appropriate, and what the government is
certainly arguing is not to consider each statement in the
abstract but as a part of a continuum, as a part of a whole
alleging -- or as a composite kind of accurately depicting
Mr. Calhoun's state of mind, which again I think was reinforced
by his testimony before the Court on Friday where he talked
about hating Communists and all that.

The concern here is that Mr. Calhoun appears to believe
that there is Communist hordes that are coming to invade
Americus, Georgia, and that belief, Your Honor, I submit,
putting aside his political perspectives, is so clearly
delusional that it raises extremely serious concerns about the
risk that Mr. Calhoun poses to the individuals that he believes,

again perhaps delusionally, have been plotting against him.

Mr. Calhoun testified under oath that he is the victim of cyberstalking, and there was some attempt to at the same time make the argument that unknown shadowy forces had altered his social media posts, while at the same time Mr. Calhoun couldn't but help himself from bragging about his social media presence and the provocative nature of the statements that he has made.

I think there is, from the government's perspective, sufficient evidence just in the form of the context -- the form of the content, rather, of Mr. Calhoun's testimony before the Court and certainly his demeanor as well, it is appropriate for the Court to consider Mr. Calhoun's behavior was at times erratic and arguably arrogant as well before an Article III judicial officer.

I think that gives a pretty clear indication of how Mr. Calhoun is going to act with people in the community that he blames either for his imprisonment or his present criminal charges or for having cooperated with law enforcement.

So there is -- again, not treating each of the items in evidence in the abstract but taking a look at all of them in context, I think there is a very serious basis for the threat under (f)(2)(A) that Mr. Calhoun is just going to decide, given the fact that he believes himself to be a martyr or political prisoner, not to abide by conditions of release, and then as well attempts, given the violent rhetoric, to retaliate against

1    people who he considers, again similarly delusionally, members

2    of a deep state conspiracy.

3            THE COURT:  Do you agree with me that (f)(2)(B)

4    requires me to find risk with respect to this particular

5    proceeding?

6            MR. ALEXANDER:  Yes, I do.

7            THE COURT:  Mr. Calhoun, you're going to have to wait

8    for your attorney to speak.

9            MR. ALEXANDER:  If I may caveat that very quickly,

10   Your Honor.  I don't know -- I believe the Court also said

11   "imminent" earlier, and I'm not sure --

12           THE COURT:  No, I was just asking that with respect to

13   trying to figure out whether any of these statements are

14   threats -- would constitute a criminal offense of a threat.

15           MR. ALEXANDER:  Respectfully, Your Honor, I don't know

16   if that is the appropriate standard to set.  I don't know if in

17   order to find that Mr. Calhoun poses either a serious risk of

18   flight or a serious risk of obstruction or danger to individuals

19   involved in the case, that the Court would need to find a

20   predicate criminal offense to have been committed previously.

21           THE COURT:  No, I don't think so either.  I'm just

22   trying to determine what the evidence you have that shows by a

23   preponderance of the evidence that he is going to obstruct these

24   proceedings in this court.

25       So my first question is, do you read the statute the way I

do, that it's tied to this proceeding as opposed to some other

legislative body or other government body?  This provision

requires that he obstruct or attempt to obstruct this judicial

proceeding, his case?

MR. ALEXANDER:  I agree, Your Honor.

THE COURT:  You agree with that.  All right.

MR. ALEXANDER:  Your Honor, may I just -- and I think

this is, you know, certainly my responsibility here to

accurately and appropriately emphasize the points of concern

here.  Referencing Exhibit 25, there is an interlocutor --

Mr. Calhoun complained earlier in his testimony that some of

these social media posts were taken out of context because you

couldn't see the back and forth, the interplay between him and

his interlocutors.  Exhibit 25 is an example of that where

another individual says, "It is a terrible thing that is

happening, but the Lord is in control.  Try not to be anxious.

Try not to be angry.  Humility is one of God's traits."

Mr. Calhoun said, "God helps those who help themselves.

God is not on the Communist side and the 60 million abortions,

and if patriots have to kill 10 million of these," pardon my

language, "fucking Communists to prove it, then it's God's

will."

It's these kinds of statements.  I think the position and

the concern of the government is I don't question Mr. Calhoun's

sincerity in his belief here.  That's precisely the area of

concern.  In reading all of these statements in context, you know -- there's another one at Exhibit 27 where Mr. Calhoun tells somebody else, "You won't be laughing when the patriots go door to door executing you commies."

If that statement is considered in isolation, I agree, Your Honor, that it's much less concerning.  But when it's considered in the context of everything else that Mr. Calhoun has said and done during the period in question, it gives rise precisely to the serious concern that the government has here.  Mr. Calhoun said he was going to the Capitol and did, in fact, go to the Capitol.

While it's not alleged that he committed more serious offenses or directly assaulted a police officer or destroyed government property, which would, I think, trigger the crime of violence provision here for purposes of the Bail Reform Act, Mr. Calhoun was a part of an aggressive crowd that pushed its way through law enforcement and he described contemporaneously as for the purposes of shutting down the government, speaking to the 1512(c)(2) charge.

THE COURT:  You don't have any evidence that he has threatened a witness or juror in any court proceeding he's been involved in in the past as a defense attorney, do you?

MR. ALEXANDER:  No, Your Honor, I don't.

THE COURT:  He's up-to-date, at least an attorney in good standing, so far as you know?

1          MR. ALEXANDER:  So far as I know.

2          THE COURT:  So what if I had before me a defendant

3     charged in a routine theft of government property, you know,

4     let's make it $1,000, and that person is standing before me and

5     had been at the Capitol doing what Mr. Calhoun had been doing on

6     that day and sending e-mails and all those things.

7          Do you think in that case the government could seek

8     detention?

9          MR. ALEXANDER:  No, because I think that's a different

10    circumstance, Your Honor.  I think this case is more akin -- if

11    I can proffer a dueling analogy to somebody who has espoused

12    extremist beliefs on the Internet and pushes their way past TSA

13    at the airport.  And that scenario, I think, is much more

14    similar to what Mr. Calhoun has done here.

15         THE COURT:  But that would be charged, then, perhaps

16    with an assault of a federal officer.

17         MR. ALEXANDER:  Perhaps if there was an assault, Your

18    Honor.  You could think of a scenario -- I think we've had

19    scenarios here where delusional or mentally ill patients,

20    thinking that they're acting in accordance with broader

21    conspiratorial thinking, access parts of the airport where

22    they're not supposed to be and may not have actually assaulted a

23    police officer in the course of doing that, but present

24    extremely troubling and serious concerns nevertheless.

25         THE COURT:  But I would be really interested to know

1    in those cases whether the offenses met any of these seven

2    categories.  In other words, there is this exception -- not

3    exception, but there is --

4            MR. ALEXANDER:  For terrorism-related offenses, right,

5    Your Honor.

6            THE COURT:  Right.  In addition to that, under

7    (distorted audio), there's also a provision for any felony if

8    such person has been convicted of two or more (distorted audio).

9            MR. ALEXANDER:  I apologize, Your Honor.  The Court's

10   feed -- I'm sorry, Your Honor.  The Court's feed hung up

11   briefly.

12           THE COURT:  Okay.  Sorry.  So my question is, under

13   (f)(1), in addition to the terrorism-related offenses, there is,

14   of course, a category in (f)(1) that includes any felony, but it

15   depends on the defendant's prior record, which you don't have

16   here.  So in some of those cases -- I'm just guessing, you know.

17   Correct me if I'm wrong.  But in those cases, I'm guessing that

18   the government met, established by a preponderance one of these

19   categories before the Court considered all of the generalized

20   evidence relating to dangerousness, that you can't just have a

21   case that doesn't meet any of these seven categories like a, you

22   know, small fraud case and then say this person acts like a

23   crazy person, so detain him.

24           MR. ALEXANDER:  Your Honor, I don't think that's the

25   government's argument here.  Certainly, Mr. Calhoun's

perspective and his mental state and the beliefs that he has

professed before the Court are relevant for the Court's

consideration, but I certainly don't share Mr. Calhoun's

perspective that he is a political prisoner and that we are --

THE COURT:  I don't mean that.  I'm just saying if you

have a fraud defendant who is doing a lot of concerning things,

making posts that are, you know, of a violent nature and that

kind of thing, can the government come before a judge in a fraud

case and say, lock this person up, absent meeting one of these

seven categories?

MR. ALEXANDER:  Your Honor, where I would respectfully

disagree is the difference between the scenario posited by the

Court and here is that Mr. Calhoun's statements that are in

evidence are directly relevant to his activities, where, in I

believe the scenario that the Court is suggesting, it would be

using unconnected, irrelevant, you know, statements in order to

justify detention, where here, the statements --

THE COURT:  I just don't -- I don't see that category

in the Bail Reform Act.  So I'm just looking for you to convince

me that I can leap into 3142(g) and start considering and

weighing all these factors before you establish that it falls

within one of these seven categories.

MR. ALEXANDER:  Yes, Your Honor, and I think that's

precisely why there is the catch-all provision of 3142(f)(2)(A)

and (B), which is providing grounds for the Court to find

1    detention may be appropriate even in cases or circumstances that

2    don't fall neatly into one of the prior enumerated categories.

3            THE COURT:  They're pretty narrow.  We will talk about

4    flight in a minute.  But this other -- this (f)(2)(B) is

5    definitely an obstruction in these proceedings offense -- not

6    offense, but it's a case that involves the potential for

7    obstruction.

8        You're arguing that based upon all of this, I can find by a

9    preponderance of the evidence that he is going to obstruct or

10   attempt to obstruct justice in this case?

11           MR. ALEXANDER:  Yes, Your Honor.

12           THE COURT:  Okay.

13           MR. ALEXANDER:  And I think again, to the extent that

14   the Court had doubts on that score just on the basis of the body

15   of evidence in the record prior to Friday, March 5th, that

16   Mr. Calhoun's statements and testimony on March 5th further

17   support that finding.

18           THE COURT:  Has he done anything since he has been

19   arrested that would --

20           MR. ALEXANDER:  No, Your Honor, not that I'm aware of.

21   I'm not aware that he has made any effort to contact victims or

22   witnesses in this case while he has been in custody.

23           THE COURT:  All right.  Your risk of flight argument,

24   you're relying solely on the evidence presented before the

25   magistrate; correct?

1          MR. ALEXANDER:  Again, Your Honor, supplemented by the

2     testimony of Mr. Calhoun before Your Honor, yes.

3          THE COURT:  Okay.

4          MR. ALEXANDER:  A reasonable --

5          THE COURT:  The judge clearly found in his findings

6     that he was being evasive, and yet he did offer an alternate

7     explanation.

8          MR. ALEXANDER:  Yes, Your Honor, and --

9        (Simultaneous speaking.)

10          THE COURT:  -- your best evidence that shows you can

11    convince me by a preponderance of the evidence, more likely than

12    not that he was evading rather than -- evading arrest rather

13    than getting away from people who were threatening him.

14          MR. ALEXANDER:  Your Honor, I would say the

15    preponderance of the evidence and, I would say, certainly clear

16    and convincing evidence would be to credit Mr. Calhoun's

17    contemporaneous statements, not his statements made after

18    spending a substantial amount of time in custody in this case at

19    a detention review hearing.

20          THE COURT:  Remind me of his contemporaneous

21    statements at the time.  Did he tell the federal agents that he

22    was evading arrest?

23          MR. ALEXANDER:  No, no, Your Honor, that's not what I

24    intended to infer.  I meant the body of statements made previous

25    to the Capitol riot events.

1          THE COURT:  I mean evidence of flight.  What is the

2     evidence that he was running from federal agents?

3          MR. ALEXANDER:  Yes, Your Honor.  And there, I would

4     point to the testimony of Special Agent Armentrout on this topic

5     at the hearing on the 21st and the findings by the magistrate.

6          THE COURT:  But as I understand it, there was a court

7     hearing scheduled that was one in which he was representing a

8     client as opposed to a request for him to appear in court;

9     correct?  This was one of his scheduled matters as an attorney

10    representing a client that he was supposed to show up for and he

11    testified or his attorney proffered, I can't recall, there was

12    some talk of him missing that and his assistant quitting because

13    of the threats, et cetera.

14       I had asked you was there any evidence that the agents were

15    sitting outside the house and he went out the back door, and you

16    said no.

17         MR. ALEXANDER:  That's correct, Your Honor.  And just

18    while the Court was speaking, I wanted to pull up the transcript

19    again that was submitted as Government's Exhibit Number 4 just

20    so I wouldn't misspeak.  And that's the direct examination of

21    Special Agent Armentrout, who testified to the fact that local

22    law enforcement, the chief of police in Americus, Georgia,

23    alerted him to Mr. Calhoun's activities, that he had done

24    subsequent investigation and there had been previous reports to

25    the FBI concerned about threats posted on social media

1    platforms.  There's testimony regarding the nature of those

2    threats that had been previously posted to social media.

3        And then I'm scrolling down to find the portion of Special

4    Agent Armentrout's testimony relating to the apprehension of

5    Mr. Calhoun that formed the basis of the magistrate court's

6    determination that he was evading law enforcement.

7        And so, Your Honor, I'm referring now to the findings on

8    the record by magistrate on pages -- beginning on pages --

9        THE COURT:  5, yeah.  I have it front of me.  Federal

10   agents sought to arrest the defendant at a scheduled court

11   hearing in Americus.

12       Did Mr. Calhoun have any notice that they were coming to

13   arrest him?  Do you have any evidence that he had -- that he was

14   aware that they were coming to arrest him before that court

15   hearing?

16       MR. ALEXANDER:  Direct evidence of his state of mind,

17   no, Your Honor.  I think the Court could certainly infer by this

18   point in the month of January, that individuals who had been

19   involved in the Capitol riot were certainly aware of the

20   potential of investigation and arrest.

21       So I don't think necessarily that the lack of direct

22   evidence to that effect obviates a finding by the Court that

23   Mr. Calhoun reasonably knew by that point that he could be the

24   subject of a law enforcement investigation.

25       THE COURT:  All right.  But you don't have -- I have

1    to infer that?  You don't have any evidence other than just a

2    general knowledge of people being arrested?

3         MR. ALEXANDER:  That's correct.

4         THE COURT:  Okay.  And when the agent showed up, he

5    didn't try to flee; he complied?

6         MR. ALEXANDER:  No, Your Honor.  Again, I don't think

7    that that is necessarily inconsistent with the magistrate's

8    findings that he may have been evading law enforcement

9    previously.  Just because Mr. Calhoun made the decision not to

10   engage in a shoot-out with the FBI doesn't mean that he may not

11   have been trying to come to their attention beforehand.

12        THE COURT:  But they found him at his sister's house.

13        MR. ALEXANDER:  Yes, Your Honor, I think the same home

14   that's proposed in the release proposal before the Court.

15        THE COURT:  And for me to detain on the basis of risk

16   of flight, I have to find by a preponderance of the evidence

17   that the defendant presents a serious risk of flight; correct?

18        MR. ALEXANDER:  That's correct, Your Honor.

19        THE COURT:  Okay.  Anything else, Mr. Alexander?

20        MR. ALEXANDER:  No, Your Honor.  I apologize for the

21   delay, but the portion of the agent's testimony relating to the

22   circumstances surrounding Mr. Calhoun's arrest begins on page 61

23   of the transcript.

24        THE COURT:  I will review that.

25        MR. ALEXANDER:  That is Exhibit 4, and that's a little

1    bit more of a granular blow by blow regarding the circumstances

2    of his arrest there.  And so I believe that was the portion of

3    the testimony that the magistrate relied on there.

4        I do think it is worth pointing out, Your Honor,

5    Mr. Calhoun testified previously that he had brought the weapons

6    to his sister's home for their safekeeping.  I think certainly

7    in hindsight that may superficially be a persuasive version of

8    events at the time, but that does not address why he would also

9    bring hundreds of rounds of ammunition with him in addition to

10   weapons and what appears to be a plate carrier and other

11   paraphernalia.  That's not necessarily consistent with his

12   representation that this was, you know, purely for self-keeping.

13       THE COURT:  Is it consistent with his representation

14   that he was receiving threats and concern for his safety?

15       MR. ALEXANDER:  Your Honor, I think that there's a

16   certain amount of irony in Mr. Calhoun's ex post facto posture

17   of victimization here, given the nature of his prior

18   communications, which were almost or fairly consistently

19   threatening in their own right.

20       I again would refer the Court back to at least in my rough

21   notes of Mr. Calhoun's testimony where he is talking about being

22   cyberstalked and that people were going to come and put

23   everybody in his community in federal prison, and made a number

24   of statements that are about burning and looting his part of

25   Georgia and that he is a political prisoner, being in prison for

1    his political speech.

2        These are all, I think, factors that the Court can

3    appropriately consider in determining whether from the Court's

4    perspective the government's met its threshold burden to even

5    prompt a bail review or a motion for bond or bail under

6    3142(f)(3)(A) and (B).

7        I again have not seen in the cases that I've reviewed

8    situations where the district court or the magistrate in our

9    circuit has been precluded from undertaking that analysis on

10   motion of the government.  I think that where the government

11   fails to successfully make a case for detention under 3142(g),

12   the situation becomes moot, but I don't think the Court is

13   precluded from considering those factors at all prior to making

14   an even earlier threshold finding.

15       But I will certainly undertake in the next hour or so to

16   see if there's any supplementary authority that I can provide to

17   the Court that may assist on that point.

18           THE COURT:  All right.  That would be helpful.  Just

19   to be clear, Mr. Alexander, my perspective, unless you convince

20   me otherwise, is that the Bail Reform Act creates a two-step

21   process for evaluating the government 's motion for detention:

22   First, whether the case is one in which the Bail Reform Act

23   permits the government to seek detention, and second, if it is,

24   then the Court determines whether any condition or combination

25   of conditions will reasonably ensure the defendant's appearance

1    and the protection of the public.  I cite *U.S. v. Watkins,*

2    940 F.3d 152 at 158.  That's a Second Circuit case.  And that's

3    because the Bail Reform Act restricts the government's ability

4    to move for detention under these seven categories we've

5    discussed, the five enumerated categories in (f)(1) or one of

6    the two enumerated categories in (f)(2).

7        So based on that, my view is now you do have to make that

8    threshold showing before I can jump in to the consideration of

9    3142(g) factors.  It's not that I can't consider any of that

10   evidence for purposes of you establishing the likelihood of a

11   threat in this proceeding.  I think I can do that.  But I think

12   you have to tie it to one of these seven categories.

13       And again, I think I gave you all the *Singleton* case,

14   *U.S. v. Singleton*, 182 F.3d 7 at 15, where the D.C. Circuit

15   explained that pretrial detention is only permissible in cases

16   involving enumerated offenses or in which the defendant is

17   likely to flee or is likely to obstruct justice.

18       So I do think it limits the types of cases in which the

19   government can seek detention.  So it would be very helpful for

20   me to see whether the government or the defense for that matter

21   has any other authority that sheds light on this issue.

22       And Ms. Sherman-Stoltz, I'm cognizant of the fact that the

23   detention hearing was held on Friday.  I think I have five

24   business days to rule.  However, I want to rule as promptly as

25   possible.  If you would like additional time to give the parties

1   time to brief this issue, then I, of course, will grant it.  I

2   know 6:00 p.m. is a tight deadline here to give me additional

3   cases.  If you all would like more time, I will grant it.  Just

4   understand, it will -- it could delay me making a decision in

5   the case.

6        Ms. Sherman-Stoltz, would you like more time?

7            MS. SHERMAN-STOLTZ:  Your Honor, I don't think that I

8   need more time.  I found some very helpful cases that speak to

9   the questions that you've addressed.  *United States v. Gibson*

10  outlines the interpretation that is followed by the Court as far

11  as assessing the (f)(2)(A) and (B), as well as

12  *U.S. v. Villatoro-Ventura* does a good job outlining it.

13       *United States v. Rodriguez-Adorno* supports what you all

14  were previously discussing as far as a risk of danger, equal

15  clear and convincing evidence, risk of flight as preponderance

16  of the evidence.  So I concur with that as well.

17       So I don't believe that the defense need additional time.

18  I think that we can provide an appropriate memo to Your Honor by

19  6:00, at least as far as addressing our position.

20           THE COURT:  All right.  Let me just give some

21  questions to you and wind this up so you all can get to work.

22       If I were to decide to release Mr. Calhoun, he has proposed

23  that his sister would serve as a third-party custodian.  This is

24  the same sister who was approved by the Middle District of

25  Georgia; correct?

1          MS. SHERMAN-STOLTZ:  That's correct, Your Honor.

2          THE COURT:  Ms. Schuck, the Pretrial Services officer

3     assigned to the case in this district, she has verified that the

4     Middle District of Georgia would accept courtesy supervision

5     from the Court should I decide to release Mr. Calhoun, but she

6     has also informed me that Pretrial Services in this district

7     will have to independently determine whether his sister is a

8     suitable third-party custodian.  So I would ask for you to help

9     facilitate anything she needs in that regard.

10         And I would -- if I were to decide to release Mr. Calhoun

11    to his sister's custody, I would want to inform her on the

12    record of her duties and have her swear to the conditions of

13    release.  So I would need her available for that purpose.

14         MS. SHERMAN-STOLTZ:  Absolutely.

15         THE COURT:  To be clear, I have not made a decision

16    yet, but I am going to go ahead and ask Pretrial Services to

17    determine if she is a suitable third-party custodian.

18         Ms. Sherman-Stoltz, you've also recommended that

19    Mr. Calhoun would be amenable to GPS monitoring as well as home

20    supervision; is that correct?

21         MS. SHERMAN-STOLTZ:  He would, Your Honor.  Of course,

22    he would prefer the opportunity to be able to continue working,

23    you know, going to and from --

24         THE COURT:  And what does to and from work

25    appointments, what do you mean by that exactly?  Are we talking

1    to a courthouse?  To multiple courthouses?  To an office?  What

2    does that mean?

3          MS. SHERMAN-STOLTZ:  So it's several courthouses that

4    are, you know, in the area that he represents clients, and it

5    would be clients that he currently has an obligation to

6    represent that have not been removed from him at this point.

7    They haven't been transferred to another attorney.

8          THE COURT:  Can he do his -- otherwise do his work

9    from the sister's address, or does he have to also go to an

10    office?

11          MS. SHERMAN-STOLTZ:  No, he can work from his sister's

12    home, with the exception of, you know, required court

13    appearances.  And I think as far as threats and whatnot are

14    continuing and have been a big concern, he probably does not

15    want to go to his office.

16          THE COURT:  Okay.  I think you've also represented

17    that -- he did, I think, represent he was no longer on social

18    media and has no interest in continuing that now; is that

19    correct?

20          MS. SHERMAN-STOLTZ:  He is not on social media

21    anymore, Your Honor.  I think a lot of his accounts have been

22    shut down, and I believe that if the Court requires him to

23    remain off of social media, he will do so.

24          THE COURT:  He would have no objection to that?

25          MS. SHERMAN-STOLTZ:  That's my understanding.

1          THE COURT:  And he would have no objection to computer

2    monitoring if I were to ask for that as well?

3          MS. SHERMAN-STOLTZ:  We haven't discussed that

4    specifically, but I can make sure that we address it and I can

5    include it in the brief.

6          THE COURT:  I will give you a moment with him.  We

7    will ask Mr. Hopkins to facilitate a breakout for you to talk to

8    him, and if you could let me know as well his position on that.

9          MS. SHERMAN-STOLTZ:  I'm sorry, Your Honor.  As far as

10   computer monitoring, how would that impact any attorney-client

11   confidentiality?

12         THE COURT:  I think that would have to be addressed.

13   But to be clear, it's not monitoring his computer for everything

14   but, rather, his social media use.  That would be the purpose.

15         MS. SHERMAN-STOLTZ:  Understood.

16         THE COURT:  Clearly, if I were to release Mr. Calhoun,

17   it would require him also -- conditions would require him to

18   surrender any other firearms that he owns.  I know that there's

19   some in the possession of family members.  To the extent anyone

20   else has any firearms of his, he would have to surrender all of

21   those.

22       And Mr. Alexander, if I were to set conditions of release,

23   are there any additional conditions that the government would

24   ask that I consider?

25         MR. ALEXANDER:  Your Honor, without conceding our

1    argument on the subject of detention, I think perhaps the most

2    important for the purposes of trying to maintain the safety of

3    the community would be realtime GPS monitoring.

4         THE COURT:  And Mr. Alexander, are you in the process

5    of providing additional discovery to Ms. Sherman-Stoltz?  Are

6    you moving that towards her so we can get this case on track for

7    resolution?

8         MR. ALEXANDER:  Yes, Your Honor.  Similar to the rest

9    of these cases, there's ongoing negotiation between my detailed

10   office and the Federal Public Defenders in the District of

11   Columbia regarding a protective order governing the production

12   of CCTV footage from within the Capitol.  We've been permitted

13   to release still images but not CCTV footage without a

14   protective order.  And so that's something certainly that I need

15   to discuss with Ms. Sherman-Stoltz.  I know that agreement is

16   still pending between the Federal Public Defenders and the U.S.

17   Attorney's Office on that subject.

18        There's certainly --

19        THE COURT:  Go ahead.

20        MR. ALEXANDER:  Your Honor, I think I referred to this

21   on Friday as well.  But search warrant applications and

22   subsequent filter and taint review for Mr. Calhoun's social

23   media applications are more time-intensive than they would be in

24   other cases given the fact that Mr. Calhoun is an attorney,

25   obviously.  So we are going through the approval process through

1    OEO and PSEU for filter protocol for Mr. Calhoun's social media

2    accounts.  So that process has not been completed.

3            THE COURT:  All right.  The reason I ask is it might

4    make sense -- given the restrictions on trials due to COVID, it

5    might make sense to pencil in a trial date in this case because

6    of the limited number of trials going on at any given time.  And

7    I think that -- I'm not certain, but there might be some

8    available dates in June.  The hope is by the fall, we will be in

9    our own courtrooms and there won't be the same sorts of

10   restrictions.  But I would ask that between now and when we

11   return for the next court date, which I'm inclined to set for

12   tomorrow or for Wednesday, depending on your schedules, that you

13   all discuss that and confer about whether it would make sense to

14   set a tentative trial date.

15       And of course, I would have to consult the master trial

16   calendar to make sure courtrooms are available, if we're talking

17   about a trial in the near future.  But I think if we are talking

18   about a trial in the fall, it's less problematic.  But do have a

19   conversation about that between the two of you.

20           MR. ALEXANDER:  Yes, Your Honor.  Your Honor, if I may

21   make a request, which would be to have until tomorrow to file

22   any supplementary notice of authority.  I'm not trying to delay

23   these proceedings.  Obviously, I understand the importance of

24   expediting them to the extent possible.  But given the fact that

25   the Court has referenced that there may not necessarily be a

clear answer evident on this threshold question of what standard

should apply to even trigger review, I would --

THE COURT:  To be clear, Mr. Alexander, I think the

circuit, this circuit's authority doesn't clearly state this,

but I do think if you look at the cases that I provided to you,

I think it's fairly clear to me.

MR. ALEXANDER:  Yes, Your Honor.  I'm not debating

that and certainly not without having reviewed the cases.  But I

do just want to give management, my management in D.C.

meaningful opportunity to weigh in as well, and I am just

cognizant as well of the fact that it is midday for me but

getting toward the end of the day in D.C.  So I would just ask

for leave until first thing tomorrow morning to file.

THE COURT:  Okay.  What is the parties' availability

tomorrow?  I am not available -- after 2:45, I've got a

conflict.  Would the parties be available -- we could either

continue this until 1:30 tomorrow or until Wednesday morning at

9:00 a.m.

MR. ALEXANDER:  Either time.  I'm sorry.  Go ahead.

MS. SHERMAN-STOLTZ:  I'm sorry, Your Honor.  What were

our time options for tomorrow?  I just pulled up my court

schedule.

THE COURT:  Let's see.  1:30 tomorrow, or I'm fairly

flexible in the morning, Wednesday morning.

MS. SHERMAN-STOLTZ:  I'm not available at 1:30.  I

1     could be available after 1:30.  But I'm in court at 1:30 p.m.

2     for something that will probably take about an hour.

3          MR. ALEXANDER:  Your Honor, my request would be, then,

4     for a hearing any time convenient for the parties and the Court

5     on Wednesday morning.  That would give us the opportunity to

6     file anything by first thing tomorrow morning, Tuesday morning,

7     and perhaps, if the Court is inclined to order release, provide

8     Pretrial Services with additional time as well.

9          THE COURT:  Ms. Sherman-Stoltz, what is your position

10    on that?

11         MS. SHERMAN-STOLTZ:  If the Court is available, if

12    Your Honor is available and Attorney Alexander, our preference

13    would be tomorrow later in the afternoon.  I could be available

14    any time after 2:30 p.m. Eastern Time.

15     Wednesday morning is going to be tough for me in all

16    honesty, Your Honor.  It would have to be probably after

17    10:30 a.m.  I have a hearing at 9:00 a.m.

18         THE COURT:  When are you available tomorrow?  I can't

19    do the late afternoon, which you're suggesting.  I have an

20    appointment and then have court staff that can't be here late.

21    But what about -- could we do noon tomorrow?

22         MS. SHERMAN-STOLTZ:  Yes, Your Honor.  My hearing is

23    right at 1:30.  I could do noon.

24         THE COURT:  What about 12:30?

25         MS. SHERMAN-STOLTZ:  Yes, Your Honor.

1          MR. ALEXANDER:  Yes, Your Honor.

2          THE COURT:  Mr. Alexander, I will give you the

3    opportunity to file something by 9:00 a.m. tomorrow morning, but

4    I would ask that if you find cases that suggest otherwise, that

5    you post a notice tonight, because I would like to be in a

6    position to rule tomorrow.

7          MR. ALEXANDER:  Yes, Your Honor.

8          THE COURT:  All right.  I do believe that given the

9    defendant's motion that is pending, I think that the time is

10   automatically excludible under the Speedy Trial Act, but I also

11   find -- either way, I find it is in the interest of justice to

12   exclude time under the Speedy Trial Act, given that the parties

13   are going to be working on a protective order and need to get

14   the discovery to the defense so that it can decide how it would

15   like to defend this case.

16       So I will exclude time from today until tomorrow in

17   calculating the time for speedy trial.  I would ask again, ask

18   you all to consult about potential trial dates.  Give me more

19   than one option to make sure it works with my calendar and the

20   master calendar, and we will go ahead and pencil in a trial date

21   now so that we have that reserved.

22       Anything else we should address?

23         MR. ALEXANDER:  Not from the government, Your Honor.

24         MS. SHERMAN-STOLTZ:  Not for the defense, Your Honor.

25         COURTROOM DEPUTY:  Your Honor, it was tomorrow at

1    12:30?

2            THE COURT:  That's correct.  Tomorrow, Wednesday,

3    March 10th, 12:30.

4            COURTROOM DEPUTY:  Sorry, Your Honor.  Tomorrow is

5    Tuesday, March 9th.

6            THE COURT:  I'm ahead of myself.  Tuesday, March 9th,

7    at 12:30.  Mr. Calhoun -- Mr. Hopkins, I'm going to ask you to

8    put Mr. Calhoun and Ms. Sherman-Stoltz in a breakout room.

9        Mr. Calhoun was acting like he had something to say, but

10   was it just about the break-out room?

11           THE DEFENDANT:  (Nodded head.)

12           MS. SHERMAN-STOLTZ:  Yes, Your Honor.

13           THE COURT:  Very well, then.  We will put you in a

14   break-out room, and we will see you tomorrow at 12:30.

15       Thank you, all.

16       (Proceedings adjourned at 4:32 p.m.)

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Sara A. Wick, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7          Please Note:  This hearing occurred during the

8     COVID-19 pandemic and is, therefore, subject to the

9     technological limitations of court reporting remotely.

10

11

12    /s/ Sara A. Wick                  December 12, 2022

13    SIGNATURE OF COURT REPORTER       DATE

14

15

16

17

18

19

20

21

22

23

24

25