1                    IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA (WASHINGTON, DC)
2

3      UNITED STATES OF AMERICA, *
                  Plaintiff,      *   21-cr-116-1
4                                 *   March 1, 2023
       vs.                        *   Washington, D.C.
5                                 *   10:04 a.m.
       WILLIAM CALHOUN, JR.,      *
6              Defendant.         *
       ***************************
7
                         TRANSCRIPT OF BENCH TRIAL
8                               **VOLUME I**
                  BEFORE THE HONORABLE DABNEY L. FRIEDRICH
9                      UNITED STATES DISTRICT JUDGE

10

       FOR THE UNITED STATES:
11

       MS. SARAH MARTIN, ESQ.
12     DOJ-USAO
       601 D. Street NW
13     Washington, DC 20001
       202-538-0035
14

       MR. CHRISTOPHER BRUNWIN, ESQ.
15     USAO-Violent and Organized Crime
       312 N. Spring Street
16     13th  Floor
       Los Angeles, CA 90012
17     213-894-4242

18     FOR THE DEFENDANT:

19     MS. JESSICA NICOLE SHERMAN-STOLTZ, ESQ.
       Sherman Stoltz Law Group
20     P O Box 69
       Gum Spring, VA 23065
21     540-255-4365

22     COURTROOM DEPUTY: MR. JONATHAN HOPKINS

23     COURT REPORTER: CHERYL K. POWELL, CCR, RPR, FCRR

24       Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
       pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and
25     Procedures Vol. VI, Chapter III, D.2.  Transcript produced by
                         computerized stenotype.

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

<u>**I N D E X**</u>

**EXAMINATION**                                         <u>PAGE</u>

**CARNEYSHA MENDOZA**

DIRECT EXAMINATION BY MR. BRUNWIN              8
CROSS-EXAMINATION BY MS. SHERMAN-STOLTZ       58
REDIRECT EXAMINATION BY MR. BRUNWIN           77
RECROSS-EXAMINATION
BY MS. SHERMAN-STOLTZ                          79

**TIMOTHY ARMENTROUT**

DIRECT EXAMINATION BY MS. MARTIN              83
CROSS-EXAMINATION BY MS. SHERMAN-STOLTZ       168
REDIRECT EXAMINATION BY MS. MARTIN            188

**EXHIBITS RECEIVED IN EVIDENCE**              <u>PAGE</u>

Government's Exhibit 700                        18
Government's Exhibit 100                        20
Government's Exhibit 101                        29
Government's Exhibit 302                        36
Government's Exhibit 607                        51
Government's Exhibit 702                        56
Government's Exhibit 200-205                    58
Government's Exhibit 402                        101
Government's Exhibit 1                          109
Government's Exhibit 2                          109
Government's Exhibits 102-113                   112
Government's Exhibit Series 600                 118
Government's Exhibit Series 400 save            118
400-405
Government's Exhibits 302-308B                  120
Government's Exhibit 703                        129
Government's Exhibit 206                        160
Government's Exhibit 209                        161

**P R O C E E D I N G S**

1

2          (In open court.  Defendant present.)

3          COURTROOM DEPUTY:  Good morning, Your Honor.  Your

4    Honor, we are in Criminal Action 21-116-1, United States of

10:04:29  5    America versus William Calhoun, Jr.

6          Could I have counsel approach the podium and state

7    your name for the record, starting with the United States.

8          MS. MARTIN:  Good morning, Your Honor.  Sarah Martin

9    on behalf of the United States.

10:04:41 10          THE COURT:  Good morning.

11          MR. BRUNWIN:  Good morning, Your Honor.  Christopher

12    Brunwin for the United States.

13          Also at counsel table with the government is Daniel

14    Haines from our office and Special Agent Timothy Armentrout

10:04:56 15    from the FBI.  Special Agent Armentrout is the case agent for

16    the case.  He will also be a witness, but we do expect to have

17    him at counsel table throughout.

18          THE COURT:  All right.  Okay.  Thank you.

19          Good morning, everyone.

10:05:09 20          MS. SHERMAN-STOLTZ:  Good morning, Your Honor.

21    Jessica Sherman-Stoltz for the defendant, Mr. William McCall

22    Calhoun.

23          THE COURT:  Good morning.  Nice to see all of you in

24    person finally.

10:05:19 25          So is the rule excluding witnesses invoked here?

1          MS. MARTIN:  Yes, Your Honor.

2          THE COURT:  I assume all these -- none of these folks

3     except perhaps the officer on the front row will be witnesses;

4     is that correct?

10:05:33  5          MS. MARTIN:  Correct.

6          MR. BRUNWIN:  Your Honor, this is Officer Carneysha

7     Mendoza.  She will be the first witness.

8          THE COURT:  That's what I meant.  Okay.  Terrific.

9          Just a couple of things.  I did receive your newest

10:05:47  10    stipulations.  Thank you for those.  I don't have it in front

11    of me right now.  Apparently one of them have the same numbers.

12         MS. MARTIN:  Yes.  We corrected that.  We've now

13    signed the stipulations.  I made an erroneous handwritten

14    correction, so by the end of the day, we will have the good

10:06:09  15    versions for you.

16         THE COURT:  All right.  All right.  I know that I've

17    reviewed the jury trial waiver with Mr. Calhoun by video.  And

18    I think the waiver that I saw had his electronic signature on

19    it.  I just want to confirm with Mr. Calhoun again -- I know

10:06:27  20    he's a lawyer.  I know he knows he has a right to a jury trial.

21         But just on the record, Mr. Calhoun, you're waiving

22    your right to a trial by jury, and you're comfortable with

23    proceeding as me being the trier of fact?

24         THE DEFENDANT:  Yes, Your Honor.

10:06:45  25         THE COURT:  I don't see a need to get a wet signature.

1    Do you all?

2            MS. MARTIN:  No, Your Honor.

3            Your Honor, you made it clear that the government

4    witnesses, the rule on witnesses is invoked.  We would also

10:06:57  5    like to make sure -- we haven't received a witness list from

6    the defense.

7            THE COURT:  I intended that to be for everyone.

8            Ms. Sherman-Stoltz, you don't have potential witnesses

9    in the courtroom aside from Mr. Calhoun?

10:07:10 10            MS. SHERMAN-STOLTZ:  We do not, Your Honor.

11            THE COURT:  All right.  Anything else?

12            THE DEFENDANT:  That's my sisters and my wife.

13            THE COURT:  Welcome, everyone.

14            MR. BRUNWIN:  I just had one logistical, and if this

10:07:22 15    doesn't work, we will do something else.  But as far as being

16    able to see what's on the monitors for the person at the

17    lectern, I understand that this screen is not working.  My

18    thought that was, since this is a bench trial, we might be able

19    to move this screen around.

10:07:41 20            THE COURT:  Well, I have -- are you worried about me

21    or the witness?

22            MR. BRUNWIN:  I'm worried about --

23            THE COURT:  You all?

24            MR. BRUNWIN:  Yes.

10:07:50 25            THE COURT:  Tell me which screen is not working,

1    Mr. Hopkins.

2              COURTROOM DEPUTY:  It's not it's not working.  It's

3    when they show their videos from the desk, it doesn't show up

4    on the podium.

10:08:01    5              THE COURT:  On the podium.  And you need to see it

6    because you need to see the video and where it is to ask the

7    questions at the appropriate time?  Is that it?

8              MR. BRUNWIN:  There's not going to be a whole lot of

9    that.  I could either move that -- I can actually see that from

10:08:17   10    here, but if I just slid it around --

11             THE COURT:  That's fine.  I just want folks, the

12    public to be able to see as well.

13             MR. BRUNWIN:  I think if I pull in it front of the

14    jury box --

10:08:28   15             THE COURT:  That's fine as long as it doesn't obstruct

16    the witness.

17             MR. BRUNWIN:  Yeah.  If it becomes awkward, we will --

18             THE COURT:  That's fine with me.

19             MR. BRUNWIN:  I will just look over Mr. Haines'

10:08:38   20    shoulder if I need to.

21             THE COURT:  Okay.

22             MR. BRUNWIN:  And I promise we will put things back

23    where we find them.

24             THE COURT:  No problem.

10:11:00   25             If there are any folks in the gallery that can't now

1    see the witness, I suggest you slide to the other side.  I

2    can't tell if this is obstructing.

3            MR. BRUNWIN:  We'll file this under an almost-good

4    idea.

10:12:00  5            One more thing I was going to say, Your Honor, is that

6    the government's very aware that some of the things we're --

7    especially with the first witness that we're going to be

8    offering, the Court has seen before.

9            THE COURT:  Very familiar with.

10:12:13 10            MR. BRUNWIN:  Yes.  And we are going to try and do our

11    best to move through those fairly quickly.

12            THE COURT:  That's great.  And if there are certain

13    parts of the videos you would like to highlight through

14    questions, you can highlight those and you can direct me to

10:12:27 15    critical portions to watch.

16            I've probably seen this video multiple times in

17    sentencings and trials.  I've seen all the barriers; I've seen

18    the crowds.

19            If there are particular videos that happen to show

10:12:43 20    Mr. Calhoun and where he was in the crowd and what he might

21    have saw, that would be helpful.  But if this is just general

22    civil disorder video footage, I've -- very familiar with it.

23            MR. BRUNWIN:  And there are -- I would expect there

24    are a number of videos, including the montage video, that the

10:13:04 25    Court has seen before.  Obviously, the defense will have full

1    opportunity to cross-examine about any of it.  But our

2    intention with most of those was to simply move them into

3    evidence so that they are part of the record.

4              THE COURT:  Terrific.

10:13:18    5         MR. BRUNWIN:  And then we don't need to sit -- we

6    don't feel like we need to necessarily sit for 22 minutes and

7    watch the montage.

8              THE COURT:  Agreed.  Thank you.

9              MR. BRUNWIN:  But that said, defense counsel has those

10:13:30   10   and can certainly have questions.

11             THE COURT:  Of course.

12             All right.  So are you ready to call your first

13   witness?

14             MR. BRUNWIN:  Yes, Your Honor.

10:13:37   15            THE COURT:  You may proceed.

16             MR. BRUNWIN:  The government would call United States

17   Capitol Police Carneysha Mendoza.

18        (Witness sworn.)

19             THE COURT:  Good morning again, Officer Mendoza.

10:14:06   20   You're becoming quite a regular here.

21             MR. BRUNWIN:  Good morning, Captain Mendoza.

22             THE WITNESS:  Good morning.

23                        **DIRECT EXAMINATION**

24   **BY MR. BRUNWIN:**

10:14:10   25   **Q**   I would ask you to state your name for the record and spell

1    your last name, please.

2    **A**    Carneysha, C-A-R-N-E-Y-S-H-A, last name Mendoza,

3    M-E-N-D-O-Z-A.

4    **Q**    And can you tell the Court your current title?

10:14:30  5    **A**    Captain.

6    **Q**    And do you have specific duties, positions in -- with your

7    captaincy?

8    **A**    Yes.  Commander of the civil disturbance unit and assistant

9    commander of the special operations division.

10:14:48 10    **Q**    And you mentioned that you are a captain.

11          How long have you been a captain?

12    **A**    Three years.  A little over three years.

13    **Q**    And before you were a captain, what role did you have?

14    **A**    Prior to a captain, I was a lieutenant and watch commander

10:14:59 15    for the United States Capitol Police.

16    **Q**    And have you also operated as a field commander?

17          Is that a term that's used?

18    **A**    Yes.  As a captain, I have been a field commander, civil

19    disturbance unit commander, and special operations division

10:15:13 20    commander.

21    **Q**    And were those the positions that you held and occupied on

22    January 6th, 2021?

23    **A**    Yes.

24    **Q**    Can you tell the Court -- and the Court with indulgence may

10:15:26 25    be aware of this -- what your duties were as field commander?

1    **A**    As the field commander, I oversaw department operations.

2    So respond to critical incidents mainly.

3    **Q**    Critical incidents.  Can you explain what kind of critical

4    incidents?

10:15:43  5    **A**    Sure.  So I oversaw department operations.  So basically

6    anything that was going on on the department and any kind of

7    critical incidents that were going on on Capitol Hill or

8    outside if Metropolitan Police Department requested assistance.

9    So those would include things like suspicious packages,

10:16:01  10    shootings, stabbings, carjackings, those type of things.

11    **Q**    Would that also involved protests, First Amendment

12    activity?

13    **A**    Yes.  As a commander of civil -- so that's separate from

14    being a field commander, though.  I have multiple roles.  As

10:16:18  15    commander of civil disturbance unit, I handled protests and any

16    type of civil disobedience or civil unrest.

17    **Q**    Riots?

18    **A**    Yes.

19    **Q**    Have you encountered riots?

10:16:31  20    **A**    I have encountered civil disobedience.

21    **Q**    Okay.  Very well.

22    **A**    And civil disorder I would say.

23    **Q**    And can you tell us how long you've been a United States

24    Capitol Police officer?

10:16:44  25    **A**    Yes.  Over 20 years.  So 20 years almost -- I'm in my 21st

1    year.

2    **Q**   Can you also tell us what the responsibilities are of the

3    United States Capitol Police?

4    **A**   Our main responsibility is protection of Congress, ensuring

10:17:00  5    the legislative process continues.  And outside of that, it's

6    protection of life, property, and -- life and property, yeah.

7    **Q**   You said protect Congress.  Does that include staff,

8    visitors?

9    **A**   Yes.

10:17:14  10    **Q**   Members of the public?

11    **A**   Yes.

12    **Q**   You mentioned the buildings.

13    **A**   Yes.

14    **Q**   Does that include the Capitol buildings and grounds?

10:17:22  15    **A**   Yes.  All congressional buildings.

16    **Q**   Does that also involve efforts, when needed, to prevent

17    disruptions?

18    **A**   Yes.

19    **Q**   Criminal incidents?

10:17:33  20    **A**   Yes.

21    **Q**   Acts of terrorism?

22    **A**   Yes.

23    **Q**   And you also said to ensure the legislature is without

24    disruption?

10:17:43  25    **A**   To ensure the legislative process continues.

1    Q    And that's something we'll probably talk about at some

2    point, including the issuance of or the implementation of

3    Capitol Police orders.  In particular, we will talk about the

4    evacuation on January 6.

10:18:04  5         Let me ask you:  Were you on duty on January 6, 2021?

6    A    Yes.

7    Q    And can you tell us what you, yourself, did on that date?

8    A    Well, I was -- I responded and -- I received a phone call,

9    and I responded in probably around -- I think I got to my

10:18:21  10    locker around 13:30.  Responded to the Capitol building.

11    Q    Let me slow down and take you one by one a little bit.

12    A    Sure.

13    Q    You said you responded in.

14         Were you -- what were you expecting to do on

10:18:36  15    January 6th?

16    A    So on January 6th, I was assigned as the field commander.

17    So I was expected to come in sometime in the afternoon and

18    oversee department operations outside of the event itself, the

19    riot in the Capitol.

10:18:57  20    Q    You say the event itself.  What event are you talking

21    about?

22    A    The riot, insurrection, protest.

23    Q    The riot on January 6th?

24    A    Yes.

10:19:07  25    Q    Were your duties also in anticipation of an official

1    proceeding on that date?

2    **A**    Were my duties in anticipation of that?

3    **Q**    Was that contemplated on January 6th?

4    **A**    We had planned for an even on January 6.  I was scheduled

10:19:25    5    to do routine, work routine.  So usually we split it up where

6    you have routine duties.  So field commander would take care of

7    all routine stuff that may occur that's not planned.  Then my

8    partner was scheduled to work the protest.  But, of course, I

9    ended up working the protest.

10:19:45    10    **Q**    And the protest in response to the counting of the

11    electoral votes; is that correct?

12    **A**    Yes, sir.  That's correct.

13    **Q**    And those duties or your responsibilities on January 6, did

14    they change during the course of that day?

10:20:02    15    **A**    Yes.

16    **Q**    And can you explain how that came about?

17    **A**    Like I said, I was scheduled to do routine work.  And I

18    received a call from one of my peers in investigations.  She

19    first called to ask me where my S.W.A.T. team was at.  I told

10:20:21    20    her where they were.  And then she called me back and told me I

21    probably should respond in.  I was not aware -- I knew there

22    was Stop the Steal rally going on and it was going to be a big

23    event, but I was not aware of the Capitol being surrounded with

24    people at that moment.

10:20:38    25    **Q**    So at some point in time during the day, you got a call

1    from -- was it from another field commander?

2    **A**   It was from -- there's one only field commander per day,

3    but it was from the investigations commander.

4    **Q**   And that person told you that you were going to need to

10:20:52  5    come in?

6    **A**   She said -- she's my peer, so she can't really tell me to

7    come in.  But she said she thought I should come in.

8    **Q**   And did she explain to you why she thought you needed to

9    come in?

10:21:04  10   **A**   No.  I just hung up the phone, and I came in.

11   **Q**   Did you have a conversation with another person telling you

12   about what was happening on January 6th?

13   **A**   Once I -- so once I drove, like, got to South Capitol

14   Street -- I'm only four-point-something miles away.  So I got

10:21:20  15   to South Capitol.  I noticed the Metropolitan Police Department

16   had a roadblock, and I had to badge myself in.  That's when I

17   figured I would call dispatcher and see what was going on.

18         So I called the dispatcher, and the dispatcher just

19   advised me.  She sounded pretty choked up, and she told me

10:21:39  20   there was a lot going on.  She told me about six different

21   things going on, including two explosive devices, one at the

22   RNC, one at the DNC.  Then the west front, multiple -- a crowd

23   of people at the west front and various other locations around

24   the Capitol building itself.

10:21:58  25         So I told her I would respond to the DNC since that

1     was pretty much across the street from my office where I had to

2     change my clothes.

3     **Q**   And let me back you up a little bit.

4          You said when you spoke to the dispatcher she sounded

10:22:11  5   a little choked up?

6     **A**   Yes.

7     **Q**   Can you explain what you mean?

8     **A**   I just -- I called her as soon as I saw the MPD officer and

9     I said, what's going on.  And she said it's pretty bad.  And

10:22:21  10  she just sounded like, you know, she was upset.  And so I said,

11    okay.  Tell me what you got going on.  She told me, and I said

12    I'm going to respond to the explosive device over at the DNC.

13         And when I -- after I changed my clothes, I turned my

14    radio on so I heard all the chaos.  I proceeded to respond over

10:22:43  15  to the DNC.  But then I heard officers calling for assistance

16    in the Capitol, so I proceeded to the Capitol building instead.

17    **Q**   And we'll kind of come back to that.  I want to cover a

18    couple of things, background things first.

19         But I'm going to ask you again, going back to your

10:23:04  20  duties and your knowledge as a police officer, what area is

21    within the jurisdiction of the Capitol Police if you can tell

22    us?

23    **A**   It's almost like -- I always compare it to a college campus

24    but with no fence or no, you know -- yeah.  No fence basically.

10:23:24  25  And it's -- it encompasses the Capitol building, House office

1   building, Senate office buildings, and that -- that's the

2   primary jurisdiction.  So it kind of starts, like, in the

3   southeast on the other -- like, on the other side of the

4   Supreme Court, which is Second Street Southeast, and then

10:23:50  5   encompasses the Capitol.  And then down to the southwest, you

6   have Third Street in the west.

7   Q    Then roughly, is it fair to say, the Capitol grounds is

8   Second Street to Third Street; is that fair description?

9   A    Well, Second Street Southeast to Third Street -- Second

10:24:04  10   Street in the east -- I'm sorry -- to Third Street in the west.

11   So -- because there's Third Street on both sides.  Right?  So

12   yeah.  It's a little bit -- and if you don't know the geography

13   of D.C., I can't really explain it to you without showing it to

14   you on the map.  I mean, it wouldn't make sense.

10:24:21  15   Q    We will get to that so hopefully it will make sense.

16       And you said kind of an area without fencing, but

17   there was fencing that we will talk about on January 6th; is

18   that right?

19   A    There was bike rack, correct.  And that, again; like the

10:24:35  20   primary jurisdiction, we also have an extended jurisdiction

21   which goes down to the baseball field.  It is a little bit

22   further away.

23   Q    And so the area within the jurisdiction includes the

24   Capitol building; is that fair to say?

10:24:48  25   A    Yes, sir.

1    **Q**    And you're familiar with the Capitol grounds?

2    **A**    Yes.

3            MR. BRUNWIN:  At this time, Your Honor, I would like

4    to read the stipulation which has been marked as Exhibit 700.

10:25:01  5    And I would like to read that into the record.

6            THE COURT:  Very well.  You may.

7            MR. BRUNWIN:  By law -- the parties have stipulated

8    and agree as follows:  By law, the United States Capitol, which

9    is located at First Street Southeast in Washington, D.C. is

10:25:18  10    secured 24 hours a day by U.S. Capitol Police.

11            Restrictions around the Capitol include permanent and

12    temporary security barriers and posts manned by the United

13    States Capitol Police.  Only authorized people with appropriate

14    identification are allowed access inside the Capitol.

10:25:40  15            United States Capitol building has 540 rooms covering

16    175,170 square feet of ground, roughly four acres.  The

17    building is 751 feet long, roughly 228 meters from north to

18    south, and 350 feet wide, approximately 106 meters at its

19    widest point.

10:26:07  20            The United States Capitol Visitors' Center is

21    580,000 square feet and is located underground on the east side

22    of the Capitol.  On the west side of the Capitol building is

23    the west front which includes a variety of open concrete

24    spaces, a fountain surrounded by a walkway, two broad

10:26:29  25    staircases, and multiple terraces on each floor.

1          On January 6, 2021, the inaugural stage scaffolding

2     was located on the west front of the Capitol building.  On the

3     east front are three staircases, porticos on both the House and

4     Senate side, and two large skylights into the visitors center

10:26:53  5     surrounded by a concrete parkway.

6          And for the court reporter, I will provide that so the

7     spellings and --

8          THE COURT:  All right.  Thank you.

9          MR. BRUNWIN:  -- will be clear.

10:27:04  10          And that is marked and we will offer that into

11    evidence.

12          THE COURT:  It's admitted.

13       (Government's Exhibit 700 was admitted in evidence.)

14    **BY MR. BRUNWIN:**

10:27:16  15    **Q**   Captain Mendoza, you heard the statement I just read?

16    **A**   Yes.

17    **Q**   Is that an accurate statement?

18    **A**   Yes, sir.  I don't know the square footage.  As far as I

19    can tell, it's very accurate.

10:27:26  20    **Q**   As far as what you heard, it is an accurate statement?

21    **A**   (Witness nods head.)

22    **Q**   I want to ask you:  Were the Capitol grounds open to the

23    public on January 6, 2021?

24    **A**   No, sir.

10:27:36  25    **Q**   And why were they not open to the public?

1    **A**    The Capitol grounds was closed due to the pandemic and also

2    the certification of the electoral votes.

3    **Q**    The certification of the electoral votes -- was that an

4    official proceeding in Congress on January 6th, 2021?

10:28:01  5    **A**    Yes, sir, it was.

6    **Q**    Was there a rally on the Mall?

7    **A**    Yes, sir, there was.

8    **Q**    Can you tell us what was the rally?

9    **A**    It was called Stop the Steal rally.

10:28:15  10    **Q**    And, to your knowledge, was the vice-president due to be

11    present in the Capitol building for the certification?

12    **A**    Yes, sir.

13    **Q**    Did the United States Capitol Police set up a restricted

14    perimeter because of those events, the counting of the

10:28:33  15    electoral votes in the presence of the vice-president?

16    **A**    Yes, sir.

17    **Q**    Can you describe the boundaries for the restricted area on

18    January 6, 2021?

19    **A**    Sure.  There was bike rack and snow fencing on Constitution

10:28:51  20    Avenue on the south side of Constitution Avenue and then the

21    north side of Independence Avenue.  And then it was encompassed

22    by First Street in the west and the Plaza in the east.

23    **Q**    Were there also uniformed police officers present?

24    **A**    Yes, there were.

10:29:18  25         MR. BRUNWIN:  At this time, I would like to show what

1    has been marked as Exhibit 100.  And I believe there is no

2    objection, and I'm going to move this Exhibit 100.

3         THE COURT:  Ms. Sherman-Stoltz, is there any

4    objection?

10:29:35  5         MS. SHERMAN-STOLTZ:  No, Your Honor.

6         (Government's Exhibit 100 was admitted in evidence.)

7    **BY MR. BRUNWIN:**

8    Q    Captain Mendoza, can you see what's been marked as

9    Exhibit 100?

10:29:49  10   A    Yes.

11   Q    Can you describe what that is?

12   A    That's the restricted perimeter that I just told you about.

13   So the red marking denotes where the bike racks were placed.

14   And, again, behind the bike rack were this snow fencing

10:30:08  15   reinforcing it and there were area closed signs along the bike

16   rack.

17   Q    Is it fair to describe this as a map of the Capitol

18   grounds?  You see the Capitol building depicted?

19   A    That's part of the Capitol grounds.  It is not a map of the

10:30:21  20   entire grounds but a part of it.

21   Q    But the Capitol building itself is in Exhibit 100 shown?

22   A    Yes.

23   Q    And the restricted area is denoted by the red line shown on

24   Exhibit 100; is that fair to say?

10:30:34  25   A    Yes.

1    **Q**    And that restricted area, if I understand your testimony,

2    members of the general public were not permitted or authorized

3    to be within that area on January 6th, 2021; is that correct?

4    **A**    Correct.  It was closed to the public.

10:31:01  5    **Q**    Now, you mentioned that the restricted area was marked and

6    that the Capitol Police had taken efforts to demonstrate to the

7    public and prevent entry by the general public into the

8    restricted area on January 6, 2021?

9    **A**    Correct.

10:31:19  10    **Q**    And you mentioned that there was snow fencing, bike racks,

11    and officers?

12    **A**    Yes.  And area closed signs.

13    **Q**    And area closed signs.  And I'm not going to -- I have been

14    warned not to belabor a discussion of barricades, so I am not

10:31:41  15    going to.

16    **A**    Okay.

17    **Q**    I would ask, Captain Mendoza:  Are those types of barriers

18    typically effective to prevent persons from entering a

19    restricted area?

10:31:53  20    **A**    Yes.  So law enforcement and security use bike rack as

21    barriers across the country and outside the country in the

22    U.K., and so they're typically effective, yes.

23    **Q**    And if I may, is it fair to say that the bike racks are not

24    very easy to just simply walk past or get past?  Is that fair

10:32:21  25    to say?

1     A   Yes.  That's fair to say.

2     Q   And are they also -- when they were on January 6 -- some of

3     these racks were linked together?

4     A   Yes.  They're interlocked.  So you have to actually

10:32:35  5     maneuver them to unlock -- I mean, I unlock them all the time.

6     You can maneuver them to unlock them.  They're not just sitting

7     side by side.  They're not easy to separate.

8     Q   Is it fair to say you can't casually walk past them?

9     A   No, you can't.

10:32:52  10     Q   And the snow fencing, that would impede someone trying to

11     enter the restricted area; is that fair to say?

12     A   Yes.  It just reinforces the bike rack.

13     Q   And the uniformed police officers, they would have been

14     noticeable and conspicuous on January 6; is that fair to say?

10:33:09  15     A   They would have been noticeable, yes.

16     Q   And at various times, they would probably even be more

17     noticeable and more conspicuous on other points in time on

18     January 6; is that fair to say?

19     A   Repeat the question.

10:33:25  20     Q   And I may not have stated it very clearly, but as events

21     transpired, you said you were responding to a distress call

22     from the dispatcher and a riot.

23         The presence of the uniformed police officers became

24     more visible and more pronounced -- their activity became more

10:33:44  25     pronounced during the day; is that fair to say?

1    **A**   Sure.  Yes.

2    **Q**   And that was all intended and designed to prevent persons

3    from entering the restricted area, correct?

4    **A**   Yes.

10:33:54  5    **Q**   And did -- to your knowledge, did officers make efforts,

6    both very audible and physical efforts, to prevent persons from

7    entering?

8    **A**   Yes.

9    **Q**   So my question:  Were those efforts to prevent persons from

10:34:14  10    entering the restricted area conspicuous -- maybe another way

11    to phrase it:  To a reasonable person, would it have been very

12    noticeable, based upon the efforts of the Capitol Police, that

13    members of the general public should not be trying to enter

14    that area?

10:34:32  15    **A**   Yes.  I think unless you had some sort of disability, you

16    should be able to know that you were -- that was a restricted

17    area.  It's -- to the average person, it was very obvious.

18    There were officers; there were signs; bike rack.  So yes; I

19    would say it was very noticeable.

10:34:54  20    **Q**   And the officers weren't just standing there, right?  They

21    were at times vocal, verbal, vocal?

22    **A**   Yes.

23    **Q**   They were making more noise than I'm making now at times?

24    **A**   Yes.

10:35:09  25    **Q**   At times, they were deploying deterrence?

1   **A**   Yes.

2   **Q**   Does that make sense?  Do you understand what I'm saying?

3         MS. SHERMAN-STOLTZ:  Your Honor, objection to leading,

4   and the prosecutor is testifying.  If he could just ask the

10:35:24  5   questions directly.

6         MR. BRUNWIN:  I will try and --

7         THE COURT:  Rephrase the question.  And I don't --

8   correct me if I'm wrong, but hasn't the defendant conceded that

9   he trespassed and knew he didn't have the right to go in there?

10:35:38  10         MR. BRUNWIN:  I believe he has, Your Honor, and I will

11   just about wrap this up and move on to the next area.

12         THE COURT:  All right.

13   **BY MR. BRUNWIN:**

14   **Q**   Captain Mendoza, can you describe in addition to merely

10:35:51  15   being present on January 6th what types of things officers were

16   doing in order to deter a crowd, a riotous crowd on that day?

17   **A**   Sure.  So officers created multiple police lines.  Officers

18   were trying to push people out of the perimeter.  There were

19   physical altercations.  Officers were vocal.  There was

10:36:15  20   chemical sprays utilized, flash bangs, and different types of

21   munitions.

22   **Q**   Chemical sprays, flash bangs.  It may not be the technical

23   term, but officers deploying chemical sprays -- might someone

24   think that chemical spray would be also described as mace?  Is

10:36:45  25   that a term?

1    **A**    Yes.  Yes, sir.  General public refer to it as mace or

2    pepper spray or something to that effect.  Of course, we have

3    more technical terms for it, but --

4              MR. BRUNWIN:  I want to come back to -- and I

10:37:06  5    apologize if I'm skipping around a little bit, but I would like

6    so show the witness what has been marked as Exhibit 411.

7              THE COURT:  You may.

8    **BY MR. BRUNWIN:**

9    **Q**    And on the screen, Exhibit 411 -- and I'm just marking this

10:37:53  10    for identification at this point in time.  It will be offered

11    later.

12              But do you see the statement on the screen, Captain

13    Mendoza?

14    **A**    Yes.

10:38:02  15    **Q**    The cops are using mace on us at the front of the Capitol?

16    **A**    Yes.

17    **Q**    And my question just to you -- I know you're not

18    specifically familiar with the defendant or his postings, but

19    that description itself, is that probably a fair statement of

10:38:20  20    what somebody may have perceived on January 6th?

21    **A**    Yes.

22    **Q**    And using mace on us, the Capitol police officers were

23    deploying chemical spray on rioters on January 6th?

24    **A**    Yes.

10:38:36  25    **Q**    That's fair?  And you also talked about -- you said flash

1    bangs were going off, being deployed?

2    **A**    Yes.

3    **Q**    The Court and -- I'm sure the Court is aware of this, but

4    just can you explain what flash bangs are and how that would be

10:38:55    5    conspicuous?

6    **A**    Sure.  Flash bang is a -- it's basically a device -- some

7    people call them grenades or -- it is a hand-tossed device is

8    what we call it and what I teach people in grenadier school.

9         It is a hand-tossed device that creates an audible

10:39:17    10    sound and a visible light.  It's supposed to be used as, like,

11    to throw someone's balance off or to, you know, alert someone

12    to something and to also give law enforcement a chance to

13    respond.

14         I mean, we use them like if we're serving a warrant,

10:39:36    15    for example, or something like that.  It creates an element of

16    surprise.

17    **Q**    Is it fair to say it's very loud?

18    **A**    It's very -- yeah.  I think 175 decibels.

19    **Q**    And it would also be another thing that, in your statement

10:39:51    20    about what a reasonable person would have perceived on that

21    date, would alert them that they should not be present in that

22    restricted area; is that right?

23    **A**    Yes, sir.  Absolutely.

24    **Q**    In an attempt to deter persons from entering the restricted

10:40:04    25    area?

1    **A**    Yes, sir.

2    **Q**    And those things were being deployed on that date?

3    **A**    Yes, sir.

4    **Q**    Was there also teargas?  Or is that chemical spray?

10:40:17  5    **A**    Chemical spray.  There were multiple kinds of chemical

6    spray.  We use CS, OC, and other types of, like, impact rounds.

7    **Q**    Pepper balls?

8    **A**    Yes.  Pepper ball is a -- it is a chemical, but it's also

9    a -- an impact.  So it's, you know, .68-caliber.  Little ball,

10:40:43 10    basically.  And whenever you shoot it, it will hit someone.  It

11    is a pain compliance, but it also releases a chemical.

12    **Q**    Were there also, to your knowledge, occasions where red

13    flares were used?

14    **A**    Yes.

10:40:56 15    **Q**    And what does a red flare signify?

16    **A**    So we deploy -- it's not a flare really.  It is just red

17    smoke.  So we deploy red smoke to summons the assistance of

18    other law enforcement if we cannot get ahold of -- the radio is

19    overrun or we can't talk on the radio or we have limited

10:41:17 20    ability to communicate.

21    **Q**    For lack of a better term, my term, red flares, were those

22    things that happened on January 6th?

23    **A**    Red smoke.  A red flare is something totally different.

24    **Q**    Red smoke.  Does that denote an officer in distress?  Is

10:41:35 25    that what I understand?

1     **A**     Yes.  It is a call for immediate assistance.

2     **Q**     And that happened on January 6?

3     **A**     Yes.

4            MR. BRUNWIN:  Okay.  At this time, I would ask to show

10:41:48  5     the witness Exhibit 101.

6            THE COURT:  Go ahead.

7            MR. BRUNWIN:  And I'm going to move Exhibit 101 into

8     evidence.  And I believe there is no objection.

9            THE COURT:  Any objection?

10:42:05  10           MS. SHERMAN-STOLTZ:  We did note an objection, Your

11     Honor, on this one as far as authenticity.  Where that came

12     from, you know, time frame that was taken in, day that was

13     taken, who took that.  So we have questions as to authenticity,

14     and that's where our objection would be.

10:42:25  15           MR. BRUNWIN:  I will lay a foundation, Your Honor.

16            THE COURT:  Go ahead.

17     **BY MR. BRUNWIN:**

18     **Q**     Captain Mendoza, do you recognize what's been shown in

19     Exhibit 101?

10:42:34  20    **A**     Yes.

21     **Q**     You had testified earlier about signs that were in place?

22     **A**     Yes.

23     **Q**     Can you explain what is shown in Exhibit 101?

24     **A**     Sure.  So that sign -- it is a rather large sign.  The

10:42:48  25    picture doesn't do it much justice, but I have a stack in my

1    office.  That sign is utilized to denote an area is closed.  We

2    use that to -- whenever we put in restricted areas for

3    different types of events.  But there were hundreds of those

4    signs throughout the restricted area on January 6th.

10:43:10  5          My partner and also I observed part of the perimeter

6    whenever I came in.  So those signs were definitely in place on

7    January 6th.

8    Q   And does Exhibit 101 fairly and accurately depict one such

9    sign that was in place on January 6th?

10:43:28  10  A   Yes.

11          MR. BRUNWIN:  And I would move Exhibit 101 into

12   evidence.

13          THE COURT:  Okay.  It's admitted over the objection.

14   (Government's Exhibit 101 was admitted in evidence.)

10:43:34  15  **BY MR. BRUNWIN:**

16   Q   And, Captain Mendoza, I believe you've already testified

17   that these signs, and lots of signs like it, were in place on

18   January 6 to -- around the restricted area; is that fair to

19   say?

10:43:53  20  A   Yes.  Around the restricted area and also inside the

21   restricted area.  If you look at that picture behind the

22   officers, there are hundreds of signs right there.  And that's

23   inside the perimeter.

24   Q   And did you say -- you say there were hundreds of signs

10:44:05  25  like this?

1  A    Yes.  And that may be a little -- actually a low-ball
2  number, but there were definitely hundreds of signs out.
3  Q    And I'm about to finish up this point, but that -- again,
4  going to what you had testified earlier; that a reasonable
10:44:25  5  person would have most likely been alerted to the fact that
6  they should not be in this area based in part on these signs?
7  Is that fair to say?
8  A    Yes.  I would say -- well, based in part on the signs.  And
9  even, if for some reason you didn't see the signs, once you got
10:44:41 10  into the restricted area, it was very clear if you are a
11  reasonable person -- it was very clear that you shouldn't have
12  been there.  And unless, like I said, there's some limited, you
13  know, capacity for that person to understand, then a reasonable
14  person should know you shouldn't have been in that area,
10:45:00 15  regardless.
16  Q    Now I'm going to go -- move on to specifically your conduct
17  and your actions on January 6th.
18       You had said that you were designated the field
19  commander for that day and that you changed plans and came in
10:45:28 20  early.
21  A    Yes.
22  Q    And that the information you had gotten from colleagues and
23  a dispatcher, who was choked up, prompted you to come in early.
24  And if you could, could you tell us -- you said you were -- you
10:45:48 25  had changed your uniform, changed what you were wearing, and

1  began to move towards the Capitol, if I have that right.

2        Can you explain what you did after that?

3  **A**  I was moving toward the DNC, the Democratic National

4  Committee.  I heard a call for assistance at the Capitol.  So I

10:46:09  5  proceeded past that to the Capitol.  And then once I pulled up,

6  you know, on Capitol grounds, came in on the east front.  I

7  was -- I heard a call for assistance.  On my way, I heard a

8  call for assistance at the Rotunda specifically.  So once I

9  pulled up, I kind of glazed over at the Rotunda and noticed

10:46:32  10  there were -- the stairs had people on them.  So I couldn't go

11  that way.  An officer came up to my car.  Said, Captain, where

12  do you want to go?  I said, the Rotunda.  And he escorted me in

13  a secure door.

14  **Q**  And did you enter the Capitol building?

10:46:47  15  **A**  I did.

16  **Q**  And can you tell us how you entered?

17  **A**  Well, when I entered that secure door, I noticed what I

18  believed to be a couple hundred people directly in front of me.

19  I turned around to go back out and I heard --

10:47:07  20  **Q**  Let me stop you there.  Why did you turn around to go back

21  out?

22  **A**  Well, so I train people not to go by themselves through a

23  crowd.  We should go in a formation as a platoon.  So if I walk

24  through the crowd and I get compromised, my officers are going

10:47:24  25  to get injured trying to rescue me.  So I wanted to turn around

1    and go back out and find another way in, but I didn't do that

2    because when I turned around to go back out -- I guess someone,

3    you know, saw me go into that door so there was immediately

4    banging on the door.  So I ended up proceeding through the

10:47:42  5    crowd.

6    Q    So if I understand you -- and it may be obvious, but when

7    you entered the door and saw the group of people, those were

8    all people who shouldn't have been there?  Is that fair to say?

9    A    Yes.  Correct.

10:47:56  10   Q    And you saw that as a potential hazard to you in that

11   circumstance; is that correct?

12   A    To my officers.  I mean, I -- yeah.  Possibly.  I mean --

13   Q    Is that a breach?

14   A    Yes.  That's a significant breach.

10:48:08  15   Q    A significant breach?

16   A    Yes.

17   Q    And how is that a significant breach?

18   A    A breach is when -- well, a breach can be when one person

19   enters the door -- a door unauthorized.  They haven't been

10:48:21  20   screened.  We don't know what they have on them.  And we have

21   a -- there's a protocol for when one single person breaches a

22   door.

23         So when you have hundreds of people or more -- I don't

24   know how many people were in the Capitol building that day, but

10:48:37  25   when you have groups of people in a building, that is a

1      significant breach.  And, for us, like I said, just for one

2      person, our members are -- our dignitaries are at risk because

3      we don't know -- it takes one person with a weapon to injure a

4      member of Congress or an officer.

10:48:55  5      Q    And hundreds of people becomes more significant; that's

6      fair to say?

7      A    Yes.

8      Q    And you indicated that you tried to leave back through

9      where you entered and someone saw -- people saw you; is that --

10:49:15 10      did I understand?

11      A    No.  I just turned around.  Like, literally I just walked

12      in the door, noticed all the people, and I was, like, yeah.

13      This isn't going to work, so I turned around.  But I heard

14      people banging on the door, so I didn't leave.  I think they

10:49:27 15      saw me entering the door because nobody knew about the door.

16      It was a secure door.  So I think once they saw me go in, then

17      maybe they tried to come behind me.  But that door secures

18      immediately when you close it.

19      Q    So what did you do after that?

10:49:42 20      A    I pushed my way through the crowd.

21      Q    Physically pushed your way through the crowd?

22      A    Yes.

23      Q    Was that easy to do?

24      A    I mean, I -- for me, I mean, I'm a defensive tactics

10:49:58 25      instructor and, you know, all that.  Krav Maga.

1    **Q**    How about for me?

2    **A**    For someone not trained, no.  Probably wouldn't be easy to

3    do.

4    **Q**    So it's fair to say the crowd was resisting your efforts?

10:50:10  5    **A**    I can't really say for sure.  I just -- I was focused on

6    one thing, and that was getting to my officers.  I just pushed

7    my way through the crowd.  I'm used to dealing with crowds.  I

8    mean, I work the civil disturbance unit.  So --

9    **Q**    But you did have to physically push your way through the

10:50:28 10    crowd?

11    **A**    Yes.  I couldn't just walk through.

12    **Q**    And you're skilled tactically in the means to confront and

13    deal with people who are obstructing you, but you did need to

14    be able to physically move yourself through them?

10:50:47 15    **A**    Yes.

16    **Q**    So there was some level of resistance to you?

17    **A**    Yes.  I guess so.

18    **Q**    Okay.  Were the people you observed engaging other officers

19    that you saw?

10:50:58 20    **A**    Yes.  Once I got further into the building.  So I -- once I

21    pushed through the crowd, I saw a line of my officers that were

22    holding -- they were holding back a crowd from penetrating

23    further into the building.  So I stopped to assist --

24    **Q**    Holding back --

10:51:16 25    **A**    I'm sorry.

**Q**   Pardon me.  Holding back.  Can you explain what you physically saw when you say holding back?

**A**   There was a line of officers in a hallway.  So from one end of the hallway to the other end of the hallway.  And they were basically trying to prevent the crowd from penetrating further into the building.

**Q**   And this may be obvious but -- and you stated the people entering the building were those -- would those people have been authorized to enter the building?

**A**   They were unauthorized.

**Q**   At this time -- and I want to make sure that I have the numbering correct.  I'm going to hold off on that one, then.

       In general, Captain Mendoza, can you estimate how many people you think you saw in the restricted area or attempting to enter the Capitol on January 6?

**A**   No.  Not really.  I mean, yeah.  I'm not really good at estimating like that.  But thousands of people in the restricted area.

**Q**   Thousands of people?

**A**   Yes.

**Q**   You had used the term before -- you had used the terms "breach, significant breach."  Is this bigger than that?

**A**   Bigger than significant breach?

**Q**   Catastrophic?

**A**   Sure.

1          MR. BRUNWIN:  At this time, I would like to show the

2     witness what has been marked as Exhibit 302.  And I believe

3     this -- I won't speak for defendant, but I don't think there's

4     an objection to this one.

10:53:27    5          THE COURT:  Any objection, Ms. Sherman-Stoltz?

6          MS. SHERMAN-STOLTZ:  No, Your Honor.

7       (Government's Exhibit 302 was admitted in evidence.)

8          MR. BRUNWIN:  And, Your Honor, a caveat that this is

9     one of the exhibits that I believe the Court and the witness

10:53:41   10    are very familiar with.  I'm not going to go through all of

11    them.

12          THE COURT:  Thank you.

13          MR. BRUNWIN:  But I did want to point out points of

14    this one.  And this will probably be one -- this one and not

10:53:57   15    much more --

16          THE COURT:  Okay.

17          MR. BRUNWIN:  -- of those.  I hope that's clear.

18          THE COURT:  Yes.  Thank you.

19    **BY MR. BRUNWIN:**

10:54:10   20    **Q**   Captain Mendoza, while that's coming up and before it

21    starts to play, I'm going to ask you:  Do you recognize

22    Exhibit 302?

23    **A**   Yes.

24    **Q**   And is this something you have reviewed before?

10:54:20   25    **A**   Yes.

1    **Q**   And can you tell us what this is?

2    **A**   This is the Senate wing door.  The first door that was

3    breached on January 6.

4    **Q**   So the Senate wing door is the area of the initial breach

10:54:33  5    of the Capitol building; is that right?

6    **A**   Correct, yes.

7    **Q**   And can you tell us what you know about this door?

8    Specifically, is this a public entry?

9    **A**   No.  It's not a public entryway.  Public entry would have

10:54:46 10    the magnetometer and the X-ray machine there.  It is basically

11    the door -- I mean, the window was breached first here.  And

12    then the door eventually was breached.

13    **Q**   But this door -- you say this is not a public entry.  Is

14    this some other type of door?  Is it exits or an emergency

10:55:09 15    exit?

16    **A**   Yeah.  Every door is an emergency exit, but yes.  You can

17    exit out basically any door in the Capitol building, but no one

18    can come in this door.

19    **Q**   And an emergency exit -- does it trigger an alarm?

10:55:22 20    **A**   Yes.

21    **Q**   And the alarm is audible?

22    **A**   Yes.

23    **Q**   Let's go ahead and play Exhibit 302.  And, again, I know

24    we're familiar with this.  So what I would like to do is move

10:55:42 25    ahead to about one minute and 30 seconds into the video and

1    then I'm going to ask you a couple of specific questions about

2    those.

3         MR. BRUNWIN:  Start it about one minute.

4    (Video played.)

10:56:11  5  **BY MR. BRUNWIN:**

6    **Q**   Captain Mendoza, do you see the windows on either side of

7    the door?

8    **A**   Yes.  I see the windows to my right which would be the left

9    of the building.

10:56:21  10  **Q**   And those windows are in tact at this point in time?

11   **A**   Yes.

12   **Q**   And, at some point, they were broken; is that right?

13   **A**   Correct.

14        MR. BRUNWIN:  If we can play that.

10:56:34  15  (Video played.)

16   **BY MR. BRUNWIN:**

17   **Q**   You see people pounding on the doors; is that right?

18   **A**   Yes.

19   **Q**   Is that consistent with things you observed on January 6th,

10:56:45  20  2021?

21   **A**   I -- well, via video, yes.  I wasn't there when people were

22   pounding on the door.  But yeah; via the video, I'm familiar

23   with that.

24   **Q**   And did you see the window that was just shattered?

10:57:03  25  **A**   Yes.

```
 1              MR. BRUNWIN:  If we can keep going.

 2         (Video played.)

 3    BY MR. BRUNWIN:

 4    Q   And one of the windows was just broken.  See glass on the

 5    floor.  Portions of the -- is being thrown inside.

 6              THE COURT:  All right.  Mr. Brunwin, you need the

 7    witness to narrate if that's what you want to do.

 8    BY MR. BRUNWIN:

 9    Q   Can you tell us what we see here?

10              MR. BRUNWIN:  Stop there.

11    A   Sure.  Basically, like I said earlier, the first breach was

12    here.  The windows were breached.  So that window -- you saw

13    the individual climb in that window.  This window over here to

14    my right is going to be breached next, and then the door will

15    be forced in.

16    BY MR. BRUNWIN:

17    Q   And --

18    A   And then a flood of people begin to come in the building.

19              MR. BRUNWIN:  And if we can play, and I will play

20    about -- just about another minute, Your Honor, and then we

21    will move on.

22              THE COURT:  That's fine.

23         (Video played.)

24              MR. BRUNWIN:  Stop there.

25    BY MR. BRUNWIN:
```

Timestamps: 10:57:42 (line 5), 10:57:55 (line 10), 10:58:10 (line 15), 10:58:17 (line 20), 10:58:51 (line 25)

1    **Q**    Can you tell us what you see in relation to the door?

2    **A**    The individual right there with the black backpack on,

3    looks like he is kicking the door to try to force it to open.

4                MR. BRUNWIN:  Go ahead and keep playing.

10:59:07    5    (Video played.)

6    **A**    Can I just point out once that light -- you see the light

7    at the top -- there is a mag lock at the top of that door.  And

8    that light -- if you want -- if you want, you can rewind it,

9    but that light was off and came on.  That's the alarm.  That's

10:59:26    10    part of the alarm system.

11                Once that light comes on, then you will get an audible

12    alarm, a local alarm at that doorway.  It will transmit to

13    dispatch center and then the dispatch center will basically let

14    officers that work in the Capitol building know that there is

10:59:41    15    an alarm at that door.

16                So on any regular day, like, right now, that alarm

17    goes off; the light comes on; dispatcher gets an alarm in the

18    dispatch center in Manassas, Virginia.  Then that alarm is

19    dispatched and officer responds to that door and tries to see,

10:59:59    20    you know, if there's anybody entered the door.

21                At the same time, the command center and dispatch will

22    pull video footage to see if anybody has entered or exited the

23    door.

24    **BY MR. BRUNWIN:**

11:00:09    25    **Q**    And this alarm, is that also audible inside the Capitol --

1    inside the Capitol building?

2    **A**    Yes.   That's what I meant by local alarm.   You will hear it

3    at that specific location.   And then the dispatch gets another

4    audible alarm in the dispatch center which is offsite outside

11:00:29  5    of D.C.

6    **Q**    And I apologize for asking the obvious, but it's part of

7    what I do.

8              When you say audible alarm, is it pretty loud?

9    **A**    Yes.   It is --

11:00:39  10   **Q**    For instance, it is intended for persons to hear it and

11   know that they should not be there?

12   **A**    It is intended for personnel to hear it.   Whether -- I

13   don't really know the -- you know, technically why it's there.

14   But either for the officer or, you know, someone to hear it.

11:00:53  15   But it's intended to be heard.

16   **Q**    And the timing of this breach, do you know approximately

17   what time this was?

18   **A**    I believe that one was at 2:13 p.m.

19             MR. BRUNWIN:   Can we keep playing that?

11:01:08  20   **BY MR. BRUNWIN:**

21   **Q**    Is there -- I will ask you if there is anything else that

22   you notice that you want to comment about that before we will

23   move ahead to about eight minutes in.

24   **A**    One thing I noticed -- this may not be relevant, but when

11:01:26  25   you played the video, the individuals that came in had tactical

1    gear on and also had Capitol Police shield.

2    **Q**    And what is significant to you about that?

3    **A**    Significant to me because it belongs to my civil

4    disturbance unit, so it was either taken or given to them.    I

11:01:43  5    would assume it was taken, but --

6                MS. SHERMAN-STOLTZ:    Your Honor, I just object to the

7    assumption being made.

8                THE COURT:    Yeah.    I will strike that last comment.

9                Captain, just -- I know it's difficult to narrate and

11:02:00  10    there are things you want to point out in the video, but you do

11    need to respond to his specific question.

12                THE WITNESS:    Sure.

13    **BY MR. BRUNWIN:**

14    **Q**    And my question would just be:    Beyond what -- but those --

11:02:14  15    observing those things as a concern and as a trained Capitol

16    Police officer, what would be your concern?    Not necessarily

17    that that specifically happened, but that would be -- what

18    would be your concern about that?

19                MR. BRUNWIN:    And I think the witness has stated that

11:02:31  20    if that's acceptable.

21                THE COURT:    Yeah.    I mean, I'm confused by your

22    question.

23                MR. BRUNWIN:    And I probably phrased it poorly.

24    **BY MR. BRUNWIN:**

11:02:42  25    **Q**    My question to you was what things you observed and what is

1  significant to you about that.

2         THE COURT:  Well, just what did she observe.  Let's

3  get the answer, and then you can ask another question.

4  **BY MR. BRUNWIN:**

11:02:55  5  **Q**   If you would, state what is it that you observed.

6  **A**   I observed individuals entering a restricted doorway.

7  **Q**   And you had mentioned you observed individuals wearing

8  tactical gear.

9  **A**   Yes.

11:03:11  10  **Q**   And what would be the concern to you as a Capitol Police

11  officer and a captain about persons breaching the Capitol

12  wearing tactical gear?

13  **A**   Well, as a trained civil disturbance officer and commander,

14  I would assume that means that they're expecting some sort of

11:03:35  15  confrontation.

16  **Q**   And you also said that you observed persons wearing Capitol

17  Police gear.

18  **A**   No.  Shield.

19  **Q**   Capitol Police shield?

11:03:46  20  **A**   Yes.

21  **Q**   And what is your concern, potentially, in observing that?

22  **A**   So that was objected to.  But I said that -- you asked me

23  what is significant to me.  Those are things that are

24  significant to me.

11:04:02  25  **Q**   You can answer that.

1    **A**   Right.

2           THE COURT:  You may answer the question.  Restate the

3    question.

4    **BY MR. BRUNWIN:**

11:04:08  5    **Q**   And what is significant to you about observing an

6    individual with a Capitol Police shield?

7    **A**   It is significant to me because I would assume it was taken

8    from one of my officers, which means to me personally that

9    there are officers out there without protective gear and also

11:04:25  10   the same as what I said earlier --

11          MS. SHERMAN-STOLTZ:  Your Honor, I would object to the

12   assumption that it was taken from officers.

13          THE WITNESS:  Yes.  Understood.

14          MR. BRUNWIN:  She's just explaining her concern.

11:04:37  15          THE COURT:  Well, I think it's fair that she was

16   concerned for her own safety, but the assumption part will be

17   stricken.  But there's a fair inference that the Court can draw

18   from all this, Mr. Brunwin.  You don't need it all to come from

19   the witness.

11:04:57  20          MR. BRUNWIN:  I don't want to keep belaboring this

21   point.  I think we're too far down that --

22          THE COURT:  Thank you.

23   **BY MR. BRUNWIN:**

24   **Q**   And at this time, unless there is anything else you wanted

11:05:19  25   to comment at this point, I'm going to move ahead to a later

1    point in this same video.

2    **A**   I'm fine.

3         MR. BRUNWIN:  Very well.  And if we can move ahead to,

4    I believe, eight minutes.  You can go ahead and play there.

11:05:55  5        (Video played.)

6    **BY MR. BRUNWIN:**

7    **Q**   And my question, Captain Mendoza is simply that the persons

8    entering -- you observe -- do you see persons entering the

9    building at this point in time?

11:06:08  10   **A**   Yes.

11   **Q**   And are those persons authorized to be entering the

12   building?

13   **A**   No.

14   **Q**   Do you see any Capitol Police officers allowing them to

11:06:17  15   enter the building?

16   **A**   No.

17   **Q**   At this time --

18        (Discussion off the record.) --

19        MR. BRUNWIN:  At this time, we are going move on from

11:06:47  20   this, so we can stop looking at this and --

21        THE COURT:  Ms. Sherman-Stoltz, with respect to all

22   these videos, are there any objections?

23        MR. BRUNWIN:  I'm going to -- to that point, I'm going

24   to offer to read Exhibit 700, the stipulation, at this point in

11:07:11  25   time.

1          THE COURT:  Okay.  That's fine.

2          MR. BRUNWIN:  And then we can --

3          THE COURT:  Okay.

4          MR. BRUNWIN:  The parties have agreed and stipulated

11:07:20  5    as follows:  By law, the United States Capitol which is

6    located --

7          MS. MARTIN:  You've already read 700.

8          MR. BRUNWIN:  I'm going to read 701.

9          The United States Capitol Police operate and maintain

11:07:41 10    closed circuit video monitoring and recording equipment that

11    captures locations inside and outside of the United States

12    Capitol building and on the Capitol grounds.  The video

13    equipment timestamps each recording with the date and time at

14    which the footage is captured.

11:08:00 15          The United States Capitol Police controlled video

16    equipment was in good working order on January 6th, 2021, and

17    video footage recovered from the cameras and equipment with the

18    timestamp of January 6, 2021 is footage from January 6, 2021.

19          The events depicted in the video footage are a fair

11:08:24 20    and accurate depiction of the events at the United States

21    Capitol on January 6, 2021.

22          The timestamps on the recordings are accurate, and the

23    video footage was not altered or edited in any way.

24          The video footage is authentic in that it is what it

11:08:50 25    purports to be.

 1          At this time, Your Honor, I'm going to move into
 2     evidence Exhibits 300 through 307 and 310.
 3          THE COURT:  Any objection, Ms. Sherman-Stoltz?
 4          MS. SHERMAN-STOLTZ:  Your Honor, we had an objection
11:09:16  5     specifically noted for 300, 301, and 310 as to relevance,
 6     specifically 300 and 301.  It's a -- you know, 300 I think is a
 7     22-minute video.  301 is a little under ten minutes.  Much of
 8     the video is not even the time that my client would have been
 9     inside of the Capitol.
11:09:41 10          So I've picked out the portion of each one of those
11     videos, 300 and 301, that he would have been in there.  But we
12     would object specifically to anything after the fact, after he
13     had left.  Does not apply to him or his case.  It is not
14     influential on any of his actions, any elements that the
11:10:02 15     government may need to prove against my client.
16          THE COURT:  All right.  Well, given that this is a
17     bench trial, at this point, I'm going to reserve any ruling on
18     relevance.  And I will pay close attention to the portions of
19     the videos that you think are relevant, and I will determine
11:10:19 20     once I've heard the government's case and your case what -- to
21     what extent the videos are relevant to proving the elements of
22     the offense against Mr. Calhoun.
23          MR. BRUNWIN:  And, specifically, Your Honor, as to
24     those videos -- and not arguing at this point, but 300 is the
11:10:37 25     montage video that's 22 minutes long that, as I said at the

1    outset, we're not intending to play at this point.

2              THE COURT:  I know.  But she's objecting to the Court

3    looking at other portions.  So --

4              MR. BRUNWIN:  Understood.

11:10:53   5              THE COURT:  For the record, so that it's clear,

6    Ms. Sherman-Stoltz, when a witness is testifying about a

7    portion of a video that you object to, can you note the

8    objection for the record so it's clear to me where you think

9    that it goes too far?

11:11:10   10              MS. SHERMAN-STOLTZ:  Yes, Your Honor.

11              THE COURT:  All right.

12              MS. SHERMAN-STOLTZ:  And at this point, I understand

13    what she's trying to describe.  But I don't think that the

14    government -- and maybe I'm incorrect.  I don't think that at

11:11:21   15    this point they are entering that particular portion that she's

16    described as being where my client was there.

17              THE COURT:  I don't think they've suggested that at

18    all.

19              Has any of this been objectionable to you?  You

11:11:38   20    haven't raised relevance objections.

21              MS. SHERMAN-STOLTZ:  Not as far as what she's

22    describing as taking place.

23              MR. BRUNWIN:  Your Honor, so we're clear, I'm not

24    intending to elicit any testimony from this witness as to those

11:11:52   25    videos I have just moved into evidence at this time.  So I'm

1    not going to be asking further questions.  This witness has

2    testified about Exhibit 302, some specific things about the

3    breach of 302.

4              THE COURT:  Understood.  And there was no objection to

11:12:06  5    that.  Correct, Ms. Sherman-Stoltz?  302?

6              MS. SHERMAN-STOLTZ:  There is no objection.

7              THE COURT:  Okay.  So the objections are to

8    Exhibit 300 and 301.  And any objection to 310?

9              MS. SHERMAN-STOLTZ:  Yes, Your Honor.  We have similar

11:12:21  10    objection as far as relevance.

11              THE COURT:  All right.  Again, I will reserve ruling

12    on all of this.  But, Ms. Sherman-Stoltz, for the record, you

13    are going to have to be clear where you have objections to

14    testimony relating to portions of the video that you think are

11:12:35  15    irrelevant.  And I'm going to allow the testimony.  But once

16    I've seen all the evidence, heard all the testimony, I will

17    make a determination where it is relevant.

18              MR. BRUNWIN:  310 we will be using with another

19    witness.  So the relevance will be shown there.  And this

11:12:52  20    witness is not talking about this defendant specifically.

21    Three -- in 302, we will hear testimony later that it does show

22    the defendant entering, but I have not asked that of this

23    defendant but that will be later.  But we're moving on from all

24    those exhibits at this point.

11:13:12  25              THE COURT:  Thank you.

**BY MR. BRUNWIN:**

1

2  **Q**  At this time I would like to show what has been marked as

3  Exhibit 607.

4       I'm going to stop and ask Captain Mendoza before we

5  get started:  Do you recognize what has been shown to you as

6  Exhibit 607?

7  **A**  Yes, I do.

8  **Q**  And is this something you've observed before?

9  **A**  Yes.

10  **Q**  And can you tell us what's depicted in Exhibit 607?

11  **A**  That is a video of the Crypt, the area of the Crypt, and

12  the individuals that -- the unauthorized individuals inside the

13  Crypt and Capitol Police units.

14  **Q**  And I'm going to ask you specific questions, but it's fair

15  to say does this -- do you recognize what's depicted in

16  Exhibit 607?

17  **A**  Yes.

18  **Q**  And does it fairly and accurately show images from the

19  Crypt in the United States Capitol?

20  **A**  Yes.

21       MR. BRUNWIN:  And I'm going to move Exhibit 607 into

22  evidence.  And I keep saying this, but I think, based upon the

23  objections that were filed, my understanding is there is no

24  objection.

25       THE COURT:  Is that correct, Ms. Sherman-Stoltz?

11:14:07  (line 5)
11:14:16  (line 10)
11:14:42  (line 15)
11:14:55  (line 20)
11:15:06  (line 25)

1          MS. SHERMAN-STOLTZ:  There's no objection, Your Honor.

2          THE COURT:  All right.  It's admitted.  That's 607?

3          MR. BRUNWIN:  Yes.

4          THE COURT:  607 is admitted.

11:15:14  5      (Government's Exhibit 607 was admitted in evidence.)

6  **BY MR. BRUNWIN:**

7  **Q**   And as we play this video, I'm going to ask you, Captain

8  Mendoza -- so you know, I will come back and ask you questions

9  about what things you saw and what you may have heard in this

11:15:38 10  recording.

11         We may need a little more volume, but we will see how

12  that goes.

13      (Video played.)

14  **BY MR. BRUNWIN:**

11:16:26 15  **Q**   Captain Mendoza -- and we may start that over again, but I

16  was going to ask you:  Did you see any Capitol Police in this

17  video?

18  **A**   Yes.  I saw a line of Capitol Police in the video.

19         MR. BRUNWIN:  Can we start it again?  It's fairly

11:16:51 20  short.

21  **BY MR. BRUNWIN:**

22  **Q**   Can you stop me when you see police officers?

23      (Video played.)

24  **BY MR. BRUNWIN:**

11:17:00 25  **Q**   Captain Mendoza, say stop when you see it.

1    **A**    Oh.  I'm sorry.  I thought -- I saw it already.  You can

2    rewind it a little.  I thought you were talking to him.  And I

3    see Capitol Police throughout the video.  But there is a line

4    of Capitol Police in front of the crowd.

11:17:19    5    **Q**    In front of the crowd?

6    **A**    Yes.

7    **Q**    And, based upon your services as a field commander, what do

8    they appear to be doing?

9    **A**    To keep the individuals -- the public from -- or the

11:17:33    10    individuals that breached the Capitol from protruding further

11    into the building.

12    **Q**    Did you see officers you recognize in this video?

13    **A**    Yes.  I recognize most of them, including my lieutenant is

14    actually in that video.

11:17:50    15    **Q**    Do you know what happened to these officers on January 6?

16    **A**    Yes.  They got overrun by the crowd.

17    **Q**    Can you explain what you mean by overrun?

18    **A**    So, basically, the officers were trying to hold the crowd

19    back.  The crowd then pushed past the officers and proceeded to

11:18:09    20    traverse throughout the building.

21    **Q**    And I may be asking the obvious, but is that a problem?

22    **A**    Yes.

23    **Q**    And how is that a problem?

24    **A**    We -- any time we don't have unauthorized people contained,

11:18:28    25    it is a problem because we then risk them, you know, injuring

1    officers or members of Congress or the vice-president.

2    **Q**    Did you hear a voice say, we are about to push through

3    these cops?

4    **A**    Yes.

11:18:43    5    **Q**    Is that something that you heard or similar to things you

6    were hearing on that -- on January 6th?

7    **A**    I personally can't testify to that.  I can just say that

8    I -- when I was in the building, it was loud.  It was loud.

9    There was a lot going on.  I can't really testify to specific

11:19:04    10    phrases that I heard because I wouldn't remember.

11    **Q**    Statements like "go to war" or "eff the deep state"?

12    **A**    Yeah.  I personally can't testify to hearing that with my

13    own ears.

14    **Q**    Let me ask you:  These incidents and the persons in the

11:19:30    15    building, did the Capitol Police take any action in response to

16    the events depicted with these persons in the building?

17    **A**    Yes.

18    **Q**    And what happened?  What did the Capitol Police do in

19    response?

11:19:42    20    **A**    So we created multiple police lines once those personnel

21    were in the building.  Eventually, we ended up pushing those

22    individuals back outside, but not prior to a lot of

23    defensive -- some defensive tactics, chemicals, and impact

24    weapons being utilized.

11:20:05    25    **Q**    Did the Capitol Police issue an evacuation order at some

1    point in time?

2    **A**    There was order issued to evacuate the chamber

3    specifically.

4    **Q**    And can you explain what that order was?

11:20:17  5    **A**    So Capitol Police gave the order to evacuate both the

6    chambers of the House and the Senate.  So that basically means

7    that we would relocate our dignitaries, meaning members of

8    Congress and the vice-president, to a separate location which I

9    prefer -- well, I can't identify, obviously, in the court.

11:20:43  10    **Q**    And the order to evacuate the chambers of Congress, if I

11    describe that correctly, did that impact the official

12    proceeding that was being conducted on January 6th?

13    **A**    Yes.  It temporarily stopped the official proceeding.

14        MR. BRUNWIN:  And at this time, Your Honor, I would

11:21:03  15    offer Exhibit 702, which is a stipulation of the parties, and I

16    would read that into the record.

17        THE COURT:  Very well.

18        MR. BRUNWIN:  On January 6th, 2021, a joint session of

19    the United States Congress convened at the United States

11:21:18  20    Capitol.  During the joint session, elected members of the

21    United States House of Representatives and the United States

22    Senate were meeting in both the House and Senate chambers of

23    the Capitol to certify the vote count of the electoral college

24    of the 2020 presidential election which had taken place on

11:21:38  25    Tuesday, November 3rd, 2020.

1          On January 6, 2021, the House of Representatives began

2     its session at approximately 12:00 p.m.; the Senate began its

3     session at approximately 12:30 p.m.; and the two houses met

4     together at approximately 1:00 p.m. in the House of

11:21:56  5     Representatives chamber to begin the joint session.

6     Vice-President Mike Pence was in the Capitol building and

7     presiding over the joint session.

8          At approximately 1:15 p.m., the House and Senate

9     adjourned to their separate chambers for up to two hours to

11:22:14 10     resolve a particular objection.

11          At approximately 2:12 p.m., Vice-President Pence

12     evacuated the Senate chamber, and approximately one minute

13     later, the senator, who had become the presiding officer in

14     Vice-President Pence's absence, declared that the Senate would

11:22:35 15     stand in recess.  Senators evacuated the Senate chamber.

16          At approximately 2:15 p.m., Speaker Nancy Pelosi, who

17     was presiding over the House of Representatives, evacuated the

18     House chamber.  Approximately 15 minutes later, the

19     representative, who became the presiding officer in her

11:22:55 20     absence, declared that the House would stand in recess.

21     Representatives then evacuated the House chamber.

22          The joint session was suspended.

23          The Senate and House resumed meeting at approximately

24     8:06 p.m. and 9:02 p.m., respectively.  The joint session of

11:23:20 25     Congress continued until approximately 3:14 a.m. on January 7,

1  2021 when it completed the certification of the electoral

2  college vote.

3            THE COURT:  All right.  That's admitted.  And again

4  that number is --

11:23:38  5            MR. BRUNWIN:  702, Your Honor.

6            THE COURT:  702.

7       (Government's Exhibit 702 was admitted in evidence.)

8  **BY MR. BRUNWIN:**

9  **Q**   Captain Mendoza, you testified that the chambers of

11:24:02 10  Congress were evacuated in response to the rioters in the

11  building; is that right?

12  **A**   Yes.

13  **Q**   And the official proceeding was interrupted?

14  **A**   Yes.

11:24:14 15  **Q**   And I'm going to ask you as well:  Did you review other

16  images in connection with your testimony here today?

17  **A**   Yes, sir, I did.

18  **Q**   And at this time, I would like to show you what's been

19  marked as Exhibit 632.  And I'm going to ask you first if you

11:24:38 20  recognize what's been shown marked as Exhibit 632.

21  **A**   Oh, I'm sorry.

22  **Q**   It may be helpful -- I think Mr. Haines can maybe enlarge.

23  **A**   No.  I see the sign.  I recognize it.  I thought you were

24  going to say something else.  But yeah.  That's the area

11:25:05 25  leading up to Speaker Pelosi's office.  She has some suites,

1    and that leads up to the suites to her office.

2    **Q**    And so this would be a pathway to House Speaker Nancy

3    Pelosi's office?

4    **A**    Yes.

11:25:23  5    **Q**    And does this appear to depict events on January 6, 2021?

6    **A**    Yes, sir.

7    **Q**    And are the persons in this image unlawfully within the

8    restricted area?

9    **A**    Yes, sir.

11:25:42  10        MR. BRUNWIN:  And I believe I was also going to offer

11    Exhibit 704, which is another stipulation, and then sit down.

12        THE COURT:  Okay.

13        MR. BRUNWIN:  If I may just check to make sure I have

14    the right one.

11:26:05  15    (Discussion off the record.)

16        MR. BRUNWIN:  Nothing further from this witness, Your

17    Honor.

18        We will do the stipulation with the other witness.

19        THE COURT:  All right.  Mr. Brunwin, at the conclusion

11:26:31  20    of the trial, I'm going to ask that you and

21    Ms. Sherman-Stoltz -- you all compare notes with the courtroom

22    deputy about what's been admitted and the record is complete.

23        MR. BRUNWIN:  Yes, Your Honor.  And I would at this

24    time like to move into evidence Exhibits 200 through 205, which

11:26:53  25    are the statutes and the portions of the Constitution.  And I

1    expect that would be without objection.

2            THE COURT:  All right.  Those are admitted.

3        (Government's Exhibit 200-205 were admitted in evidence.)

4            MR. BRUNWIN:  Thank you, Captain Mendoza.  You're

11:27:08  5    still there.

6            THE WITNESS:  Thanks.

7            THE COURT:  Okay.  All right.  Any cross,

8    Ms. Sherman-Stoltz?

9            MS. SHERMAN-STOLTZ:  Yes.  Thank you, Your Honor.

11:27:15 10                  **CROSS-EXAMINATION**

11    **BY MS. SHERMAN-STOLTZ:**

12    **Q**   Good morning.  If it's still morning.  I didn't even look

13    at the time as I came up here.

14            I'm going to take you back to the photo that the

11:27:33 15    government showed at the beginning of their direct examination

16    that had the red outline around the Capitol building.

17    **A**   Sure.

18    **Q**   You indicated to the Court that that red outline would

19    portray the restricted area that was in place?

11:27:48 20    **A**   Yes, ma'am.

21    **Q**   Now, and then you described that there was snow fencing and

22    bike racks.  Were they around that red perimeter area?

23    **A**   Yes, they were.

24    **Q**   All the way around it?

11:28:02 25    **A**   Yes.

```
 1    Q   So there would have been bike racks encompassing that
 2    entire red perimeter?
 3    A   Yes, ma'am.
 4    Q   And then the snow fencing as well?
 5    A   Snow fencing is used to reinforce the bike rack.  I can't
 6    say exactly which bike rack that was behind.  I'm not sure
 7    about that one.  But there was snow fencing behind the bike --
 8    we usually put it behind the bike rack in the front areas -- or
 9    the most dire areas, I should say.
10    Q   So the bike racks would have been -- I mean, can you -- do
11    you know approximately how long they were?
12    A   I think they're about -- I want to say they're about six
13    feet maybe long.  Yeah.  Don't quote me on that, though.
14    Q   So they would have been end to end -- as soon as one ended,
15    then they would be butted up against another one?
16    A   They are interlocked.  So there's, like, little prong-type
17    things.  Like, they're maybe about that long (indicating).
18    There's usually two per bike rack.  And then they interlock to
19    the other bike rack.
20    Q   Okay.  And so they were interlocked and connected all the
21    way around that perimeter with no openings?
22    A   So not -- no.  No opening.  We have ways to designate
23    specific areas where we would enter.  Those are identified to
24    the officers, and we use certain ties to tie them.  And there
25    is a certain way to cut them -- without, obviously, revealing
```

1    all of our security measures, but they should be interlocked

2    all the way around, yes.

3    **Q**    Now, at the time -- and could you just describe what snow

4    fencing is?  I know we may be familiar with it.  But --

11:29:57  5    **A**    Sure.  And I'm sorry.  Can I go back to the previous

6    question?

7         So when I say they were locked, every so many bike

8    rack are -- we use specific ties so we can cut them is what I

9    meant -- what I was -- I wanted to clarify.  And we don't

11:30:16  10    interlock them at those specific places.  We use other

11    mechanisms to tie them together.

12         If officers have to get through in an emergency, for

13    example, platoon commanders have the tool to quickly unlock it

14    at that location and -- instead of having to maneuver it to

11:30:35  15    unlock it.

16    **Q**    Understood.  Okay.  And now regarding the snow fencing, if

17    you could describe that, please.

18    **A**    It's literally, like, just a mesh-type fencing.  And it's

19    placed behind the bike rack to reinforce the bike rack itself.

11:30:51  20    So it just helps, like -- if you do interlock it, it then is --

21    can, like, basically tangle, I guess, the bike rack up to make

22    it a little bit more difficult for an individual to breach it.

23    **Q**    And that snow fencing, then, was reinforcing the bike

24    racks, again, all the way around the perimeter; is that

11:31:12  25    correct?

1    **A**   And I can't say for sure if it was all the way around the

2    perimeter.  We usually use that in specific locations.  So it

3    would have been on First Street in the west and on the Plaza,

4    the east front Plaza.  So I can't say for 100 percent sure

11:31:33  5    whether it was all the way around the perimeter.  And there was

6    also snow fencing -- once you go inside the perimeter, there

7    was snow fencing inside the perimeter as well.

8    **Q**   And how was that secured?

9    **A**   That was secured by -- there was some bike rack and then

11:31:49  10    also signs that just say area closed.

11    **Q**   And what would those -- and you spoke about the signs, and

12    the government showed a picture of what they looked like.  How

13    were the signs secured?  What were they secured on?

14    **A**   The signs are secured on the bike rack.

11:32:08  15    **Q**   Okay.  How tall are the bike racks?

16    **A**   I couldn't really tell you.  They are probably -- on me,

17    they're probably about -- I'm 5'3", and they're probably about

18    waist high.

19    **Q**   Okay.  And do you know how many of these signs were around

11:32:29  20    the perimeter?

21    **A**   No.  Hundreds.  The signs are usually every other bike

22    rack.  So -- but hundreds of signs around the perimeter.

23    **Q**   Okay.  And then --

24    **A**   If not more.  I'm sorry.  I don't want to over say

11:32:43  25    thousands, but at least hundreds.

Q    Okay.  You also described that there were uniformed Capitol
Police that were also stationed around the restricted area?

A    Yes, ma'am.

Q    Do you know how many there were?

A    That were specifically before the breach happened or after
or when?

Q    Yeah.  We could say how many there were, you know, maybe
allocated to be around the perimeter that day.

A    So we had eight platoons assigned that day.  I wouldn't say
all the platoons were full.  So maybe, like, six full platoons.
A platoon is 45 personnel.  But I really wouldn't be able to
say how many were deployed at the moment because they have
various assignments.

Some may have been on the bike rack.  Some may have
been -- civil disturbance units don't normally leave a
designated area unless there is civil disorder.  So they don't
typically stand on a bike rack.  So -- but no.  I can't
honestly tell you how many uniformed officers were deployed
around the bike rack.

Q    Okay.  So -- and that's helpful.  So you don't
normally when you're doing your assignments for the day, you
know, two platoons, divide everybody up so you've got 90
uniformed police officers positioned on the outside of the
perimeter -- that's not how it was done that day; is that
correct?

**A**    Like I say, I don't know.  I came from home.  So -- but
there are specific officers who were assigned -- in an event
like that, you have hundreds of assignments.  So I'm sure that
whoever was the platoon sergeant assigned, you know, X amount
of officers on the perimeter.  But I don't know that number,
and I don't know that anybody would be able to give you an
honest answer on that.

**Q**    Okay.  And I understand they were probably moving around at
various times, depending on what was going on, if there was a
call; would that be accurate?  If there was a call for maybe
assistance, then officers would relocate to where that call
was?

**A**    Depending on the officer.  So -- but yes.  I mean, some
officers -- the officers assigned to the perimeter normally
stay on the perimeter.  Now, when those officers got overrun,
obviously, I don't expect them to stay there.  Right?  But
officers assigned to a perimeter stay on the perimeter.  Then
you have your response officers.

So your response officers are the ones that respond
to.  Your perimeter officers are the ones that are already
there stationary -- they're there.  But could they have left?
To answer your question, of course.  I would never expect any
officer to stay in an area where they are overrun by people.

**Q**    So -- and that kind of segues us into some of my next
questions.  At some point in time, those bike racks came down;

1    is that correct, were knocked over, were moved?

2    **A**    Yes, ma'am.  Some of them did.

3    **Q**    Do you know what areas that happened?

4    **A**    Well, they -- there were people that pushed through the

11:35:57  5    bike racks at various locations.  So that was all throughout

6    the complex.  And, you know, some of the -- I know what you're

7    getting at.  Some of the bike rack maintained its integrity and

8    some of it didn't.  So --

9    **Q**    Okay.  And you used the term "overrun."  Can you just kind

11:36:16  10   of describe that a little bit more what you mean by that when

11   you use that word?

12   **A**    Sure.  So if I have -- a platoon of officers is 45.  But

13   let's say I have half a platoon of officers on any designated

14   location.  Once those officers are -- that line is breached or

11:36:35  15   somebody pushes through their police line that they've

16   established, then at that point, those officers have to regroup

17   and then they have to reallocate themselves to another

18   position.

19        And normally what we do is once our line, you know,

11:36:55  20   gets compromised, then we will basically come up with a plan to

21   reallocate somewhere else and designate another line.  And then

22   we just keep doing that until we can hold a line.

23   **Q**    So as these bike racks are being displaced or pushed down,

24   is it safe to say that people were kind of flooding in to the

11:37:23  25   restricted area?

1    **A**    Yes.   Once the west front was breached at 12:53, then it

2    created an entire chain of events.

3    **Q**    Okay.   So 12:53 you would say would have been the initial

4    breach of the perimeter?

11:37:40  5    **A**    Yes.

6    **Q**    And had you arrived at that point?

7    **A**    No, ma'am.   I hadn't.

8    **Q**    Do you recall what time you arrived?

9    **A**    At the Capitol itself or to work?

11:37:52  10    **Q**    At the Capitol.   Because I know you were, like, headed

11    towards the DNC first and then you kind of redirected.

12    **A**    Right.   I arrived at the Capitol maybe around 14:15,

13    14:00ish.   Somewhere around there.   Between 14:15 and -- 14:00

14    and 4:15 -- or I'm sorry.   2:00 p.m. and 2:15 p.m.

11:38:17  15    **Q**    I was just going to clarify for nonmilitary.   So around

16    2:15?

17    **A**    Yes.

18    **Q**    And you said you usually kind of went up to where the

19    Rotunda was, the steps leading up to the Rotunda?

11:38:27  20    **A**    I didn't go up there.   As soon as I pulled up on the east

21    front, I saw the steps -- there were people on the steps.   I

22    mean, I saw that the steps had been breached.   So I didn't --

23    that's the route I was going to take, but I did not.

24    **Q**    Okay.   You initially described that the restricted area was

11:38:47  25    in place for two reasons.   You said just due to, I guess, COVID

1  restrictions; is that why the -- one of the reasons?

2  **A**   No, ma'am.  Let me clarify.  The -- so the building was

3  closed to the public due to the pandemic.

4  **Q**   Okay.  Thank you.

11:39:03  5  **A**   Yes, ma'am.  And also due to the certification of the

6  electoral votes.  The perimeter itself was just due to the

7  certification of the electoral votes.  It was put up the night

8  prior.

9  **Q**   Is that -- I guess when you're putting up a perimeter

11:39:25  10  around the Capitol for some type of event or to keep the public

11  out, is that typically what you use are the bike racks and the

12  snow fence in order to maintain the integrity of that area?

13  **A**   Yes, ma'am.

14  **Q**   How about as far as uniformed Capitol Police?  Is that

11:39:43  15  typically the number of Capitol Police that you would use for

16  an event, or did you have more than what you would normally

17  use?

18  **A**   We had -- I'm sorry.  We actually had more that day.  We

19  activated all of our civil disturbance units that we had

11:39:58  20  available.  The only caveat was there were some people that

21  were sick with COVID, so those people could not come to work.

22  But we actually activated more than we would normally activate

23  for an event, a regular event.  An event where we have all

24  hands on deck, which is what that was supposed to be, would be,

11:40:18  25  like, state of the union, inauguration, and a protest like the

1    one we had -- or the one we were expecting, I should say.

2    **Q**    So at this time that you arrived at the Capitol, 2:15,

3    already the breach of the perimeter has occurred.  So there --

4    would you say it is fair to say that there are individuals that

11:40:45  5    are still kind of coming onto, you know, the Capitol grounds

6    where there's really no more bike racks in place to try to

7    prevent them from, you know, coming inside?  Would that be

8    accurate?

9    **A**    It would be accurate that there were still personnel coming

11:41:03  10    onto the grounds.  And like I said before, some of the bike

11    rack was compromised.  Some was still in place; some was not,

12    so --

13    **Q**    Okay.  The government showed their Exhibit 302.  And that

14    was the video of the initial breach over -- you know, the

11:41:33  15    camera showing the Senate wing doors.  And you described kind

16    of what was taking place at that point in time.  But that's --

17    is it correct that you weren't actually there when that

18    happened?

19    **A**    No, ma'am.  I was not.

11:41:45  20    **Q**    And where were you -- well, if -- that would have been 2:12

21    to 2:13 I believe is what was said, so you weren't maybe even

22    possibly in the building yet; is that correct?

23    **A**    Correct.

24    **Q**    Do you know where Mr. Calhoun was at that time?

11:42:09  25    **A**    No, ma'am.

1    **Q**   Do you recall seeing Mr. Calhoun at any point in time while

2    you were there and inside?

3    **A**   No, ma'am.

4    **Q**   And then they showed a video of the Crypt or as you

11:42:23  5    described as the Crypt in their Exhibit 607.

6         Do you know where Mr. Calhoun was at that time?

7    **A**   No, ma'am.  I do not.

8    **Q**   You spoke about an alarm that, you know, was going off or

9    would have been going off when either -- well, let me ask you:

11:42:46  10   When would the alarm have engaged, started going off?  And I'm

11   referring specifically to the one in that video of the breach

12   of the Senate wing doors.

13   **A**   Sure.  When you saw the light come on, that's when the

14   alarm would have went off.  So there's a mag lock.  Once that

11:43:03  15   mag lock at the top disengages, that's when the alarm goes off.

16   **Q**   Okay.  And does the alarm just go off, like, indefinitely?

17   **A**   It will go off until an officer re-secures the door.  It

18   should go off until an officer re-secures the door unless the

19   alarms are broke or something like that.  But yes; it will

11:43:20  20   continue to go off until it's reset.

21   **Q**   Do you know specifically if that alarm continued for any

22   length of time?

23   **A**   I will not be able to testify to that specifically.  But --

24   because I'm not hearing it on the video.  But -- obviously,

11:43:37  25   there's no sound.  But looking at the light, I would say yes

```
 1   because, like I said, when the light is on, the alarm is going

 2   off.

 3   Q   Okay.

 4   A   There's an audible and a visual of that alarm.

 5   Q   So the light and then the sound?

 6   A   Yes.

 7   Q   And if the light is on, is it safe to say that the sound is

 8   on as well?

 9   A   Yes, ma'am.

10   Q   And vice versa?

11   A   Yes.

12   Q   Now, you described -- and I didn't write down.  I should

13   have.  But, like, did you refer to it as like an evacuation

14   order?

15   A   Of the chambers, yes.

16   Q   Okay.  And do you recall the time that that was, you know,

17   either signed, put into effect, implemented?

18   A   I don't know the time off the top of my head.  It should be

19   on the official timeline.

20   Q   Was that after you arrived, or was that already in effect

21   once you got there?

22   A   I would not be able to say for sure.

23   Q   Okay.  And what caused that order to come about?

24   A   There -- any time -- well, there was a breach of the

25   Capitol building.  So any time we get a breach of the Capitol
```

1    building or any of the buildings, we have to assess that.  And

2    so due to the significance of the amount of people that were in

3    the building that were not screened -- we didn't know whether

4    they had weapons on them, those type things -- that was the --

11:45:08  5    that's why the chambers would have been evacuated.

6    Q    So more so just due to the volume of individuals and, as

7    you said, the volumes of individuals that had not been

8    screened?

9    A    Yes.  Volume, the actions of individuals.  I mean, the

11:45:27  10   totality of the entire circumstance.

11   Q    Okay.

12   A    So that's a decision that has to be made by, you know -- it

13   can be made by any Capitol Police officer, really, but yeah.

14   Q    Describe, please, what you mean by screened.  What process

11:45:42  15   is that?

16   A    In order to enter into the building itself, you have to go

17   through an X-ray -- well, you have to put your bags and

18   anything that you have that is authorized on the X-ray machine,

19   and the officer has to look at it to make sure you don't have

11:45:57  20   any contraband.  Then you walk through a magnetometer or metal

21   detector to ensure you don't have any weapons on you.  Those

22   individuals, the public goes through the Capitol Visitors

23   Center.

24   Q    And you said that that was -- I don't want to put -- where

11:46:15  25   is the Capitol Visitors Center?

1    **A**    On the east side of the Capitol underground.  So you can

2    get there from -- if you walk in on First Street, there are

3    steps that go down.  You can get there that way.

4    **Q**    Okay.  Would you happen to know how long that screening --

11:46:32  5    that -- the particular screening process that's in place now --

6    do you know how long that's been in place for?

7    **A**    I have no idea.  It's -- at least the 20 years I've been

8    here.  Yes.

9    **Q**    Okay.  And that's always in place when it's open to the

11:46:51 10    public; is that correct?

11    **A**    Yes.  365 days a year, 24/7.

12    **Q**    And typically, the Capitol would have been open, but not

13    for the event that was taking place that was -- that caused it

14    to be closed; is that correct?

11:47:12 15    **A**    Not -- correct.  Not for the certification of the electoral

16    votes.  It would have been closed because that is a joint

17    session of Congress.  So the official visitors and official

18    business only basically.  And also, again, the pandemic -- the

19    building was already closed due to the pandemic.

11:47:31 20    **Q**    Do you know how long it had been closed for?  Had it been

21    since pretty much March of 2020?

22    **A**    Yes.

23    **Q**    Okay.  Now, was the perimeter in place?  No.  I'm sorry.

24    You said it just went into place the night before?

11:47:51 25    **A**    Correct.  You could still -- outside of the event that day,

 1    you could still traverse the grounds itself.  You just couldn't

 2    go inside the building.

 3    Q    Okay.  Perfect.  Now, when you arrived or even throughout

 4    the entirety of the time that you were on the grounds or inside

 5    of the building, you referred to the individuals or you've

 6    referred to the group as, you know, rioters.

 7         Would you -- how would you describe a rioter?

 8    A    Well, the definition of a riot is where four or more

 9    people -- in D.C. is where four or more people engage in civil

10    disorder.  So there were definitely more than four people

11    engaging in civil disorder that day.

12    Q    Is it fair to say, though, that there were many people that

13    were not engaging in civil disorder that were on the grounds?

14    A    I would -- yes.  That's fair to say.  Some individuals --

15    they breached the grounds but didn't necessarily engage in

16    civil disorder, yes.

17    Q    But hypothetically, if they weren't one of the initial

18    breachers and they're walking along an area that is no longer,

19    you know, blocked off by bike racks and they just kind of enter

20    in, would you at that point even say that they breached --

21    A    Well, can I go back?  So I try to refer to people as

22    unauthorized individuals 90 percent of the time.

23    Q    Okay.

24    A    I say rioters when I feel the need to say that.  But to

25    answer your question that you just asked, if the individuals --

1    you're saying if the bike rack was gone, those individuals who

2    just walked in -- I would -- so, like I said before, there's --

3    there's no way a reasonable person could have thought that once

4    they got into that specific location it was okay to be there.

11:50:06  5         There was -- I was in there.  There was a lot of

6    noise, a lot of yelling, a lot of pushing.  So for an

7    individual that just walked in there, you know, they should

8    have known they shouldn't have been in there.

9    Q    So -- and do you mean in there as in in the building or

11:50:24  10   just on the grounds?

11   A    Both.

12   Q    Like, through that perimeter area?

13   A    Both.  There was a lot -- now, most of the fighting was

14   going on on the west front.  So if you approached from the west

11:50:36  15   front, there's obviously an issue there.

16   Q    So if you're not approaching from the west front and you're

17   approaching from another area and there's, let's say, a large

18   gap in the bike racks and you see people milling about -- I

19   mean, as a reasonable person, would you think that it's still

11:50:54  20   no longer, you know, authorized to kind of go onto the grounds

21   if you're seeing other people there?

22   A    No.  In my honest opinion, I -- that -- to me, there's no

23   way you couldn't have known that was not authorized.

24        I was on the east side of the building and there was

11:51:10  25   definitely -- we were trying to push people down the stairs to

1    get them, you know, to clear so that we could push people out

2    of the building.  So I just -- with all the chaos that was

3    going on there, I would definitely not be able to testify to

4    the fact that you should not have known.

11:51:25  5         I mean, I think my four-year-old niece would have

6    known that was not a good place to be at that moment.

7    Q    Okay.  Now, of the individuals, the unauthorized

8    individuals that you came across or saw inside of the Capitol,

9    would you say that there were some that were not, you know,

11:51:45  10   acting upon any type of civil disorder and were just kind of

11   milling about?

12   A    I would certainly say that there were individuals there

13   that were not engaging in civil disorder, specifically, as in

14   our definition that we use for civil disorder.  But, again, I

11:52:06  15   don't know, like, about people milling about or anything like

16   that.  I can't say yes or no to that because I -- like I said,

17   I was very focused on getting people out of the building.  And

18   so yeah.  I can't really say -- answer that one way or the

19   other.

11:52:21  20   Q    Do you know how many people entered into the Capitol that

21   day?

22   A    I don't have a number, no.

23   Q    Do you have an estimate?

24   A    I'm going to be guessing if I give you an estimate.  I

11:52:39  25   mean, definitely hundreds.  Maybe thousands.  But, again, I

1    don't know a specific number.

2    **Q**    Back to the evacuation of chambers.  Would that have

3    applied to both House and Senate?

4    **A**    Yes, ma'am.  And can I clarify one thing, too?

11:53:02  5    **Q**    Yes.

6    **A**    You asked about an individual milling about or whatever.  I

7    think I said this earlier in my testimony, but there were

8    definitely flash bangs and OC, CS, pepper ball, those type of

9    things being deployed.  So I just would find it very difficult

11:53:20  10    to say that anybody would know they should not have been there

11    [sic].

12    **Q**    Were those being deployed inside and outside?

13    **A**    So you can't -- well, you could deploy flash bangs inside

14    the building because we've done it.  The flash bangs were being

11:53:37  15    deployed outside.  There were chemicals being deployed inside

16    and outside, yes.

17    **Q**    And, I mean, throughout the entirety of the day or more so

18    at the -- you know, the start of the initial breach?

19    **A**    It was until we got everybody out of the building.  There

11:53:53  20    was munitions being deployed throughout the event.

21    **Q**    Okay.  So inside and outside throughout the -- until you

22    were able to get everybody out?

23    **A**    Yes.  And I can say inside there was more hands-on going

24    on, but there were munitions deployed inside as well.  But lots

11:54:18  25    of pushing, shoving, that type of thing.

1    Q    But not everybody, you said, was engaged in that type of

2    behavior, correct?

3    A    Correct.

4    Q    And the evacuation order for chambers -- I apologize.  I'm

11:54:31  5    not sure if you answered -- was that for both House and Senate?

6    A    Yes, ma'am.

7    Q    And that was, as you said, just due to, you know, the

8    volume of people that were inside the Capitol, the behavior of

9    some that were inside the Capitol, and things of that nature,

11:54:54  10    right?

11    A    Yes.  The totality of the entire circumstances.

12    Q    And you are not sure if that was in place when you arrived?

13    A    Yeah.  I don't know what time the chambers was evacuated.

14    I don't have that off the top of my head, but I think it's on

11:55:07  15    the official timeline.

16    Q    So more people were still coming into the Capitol even

17    after the House and the Senate chambers had been evacuated --

18    recessed and evacuated; is that correct?

19    A    Yes.  It was.  And I'd like to make sure that I'm clear on

11:55:30  20    the fact that regardless of when you came in, for you to remain

21    in that building at any point, even if you came in at 7:00

22    p.m., at any point, we could not start the -- restart the

23    certification of the electoral votes until we knew that

24    building was secure.

11:55:48  25        We did bomb sweeps, K9 sweeps, and the like.

So regardless of when you came in, if you were there
at any moment, you were preventing the certification of the
electoral votes.

Q   So, at that point, preventing it from restarting?

A   Correct.  You know, we can't reconvene Congress until we
know the building is secure.

MS. SHERMAN-STOLTZ:  If I can just have a moment of
the Court's indulgence.

THE COURT:  Of course.

(Discussion off the record.)

MS. SHERMAN-STOLTZ:  We have no additional questions
for this witness, Your Honor.  Thank you.

THE COURT:  All right.  Any redirect?

MR. BRUNWIN:  I'm going to try not to say briefly.

THE COURT:  Oh, boy.

## REDIRECT EXAMINATION

**BY MR. BRUNWIN:**

Q   Captain Mendoza, after everything happened, there was a
point in time probably -- you had talked about the bike racks.
And I imagine during the course of those, bike racks had been
broken apart, scattered, probably signs scattered.  Was there a
point in time where the officers went about collecting --
trying to collect and replace and repair things?

A   On January 6th?

Q   Or thereafter at some point in time.

**A**   So the Architect of the Capitol repaired -- did -- if I'm
understanding your question correctly, the Architect of the
Capitol came that night after everything was over or early that
morning, I should say, and started making repairs or cleaning
up.

**Q**   And those remnants of fencing, snow fencing, bike racks,
signs, I assume those would have been probably littered all
over the Capitol grounds and Capitol buildings themselves; is
that fair to say?

**A**   On the grounds.  None of the bike racks came into the
building.

**Q**   On the grounds?

**A**   On the grounds.

**Q**   But even if they were lying on the ground, they would still
be visible to the public, people trying to, you know, enter
that area, the restricted area; is that fair to say?

**A**   Sure.

**Q**   And that would be true of the area closed signs; the
hundreds of area closed signs presumably would have been
scattered?

**A**   I -- so when I saw the aftermath, it appeared that the area
closed signs were still on the bike rack.  I didn't see any of
them -- they were secured on there pretty well.  But -- I
didn't see any of them on the grounds per se, but they were on
the bike rack still.

1    Q    And you said this was an all-hands-on-deck moment.  Did I

2    understand you correctly?

3    A    Yes.

4    Q    Is it correct to understand that to mean everybody who was

11:59:39  5    able was called in to respond?

6    A    All available officers.  When we say all hands on deck, we

7    still, obviously, reserve officers for contingency, like,

8    working midnight shift because, you know, we're 24-hour

9    operation.  But yes.  All available officers.  And those that

11:59:56  10    weren't sick with COVID.

11            MR. BRUNWIN:  Nothing further, Your Honor.

12            THE COURT:  All right.  Thank you.  May the witness be

13    excused?

14            MS. SHERMAN-STOLTZ:  Your Honor, may I ask one

12:00:07  15    question only having to do with --

16            THE COURT:  All right.  And then will we be able to

17    excuse this witness?  All right.  Very well.  One question

18    relating to the redirect.

19                        **RECROSS-EXAMINATION**

12:00:15  20    **BY MS. SHERMAN-STOLTZ:**

21    Q    The government asked as far as, like, the bike racks, you

22    know, being kind of moved, strewn about, kicked over -- if they

23    would still be visible.

24            Did you, yourself, walk the perimeter at any point of

12:00:30  25    time and confirm that they would actually still be visible?

1    **A**    No, ma'am.  I did not.

2              MS. SHERMAN-STOLTZ:  Okay.  No additional questions.

3              THE COURT:  All right.  Thank you.

4              Thank you, Captain.  You're excused.

12:00:40  5              THE WITNESS:  Thank you, Your Honor.

6         (Witness excused.)

7              THE COURT:  All right.  So I do have another matter

8    that's scheduled for 12:30.  At least one of the attorneys

9    often isn't on time.

12:00:55  10              If the court reporter and the courtroom deputy and all

11    of you can continue for another 30 minutes or so, I would

12    prefer to do that.

13              If anyone needs a break, I understand.  We can take a

14    short break and come back.  Mr. Calhoun?  Anybody?  Anybody

12:01:08  15    want a brief break and we come back?

16              MS. MARTIN:  Can we have a five-minute break, Your

17    Honor.

18              THE COURT:  Sure.  We'll take a five-minute break.

19              Let me make one other point.  Mr. Brunwin, there

12:01:20  20    haven't been a lot of objections, but I do want you to be

21    careful about leading the questions on direct, about testifying

22    yourself.  And if you can, please instruct your witnesses to

23    answer the question and only the question.  You know, this

24    witness had a tendency to come back and want to add additional

12:01:40  25    information.  They need to respond only to the question and not

1    go on with narratives.  All right?  So warn the officers

2    because I'm going to start jumping in.  All right?

3              MR. BRUNWIN:  Very well, Your Honor.

4              THE COURT:  Okay.

12:01:56  5              COURTROOM DEPUTY:  All rise.

6         (Short recess.)

7              COURTROOM DEPUTY:  Good afternoon, Your Honor.

8              THE COURT:  Mr. Brunwin, is this you again or

9    Ms. Martin?

12:10:58  10              MS. MARTIN:  No, Your Honor.  I will be doing the next

11    witness.  He actually just went for a restroom break.

12              THE COURT:  No problem.

13              MS. MARTIN:  Oh.  And while we're waiting for him, if

14    we could just address 300 and 301, I believe -- I just want to

12:11:11  15    be clear.  Have they been admitted in their entirety yet?

16              THE COURT:  No.  I am not making any decision on

17    what's admitted at this point.  I mean, I'm going to hear the

18    testimony.  I think if the defense is in agreement, I think

19    they said -- I forgot what you said, Ms. Sherman-Stoltz, about

12:11:27  20    the length.  You agree that certain portions are relevant; is

21    that correct?

22              MS. SHERMAN-STOLTZ:  Yes.  There are certain

23    portions -- and I've got the timestamps for them -- that we

24    would say would be relevant.

12:11:38  25              THE COURT:  Well, at a minimum, I will admit those

1    portions.  Whether I allow more, I'm waiting to make that

2    determination.  You can elicit the testimony.  She can object

3    when it is about portions of the video she thinks shouldn't be

4    admitted.  I'm just going to reserve ruling on this until I

12:12:01  5    have a chance to hear all the evidence.

6                MS. MARTIN:  I understand, Your Honor.

7                The point I'm trying to make is we will not be playing

8    in full because those are ones Your Honor has already viewed.

9                THE COURT:  Understood.  But if I decide to go back

12:12:12  10    and watch them, they're in the record.  And for any appeal, if

11    the whole video is in the record and there's irrelevant

12    information on there, that could prejudice Mr. Calhoun on

13    appeal.  So I think it's important that I make clear for the

14    record whether I'm admitting them in their entirety or

12:12:31  15    portions.  And I will do so.  But I don't see any need to do so

16    until -- frankly, until I rule.  Do you all disagree?

17                MS. MARTIN:  I don't disagree, Your Honor.  I would

18    just like the opportunity to address whether --

19                THE COURT:  Sure.  Sure.  And yeah.  You mean have an

12:12:46  20    argument on it?

21                MS. MARTIN:  Yeah.

22                THE COURT:  Yeah.  Absolutely.  We can do that at the

23    conclusion of the trial or you all -- we haven't talked about

24    whether it will be post-trial briefing.  I think it -- I think

12:12:58  25    Ms. Sherman-Stoltz wanted to do that.  So it could even be

1    addressed in that as well.  All right?  I will give you a

2    chance to make your argument.

3              MS. MARTIN:  Thank you.

4              THE COURT:  All right.  So which witness is this?

12:13:08  5              MS. MARTIN:  Your Honor, we're going to call Special

6    Agent Timothy Armentrout to the stand.

7              THE COURT:  All right.

8         (Witness sworn.)

9              THE COURT:  Good afternoon.

12:13:35  10              THE WITNESS:  Good afternoon, Your Honor.

11                        **DIRECT EXAMINATION**

12    **BY MS. MARTIN:**

13    **Q**   Good afternoon, Agent Armentrout.

14              Can you please state and spell your name for the

12:13:47  15    record?

16    **A**   Timothy Armentrout, T-I-M-O-T-H-Y  A-R-M-E-N-T-R-O-U-T.

17    **Q**   And where do you work?

18    **A**   Special agent with the FBI.

19    **Q**   How long have you been a special agent?

12:14:07  20    **A**   Over 13 years.

21    **Q**   And where is your current assignment?

22    **A**   I'm assigned to the Atlanta field division, but I am

23    assigned to a, like, a sub office -- what we call residency

24    agency -- in Albany, Georgia.

12:14:21  25    **Q**   How big is that agency division?

1    A    Currently, three agents that work there, and we cover 13

2    counties in southwest Georgia.

3    Q    And back in January 6th of 2021, how many agents were

4    there?

12:14:32  5    A    There were two agents assigned at that time.

6    Q    And you were one of them?

7    A    Yes.

8    Q    What did you do before you became an agent?

9    A    Before I was an agent, I was an intelligence officer in the

12:14:41  10    Marine Corps for eight years.

11    Q    Were you working in your capacity as a field agent on

12    January 6, 2021?

13    A    I was.

14    Q    And what were you doing that day?

12:14:50  15    A    It was Friday.  Typically, Fridays in our office were admin

16    days, so we were in the office, writing reports, covering

17    administrative issues, things like that.

18    Q    What, if anything, of note happened on January 6th?

19    A    So when in the office, we also usually have the news

12:15:07  20    playing.  We became aware there was an event occurring at the

21    Capitol that day.

22    Q    And you were watching that on the news?

23    A    Correct.  We were typing our reports, paying attention on

24    the news.  Understood that the election was going to be

12:15:22  25    certified that day and that there was a protest and,

1    eventually, that that protest led to the Capitol being

2    breached.

3    Q    And at that time, were you involved in any of the FBI's

4    investigation of January 6th?

12:15:34  5    A    No, ma'am.  At that point, my knowledge was just what you

6    could see on the news.

7    Q    Anything else of significance happen on January 6th?

8    A    So later that evening on the Sixth, I began to receive text

9    messages from a police chief in the Americus Police Department,

12:15:57  10   stating that he had become aware from local citizens that a

11   member of their community had traveled to the Capitol and

12   participated in what they were referring to as the Capitol

13   riots.

14   Q    And where is Americus?

12:16:10  15   A    Americus, Georgia is about an hour north of Albany,

16   Georgia.  In southwest Georgia, Sumpter County, Georgia.

17   Q    And how did you receive this information from the chief of

18   police?

19   A    Initially, I believe it was a text message, and then it was

12:16:24  20   followed by a phone call.

21   Q    And what was the content of the text message?

22   A    Content -- I don't remember the specific content, but

23   basically he was saying that an individual, Mr. Calhoun, was --

24   had traveled -- he believed had traveled to the Capitol and

12:16:43  25   participated in the riot, and there was social media

1    screenshots of Mr. Calhoun being there.

2    Q    When you say social media screenshots, do you know whose

3    account it was?

4    A    There were screenshots -- I don't know -- so the

12:16:59  5    screenshots were of Mr. Calhoun's Facebook and Parler accounts,

6    showing postings from the Capitol.

7    Q    And had you heard that name before, William Calhoun?

8    A    I had.

9    Q    When?

12:17:15 10    A    In early to mid-November -- I want to say approximately the

11    12th -- our office received a tip for -- we call it a tip --

12    that someone had wrote in, stating that an individual by the

13    name of Mr. Calhoun was posting concerning things on social

14    media and they were calling our attention to it.

12:17:45 15    Q    And what happened with that tip?

16    A    So the tip -- the other agent in the office at the time --

17    it was a two-man office.  He had been a new agent right out of

18    the academy, so I had been his training agent.  So at that

19    point in time, his training probation period was over, but he

12:18:07 20    still came to me for guidance on things.  So he received the

21    tip.

22         He came to me and asked me how to handle it.  And I

23    recommended he reach out to the state and local law enforcement

24    in that area, determine if they had any knowledge of

12:18:20 25    Mr. Calhoun, if they had dealt with him, and that was a good

1    place to start.

2    **Q**    And did you do that?

3    **A**    We did.  We reached out to the local police chief, and we

4    reached out to the local Georgia Bureau of Investigation, what

12:18:39    5    we call, special agent in charge of their local field office.

6    **Q**    And what ultimately happened with that tip?

7    **A**    So, ultimately, from the FBI, we were notified -- in our

8    conversations with local and state partners, they referred us

9    to the United States Secret Service office.  They have an

12:18:56    10    office in Albany, Georgia, as well, and had stated they had

11    already had conversations concerning these posts on social

12    media with the Secret Service.

13         We conferred with the Secret Service.  They said they

14    were aware of the issue; they were monitoring the issue.  So at

12:19:11    15    that point in time, we said if there's anything you need from

16    us, please don't hesitate to ask.  If it escalates, let us

17    know, but we are going to consider the matter closed because

18    you're handling it.

19    **Q**    So at that point, your action on that tip was over?

12:19:27    20    **A**    Right.

21    **Q**    The next time you heard this name was when you received the

22    tip from the Americus chief of police?

23    **A**    Correct.

24    **Q**    When did you receive the message and, it sounds like,

12:19:36    25    talked to the police chief on the phone?

**A**   So at that time, I reached out to my supervisor.  My

supervisor sits in Columbus, Georgia and supervises several

offices, including mine.  I reached out to him and notified him

that I was being notified by local law enforcement that an

12:19:54   individual from our territory had potentially traveled and

participated in the Capitol riot.

**Q**   And what did you do after you contacted your supervisor?

**A**   I also contacted the assistant United States attorney for

the Middle District of Georgia, the Albany division, one of the

12:20:10   AUSAs there that we have a really good relationship with.

Notified her that this also had occurred.

And at that point, it was more of a -- we were more in

an information collecting and seeking guidance.  We didn't know

how this was going to be handled or what actions we were going

12:20:28   to be asked to take.

**Q**   What actions did you ultimately take with respect to that

investigation?

**A**   So I say it was either the following -- on Saturday -- so

that was Friday and Saturday we began reaching out to local law

12:20:45   enforcement and local officials that we had been hearing from.

And, ultimately, we opened an investigation.  I believe the

investigation technically wasn't open until the Monday when we

returned from the office.  But it was clear that we were

opening an investigation at that point in time.

12:21:00   **Q**   And you said that you received social media posts.  So at

1    any point, did someone from the FBI review to see if he had a

2    social media account?

3    **A**    We did.  I think the evening of the Sixth we attempted to

4    locate his Facebook account.  But I believe it was not

12:21:22  5    available at that time.  I don't know if he took it down or

6    Facebook took it down.  We could not access it to see what was

7    posted.

8    **Q**    All right.  And you said you had opened an investigation,

9    you think, on Monday.  Are you the primary case agent assigned

12:21:34  10    to that investigation?

11    **A**    Yes, ma'am.

12    **Q**    Aside from the text message that you received from the

13    Americus Police Department, did you receive any other

14    information from outside sources regarding Mr. Calhoun?

12:21:48  15    **A**    Yes.  The Georgia Bureau of Investigation special agent in

16    charge who we had originally conferred to on the tip reached

17    out to us and multiple members of local community also -- I

18    won't say reached out to us but they -- at times, it was not

19    directly; it was via local law enforcement.  So they would

12:22:08  20    reach out, and they would be referred to us, and then we would

21    make contact with them.

22    **Q**    What kind of information were they providing local law

23    enforcement and then, subsequently, the FBI?

24    **A**    It was -- I'm hesitant to say in its entirety, but I

12:22:29  25    believe it was generally in its entirety screenshots of his

1  social media posts.  The local D.A.'s office, the district

2  attorney -- we made contact with him.  He eventually provide a

3  recorded phone call between himself and Mr. Calhoun.  And we

4  received information from an assistant district attorney for

12:22:50  5  text message and comments made by Mr. Calhoun in the court.

6  And we received court transcripts from those proceedings.

7  **Q**   When you say court transcripts, why would you have received

8  court transcripts regarding Mr. Calhoun?

9  **A**   So he was a lawyer or he is a lawyer in Sumpter County.

12:23:13  10  And he was a defense attorney or is a defense attorney.  And he

11  had made comments in open court in relation to the Capitol

12  riots.  And this is after the riots, after he returned back and

13  continued working.  The assistant D.A. made us aware of them,

14  and then we sought out that record.

12:23:35  15  **Q**   Now, you said the information that was received by citizens

16  and then passed along to the FBI were a lot of social media

17  posts, correct?

18  **A**   That's correct.

19  **Q**   Were those posts that you received from these other

12:23:46  20  citizens consistent with the original post that was included in

21  the text message from the Americus chief of police?

22  **A**   Correct.

23  **Q**   What did you do after you received the tips from the

24  citizens, from the D.A., from the assistant D.A.?  What did you

12:24:02  25  do then?

1    **A**    So we were working the investigation.  We were conferring

2    with the assistant U.S. attorney.  We had drafted search

3    warrant affidavits for social media accounts.  And this is kind

4    of when -- contextually, this is kind of when big government

12:24:23   5    kind of caught up and they were providing more guidance that

6    these cases would be handled out of Washington field office.

7         So those warrants began to circulate outside of the

8    Middle District.  So we were a little bit delayed.  We began to

9    conduct surveillance on Mr. Calhoun to locate him.  And those

12:24:41  10    affidavits for search warrants -- as they were pending, in

11    conference with the assistant U.S. attorney, we determined that

12    a complaint was necessary.

13    **Q**    And by complaint, do you mean a complaint for an arrest

14    warrant?

12:24:57  15    **A**    Correct.  And there was some back and forth on where that

16    complaint should be issued.  And I only say that because that's

17    kind of why there was a little bit of delay.  That was -- I was

18    not involved in that conversation.  That was attorney

19    conversation.  But we sought out a complaint, and there was

12:25:15  20    some delay of us getting a warrant because they were conferring

21    between Middle District of Georgia and Washington, D.C.

22    District.

23    **Q**    And, ultimately, was an arrest warrant sought by the FBI

24    for the arrest of Mr. Calhoun?

12:25:29  25    **A**    It was.

1      Q    And did you participate in that arrest?

2      A    Yes, ma'am.

3      Q    So you personally interacted with Mr. Calhoun?

4      A    Yes, ma'am.

12:25:37  5      Q    Do you see him in the courtroom today?

6      A    Yes, ma'am.

7      Q    Where?

8      A    He is sitting in the white-collared shirt and blue suit,

9      glasses on, at the table.

12:25:46  10           MS. MARTIN:  Your Honor, at this time I would like to

11     reflect in the record that an in-court ID has been made of the

12     defendant.

13           THE COURT:  Okay.  It will reflect so.

14     **BY MS. MARTIN:**

12:25:54  15     Q    And just going back to the basics, do you know if

16     Mr. Calhoun goes by William Calhoun or if he goes by another

17     name?

18     A    I believe he goes by McCall is what I understand he goes

19     by.

12:26:06  20     Q    That is his middle name?

21     A    Correct.

22     Q    Now, you referenced social media warrants and the fact that

23     there was some back and forth between the field offices on who

24     was ultimately going to do those.

12:26:20  25           Did you ultimately seek social media warrants of

1    social media accounts for Mr. Calhoun?

2    **A**    We did.  We sought warrants for his Parler and his Facebook

3    account.

4    **Q**    Did you receive responsive content from Facebook and Parler

5    in response to those search warrants?

6    **A**    We did.

7    **Q**    Let's look at the Parler account first.

8            Do you recall the date the account was created?

9    **A**    It was mid-October.  I believe was the 16th.

10   **Q**    Of what year?

11   **A**    2020.

12   **Q**    So that was pretty recent to the start of then your

13   investigation of his conduct on January 6th?

14   **A**    That's correct.

15   **Q**    And were the returns you received from Parler consistent

16   with the Parler posts you had received from tips from citizens?

17   **A**    Yes, ma'am.

18   **Q**    Was there any indication that the tips you had received

19   from citizens had been altered or edited in any way based on

20   the returns that you received?

21   **A**    No, ma'am.

22   **Q**    In addition to Parler, did you also receive responses from

23   Facebook?

24   **A**    We did.

25   **Q**    And were those returns consistent with Facebook posts that

1    you had received as a part of tips regarding Mr. Calhoun?

2    **A**    Yes, ma'am.

3    **Q**    Again, any indication that the substance of those posts had

4    been altered or edited in any way?

12:27:41  5    **A**    No, ma'am.  There are, I believe, three posts that were not

6    in the return that were forwarded to us.  Those -- I can't

7    explain why they're not in the Facebook return.  I don't know

8    if Facebook removed them.  I can't explain that.  I don't have

9    any information on how Facebook keeps their records.  But they

12:28:03  10   were not in the return.

11   **Q**    And we'll address that later --

12   **A**    Okay.

13   **Q**    -- when we talk about those three exhibits specifically.

14   **A**    Outside those three, they were all consistent.

12:28:14  15          MS. MARTIN:  And, Your Honor, at this time I would

16   like to read in a stipulation.

17          I'm not sure when Your Honor wants to take a stopping

18   point for your 12:30.

19          THE COURT:  I was just going to wait until I see the

12:28:24  20   attorneys appear.

21          Go ahead and read it.

22          MS. MARTIN:  Court's indulgence, Your Honor.  And,

23   Your Honor, this is stipulation -- it will be Exhibit 704.

24   This is the stipulation as to the authenticity of social media

12:29:00  25   and cell phone exhibits.

1    And it reads, the United States and defendant, William
2    McCall Calhoun, agree and stipulate to the following:  Social
3    media posts.  Government Exhibit Series 400 are fair and
4    accurate representations of the posts from the defendant's
12:29:14  5    Parler account.  At all relevant times, the defendant was the
6    user of the account and the author of the posts.  The substance
7    of the posts have not been altered or edited.  Date and
8    timestamps have been added to the posts for trial.  The
9    timestamps are in Universal Time Coordinated, UTC, Time.
12:29:31 10    Eastern standard time was five hours behind UTC time on
11    January 6, 2021.

12    Government Exhibits 500 to 504 and 508 to 512 are fair
13    and accurate representations of the posts from the defendant's
14    Facebook account.  At all relevant times, the defendant was the
12:29:51 15    user of the account and the author of the posts.  The substance
16    of the posts has not been altered or edited.  Like Exhibit
17    Series 400, the date and timestamps have been added to the
18    posts for trial.  The timestamps are in UTC time.

19    Cell phone evidence and videos.  Government Exhibit
12:30:07 20    Series 600 are copies of files, including videos, images, and
21    chats obtained from the search -- from a search of the
22    defendant's cell phone.  The files have not been altered or
23    edited and are fair and accurate copies of the files obtained
24    from the defendant's cell phone.

12:30:24 25    And that is signed by both the United States and the

1    defendant.

2            THE COURT:  All right.  That's admitted.

3    **BY MS. MARTIN:**

4    **Q**   All right.  So let's take a look at some of the social

12:30:32  5    media posts.  Let's start with Exhibit 402.  And just let me

6    know when that appears on your screen.

7    **A**   It's on the screen.

8    **Q**   Can you read the date and time stamp?

9    **A**   November 4th, 2020, 21:18:43.

12:31:07  10            MS. SHERMAN-STOLTZ:  Your Honor, I apologize.  Before

11    he reads anything into the record, or the attorney does, we do

12    have an objection to this one as far as relevance is concerned.

13            This was November 4th, 2020, well before Mr. Calhoun

14    had even decided to go to Washington, D.C.

12:31:24  15            THE COURT:  Yeah.  Well, government will want to

16    respond.

17            It's two months before.  It refers to the election

18    being stolen, and I think it's relevant here.

19            MS. MARTIN:  And our position, Your Honor, is it's

12:31:40  20    certainly relevant to why he went on January 6th.  This was a

21    statement of intent from beforehand, and it's certainly

22    relevant to whether he knew his actions were wrongful and

23    whether he had corrupt intent on the day of January 6.

24            MS. SHERMAN-STOLTZ:  And we would object as far as it

12:31:56  25    being considered even for intent, Your Honor, because, as has

1    been previously established in the record, he didn't even know

2    he was going at that time.  So, you know, his corrupt intent --

3            THE COURT:  Doesn't that go to weight of this evidence

4    rather than the admissibility of it?

12:32:14  5            MS. SHERMAN-STOLTZ:  I think it would go for what

6    the -- I mean, the purpose of what they're offering, the

7    content of the social media posts.

8            THE COURT:  Okay.  I hate to do this right now at this

9    very exciting moment, but one of the attorneys who is in the

12:32:32 10   other trial and this is -- she just stepped in and she stepped

11   back out.  I do want to take a break now.  And tell me how much

12   time you all need for lunch.  Could you be back at 1:45?  Does

13   that give you adequate time?

14           MS. MARTIN:  That's fine with the government.

12:32:50 15           MS. SHERMAN-STOLTZ:  Yes, Your Honor.

16           THE COURT:  Does that work?

17           MS. SHERMAN-STOLTZ:  Yes, Your Honor.

18           THE COURT:  All right.  So we will take a recess until

19   1:45.  Thank you.

12:33:00 20       (The proceedings were recessed at approximately 12:32 p.m.

21   and continued at approximately 2:21 p.m. as follows:)

22           THE COURT:  All right.  The government ready to resume

23   with the witness?

24           MS. MARTIN:  Yes, Your Honor.

14:21:36 25           COURTROOM DEPUTY:  I want to remind you, Agent

```
 1    Armentrout, you remain under oath.

 2               THE WITNESS:  I understand.

 3               MS. MARTIN:  Your Honor, I may have missed it, but

 4    before we adjourned, did you rule on Exhibit 402?

 5               THE COURT:  The relevance?

 6               MS. MARTIN:  Yes.

 7               THE COURT:  Yeah.  Is there any additional argument?

 8               I am inclined to permit the government to enter that

 9    exhibit into evidence.  I realize that the defense has a

10    different perspective of that exhibit, and I will weigh the

11    evidence accordingly.

12               Is there anything else you would like to add that you

13    haven't mentioned already, Ms. Sherman-Stoltz?

14               MS. SHERMAN-STOLTZ:  Yes, Your Honor.  Because I think

15    we kind of left it at, you know, the purpose of the submission

16    of the picture -- or the screenshot of the Parler post I

17    believe is what it was.  But I would like to get my complete

18    objection on the record.

19               THE COURT:  Yes.  You may.

20               MS. SHERMAN-STOLTZ:  And it can apply to all of the

21    ones prior to December 22nd that they plan on introducing

22    because it would be the same objection.

23               THE COURT:  Why is December 22nd the critical date?

24    Is that the date that he requested time off?

25               MS. SHERMAN-STOLTZ:  It is the date that he posted on
```

14:21:46
14:22:01
14:22:11
14:22:26
14:22:44

1  social media that he would be going to Washington, D.C.  I

2  mean -- and in order to see the Trump rally.  So that's -- at

3  that point in time is when he decided he was going to be going

4  to Washington, D.C. on January 6, 2021.

14:23:02  5        THE COURT:  All right.  Can I see the exhibit again?

6        MS. MARTIN:  Yes.  Could you pull up 402, please?

7        And if I could respond to the defense's argument.

8        THE COURT:  Sure.  Go ahead.

9        MS. MARTIN:  Your Honor, I mean, like anybody, I'm

14:23:32  10  sure you know that people just in their head have an idea that

11  they're going somewhere before they actually book the tickets

12  or before they even post on Facebook or maybe they don't post

13  on Facebook that they are intending to go somewhere.

14        Anything before January 6th is certainly probative of

14:23:50  15  his intent leading up to that day.

16        THE COURT:  Yeah.  Anything else you would like to

17  add?

18        MS. SHERMAN-STOLTZ:  I think as of November 4th, 2020,

19  there wasn't even a scheduled -- there definitely wasn't a

14:24:01  20  scheduled rally, which the defendant will testify that was the

21  purpose of his trip.  But I don't believe that there was

22  anything else, like, the actual certification of the vote

23  publically announced as being taking place on January 6.

24        THE COURT:  All right.  Well, the post itself says, we

14:24:18  25  have a communist revolution happening before our very eyes to

steal this election.  It goes on to say, Americans get ready to

rise up and kill the democratic communists before they do it to

us.

I mean, I think it's relevant.  I think it's

14:24:35  probative.  You may convince me that this -- he had no

intention at that time to go, but I think it's -- I think

they've met their threshold to show that it's relevant to his

intent in this case.

MS. SHERMAN-STOLTZ:  Your Honor, I think the

14:24:52  government is trying to, you know, use social media posts,

which was his state of mind at the time, to establish a corrupt

intent element of an event that hadn't even been determined at

the time that he is writing these things.

So you're using someone's past acts to establish a

14:25:16  corrupt intent for at the time of those past acts wasn't even

in existence.

THE COURT:  But that's the evidence you're going to

present, but they can have a different theory.

MS. SHERMAN-STOLTZ:  But the Court, if allowed, and

14:25:34  overrules my objection is going to take these posts into

consideration in your determination.  And we don't believe that

it's probative to his decision to go to Washington, D.C. on

January 6th.

It establishes his state of mind at the time that he

14:25:53  wrote it, not that he was establishing the corrupt intent to

then go on January 6th and attempt to interfere with the

certification of the vote when that hadn't even been

established.

THE COURT:  Well, to the extent it's consistent with

what he says in the future -- and I don't recall -- I've seen

these posts.  I haven't reviewed them all before this trial,

but to the extent this is consistent, I think it can be

relevant.  I may give it very little weight.  I mean, you've

got strong arguments to make, but I'm not prepared to exclude

it entirely.

In the end, based on the evidence, I may say it has

virtually -- you know, very little, if any, weight.  But as a

finder of fact.  But not excluding it because you haven't met

the -- the government hasn't met the relevance threshold.  I

think that that's -- those are two different issues.

I may reject their theory.  But I don't -- I'm not

going to exclude this evidence and say they can't argue their

theory based on posts that predate the date you say he decided

to come to Washington, D.C.

MS. SHERMAN-STOLTZ:  I understand.

THE COURT:  All right.  You may proceed.

(Government's Exhibit 402 was admitted in evidence.)

**BY MS. MARTIN:**

Q   All right.  And could you just read the date on that again

so we're clear?

1    **A**    Just the date?

2    **Q**    Yes.

3    **A**    November 4th, 2020, 21:18:43.

4    **Q**    And, to be clear, the presidential election took place on

14:27:34  5    November 4th, 2020?

6    **A**    I believe that's correct.

7    **Q**    And although Your Honor has already read it, could you

8    please just read the post for the record?

9    **A**    Yes.  We have a communist revolution happening before our

14:27:44 10   very eyes to steal this election.  It's obvious.  Americans,

11   get ready to rise up and kill the democrat communists before

12   they do it to us.  There can be no other way absent a miracle,

13   and if conservative America lacks the courage to save the last

14   free country on earth, then to hell with you all.

14:28:04 15            MS. MARTIN:  Could you please pull up Exhibit 500?

16   **BY MS. MARTIN:**

17   **Q**    Could you please read the date on that post?

18   **A**    November 7th, 2020.

19   **Q**    And that's three days after the election?

14:28:25 20   **A**    Correct.

21   **Q**    Could you please read that post to the Court?

22   **A**    George, the communists are trying to steal the election;

23   it's obvious.  We go to bed and Trump is winning, then wake up

24   to magically find hundreds of thousands of only Biden votes.

14:28:40 25   Normally, a candidate who is honest wants transparency.  We are

1   on the verge of civil war -- I believe that's supposed to say

2   and -- it's misspelled -- the battleground will be ATL.  We're

3   going to go door to door and execute the fucking communists.  I

4   want to make that clear.

14:29:06  5          MS. MARTIN:  Please pull up Exhibit 403.

6   **BY MS. MARTIN:**

7   **Q**   Could you please read the date on this post?

8   **A**   It says November 22nd, 2020.

9   **Q**   And please read that to the Court.

14:29:18  10  **A**   Hold the line, patriots.  Trump has got this.  If I learned

11  anything from the 30 years of practicing law, the evidence of a

12  massive, national scheme to steal this election is

13  overwhelming.  It's clear and it's more than sufficient to

14  overturn the fraudulent and false election results.

14:29:47  15  Furthermore, this was a criminal scheme by the democrats.

16  People are going to go to prison.  The swamp will be drained.

17  Everything Trump's lawyers have told us has been true.  So take

18  heart and be confident that we will prevail.  Biden will never

19  take office.

14:30:09  20  **Q**   Now, let's circle back for a minute on the defendant's

21  profession.

22          You previously testified earlier in your direct that

23  he's a defense attorney is; is that right?

24  **A**   That's correct.

14:30:18  25  **Q**   Do you know what kind of defense attorney?  Civil or

1    criminal?

2    **A**    I know that he does criminal defense.  I don't know if he

3    does any civil work.

4    **Q**    But he does do criminal defense?

14:30:29  5    **A**    Yes.

6    **Q**    And was he practicing at the time of January 6th?

7    **A**    I believe so.

8         MS. MARTIN:  Could you please pull up Exhibit 404?

9    **BY MS. MARTIN:**

14:30:49 10    **Q**    And could you please read that to the Court along with the

11    date?

12    **A**    November 22nd, 2020.  Or we show up at the Capitol with

13    guns like we've done in Georgia.

14    **Q**    What did you read that post to mean?

14:31:06 15    **A**    He's referencing showing up to the U.S. Capitol with guns

16    like, presumably, he has in the past in the State of Georgia.

17    **Q**    Are you aware of him showing up in Georgia with firearms

18    anywhere?

19    **A**    I'm not aware of him being at the Georgia State Capitol

14:31:28 20    with firearms.  I am aware that he held, I believe, two

21    separate Second Amendment open-carry rallies, for lack of a

22    better term, at the -- I believe at the Sumpter County

23    Courthouse in Americus, Georgia.  May not have been the

24    courthouse, but it was in Americus, Georgia.

14:31:49 25    **Q**    And was he carrying firearms during the demonstration?

1    **A**    Yes.  And he had coordinated that with law enforcement.

2    **Q**    Thank you.

3                MS. MARTIN:  Could you please pull up Exhibit 405?

4    **BY MS. MARTIN:**

14:32:00  5    **Q**    Could you read the date on that?

6    **A**    December 9th, 2020.

7    **Q**    And please read the post to the Court.

8    **A**    Yes, ma'am.

9                Stop the steal.  Biden lost.  Accordingly, the 80

14:32:18 10    million Americans who voted for Trump aren't going to agree,

11    follow, acquiesce to, and we damn sure aren't going to obey any

12    policy coming from a fraudulent Biden-Harris administration.

13    Trump is going back for four more years anyway based on massive

14    and compelling evidence.  These are the facts of life.

14:32:46 15                MS. MARTIN:  And could you pull up Exhibit 406?

16    **BY MS. MARTIN:**

17    **Q**    And could you please read the date on that?

18    **A**    December 22nd, 2020.

19    **Q**    And read the post, please.

14:33:00 20    **A**    See you in Washington on January 6th.

21    **Q**    Is this the first time, specifically, that the defendant

22    references going to Washington, D.C. on January 6 that you are

23    aware of?

24    **A**    Yes.

14:33:15 25                MS. MARTIN:   Could you please pull up government's

1    Exhibit 407?  Sorry.  Yes.  407.

2    **BY MS. MARTIN:**

3    **Q**    And could you please read the date on that?

4    **A**    December 29th, 2020.

14:33:29  5    **Q**    And read the post.

6    **A**    Being physically present in Washington on January 6 is of

7    key importance.  We, the people, have no other realistic option

8    to communicate our unwavering intent to demand fair elections

9    now and forever or else.  I'll see you there.

14:33:52  10          MS. MARTIN:  Could you pull up Exhibit 408?

11    **BY MS. MARTIN:**

12    **Q**    What is the date on this post?

13    **A**    January 4th, 2021.

14    **Q**    So that's two days before January 6th?

14:34:10  15    **A**    That's correct.

16    **Q**    Could you please read that for the Court?

17    **A**    Headed to D.C. to give the GOP some backbone, to let them

18    know this is their last chance to stop the steal or they are

19    going to have bigger problems than these coddled Antifa burning

14:34:27  20    down their safe spaces.  D.C. announced it is banning guns when

21    we storm the Capitol tomorrow.  LOL.  Guns are already banned

22    in D.C.  Very illegal.  Whether the police can enforce their

23    gun laws depends on how many armed patriots show up.

24    **Q**    Are you aware if the defendant owns any firearms?

14:34:50  25    **A**    He does.

1    **Q**    How do you know that?

2    **A**    When we served the arrest warrant, we confiscated, I

3    believe, nine firearms from him at the -- where he was residing

4    at the time.

14:35:02   5    **Q**    And were those legally owned firearms?

6    **A**    They were.

7    **Q**    And when you say executed a search warrant, where did you

8    execute that warrant?

9    **A**    So when we confiscated the firearms, we did not execute a

14:35:18  10    search warrant.  We executed an arrest warrant, and, during our

11    protective sweep of the resident, we identified a room we

12    believed he was residing in that contained firearms and

13    ammunition.  And we gained his consent to search that room

14    within that residence.

14:35:33  15    **Q**    And when you say, he, you mean the defendant, Mr. Calhoun?

16    **A**    Yes.  Mr. Calhoun.  Excuse me.

17    **Q**    After you received consent to search the residence, did

18    you -- you were in the house while that search was happening?

19    **A**    Yes, ma'am.

14:35:45  20    **Q**    Did you recover any physical evidence from that search in

21    addition to the firearms?

22    **A**    We recovered a hat which we believed he was wearing in

23    social media posts and videos at the Capitol and a scarf.

24    **Q**    And are those Government's Exhibits 1 and 2?  Or sorry.

14:36:06  25    Government's Exhibit 100 and 101?

1    **A**   I would have to check the exhibit list.  I believe that's

2    correct.

3    **Q**   And you obtained those from evidence at the Washington

4    field office?

14:36:19  5    **A**   I did not.  Another agent from the Washington field office

6    obtained them from the evidence room and signed them over to me

7    at the courthouse.

8    **Q**   All right.  And do you have those with you?

9    **A**   I do.

14:36:28  10           MS. MARTIN:  Would he be able to step down and grab

11    those exhibits, Your Honor?

12           THE COURT:  Yes.

13           MS. MARTIN:  And just for the record, those are

14    Government's Exhibits 1 and 2.  And just for the record, Agent

14:37:17  15    Armentrout is opening a sealed evidence bag.

16    **BY MS. MARTIN:**

17    **Q**   And you're holding up Government's Exhibit 1; is that

18    right?

19    **A**   Yes.  This is a camouflage in color ball cap that says

14:37:33  20    Trump 2020 keep America great.

21    **Q**   And does that appear to be a ball cap that you found during

22    the search of his bedroom?

23    **A**   Yes, ma'am.

24    **Q**   And does that also appear to be the same cap that he's seen

14:37:46  25    wearing on restricted Capitol grounds on January 6th?

1    **A**    Yes, ma'am.

2            MS. MARTIN:  Your Honor, at this time, we would like

3    to admit Government's Exhibit 1.

4            THE COURT:  Any objection?

14:37:54   5            MS. SHERMAN-STOLTZ:  No objection.

6            THE COURT:  It's admitted.

7        (Government's Exhibit 1 was admitted in evidence.)

8    **BY MS. MARTIN:**

9    **Q**    And are you showing us what's been marked as Government's

14:37:58  10    Exhibit 2?

11    **A**    Yes, ma'am.

12    **Q**    And does that appear to be the same scarf that you

13    recovered during the search of Mr. Calhoun's residence?

14    **A**    Yes, ma'am.

14:38:09  15            MS. MARTIN:  Your Honor, I would like to admit that

16    into evidence.

17            THE COURT:  Any objection?

18            MS. SHERMAN-STOLTZ:  No objection.  Just a question.

19            The last exhibit list I have has that as Three.  I

14:38:16  20    don't know if that matters to the Court.  But --

21            THE COURT:  No.  We want to be clear.  What is it?

22            MS. MARTIN:  It's Government's Exhibit 2.  We will

23    provide an updated exhibit list to defense.

24            THE COURT:  All right.  It's admitted.

14:38:27  25        (Government's Exhibit 2 was admitted in evidence.)

**BY MS. MARTIN:**

Q   And was this also -- was Government's Exhibit 2 also an item of clothing that was worn by the defendant on January 6?

A   Yes, ma'am.

14:38:35  Q   Are you aware whether pictures were taken during the search of the defendant's bedroom?

A   Yes, ma'am.  They were.

Q   And prior to testifying today, did you review some of those photos?

14:38:49  A   Yes, ma'am.

Q   And those were marked as Government's Exhibits 102 to 113?

A   I believe so.  I don't have --

MS. MARTIN:  Would you pull up Government's Exhibit 102, please?

14:39:07  **BY MS. MARTIN:**

Q   And were the photos that you reviewed prior to trial a fair and accurate depiction of how the defendant's bedroom appeared during the search?

A   Yes.

14:39:24  MS. MARTIN:  I would like to admit 102 through 113, photos from the search.

THE COURT:  Any objection?

MS. SHERMAN-STOLTZ:  We had multiple objections.  I can just -- 103, 104, 105, 106, 107, 108, and 112 -- objection

14:39:42  as far as relevance.  And just the fact that the prejudice

outweighs the probativeness.  He's not alleged to have brought

any firearms with him on January 6th, and those are all

pictures of just firearms.  So I guess the first objection

would be relevance.  And I can allow the government to respond

14:40:02    to that.

THE COURT:  Okay.  So all of these objections relate

to photographs of firearms.

MS. SHERMAN-STOLTZ:  And ammunition, yes, Your Honor.

THE COURT:  And ammunition.  Okay.

14:40:11    Ms. Martin?

MS. MARTIN:  Yes, Your Honor.  So while Mr. Calhoun --

we don't have any evidence that he carried a firearm to the

Capitol on January 6.  It was certainly part of his rhetoric

leading up to the Sixth.  And the fact that he actually did

14:40:26    possess firearms and then was writing about using them and

killing people goes to whether or not his corrupt intent and

what he was writing was to be believed.

If he was writing all this stuff about bringing guns

to the Capitol and what he was going to do there and didn't

14:40:44    have guns, then that would be more probative of the fact that

he didn't mean what he said.  But he did, in fact, have all of

these guns and all of this ammunition.

And this isn't in front of a jury.  Your Honor is able

to take what probative value you can from the search warrant

14:41:02    pictures and dismiss any of the prejudice to the defendant.

1        THE COURT:  I'm curious.  Is your theory that he might

2   have had a firearm?

3        MS. MARTIN:  No.  Your Honor, we don't have any

4   evidence to show he had a firearm that day.

14:41:16  5        THE COURT:  Okay.  You just want to introduce this

6   evidence to show that these threats were credible because he

7   could himself show up with firearms if he wanted to.

8        MS. MARTIN:  The threats are credible and the fact

9   that he -- it was all part of his corrupt intent of going that

14:41:36  10  day.

11        Somebody who threatens to bring guns to the Capitol

12   and who has guns at home and could fulfill that threat, it's

13   more likely to believe that their intent was corrupt, not just

14   going for peaceful demonstration, which is what his defense is.

14:41:53  15        THE COURT:  Let me rephrase the question I asked

16   originally.

17        Is it your theory that, at one point, he might have

18   had intent to take a firearm?

19        MS. MARTIN:  Certainly I think that theory can be

14:42:00  20  believed, based on the posts.

21        THE COURT:  All right.  So I will allow it.

22        I think that you have a competing theory,

23   Ms. Sherman-Stoltz, that -- but I will allow the government to

24   introduce it.

14:42:13  25        (Government's Exhibits 102-113 were admitted in evidence.)

**BY MS. MARTIN:**

Q   And after the search warrant, did you recover any firearms and take them into law enforcement possession?

A   Yes, ma'am.  I believe we recovered nine firearms; four shotguns; four, like, AR-15-style rifles; and one handgun.

Q   Were there any other weapons in his room that you recovered?

A   The only thing I think would be -- we didn't recover anything.  There was a set of, like, brass knuckles present, but we didn't confiscate those.

Q   And in some of the photos, there's depictions of ammunition; is that right?

A   Yes, ma'am.

Q   And how much ammunition?

A   A large quantity.  I would say hundreds of rounds.

Q   Now, to be clear -- you heard our argument to the Court, but, to be clear, you're not aware of any evidence that the defendant had a gun on January 6th?

A   That's correct.

Q   All right.  Let's turn to the actual day of January 6th.

        In addition to just posting about -- just posting pre-January 6th about going to Washington D.C. on that day, did he actually travel to D.C. for January 6?

A   I'm sorry.  Was the question did he travel before January 6?

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

1    **Q**    Sorry.  I should rephrase that.

2            Did the defendant actually travel to Washington, D.C.

3    for January 6th?

4    **A**    Yes.

14:43:46  5    **Q**    And how do you know that?

6    **A**    From his social media posts, from his statements.

7    **Q**    And did you also view video and photo evidence that showed

8    him at the Capitol on January 6th?

9    **A**    Yes.  There's videos and photo -- videos and photos of him

14:44:07 10   from his cell phone at the Capitol, and then there was also the

11   Capitol video footage, the cameras from the Capitol that

12   captured video, as well, of him being present there.

13   **Q**    Do you know how he traveled to Washington, D.C.?

14   **A**    I believe he drove along with -- I take that back.  I don't

14:44:29 15   know if he drove or not.  He traveled with another individual.

16   I can't say for certain that they drove.

17   **Q**    And was that other individual his co-defendant, last name

18   Nalley?

19   **A**    Correct.

14:44:45 20   **Q**    Did the defendant post on social media on the day of

21   January 6th?

22   **A**    Yes.

23            MS. MARTIN:  Could you please pull up Exhibit 504?

24   **BY MS. MARTIN:**

14:45:05 25   **Q**    And could you please read the date and timestamp on that?

1    **A**    Yes.  January 6th, 2021 at 11:29:12 UTC.

2    **Q**    Is 11:29 UTC approximately 6:29 a.m. eastern?

3    **A**    That's correct.

4    **Q**    Could you read what the post says?

14:45:26  5    **A**    McCall Calhoun was in Washington, D.C.  And then it also

6    has region, United States, Washington, D.C., and then Nicole

7    and 101 other friends have been here.

8    **Q**    And is this just what would be called a check-in on

9    Facebook?

14:45:44  10    **A**    Yes.

11    **Q**    And do you know why people use things like that?

12    **A**    Generally speaking -- I can't speak to why everyone does

13    it, but, generally speaking, people do post on Facebook just

14    where they are, what their location is, to let other people

14:46:01  15    know where they are.

16        MS. MARTIN:  And, Your Honor, just to be clear on the

17    exhibits that have been admitted, so we read in the

18    government's stipulation, and those authenticated the Exhibit

19    Series 400, 500, and 600.

14:46:16  20        We would like to offer those into evidence and have

21    them admitted.  And I'm not sure if I did that before.  I just

22    wanted to be clear on that.

23        THE COURT:  I'm not sure either.  Any objection?

24        MS. SHERMAN-STOLTZ:  I'm just verifying that we have

14:46:30  25    all of our objections on the record.

1          THE COURT:  Remind me, Ms. Martin, what these various

2     exhibits are.  These photographs?

3          MS. MARTIN:  Exhibit Series 400 are Parler posts;

4     Series 500 are Facebook posts; and then Exhibit Series 600 are

14:46:47 5     files obtained from the defendant's phone.  So those include

6     pictures, two chats, and videos.

7          THE COURT:  So you haven't had the agent testify as to

8     each -- each of these posts and each of these, or have you?

9          MS. MARTIN:  No, Your Honor.  He has not -- and he

14:47:02 10   won't testify as to each and every exhibit.

11         Given that this is a bench trial, we would like to

12    just admit them for the Court's consideration.

13         THE COURT:  Understood.  Ms. Sherman-Stoltz, do you

14    have some of the same objections to some of those exhibits?

14:47:16 15    MS. SHERMAN-STOLTZ:  The 600 series we have no

16    objections.  The 400 series I believe that I've already noted

17    our objections as to relevance having to do with the posts that

18    predate December 22nd.  I can say them again for the Court's

19    record.

14:47:35 20         THE COURT:  Just for clarity, please.

21         MS. SHERMAN-STOLTZ:  400, 401, 402, 403, 404, and 405.

22    And those were for the 400 series.  The 500 series, we had

23    objections to 500, 501, and 502 as to relevance.

24         THE COURT:  And that's the gun photographs?

14:48:03 25    MS. SHERMAN-STOLTZ:  No.  These were Facebook records

1    and posts that predated.

2            THE COURT:  Okay.

3            MS. SHERMAN-STOLTZ:  And then 505, 506, and 507, our

4    objection was as to authenticity because those were three posts

14:48:19  5    that were not on the subpoena duces tecum returned.  And I

6    believe special agent referred to those earlier.

7            MS. MARTIN:  And we can address those now, Your Honor,

8    or I can address them in due course, Exhibits 504 through --

9            THE COURT:  You're seeking to introduce them all now,

14:48:40 10    aren't you?

11            MS. MARTIN:  Yes.  And I misspoke, Your Honor.  I'm

12    sorry.  I realize that we cut out a couple of the 500 series in

13    the stipulation because of that issue, that objection from

14    defense.

14:48:49 15            THE COURT:  You want to save that for now?

16            MS. MARTIN:  I can save that.

17            THE COURT:  All right.  So we will -- the Court, if I

18    haven't already, will admit the 600 series in full because

19    there's no defense objection to those.

14:49:03 20            With respect to the 400 series, the Court is admitting

21    those, but the objections to 400 through 405 regarding the date

22    of the posts or messages is preserved.  But I'm admitting the

23    400s as well.

24            And we will address the 500s later.  Is that all

14:49:31 25    right?

1              MS. MARTIN:  That's fine, Your Honor.

2              THE COURT:  Okay.

3          (Government's Exhibit Series 600 was admitted in evidence.)

4          (Government's Exhibit Series 400 save 400-405 was admitted

14:49:36  5      in evidence.)

6      **BY MS. MARTIN:**

7      **Q**  All right.  Agent Armentrout, you heard Captain Mendoza

8      testify earlier, correct?

9      **A**  Correct.

14:49:43  10     **Q**  And you heard her testify about the breach of the Senate

11     wing door that took place at approximately 2:13 p.m.?

12     **A**  Yes, ma'am.

13             MS. MARTIN:  All right.  Could you please pull up

14     Exhibit 302A?  Pause at 14 seconds.

14:50:27  15     **BY MS. MARTIN:**

16     **Q**  Do you see the defendant in this frame?

17     **A**  I do.

18     **Q**  Can you describe where?  And you can also use the part on

19     your screen to circle.

14:50:39  20     **A**  Yes, ma'am.  He's right in the doorway.

21             MS. MARTIN:  For the record, Agent Armentrout has

22     circled the defendant on his screen.

23             THE COURT:  You may have covered this already,

24     Ms. Martin, and this is more a question for you, Agent, if you

14:50:53  25     can answer:  Is that timestamp correct?

```
 1              THE WITNESS:  I don't have any knowledge of the

 2    timestamp, ma'am.

 3              MS. MARTIN:  That was a part of government's

 4    stipulation as to the timestamps.

 5              THE COURT:  And they are all correct?
14:51:05
 6              MS. MARTIN:  Per the stipulation, yes, they are.

 7              THE COURT:  So this is actually at 2:19 p.m.?

 8              MS. MARTIN:  Yes.

 9    BY MS. MARTIN:

10    Q    And, just to be clear, Agent Armentrout, this is
14:51:16
11    approximately six minutes after the door was breached?

12    A    I believe that's correct, yes.

13    Q    And is Mr. Calhoun holding up a phone in this frame?

14    A    He appears to be.

15    Q    Could you clear your screen?  I think there's a clear
14:51:29
16    button on the right-hand side if you go back to the --

17    A    I don't see a clear button.

18              MS. MARTIN:  Your Honor, may I approach the witness?

19              THE COURT:  Yes.

20         (Discussion off the record.)
14:51:54
21              MS. MARTIN:  All right.  And could you continue to

22    play the rest of the video?

23         (Video played.)

24              MS. MARTIN:  All right.  And you can pull that down.

25              Could you please pull up Exhibit 303?
14:52:22
```

1          And, Your Honor, before we go into the remaining CCTV

2     footage videos -- we're going to have Agent Armentrout identify

3     the defendant in all of them -- but we would just ask to admit

4     all of them.

14:52:48  5          THE COURT:  Any objection?

6          MS. SHERMAN-STOLTZ:  I'm looking, Your Honor.  I

7     believe we already noted our objections much earlier to the 300

8     and 301.  I think the only other objection we had was to 310,

9     and that doesn't have to do with the videos.

14:53:11  10          I will state again, though, that the last exhibit list

11    I received from the government yesterday morning has some

12    different numbering.  But as far as these videos are concerned,

13    we don't have an objection if that's all they're admitting at

14    this time.

14:53:25  15          MS. MARTIN:  And to clarify, we will seek to admit

16    Exhibits 302 through 308B which are all CCTV clips from inside

17    the Capitol building.

18          THE COURT:  No objection?

19          MS. SHERMAN-STOLTZ:  No objection.

14:53:37  20          THE COURT:  Those are admitted.

21       (Government's Exhibits 302-308B were admitted in evidence.)

22          MS. MARTIN:  All right.  And we're looking at

23    Exhibit 303.

24          And could you continue to play?

14:53:45  25       (Video played.)

1          MS. MARTIN:  Just pause when it gets to five seconds,

2     please.

3          All right.  It's paused at five seconds.

4     **BY MS. MARTIN:**

14:53:56  5     **Q**   Agent Armentrout, do you see the defendant in this frame?

6     **A**   Yes, ma'am.

7     **Q**   Where?

8     **A**   He's here.

9          MS. MARTIN:  And for the record, Agent Armentrout has

14:54:05 10     circled the defendant in yellow.

11     **BY MS. MARTIN:**

12     **Q**   It's fair to say he's on the right-hand side of the

13     hallway, and he's walking sort of in the direction of the

14     camera?

14:54:14 15     **A**   Correct.  Where it's paused, he's turned away from the

16     camera, but he was walking in the direction of the camera, yes.

17     **Q**   And, again, can you see the defendant has his phone out?

18     **A**   He appears to, yes.

19          MS. MARTIN:  Could you please play the rest of the

14:54:26 20     exhibit?

21          (Video played.)

22          MS. MARTIN:  All right.  And you can stop and take it

23     down?

24          And please pull up Exhibit 305.  And this is the

14:54:40 25     original.  And can you pause there?

1   **BY MS. MARTIN:**

2   **Q**   Do you see the defendant in this frame?

3          We can continue playing if you need to look.

4   **A**   Please.

14:55:02  5      (Video played.)

6          MS. MARTIN:  And pause it there.

7   **BY MS. MARTIN:**

8   **Q**   Do you see the defendant in this frame?

9          I'll direct your attention to sort of the center of

14:55:12  10   the frame in front of the gentleman that's holding up his

11   phone.

12          Do you see the defendant there?

13   **A**   Oh, yes.  I'm sorry.  I was confusing this with the other

14   video.  Yes, ma'am.

14:55:24  15   **Q**   And could you please identify where he is?

16   **A**   Here.

17   **Q**   Thank you.  And clear your screen.

18   **A**   (Witness complies.)

19          MS. MARTIN:  And could you continue to play?

14:55:37  20      (Video played.)

21          MS. MARTIN:  Could you just pause there?

22          And we have paused at 38 seconds.

23   **BY MS. MARTIN:**

24   **Q**   What does the defendant's demeanor appear to be here?

14:56:13  25   **A**   In this video, he appears to be walking around, filming

1  things with his camera.

2  **Q**   And does he appear to be able to walk around freely?  Are

3  there people compressing him in this crowd and not allowing him

4  to leave?

14:56:27  5  **A**   He's moving around pretty freely.

6        MS. MARTIN:  Could you continue to play?

7        (Video played.)

8        MS. MARTIN:   And you can stop the video there?

9  **BY MS. MARTIN:**

14:57:01  10  **Q**   And for the record, does he appear to be walking out toward

11  the right-hand side of the frame?

12  **A**   Yes, ma'am.

13        MS. MARTIN:  Could you please pull up Exhibit 306A?

14  And could you start playing from 30 seconds?

14:57:16  15      (Video played.)

16        MS. MARTIN:  Perfect.  And could you just pause there?

17  **BY MS. MARTIN:**

18  **Q**   Do you see the defendant in this frame?

19  **A**   Yes, ma'am.  He just came through the doorway.  Currently,

14:57:39  20  his face is a little bit obscured where he paused by the person

21  holding the cell phone in front of him.

22        MS. MARTIN:   Just to be clear, Agent Armentrout has

23  circled the defendant in yellow.

24  **BY MS. MARTIN:**

14:57:50  25  **Q**   Could you please clear your screen?

1    **A**    Yes.

2              MS. MARTIN:  And could you continue to play the video?

3         (Video played.)

4              MS. MARTIN:  And you can stop the video there?

14:58:51 5         Could you pull up Exhibit 306B?  And start playing

6    from 50 seconds.

7         (Video played.)

8              MS. MARTIN:  Can you pause there?

9    **BY MS. MARTIN:**

14:59:13 10   **Q**    Do you see the defendant in this frame?

11   **A**    He just passed through the doorway in the middle of the

12   frame, and I circled him there.

13             MS. MARTIN:  And just for the record, Agent Armentrout

14   has circled the defendant in yellow.

14:59:23 15   **BY MS. MARTIN:**

16   **Q**    And you can clear your screen?

17   **A**    Yes, ma'am.

18             MS. MARTIN:  And continue to play the video, please.

19        (Video played.)

14:59:33 20            MS. MARTIN:  Thank you.

21             And can we pull up Exhibit 307?  And this is the

22   original.  Thanks.

23        (Video played.)

24             MS. MARTIN:  And can you please pause there?

14:59:59 25   **BY MS. MARTIN:**

1    **Q**   Do you see the defendant in this frame?

2            I can continue to play.

3    **A**   Yes.  Please do.

4            MS. MARTIN:  Could you please keep playing?

15:00:07  5    (Video played.)

6    **BY MS. MARTIN:**

7    **Q**   Just let me know when you see him.  I will just --

8            MS. MARTIN:  Could you pause there?

9    **BY MS. MARTIN:**

15:00:26  10   **Q**   I will direct your attention to the center of the frame

11   sort of toward the doorway entry.  You see an individual with a

12   camo hat on and then, to his right, is an individual with a

13   yellow and black scarf?

14   **A**   Yes, ma'am.

15:00:37  15   **Q**   That individual we see with the camo hat, is his clothing

16   consistent with the defendant?

17   **A**   Yes, ma'am.  This individual here.

18   **Q**   All right.  And I am going to replay it from the start, and

19   just let me know if you believe that individual is the

15:00:48  20   defendant.

21           (Video played.)

22   **A**   Yeah.  You can pause it there.  If you could pause it.

23   **BY MS. MARTIN:**

24   **Q**   Yes.

15:01:06  25   **A**   It's more clear here.

1    Q    Right.  And just for the record, although the defendant has

2    his back turned, how are you aware that it's him?

3    A    The ball cap is the same; you can still see some of the

4    scarf; and then the backpack was consistent with what he was

15:01:21  5    wearing in the other photos.

6    Q    And is his facial hair also visible at certain angles?

7    A    Yes.  I would say at this angle it does appear his beard is

8    somewhat visible.

9         MS. MARTIN:  All right.  Could we play this exhibit to

15:01:35  10   the end?

11        (Video played.)

12        MS. MARTIN:  And you can clear your screen.  Sorry

13   about that.

14        All right.  And you can stop the video there.

15:02:07  15   **BY MS. MARTIN:**

16   Q    And Agent Armentrout, can you clear your screen, please?

17   A    Yes, ma'am.

18   Q    And at the end of that video, does the defendant appear to

19   be exiting the Capitol building?

15:02:17  20   A    He does.

21        MS. MARTIN:  And could you please pull up 308A?  And

22   could you fast-forward to 40 seconds and play from there?

23        (Video played.)

24   **BY MS. MARTIN:**

15:02:40  25   Q    And I will direct your attention to the center of the

1   frame, Agent Armentrout.

2   **A**   Pause right there.

3          MS. MARTIN:  Pause.

4   **BY MS. MARTIN:**

15:02:58  5   **Q**   Can you circle?

6   **A**   Yes, ma'am.  He's right in the middle.

7          MS. MARTIN:  And just for the record, Agent Armentrout

8   has circled the defendant in 308A.

9   **BY MS. MARTIN:**

15:03:07  10  **Q**   And could you clear your screen?

11  **A**   Yes, ma'am.

12         MS. MARTIN:  And continue playing to the end of the

13  exhibit.

14         (Video played.)

15:03:13  15  **BY MS. MARTIN:**

16  **Q**   And he appears to be taking pictures in this video?

17  **A**   Yes, ma'am.

18         MS. MARTIN:  Could you please pull up Exhibit 308B and

19  start playing from 15 seconds?

15:03:29  20        (Video played.)

21  **BY MS. MARTIN:**

22  **Q**   And I'll direct your attention to the right-hand side of

23  the frame.

24  **A**   Yes, ma'am.  Pause it.

15:03:47  25        MS. MARTIN:  Please pause.

1    **A**    It is a little bit clearer a second ago, but he is on the

2    far side of his -- the other individual with him, circled

3    there.

4    **BY MS. MARTIN:**

15:03:56  5    **Q**    And he appears to be with the same individual throughout

6    these CCTV clips?

7    **A**    That's correct.

8    **Q**    And to your knowledge, is that his codefendant?

9    **A**    Correct.

15:04:07  10           MS. MARTIN:  Could you please pull up Government's

11    Exhibit 311?  Pause.

12           And, Your Honor, at this time, I would like to read in

13    stipulation which is Exhibit 703.

14           THE COURT:  Okay.  Go ahead.

15:04:25  15           MS. MARTIN:  This is a stipulation as to the

16    authenticity of video in Government Exhibit 311.

17           The United States and defendant, William McCall

18    Calhoun, agree and stipulate to the following:  Exhibit 311 is

19    a compilation of video footage of the defendant on January 6th,

15:04:39  20    2021.  The compilation includes Capitol CCTV footage, videos

21    surrendered to the government by another Capitol breach subject

22    or defendant, and video footage obtained through publically

23    available sources, open source.  Some of the videos have been

24    clipped or shortened.  The videos have not otherwise been

15:04:57  25    altered or edited.

1          The videos are authentic in that they are what they
2   purport to be.  The videos fairly and actually depict events
3   and circumstances that occurred on or near the Capitol grounds
4   on January 6th, 2021.  The videos and/or any other copies are
15:05:12   5   admissible into evidence to the same extent as the original
6   within the meaning of Federal Rule of Evidence 1003.
7          And that's signed by the defendant and the United
8   States.
9          THE COURT:  Any objection?  No.  It is a stipulation.
15:05:24  10   It is admitted.
11      (Government's Exhibit 703 was admitted in evidence.)
12   **BY MS. MARTIN:**
13   **Q**   And, Agent Armentrout, you'll notice on the paused screen
14   at two seconds that there is a yellow circle on the screen.
15:05:33  15          Do you see that?
16   **A**   Yes, ma'am.
17   **Q**   Throughout this compilation video, is that yellow circle
18   going to appear around the defendant?
19   **A**   Yes.
15:05:40  20          MS. MARTIN:  Could you continue to play the rest of
21   the exhibit?
22      (Video played.)
23          THE COURT:  Do you not have sound on this one?
24          MS. MARTIN:  The CCTV footage does not have sound.
15:08:04  25          And could you please just go back to about six seconds

1    in Exhibit 311?  And just stop right there.

2    **BY MS. MARTIN:**

3    Q   And, Agent Armentrout, just looking at the frame at six

4    seconds, do you see what is -- do you see the defendant?

15:08:21  5    A   Yes, ma'am.

6    Q   And is the scarf and the hat he's wearing in this frame

7    consistent with Government's Exhibit 1 and 2 that were

8    recovered during the search warrant?

9    A   Yes, ma'am.

15:08:32  10           MS. MARTIN:  And you can take that down.

11           All right.  Let's turn back to some additional social

12    media posts.

13           If you could, pull up Exhibit 410.

14    **BY MS. MARTIN:**

15:08:49  15    Q   Could you please read the date and timestamp on that?

16    A   Yes.  It's January 6th, 2021, 18:43:34.

17    Q   And 18:43 UTC is approximately 1:43 eastern?

18    A   That's correct.

19    Q   And, to be clear, you previously testified that the

15:09:09  20    defendant entered the Capitol at 2:19 p.m.; is that right?

21    A   That's correct.

22    Q   All right.  And so this is a little less than 20 minutes --

23    little more than 20 minutes before?

24    A   Yes, ma'am.  About half-hour.

15:09:21  25    Q   Could you please read that to the Court?

1     **A**   There are a lot of people here.  The crowd is surging

2     towards the Capitol.

3     **Q**   And is this post consistent with the timing of when the

4     defendant would have been approaching the Capitol building?

15:09:38   5     **A**   Depending on where he was located, yes.

6              MS. MARTIN:  Could you please pull up Exhibit 411?

7     **BY MS. MARTIN:**

8     **Q**   And could you please read the date and timestamp on that?

9     **A**   It is January 6th, 2021, 19:04:34.

15:09:58   10   **Q**   And is 19:04 UTC approximately 2:04 p.m. eastern?

11    **A**   That's correct.

12    **Q**   Could you please read that?

13    **A**   The cops are using mace on us at the front of the Capitol.

14    **Q**   And is Exhibit 511, which we will pull up, almost the same

15:10:14   15   as Exhibit 411 but it was a post that appeared on Facebook

16    instead of Parler?

17             And shortly we will pull up 511.

18    **A**   Yes.  Slightly different.  But it says, so the cops are

19    using mace on us in front of the Capitol.

15:10:37   20   **Q**   All right.  And, again, the date and timestamp on 511,

21    could you please read that?

22    **A**   January 6, 2021, 19:03:23.

23             MS. MARTIN:  And could you please pull up Government's

24    Exhibit 412?

15:10:48   25   **BY MS. MARTIN:**

1   **Q**   And could you read the date and timestamp on that?

2   **A**   January 6th, 2021, 19:39:35.

3   **Q**   And is 19:39 UTC approximately 2:39 p.m. eastern?

4   **A**   That's correct.

15:11:07  5   **Q**   And could you please read that?

6   **A**   We're have busted through into the Capitol and taken it.

7   **Q**   And 2:39 p.m., that would be after the defendant initially

8   entered the Capitol at 2:19 p.m.?

9   **A**   That's correct.

15:11:23  10       MS. MARTIN:  And could you please pull up Exhibit 413?

11   **BY MS. MARTIN:**

12   **Q**   And what are we looking at here?

13   **A**   This is a Parler post of a photo within the Capitol that

14   appears to be outside the doorway to the Speaker of the House,

15:11:44  15   Nancy Pelosi's, office space.

16   **Q**   And how do you know it is outside the Speaker of the House,

17   Nancy Pelosi's, office?

18   **A**   There is a sign above the door that says Speaker of the

19   House, Nancy Pelosi.

15:11:58  20       MS. MARTIN:  Could you also pull up Exhibit 632?

21   **BY MS. MARTIN:**

22   **Q**   And Exhibit 632 was a photo obtained from the defendant's

23   cell phone, correct?

24   **A**   Yes.

15:12:14  25   **Q**   And does that appear to be the same photo that was then

1  subsequently posted on Parler?

2  **A**   It does.

3       MS. MARTIN:   Could you please pull up Exhibit 4:14?

4  **BY MS. MARTIN:**

15:12:30  5  **Q**   And what is the date on this post?

6  **A**   January 6th, 2021, 21:16:17.

7  **Q**   And could you please read that to the Court?

8  **A**   Patriots have taken the Capitol building.  We overran

9  multiple police barricades and busted through.  After we had

15:12:50  10  overrun that last police barricade, the momentum caused a bad

11  crush at one point.  But carried the vanguard through several

12  smaller doors and down halls as we swarmed Congress, yelling

13  the names of various members.  Then we stormed upstairs through

14  the Rotunda.

15:13:08  15       The first of us who got upstairs kicked in Nancy

16  Pelosi's office door and pushed down the hall towards her inner

17  sanctum.  The mob was howling with rage.  Crazy Nancy probably

18  would have been torn into little pieces, but she was nowhere to

19  be seen.  Then a S.W.A.T. team showed, and we retreated back to

15:13:30  20  the Rotunda and continued our hostile takeover of the Capitol

21  building.

22       If this steal doesn't get fixed, there's talk of

23  patriots coming back.  This time fully armed for war.  We

24  proved today that we're in control, and we outnumber the deep

15:13:47  25  state 10,000 to one.  They can't stop us.

1   **Q**   Now, let's go to the term "vanguard" which is used in the

2   second paragraph.  Do you know what that means?

3   **A**   My understanding of vanguard -- I've heard it in military

4   terms, and it's -- usually refers to the lead element or --

15:14:04   5   lead element of the military is the vanguard.

6   **Q**   And so you've typically heard that used in the military

7   context?

8   **A**   Correct.

9           MS. MARTIN:  All right.  Let's turn to the Facebook

15:14:13  10  posts.

11          And, Your Honor, at this time, we will be looking at

12  Government's Exhibit 505 through 508, which are the exhibits

13  that the defendant had objected to.

14          THE COURT:  And that's because they were not obtained

15:14:25  15  from Facebook?

16          MS. MARTIN:  They were not included in the return,

17  correct.  So I can lay the foundation and then we can discuss

18  the objection if that works for Your Honor.

19          THE COURT:  Okay.  That's fine.

15:14:36  20          MS. MARTIN:  All right.  Pulling up Exhibit 505.

21  **BY MS. MARTIN:**

22  **Q**   And I'm just going to show you 505, 506, and 507 really

23  fast so you can just be familiar with what they look like.

24  **A**   Okay.

15:14:59  25  **Q**   So that's 506, and that's 507.  Do you recognize those?

1     A     Correct.  Yes.

2     Q     Where do you recognize them from?

3     A     These were posts we received -- screenshots from various

4     individuals shortly after or beginning on the Sixth and into

15:15:28  5     the Seventh, the beginning of our investigation.

6     Q     And you said from various individuals.  That was more than

7     one individual?

8     A     Yes.  There were several individuals that submitted

9     screenshots to us.  It was a Houston Scott; a Patrick Owens, I

15:15:48 10     believe was his name; and a Kathy Partridge.

11     Q     And do you know any of those individuals?

12     A     Prior to the Sixth, I did not.  We interviewed them all,

13     though, during the course of the investigation.

14     Q     And were the tips submitted by these individuals -- did

15:16:13 15     they include some of the same posts?

16     A     Correct.

17     Q     And were all those posts consistent, even though they were

18     obtained from other individuals?

19     A     That's correct.  If you want me to comment on each of them.

15:16:25 20     Q     Sure.  Go to 505.

21     A     For instance, with this post, this picture, this exact

22     picture was found on his cell phone during the download.  And

23     it's consistent with all of his other posts.

24         THE COURT:  Wait.  So this very picture was found on

15:16:48 25     Mr. Calhoun's cell phone?

1          THE WITNESS:  Yes, ma'am.  When we downloaded the

2    content from his cell phone, this picture was found on his cell

3    phone.

4    **BY MS. MARTIN:**

15:16:59  5    **Q**   And, to be clear, these three exhibits were not in the

6    Facebook return that you received?

7    **A**   That is correct.

8    **Q**   And were you aware of other instances on January 6 where

9    Facebook was removing posts by individuals that violated the

15:17:14  10   Facebook policies?

11   **A**   They were.

12   **Q**   And when comparing these posts across individuals -- across

13   the different individuals they were submitted by, were there

14   any inconsistencies between them?

15:17:31  15   **A**   No, ma'am.  And I think even in one of the other posts, he

16   uses the word "vanguard," which was similar to the other post.

17   **Q**   And just speaking generally about all of the Parler posts

18   and the Facebook posts that were included in the returns, were

19   all of those consistent with the posts that were sent to you

15:17:50  20   via tips?

21   **A**   Correct.

22   **Q**   So it didn't appear that posts sent in tips had been

23   altered or edited in any way when compared with the Facebook

24   returns or the Parler returns?

15:18:02  25   **A**   No, ma'am.  Throughout the course of our investigation, we

1    never had any indication that any post provided to us was

2    altered in any way.

3        MS. MARTIN:  And, Your Honor, at this time we would

4    seek to admit 505, 506, and 507.

15:18:15  5        THE COURT:  Okay.  Let me ask the agent one question.

6        Do you have a sense as to when Mr. Calhoun entered the

7    Capitol in terms of numbers?  Was he in the first 200 or so?

8    Do you know?

9        THE WITNESS:  I don't know exact number, ma'am.  He

15:18:34 10   said he's in the lead elements.  In one of the videos -- I

11   don't know that we've reviewed those yet -- he makes a

12   statement that they've entered the Capitol.  And, as he's going

13   up the stairs, there's someone saying come on; we need more

14   numbers and he pushes into -- you see him go into the Capitol.

15:18:56 15       In another video, you can see him in -- to -- I

16   believe it is the Crypt.  And he is probably in the second --

17   it varies because people are moving around, but the second or

18   third row of people that have entered the Capitol.  And they

19   are -- they are basically in a confrontation with the police

15:19:20 20   line, ma'am, so he is within one or two people of the police in

21   the Capitol.

22       THE COURT:  Okay.

23       MS. MARTIN:  And, Your Honor, if I could just follow

24   up on that, you know, previously through Captain Mendoza, we

15:19:32 25   saw that the breach at the Senate wing door happened at 2:13

1   p.m., and he was only six minutes behind that.

2          THE COURT:  Six minutes.  Yep.

3          Can you clarify the testimony about multiple

4   individuals submitting the same texts, the same messages here?

15:19:51   5          Did every one of these come from multiple individuals

6   who pointed the finger at Mr. Calhoun?  Is that what you're

7   saying?

8          MS. MARTIN:  I would have to have Agent Armentrout

9   answer that, and he may have to refer to his notes on that.

15:20:06   10          THE WITNESS:  Yeah.  I may have to refer to the file,

11   but -- I can't say --

12          THE COURT:  Just expand on what you meant by these

13   were obtained from multiple individuals.

14          THE WITNESS:  Yes, ma'am.  So at the time, there were

15:20:19   15   people referring stuff to us through online tips, call-ins.

16   Then there were also people referring to us via, like, local

17   law enforcement.  And several of the people that referred

18   things to us through local law enforcement were basically

19   giving us a summary of all the posts that they observed that

15:20:37   20   day.

21          And so we received these posts from numerous people.

22   It wasn't just one individual that submitted these posts to us

23   as Mr. Calhoun's posts.

24          Is that -- did I answer the question?

15:20:54   25          THE COURT:  It is.  I was just curious whether -- I

1    think, based on what you're saying and your testimony, it

2    sounds as if of these, what, three or four photos?

3            MS. MARTIN:  Three exhibits, Your Honor.

4            THE COURT:  Three exhibits.  There were more than

15:21:15  5    three individuals who sent you these exhibits?

6            THE WITNESS:  I don't know it was more than three.

7    I'm confident that we received it from at least three.

8            THE COURT:  Obviously.

9            THE WITNESS:  Yes, ma'am.  I apologize.

15:21:29  10            THE COURT:  That's all right.

11            MS. MARTIN:  If I could ask a follow-up, Your Honor.

12            THE COURT:  Sorry?

13            MS. MARTIN:  If I could have a follow-up.

14            THE COURT:  Sure.

15:21:36  15    **BY MS. MARTIN:**

16    **Q**    Any indication the individuals you received these posts

17    from knew each other?

18    **A**    So one of the individuals, Mr. Scott, I don't believe he

19    knew the others.  The other individuals may have.

15:21:49  20    **Q**    And how would they have known each other?

21    **A**    Americus is not a very large place.  It's very possible

22    they knew each other, worked with each other, talked to each

23    other.  It's just not a big place.

24    **Q**    Do you know the professions of the two individuals?  Not

15:22:05  25    Mr. Scott, the other two individuals?

1    **A**    I don't.

2    **Q**    Okay.

3    **A**    I don't recall.

4            MS. MARTIN:  And, Your Honor, at this point, I think

15:22:14  5    we would just make the argument that these are clearly

6    relevant; that they should come in; and Your Honor should just

7    weigh them based on the fact that they were not corroborated in

8    the Facebook returns and just weigh that when you consider the

9    evidence.

15:22:29  10            THE COURT:  All right.  Ms. Sherman-Stoltz, you're not

11    objecting, are you, to 505 if it was also on his cell phone?

12            MS. SHERMAN-STOLTZ:  Our objection would be to the

13    text, the verbiage, Your Honor.  I'm not objecting to the

14    picture.

15:22:43  15            Mr. Calhoun has said from the very beginning, which is

16    one of the reasons why we were insistent on receiving the

17    Parler and Facebook subpoena duces tecum return to

18    authenticate, but he said from the very beginning that the

19    screenshots submitted to the FBI by individuals that he did not

15:23:03  20    have a great relationship with -- there were some that had been

21    altered.  He knew specifically --

22            THE COURT:  Well, he testified at the detention

23    hearing about one comment that omitted a sentence about the

24    guns.  But are you going to present additional evidence other

15:23:21  25    than that?  I've heard that already.

1          MS. SHERMAN-STOLTZ:  So we don't have the original

2     because his Facebook is shut down.  So the only way that we

3     could verify them would be on a return.  And they weren't on

4     the return.

15:23:35    5          THE COURT:  All right.  So, just to be clear, on

6     Exhibit 505, you're objecting to the text message, not the

7     photograph?

8          MS. SHERMAN-STOLTZ:  The authenticity.  We have no way

9     of verifying that that is what he wrote.

15:23:49   10          MS. MARTIN:  And, to be clear, Your Honor, the

11     defendant has admitted on the record that he used this account

12     as well.  So he's admitted to authoring all of the other posts.

13     It's these specific posts.  And Agent Armentrout has testified

14     that the other posts, some of which were submitted in tips by

15:24:06   15     this same individual that he says edited the posts, were

16     verified by the Facebook return and that there were no

17     inconsistencies in any of the other posts he viewed.

18          THE COURT:  Okay.  I'm going to hear the testimony on

19     this.  I'm going to reserve.  Just preliminarily, I do see a

15:24:29   20     lot of connections.  You know, as the agent pointed out,

21     vanguard appears.  We know that it appeared in another text

22     coming from the Facebook return.  There's a reference to

23     co-defendant, Nalley.  The first 200 or so to enter the Capitol

24     perhaps is consistent with the first six minutes after the

15:24:54   25     breach.

1          I don't -- I'm not saying that for certain now, but

2    these are consistencies that I see.  But I want each side to

3    lay this out.  And I will decide when I consider the evidence

4    whether you've met your threshold.

15:25:13  5          I think it's possible, Ms. Sherman-Stoltz, that they

6    authenticated it enough and it's going to go to weight, but I'm

7    not ruling now.  I need you all to focus on the specifics.  I

8    think that there are a number of things that suggest that they

9    can come in.  I'm just not prepared to rule now.

15:25:34 10          MS. MARTIN:  Yes, Your Honor.

11   **BY MS. MARTIN:**

12   **Q**   So, Agent Armentrout, looking at Exhibit 505 -- or talking

13   about 505, 506, and 507 together, do you know that -- when

14   those were posted?

15:25:49 15   **A**   Outside of being on the Sixth, no.

16   **Q**   Not the specific timing, but do you know they were posted

17   on the Sixth because that's the day they were screenshot and

18   forwarded along to the FBI?

19   **A**   Correct.  That's the information we were provided.

15:26:05 20   **Q**   All right.  And so you don't know the exact timestamp for

21   each of these?

22   **A**   No, ma'am.

23   **Q**   All right.  Could you just read what's posted here in

24   Exhibit 505?

15:26:15 25   **A**   We're going to get inside the Capitol before this ends.

1    **Q**    And in the picture, you previously said during the Court's

2    inquiry that this picture was obtained from the defendant's

3    cell phone?

4    **A**    Correct.

15:26:28  5    **Q**    And can you see smoke in the background of this crowd?

6    **A**    You can.  On the middle of the screen over by the trees on

7    the left-hand side.

8    **Q**    Thank you.

9        MS. MARTIN:  And could you please pull up Exhibit 506?

15:26:38  10    **BY MS. MARTIN:**

11    **Q**    All right.  And, again, you don't know the exact timing of

12    when this was posted?

13    **A**    No, ma'am.

14    **Q**    Could you please read that to the Court?

15:26:50  15    **A**    Today the American people proved that we have the power.

16    We physically took over -- I'm sorry.  We physically took

17    control of the Capitol building in a hand-to-hand hostile

18    takeover.  We occupied the Capitol and shut down the

19    government.  We put down their stolen election shenanigans.  I

15:27:15  20    was there and saw it all.

21        My buddy, Andy Nalley, and I were in the first 200 to

22    rush up the steps and inside after the vanguard had clashed

23    hard with the police and made them retreat.

24        The military isn't going to save the democrat

15:27:29  25    communists.  They are done.  Today we brought our government to

1    its knees with no weapons.  Now we're all going back armed for

2    war, and the deep state is about to get run out of D.C.

3            MS. MARTIN:  And could you please pull up Exhibit 507?

4    **BY MS. MARTIN:**

15:27:49 5    **Q**    And could you please read that?

6    **A**    These were first 200 or so of us to actually get inside the

7    Capitol.  There was a group outside who made the initial

8    breakthrough.  Not shown.  And a few of them got hurt good.

9    Sorry.  A few of them got hurt pretty good, but it didn't

15:28:12 10   matter.  Those of us coming up filled the ranks, and we pushed

11   on through and headed to the next barricade without stopping.

12   That's what you're seeing here.

13   **Q**    Thank you.  All right.

14           MS. MARTIN:   And could you please show Exhibit 508?

15:28:25 15           And, to be clear, Your Honor, this was included in the

16   return and has already been admitted by the Court.

17   **BY MS. MARTIN:**

18   **Q**    Could you please -- and this is a longer post, so it's

19   going to be multiple pages.  So if you could, just read the

15:28:39 20   first page we're seeing here.

21   **A**    Okay.  Patriots have taken the Capitol building.  We

22   overran multiple police barricades and swarmed the building.

23   We busted through.  Thousands of us swarmed in.  There was a

24   last police barricade inside, and we had packed in right up to

15:29:01 25   them.  Somebody yelled, push through.  So we did.  And the

1    shock of our momentum brushed them aside.  Some people were

2    bleeding pretty badly at that point.

3         After we had overrun the last police barricade, the

4    momentum caused a bad crush at one point.  But carried the

15:29:18  5    vanguard through several smaller doors and down the halls as we

6    swarmed Congress, yelling the names of various members.

7         MS. MARTIN:  And if you could go to the next page of

8    that exhibit.  All right.  And this is Page 2 of Exhibit 508.

9    **BY MS. MARTIN:**

15:29:40  10   **Q**   Could you please read that?

11   **A**   Then we stormed upstairs through the Rotunda, admiring the

12   amazing artwork but, at the same time, looking for members of

13   Congress, as, by this time, we physically owned the Capitol.

14   All law enforcement had retreated to the perimeter and even

15:29:59  15   more thousands were trying to push in.  And get this.  The

16   first of us who got upstairs kicked in Nancy Pelosi's office

17   door and pushed down the hall towards her inner sanctum, the

18   mob howling with rage.  Crazy Nancy probably would have been

19   torn into little pieces but she was --

15:30:24  20        MS. MARTIN:  And if you could go to the third page.

21   All right.

22   **BY MS. MARTIN:**

23   **Q**   Could you please read the first page of Exhibit 508?

24   **A**   -- nowhere to be seen.  Then a S.W.A.T. team showed, and we

15:30:35  25   retreated back to the Rotunda and continued our hostile

1    takeover of the Capitol building.  There was such a push of

2    even more patriots coming into the Capitol that we couldn't get

3    out for about 20 minutes.

4        If this steal doesn't get fixed, there's a talk of

15:30:52  5    patriots coming back.  This time fully armed for war.  We mean

6    business.  We proved today that we're in control, and we

7    outnumber the deep state 10,000 to one.  They can't stop us.

8    **Q**   And just focusing on the phrase "this time fully armed for

9    war," did we see that in one of the previous exhibits that were

15:31:14 10    not included in the return, as well?

11        MS. MARTIN:  If you could, go back to 507.

12        THE COURT:  506.

13        MS. MARTIN:  Oh.  506.  Thank you, Your Honor.

14    **BY MS. MARTIN:**

15:31:33 15    **Q**   And could you just read the last line on that?

16    **A**   Now we're all going back armed for war, and the deep state

17    is about to get run out of D.C.

18    **Q**   So that's also a phrase we saw you just read in 508 that

19    was verified by the returns, correct?

15:31:48 20    **A**   Correct.

21    **Q**   And going back to 508, if you could, and this was a long

22    post, but he posted something similar on Facebook, correct,

23    that was at Government's Exhibit 414 -- if we could pull that

24    up.

15:32:14 25        And is this, once you had a chance to look at it, sort

1    of similar to that narrative that we saw in 508?

2    **A**    Yeah.  And the other one is a Facebook post.  This is a

3    Parler post, just to clarify.

4    **Q**    Oh.  I apologize.  Thank you so much.

15:32:28    5    **A**    No problem.

6            MS. MARTIN:  So 414 is a Parler post and 508 was a

7    Facebook post just for the record.

8    **BY MS. MARTIN:**

9    **Q**    And 414 -- was that also posted on January 6th?

15:32:37    10    **A**    Correct.

11    **Q**    Could you please read that to the Court?

12    **A**    Patriots have taken the Capitol building.  We overran

13    multiple police barricades and busted through.  After we had

14    overrun the last police barricade, the momentum caused a bad

15:32:51    15    crush at one point.  But carried the vanguard through several

16    smaller doors and down halls as we swarmed Congress, yelling

17    the names of various members.  Then we stormed upstairs through

18    the Rotunda.

19            The first of us who got upstairs kicked in Nancy

15:33:08    20    Pelosi's office door and pushed down the hall towards her inner

21    sanctum, the mob howling with rage.  Crazy Nancy probably would

22    have been torn into little pieces, but she was nowhere to be

23    seen.  Then a S.W.A.T. team showed, and we retreated back to

24    the Rotunda and continued our hostile takeover of the Capitol

15:33:29    25    building.

1        If this steal doesn't get fixed, there's talk of

2   patriots coming back, this time fully armed for war.  We proved

3   today that we're in control, and we outnumber the deep state

4   10,000 to one.  They can't stop us.

15:33:43  5   **Q**   And these two posts, 414 and 508 that have a similar

6   narrative, did you also find a similar narrative written in the

7   defendant's notes that were obtained from his phone?

8   **A**   Yeah.  I believe we did, but I'm not sure.  I'd have to

9   review it.

15:34:04 10   **Q**   That's okay.

11   **A**   I think that we did, but I can't be for certain.

12   **Q**   If you don't remember, that's fine.

13   **A**   We -- I remember the investigation when we found where,

14   like, the narrative was being written.  Not in a post.  Like,

15:34:19 15   it was being written out prior to posting so they could copy

16   and paste it.  I believe it was in the phone, but I'm

17   questioning if I remember that correctly at this point, to be

18   fair.

19   **Q**   That's okay.  All right.  Let's move on to 420.  And this

15:34:38 20   is, again, a Parler post.

21        And could you please read the date stamp on that?

22   **A**   January 7th, 2021.

23   **Q**   So one day after January 6th?

24   **A**   Correct.

15:34:49 25   **Q**   Could you please read that?

1    **A**   What I've learned about January 6.  This was a historic

2    moment for the USA.  I think that, on the whole, it helped.

3    The people inside the Capitol on my videos are not doing

4    anything violent.  In fact, no protester assaulted anyone.

15:35:10  5    There supposedly was violence in town later that evening, but

6    that wasn't during the Capitol incident.  And the crowd was

7    not, in fact, violent from what I saw.  The police kept

8    withdrawing backwards as it pushed forward.  We were admiring

9    artwork in the Rotunda.  Nothing was vandalized or burned.

15:35:28  10       Somebody yelled Speaker Pelosi's office door had been

11   kicked in.  And it was.  But that was all I saw as far as

12   property damage.  The crowd was not there to destroy.  It only

13   wanted to communicate to Congress in the only real way

14   available at the time.  And that's what happened.  This was the

15:35:48  15   first crowd to enter the Capitol.  What came later I don't know

16   because I had left.

17   **Q**   Thank you.

18            THE COURT:  Sorry to interrupt.  This was part of a

19   return?

15:35:59  20            THE WITNESS:  Correct.

21            THE COURT:  This one?

22            THE WITNESS:  Yes, ma'am.  This was in the Parler

23   return, yes, ma'am.

24            THE COURT:  All right.  And there's no record why

15:36:05  25   certain messages are missing from the return?

1          THE WITNESS:  I don't think there's any messages --

2          THE COURT:  Facebook can't --

3          THE WITNESS:  I don't believe there are any messages

4     missing from Parler.

15:36:16  5  **BY MS. MARTIN:**

6     **Q**   To be clear, the only three that were missing from the

7     Facebook return were 505, 506, and 507, correct?

8     **A**   Yes.

9     **Q**   All the other exhibits in Exhibit Series 400 and 500 were

15:36:27 10   verified in returns, right?

11    **A**   Yes.

12    **Q**   And would one of the potential reasons -- I mean, you said

13    earlier that you weren't sure, but Facebook itself was taking

14    down posts on January 6 because it violated their policies,

15:36:40 15   correct?

16    **A**   That is correct.

17         THE COURT:  But there's no record Facebook can provide

18    that shows they took it down or they didn't take it down?

19         THE WITNESS:  Ma'am, in my experience, trying to

15:36:50 20   communicate with Facebook and get an explanation of --

21         THE COURT:  Anything?

22         THE WITNESS:  -- why something is or isn't present is

23    not very fruitful, and they typically say, you got what you

24    got.

15:37:04 25        MS. MARTIN:  All right.  And could you please pull up

1  Exhibit 423?

2  **BY MS. MARTIN:**

3  **Q**   And could you please read the date on that?

4  **A**   January 9th, 2021.

15:37:21  5  **Q**   We're now three days after January 6th?

6  **A**   That's correct.

7  **Q**   Could you please read that?

8  **A**   Well, I made the Atlanta Journal Constitution.  It is a

9  good article, although I would disagree with the part that says

15:37:31  10  we broke into the Capitol.  We didn't break anything.  That's a

11  fact.  Later on, from video, I learned that a couple of windows

12  were broken.  Since people could have just walked in the front

13  door, I don't know why they broke anything.  But whatever.  I

14  suspect that those were the Antifa infiltrators that the D.C.

15:37:52  15  police escorted into town.  Nobody I saw did any property

16  damage.  The accusations of domestic terrorism are straight up

17  bullshit.  Just a false cover thrown out there by the real

18  criminals who stole our election.

19  **Q**   Thank you.  Let's talk about some of the content that you

15:38:12  20  found on the defendant's phone which have now been admitted at

21  Government's Exhibit 600 through 632.

22          MS. MARTIN:  So if we could pull up Exhibit 603.

23  Actually, hold on that for a second.

24  **BY MS. MARTIN:**

15:38:25  25  **Q**   Exhibit 600 through 608 are cell phone videos, correct?

                1   **A**   Yes.  I believe so.

                2   **Q**   And what day were those videos recorded on, according to

                3   the cell phone extraction?

                4   **A**   They were all on January 6.

    15:38:40     5   **Q**   And how do you know they were recorded on the Sixth?

                6   **A**   From the cell phone extraction, it gives a date, timestamp

                7   of when the video was recorded.

                8           MS. MARTIN:  Could we please pull up Exhibit 603?

                9       (Video played.)

    15:39:11    10           MS. MARTIN:  Could you pause there?

               11   **BY MS. MARTIN:**

               12   **Q**   And that's the defendant, correct?

               13   **A**   Yes, ma'am.

               14           MS. MARTIN:  Could you keep playing?

    15:39:22    15       (Video played.)

               16   **BY MS. MARTIN:**

               17   **Q**   In the view that we see in this exhibit, is that consistent

               18   with the picture that was included, 505, that had the caption,

               19   we're going to get inside by the end of the day or something to

    15:39:50    20   that effect?

               21   **A**   Yes, ma'am.  Appears to be.

               22   **Q**   And is there anything significant to you about this video?

               23           What did you notice as a part of your investigation?

               24   **A**   So it's a -- I would say a lot going on in that video.  One

    15:40:05    25   is the -- it appears as though the crowd has been -- I would

1    call it teargas -- I think that is a colloquial term.  I don't

2    know what the Capitol Police had used.  But, clearly, some kind

3    of chemical had been dispersed on that crowd at some point.

4    You can tell from the smoke and also tell by the other people

15:40:26   5    in that video that are coughing, rubbing their eyes, covering

6    their mouth.  They appear to be suffering the symptoms of what

7    would occur if you had been confronted with one of those

8    chemical agents.

9    Q    Anything else that you would like to add?

15:40:44   10   A    The defendant talks in that video about crossing

11   barricades.  And they are making their way up towards the

12   Capitol building.  And I think, as we move forward, we'll see

13   how they progress.

14   Q    And is the statement he made in that video consistent with

15:41:02   15   what he was posting on Facebook and Parler?

16   A    Yes, ma'am.

17        MS. MARTIN:  Could you please play 604?

18   (Video played.)

19   **BY MS. MARTIN:**

15:41:49   20   Q    And, in that, you heard the defendant say, we're storming

21   the Capitol?

22   A    That's correct.

23   Q    And is that also consistent with what he was posting on

24   social media?

15:41:58   25   A    Yes.  I think it's hard to hear.  Towards the beginning of

that video as they're making their way to the steps, there is a

gentleman that says something to the effect of come on; we need

numbers or something -- I would have to rewind it and listen to

it again.  But he says something to the effect of get in there;

15:42:17   we need numbers, something to that effect, which is consistent

with the post vanguard made entry and then they filled the

ranks.

**Q**   And if we could just replay the video and maybe you could

just indicate when you hear that statement being said.

15:42:30 10   **A**   Yes, ma'am.

11      (Video played.)

12   **A**   Right there, ma'am.  That's right, guys.  Hurry up.  We

13   need numbers.  Let's go.  Something to that effect.

14         MS. MARTIN:  Just for the record, that is a little

15:43:02 15   before 22 seconds.

16         If you could, pull up 607, please.

17      (Video played.)

18         MS. MARTIN:  Could you pause at eight seconds?  Sorry.

19      (Video played.)

15:43:18 20         MS. MARTIN:  Perfect.

21   **BY MS. MARTIN:**

22   **Q**   What are we seeing in this frame or just --

23         MS. MARTIN:  If you could, just go back a tad, Dan.

24   Just when you can see the police.  That's fine.  Great.  It's

15:43:36 25   paused at seven seconds.

**BY MS. MARTIN:**

1

2    **Q**   So what are we seeing in this frame?

3    **A**   So it appears to be the protesters have entered the

4    Capitol.  I believe this is the Crypt.  And they are -- have

15:43:52 5    been confronted by police at this point.  And they've come

6    to -- at this point in the video, it is kind of a stalemate.

7    They're squared off with the police.

8    **Q**   And does it appear that the defendant is pretty close to

9    the front of the line of rioters in front of the police?

15:44:08 10    **A**   Yes, ma'am.  I believe he's within the first couple of rows

11    for sure.

12    **Q**   And, again, you heard Captain Mendoza testify earlier,

13    correct?

14    **A**   Yes, ma'am.

15:44:19 15    **Q**   And she testified that this line of police officers was

16    ultimately overrun?

17    **A**   Yes, ma'am.

18         MS. MARTIN:  Okay.  Could you continue to play?

19         (Video played.)

15:45:00 20    **BY MS. MARTIN:**

21    **Q**   Now we didn't see the defendant's face in that video, but

22    you interacted with the defendant before, correct?

23    **A**   That's correct.

24    **Q**   And are you able to say if that's his voice or not?

15:45:08 25    **A**   I believe it is.

1          MS. MARTIN:  Could you please play Exhibit 608?

2      (Video played.)

3          MS. MARTIN:  Could you pause there, Dan, or just a

4  second before where you can see the sign on the door?  Perfect.

15:45:49  5          We're paused at 24 seconds.

6  **BY MS. MARTIN:**

7  **Q**   Did you review this exhibit prior to your testimony today?

8  **A**   Yes, ma'am.

9  **Q**   And did you have the ability to zoom in on that nameplate?

15:45:57 10  **A**   We did.

11  **Q**   And did that appear to be a congressperson's nameplate?

12  **A**   It does.

13  **Q**   In other posts that we've reviewed today, did the defendant

14  state in those media posts that they were looking for members?

15:46:11 15  **A**   Yes.

16  **Q**   And is that what he's saying he's doing in this video?

17  **A**   Correct.  And in this video, you can hear them pounding on

18  the doors, going down the hallway.

19          MS. MARTIN:  All right.  Continue playing, please.

15:46:22 20      (Video played.)

21  **BY MS. MARTIN:**

22  **Q**   All right.  Now you previously testified that the

23  defendant's a practicing criminal defense attorney in Georgia;

24  is that right?

15:47:06 25  **A**   Yes, ma'am.

1          MS. MARTIN:  Could you please pull up Exhibit 206?

2    **BY MS. MARTIN:**

3    **Q**   During your investigation, were you made aware of a hearing

4    that took place in Crisp County on May 12th of 2021?

15:47:19  5    **A**   Yes, ma'am.

6    **Q**   How did you become aware of that hearing?

7    **A**   The D.A.'s office notified me of that hearing.  I believe

8    it was the ADA.  Well, I believe I first was notified by the

9    Americus police chief who directed me towards the ADA who I

15:47:38 10    then contacted.  Would have been Ms. Owens, I believe.

11    **Q**   And why did they notify you of this hearing?

12    **A**   They stated that during the -- while in the courtroom,

13    Mr. Calhoun had made comments about his presence in the

14    Capitol.

15:47:53 15    **Q**   And was he in his capacity as a defendant or as a defense

16    attorney?

17    **A**   He was there -- my understanding was he was there

18    representing someone in court.

19    **Q**   All right.  What did you do after you received that

15:48:07 20    information from the ADA?

21    **A**   Contacted the ADA to determine what was possibly said.  And

22    we then contacted, I believe it was, the clerk of the court to

23    determine if there was a record of it.

24    **Q**   And was there?

15:48:24 25    **A**   Yes.

**Q**   And I'm showing you Exhibit 206.  Is this that transcript?

**A**   Yes.  It appears to be.

**Q**   This is the transcript that you received from the Crisp County clerk?

**A**   Yes.

**Q**   All right.  And is it a fair and accurate depiction of what you obtained from the clerk?

**A**   It is.

MS. MARTIN:  Your Honor, I would seek to admit this exhibit.  And only Pages 1 through 3 are relevant for our purposes.

THE COURT:  Any objection?

MS. SHERMAN-STOLTZ:  Yes.  We noted an objection as far as relevance.  I mean, the government just said that I guess only one page is relevant to what they're speaking to.

THE COURT:  Did you say one page or --

MS. MARTIN:  Pages 1 through 3, Your Honor.

Obviously, I think the first page is important because of the date and the proceeding type and his role in it, which says he is a defense attorney, representing a defendant.  And then the second page has the substance.

THE COURT:  And what does the third page add?

MS. MARTIN:  If we could just go to the second page and then the third page.

I believe it's just the tail end of his statement.

1          THE COURT:  Can you go back to the second page,

2     please?

3          MS. MARTIN:  So it's really the last paragraph there.

4          THE COURT:  All right.  Well, Ms. Sherman-Stoltz, I

15:49:50  5     think at a minimum it goes to his credibility.  I think he

6     testified a little inconsistently with that at the detention

7     hearing, if I'm recalling correctly.

8          MS. MARTIN:  And, Your Honor, just for the record,

9     will that be admitted?

15:50:03  10          THE COURT:  Yes.  Over defense objection.

11          MS. SHERMAN-STOLTZ:  Is that all in its entirety or

12     just the pages that the government is requesting?

13          THE COURT:  Do you have any objection to the context,

14     the date and the place and --

15:50:16  15          MS. SHERMAN-STOLTZ:  No.

16          THE COURT:  He is an officer of the Court?  It's

17     just --

18          MS. MARTIN:  It's 13 pages, and we just didn't see the

19     relevance of, like, everything.

15:50:24  20          THE COURT:  I don't think they're seeking to -- in

21     fact, it sounds like, Ms. Martin, you would be fine redacting

22     it after the top of Page 3.  Or is there something more?

23          MS. MARTIN:  Yes.  That's fine, Your Honor.  We can

24     just submit the first three pages to the Court.

15:50:38  25          THE COURT:  So understanding how I've ruled,

1      Ms. Sherman-Stoltz, would you prefer that it not include the

2      full third page, just the first sentence?

3              MS. SHERMAN-STOLTZ:  Yes.

4              THE COURT:  Yes?

15:50:49  5              MS. SHERMAN-STOLTZ:  Yes, Your Honor.

6              THE COURT:  All right.  I don't see, unless you can

7      make an argument, the relevance of the rest.

8              MS. MARTIN:  Your Honor, I will make it easier.  I

9      think we can just exclude Page 3.  Looking at it now, I think

15:51:00 10      it's really only relevant up to the second --

11              THE COURT:  So the cover sheet and the first page.

12      That's the extent of the exhibit, correct?

13              MS. MARTIN:  Yes, Your Honor.

14              THE COURT:  All right.  That's admitted.

15:51:10 15          (Government's Exhibit 206 was admitted in evidence.0

16              MS. MARTIN:  Thank you, Your Honor.

17      **BY MS. MARTIN:**

18      **Q**   All right.  Agent Armentrout, can you read the second big

19      paragraph at the bottom on that page where it says Mr. Calhoun?

15:51:21 20              And Mr. Haines is going to blow it up for us.

21      **A**   Mr. Calhoun:  I can respond to this.  Your Honor,

22      Mr. Wesley, is -- I think he has done this before.  There have

23      multiple calendars in this case.  He cannot get past the fact

24      that I was in federal detention for two months for entering the

15:51:44 25      Capitol, and I have had enough.  My position on that, somebody

1    had to do it, okay?  I would do it again a hundred times if

2    I -- if I were in the same situation.  That's just how I feel

3    about it.  He can't get past it.  And I'm afraid if the Court

4    doesn't address this today, whatever your decision is, if it's

15:52:05  5    adverse to him --

6    **Q**   That's fine.  Thank you.

7         MS. MARTIN:  And could you please pull up Exhibit 209?

8    **BY MS. MARTIN:**

9    **Q**   And are you also aware that Mr. Calhoun testified in

15:52:18  10   support of a defense motion before this Court on March 5th,

11   2021.

12   **A**   I am.

13        MS. MARTIN:  And, Your Honor, we would like to admit

14   this transcript in its entirety, although I think the Court may

15:52:31  15   be able to just take notice of it as well.

16        This is Mr. Calhoun's testimony during his bond review

17   hearing.

18        THE COURT:  Any objection?

19        MS. SHERMAN-STOLTZ:  No objection.

15:52:40  20        THE COURT:  All right.  It's admitted.

21      (Government's Exhibit 209 was admitted in evidence.)

22        MS. MARTIN:  Could you please turn to Page 16?  All

23   right.

24   **BY MS. MARTIN:**

15:52:55  25   **Q**   And, Agent Armentrout, I'm going to direct your attention

1    to the top of the page to Lines 1 and 2.

2            Could you please read those to the Court?

3    A   I'm sorry.  You want me to read Lines 1 and 2?

4    Q   Yes.  So if you see on the left-hand side, there is line

15:53:10  5    numbering.  So if you could read Lines 1 and 2.

6            And I think Mr. Haines will blow it up for us.

7    A   Yes.  I did write that.  But you've got to understand I had

8    a fairly significant following on social media.  And that

9    was -- I'm sorry.

15:53:25  10    Q   Thank you.

11            MS. MARTIN:  And could you please go to Page 18?

12    **BY MS. MARTIN:**

13    Q   And I'm going to direct your attention to the middle of the

14    page to line 12.

15:53:40  15            Could you please just read that first sentence?

16    A   I think on Facebook I had slightly less than 5,000.

17    Q   And you understand that to mean followers?

18    A   Friends, followers, yes.

19    Q   And are you, yourself, experienced using Facebook?

15:53:58  20    A   Yes.

21    Q   How many followers do you think is a significant number?

22    A   Well --

23    Q   Would 5,000 be a significant number?

24    A   5,000 would be significant in my mind, yes.

15:54:11  25            MS. MARTIN:  All right.  Could you please go to

1    Page 38?

2    **BY MS. MARTIN:**

3    **Q**    And I will direct your attention to Lines 13 through 21.

4         And could you please read that to the Court?

15:54:34  5    **A**    Look.  Why were regular, normal Americans entering the

6    Capitol?  That's the question.  We're not going to be turned

7    into criminals.  We're not criminals.  What did the government

8    do to make us enter the Capitol?  That's what really I would be

9    asking.  I mean --

15:54:54  10        I'm curious.  So what did the government do to make

11    you enter the Capitol?

12        Well apparently 80 percent of Republicans think they

13    stole the election.

14    **Q**    Thank you.

15:55:04  15        MS. MARTIN:  And could you please go Page 45?

16    **BY MS. MARTIN:**

17    **Q**    And I'll direct your attention to Lines 9 through 15.

18        Could you please read that to the Court?

19    **A**    That's a transcript of an audio -- or audio from a video

15:55:29  20    that you took and posted on Facebook, correct, sir?

21        Look.  I posted every video that I took on Facebook.

22    I don't know what you people did with them.  I don't know what

23    that is you just said.  I posted photographs and I posted

24    videos because I did not do anything wrong.  Okay?  Maybe I

15:55:50  25    trespassed.  Big deal.  Don't steal elections next time.

1    **Q**   Thank you.  Now, going back to the beginning of your

2    investigation, as part of your investigation, did you interview

3    the district attorney, Lewis lamb?

4    **A**   We did.

15:56:07  5    **Q**   And did you receive a recording from Mr. Lamb that

6    purported to be a phone call between Mr. Lamb and the

7    defendant, Mr. Calhoun?

8    **A**   Correct.

9    **Q**   And have you reviewed that audio recording?

15:56:20  10   **A**   I have.

11   **Q**   And through your interaction with the defendant, were you

12   able to determine if it was, in fact, the defendant on that

13   call with Mr. Lamb?

14   **A**   The voice is similar.  I would say that it is him.  And

15:56:33  15   then at the very beginning of the call, Mr. Lamb says, McCall,

16   and then he responds as if it is him.

17          MS. MARTIN:  Your Honor, at this time I would like to

18   admit the call, the audio recording of the call in its

19   entirety.  It is 29 minutes long.  So I don't intend on playing

15:56:52  20   all of it for the Court today, but I would like to admit it

21   all.

22          THE COURT:  Any objection?

23          MS. SHERMAN-STOLTZ:  Our objection, our question is

24   relevance.

15:57:00  25          THE COURT:  I haven't heard it.  So --

1          MS. SHERMAN-STOLTZ:  Yeah.  I'm not sure what they're

2     intending on introducing it for.  Like, what are the purposes?

3          THE COURT:  Can you make a proffer what's coming out

4     here?

15:57:13  5          MS. MARTIN:  Sure, Your Honor.  So on the call, he

6     appears to call Mr. Lamb because of his conduct on January 6th,

7     and he appears to basically want to tell Mr. Lamb, I did this,

8     but -- I was there, but I didn't do anything wrong.  And he

9     then sort of just goes on for 29 minutes.

15:57:33  10          And I think, you know, there are certainly statements

11     that aren't as probative as to his intent in that call, but

12     there are certainly statements that I think are probative and I

13     think also go to his credibility because, you know, we're now

14     after January 6th.  And I think through the call you would be

15:57:52  15     able to tell that he's sort of trying to backtrack on some of

16     his conduct that is clearly contradicted by some of the other

17     evidence.

18          THE COURT:  Based on the proffer, I will allow it.

19     After I hear it.  If I think differently, I will revisit it.

15:58:12  20          MS. MARTIN:  Thank you, Your Honor.  Obviously we are

21     not going to play all 29 minutes.

22          THE COURT:  Back to the length of the video, do you

23     have a separate objection, Ms. Sherman-Stoltz, even assuming

24     that some is relevant, not all, or is it just an all or nothing

15:58:26  25     objection?

1          MS. SHERMAN-STOLTZ:  I mean, that's what we would have
2     hoped to have gotten some clarification on.  Obviously, if
3     there were just certain parts of it they were trying to submit
4     for the Court to review, then we would object to the rest of it
15:58:38  5     being included.  But what I'm gathering from the government,
6     she's essentially saying she needs the whole thing.
7          THE COURT:  The whole thing.  Ms. Martin, is that
8     correct?  I'm not comfortable just simply because the
9     government only plays a short portion that it deems relevant
15:58:56 10     but the whole tape comes in that that doesn't create a problem
11     for the record.
12          MS. MARTIN:  I understand, Your Honor.  And I think
13     it's difficult because there are relevant statements that are
14     sort of interspersed amongst the conversation that he's having.
15:59:10 15     And because this isn't a jury trial, because it is Your Honor
16     reviewing it, you know, the government is comfortable having
17     you reserve on admitting the entire --
18          THE COURT:  You understand ultimately I may need to
19     address this unless I decide not to rely on it at all, right?
15:59:25 20          MS. MARTIN:  Yeah.  And we would be happy at that
21     point to make more -- we could cut it down specifically if you
22     would like.  It is difficult because there are statements
23     interspersed throughout the entire conversation.  It is not as
24     if we played the first two minutes that that's the only
15:59:40 25     relevant part.  He goes on for quite sometime.

```
 1              THE COURT:  All right.  Go ahead.

 2              MS. MARTIN:  If we can just start the audio from the

 3       beginning, please.

 4          (Audio played.)

15:59:51  5              MS. MARTIN:  And we're just going to play the first

 6       five minutes and 50 seconds if that's all right with Your

 7       Honor.

 8              THE COURT:  Yes.

 9          (Audio played.)

16:00:07 10              MS. MARTIN:  It's 310.

11          (Audio played.)

12              MS. MARTIN:  Could you please fast-forward to eight

13       minutes and play from there?

14          (Audio played.)

16:07:49 15              MS. MARTIN:  And, Your Honor, for the record, we're

16       stopping at 9:29.

17       BY MS. MARTIN:

18       Q   I just have a few concluding questions for you, Agent

19       Armentrout.

16:07:57 20              Throughout your investigation, were you aware of any

21       instance in which the defendant would have had lawful authority

22       to be on Capitol grounds on January 6, 2021?

23       A   No.

24       Q   To your knowledge, is the defendant a member of law

16:08:10 25       enforcement?
```

1    A    He is not.

2    Q    And, to your knowledge, is he a member of the press?

3    A    No.

4         MS. MARTIN:  Your Honor, I would tender the witness.

16:08:17    5         THE COURT:  All right.  Thank you.  Cross?

6         MS. SHERMAN-STOLTZ:  May I ask if we can take five

7    minutes?

8         THE COURT:  Sure.  Absolutely.  Yeah.  We will take a

9    five-minute break.  Thank you.

16:08:29    10        COURTROOM DEPUTY:  All rise.

11        (Short recess.)

12        MS. SHERMAN-STOLTZ:  May I approach, Your Honor?

13        THE COURT:  Of course.

14                   **CROSS-EXAMINATION**

16:22:26    15   **BY MS. SHERMAN-STOLTZ:**

16   Q    Good afternoon.

17   A    Good afternoon, ma'am.

18   Q    I believe that you kind of clarified this under direct

19   examination, but I wanted to ask again.

16:22:38    20        Throughout the course of your investigation -- and,

21   you know, you were the lead investigator on the investigation

22   into Mr. Calhoun -- was it ever alleged that he was attempting

23   to or had brought any type of firearm to Washington, D.C.?

24   A    No.

16:22:57    25   Q    And I think you testified to two prior occurrences of,

1    like, open carry -- can you, like -- I don't know if they were

2    a rally or peaceful display.

3         Can you give more information on that?

4    **A**    I think that's accurate.  He coordinated, like, a rally is

16:23:19  5    probably accurate.  A gathering, if you will, of people who

6    wanted to support Second Amendment in an open-carry

7    demonstration, like, peaceful demonstration that was

8    coordinated through the police department and sheriff's

9    department in Sumpter County, Georgia.

16:23:38  10         I don't remember if this was specifically at the

11    courthouse or another location within Americus.  But it was in

12    the Town of Americus.  I believe it was at the courthouse.  I

13    don't recall specifically.  But I do know that it was

14    coordinated and it was peaceful.

16:23:51  15    **Q**    Okay.  So far as you are aware, he followed all the

16    necessary procedures, talking to whomever he needed to to gain

17    permission to make sure that it was authorized?  He followed

18    all those steps, to your knowledge?

19    **A**    To my knowledge, I don't believe that -- so from my

16:24:07  20    perspective, I can't say what steps he took to do that.  I just

21    know with my engagement with local law enforcement that it was

22    done to their satisfaction.

23    **Q**    Okay.  And do you recall time frame for those two?

24    **A**    November, 2020.  One may have been in October.  But I

16:24:32  25    believe, from my recollection, both occurred in November of

1    2020.

2    **Q**    Okay.  So that would be -- I mean, we saw some of the

3    posts, Facebook and Parler posts, from November that, you know,

4    he's clearly communicating that he's upset about the election.

16:24:50 5              So during that period of time where he's voicing his

6    feelings online, your testimony would be that he's conducted a

7    peaceful type of protest or rally with no violence?

8    **A**    So in November of 2020 when he was posting violent things

9    on Facebook, he did also hold two rallies in Sumpter County,

16:25:17 10   Georgia that were peaceful.

11   **Q**    Okay.  And throughout your investigation, was there ever

12   any type of allegations by others against him of him having

13   threatened an individual, harmed an individual, threatened harm

14   of an individual, anything along those lines?  Any type of

16:25:41 15   violence against another human being?

16   **A**    So I think if you look at his social media posts, those are

17   threatening in nature of a group of individuals based on their

18   ideology.

19              I do not have a specific individual, like, that he per

16:25:57 20   se named that he threatened.  He threatened Democrats.  He

21   threatened communists.  He made very broad generalizations in

22   his threats to the point where it rose to the level of multiple

23   federal agencies becoming aware of him, which is not common.

24              But to a specific individual, I do not have any

16:26:18 25   evidence of that, no.

1                I hope that answered your question.

2    **Q**    And no evidence that he acted upon any of that frustration,

3    comments that he was saying online?

4    **A**    No, ma'am.

16:26:32  5    **Q**    And you said -- so multiple agencies were being alerted.

6    Was multiple agencies being alerted by the same individuals?

7    **A**    So I don't know where the United States Secret Service

8    knowledge came from.  I think it's fair to say individuals

9    within the same area of Americus, Georgia.  I can't speak to

16:27:00  10   where the initial information came from when it went to the

11   United States Secret Service.  I just know where our

12   information came from and then our conversations with local and

13   state law enforcement individuals.

14   **Q**    And you named three individuals.

16:27:13  15           Were those the ones that were just sending you the

16   screenshots, or were those the ones that had also made the

17   complaints?

18   **A**    Which three individuals?

19   **Q**    You mentioned three names.  I think one was, like, Patrick

16:27:31  20   Owens?

21   **A**    Yes, ma'am.  I'm sorry.  I mentioned some law enforcement

22   names, too.  I wasn't sure.  So yeah.  There was Houston Scott,

23   Patrick Owens, Kathy Partridge.  Repeat -- they provided

24   information.  The complaints came from numerous places.  I

16:27:55  25   think Houston Scott was one of them.

1        Those individuals' complaints typically came through

2   local law enforcement.  And there was other complaints that

3   were filed online of individuals we did not make contact with,

4   alerting us to Mr. Calhoun.

16:28:12  5   Q   And you -- you said you couldn't remember, I guess, their

6   employment, the individuals that -- you know, Houston Scott,

7   Patrick Owens, and Kathy Partridge?

8   A   So in reference to -- I think I was referencing how -- if

9   they knew each other.  I don't believe Houston Scott -- I

16:28:37  10   don't -- I think he was a student at the time or he had

11  recently been a student, and I don't know if he was employed or

12  not.  I do not believe that he had knowledge of Owens and

13  Partridge.

14        Now, if Owens and Partridge had knowledge of each

16:28:57  15   other, I would say it's possible simply because Americus is a

16  very small town.  I do not recall asking them what their

17  profession was or inquiring about their profession.

18  Q   And so Houston Scott, you said, a student.  Do you know if

19  he had, like, a prior relationship with Mr. Calhoun?

16:29:20  20   A   Not to my knowledge.

21  Q   And then Patrick Owens.  I mean, is it possible that it is

22  the Patrick Owens that's the husband of the deputy D.A. there?

23  A   Yes, ma'am.

24  Q   And as far as that -- you explained that Mr. Calhoun

16:29:43  25   practices criminal defense.

1     A     Correct, ma'am.

2     Q     So deputy D.A. would be someone that he regularly kind of

3     comes up against?

4     A     Certainly.

16:29:53  5     Q     Or has.  And so the husband is one of the ones making these

6     complaints or sending you screenshots?

7     A     Provided information is what I would say.  We use complaint

8     in a -- the FBI complaint means if someone provided us

9     information that is alleging some wrongdoing had occurred.

16:30:12 10     It's not like he was -- I don't want it to be misconstrued as

11    they were calling up and complaining about him.  It was they

12    were providing us information that they believed a crime was

13    committed.

14    Q     And what crime did they believe had been committed other

16:30:25 15    than just posting stuff on social media?

16    A     That Mr. Calhoun had traveled to Washington, D.C. in order

17    to disrupt the certification of the election.

18    Q     And that's specifically what they said?

19    A     No.  They did not specifically say that.  They specifically

16:30:41 20    said that he -- no.  They did not say that specifically, to be

21    clear.

22          That he traveled there and participated in the riot,

23    was posting stuff within the Capitol, and was there throughout

24    the events and posting about it would have been more on the

16:31:03 25    line of what they specifically said.

1    Q    It didn't seem like he was trying to hide that, though.  I

2    mean, he was posting it publically on social media, and then

3    even did an interview with the Atlanta Journal, right?

4    A    Yes, ma'am.  Correct.

16:31:17  5    Q    I mean, they're just making you aware, I guess, of

6    something he's already making everybody else aware of?

7    A    Certainly, ma'am, people post criminal activity on social

8    media all the time.  Doesn't mean law enforcement is aware of

9    it.  So they were making law enforcement aware of it.

16:31:30 10    Q    But he had a rather large following?

11    A    According to him, yes.

12    Q    Okay.  Oh.  So you didn't verify that?

13    A    No.  I believe I did in previous testimony, yes, ma'am.

14    Q    You did verify the 5,000 or you didn't?  I'm sorry.

16:31:44 15    A    I think I previously testified that he had a large

16    following.  I don't know that I verified that 5,000 was

17    accurate.

18    Q    I understand.  You mentioned that you all had received, I

19    guess, a tip prior to January 6th?

16:32:05 20    A    Correct.

21    Q    And I guess someone that you were overseeing had received

22    that tip.

23             Do you recall time frame for that?

24    A    Early to mid-January -- I'm sorry.  Early to mid-November

16:32:20 25    of 2020.

1    Q    Okay.  So when some of the social media posts that this

2    Court has seen were being posted?

3    A    Yeah.  I'm trying to think if -- so he was posting on

4    social media concerning things in line with what we've reviewed

16:32:43   5    here today.  I think the postings that were in that tip may

6    predate what we covered today, but they were discussing things

7    like I can shoot head shots with my AR-15 out to 200 yards; I

8    will kill communists; kill the Democrats.  It was all in

9    keeping with what -- it was very similar to what he was posting

16:33:10  10    we covered in the trial today.

11    Q    I mean, and did you verify those posts; that he -- you

12    know, that they were there?  You got the subpoena duces tecum

13    returned.  Did you verify that those posts were present?

14    A    At what point in time?

16:33:26  15    Q    Well, at any point in time upon the initial, you know,

16    alert of the tip or later on in your investigation.

17    A    So upon the initial alert of the tip when we determined

18    that the other federal agency involved was essentially handling

19    this issue, we went -- we didn't go any further.  We stopped

16:33:48  20    there and alerted them that, should they need our assistance,

21    we're available.  But, obviously, having two federal agencies

22    trying to do the same thing is usually not good.

23         We allowed them, since they had already had previous

24    knowledge, to maintain what was going on.  We closed it out on

16:34:05  25    our end, and we didn't go any further.

         1    Q    Okay.  And I guess I'm just trying to kind of confirm as

         2    far as your tip was -- were you receiving screenshots or were

         3    you just -- did someone call in and say, I'm concerned about

         4    this individual because this is what their posts are saying?

16:34:23 5    A    No.  I believe it was the tip came in I believe through our

         6    national tip line.  And it must have been electronically

         7    because there were screenshots provided, if I remember

         8    correctly.

         9    Q    And then you -- did you say was it the Secret Service kind

16:34:42 10   of said, we've got this; we're looking into it?  And did

        11    anything come of that?

        12    A    I don't know.  I can't speak to what Secret Service did.

        13    Q    Okay.  So you went through his phone and looked at the

        14    pictures and videos; is that correct?

16:35:06 15   A    Correct.

        16    Q    And you viewed all of the government's exhibits related to

        17    his Parler posts and Facebook posts; is that correct?

        18    A    Yes.  Just to be clear, that's separate from the phone,

        19    though.

16:35:17 20   Q    Right.

        21    A    Yes, ma'am.

        22    Q    Yeah.  Second question.  Sorry.

        23    A    Yes, ma'am.

        24    Q    So you reviewed all those, and then you reviewed everything

16:35:23 25   in his phone.  So you're very familiar with kind of all of

1   these exhibits from the phone to the social media, the various

2   security footage; would that be correct?

3   **A**   Yes, ma'am.

4   **Q**   At any point in time, do you hear him yelling or chanting,

16:35:43  5   screaming at people?

6   **A**   No.

7   **Q**   How about even -- I heard in one of the videos there are

8   other people yelling, like, stop the steal.  Do you ever hear

9   him say that?

16:35:58 10   **A**   In the videos, no.  In his posts, yes.  He references

11   stopping the steal.

12   **Q**   Right.  In his videos, particularly, when he's on the

13   grounds and inside of the Capitol?

14   **A**   I'm sorry.  What is the question?

16:36:15 15   **Q**   Do you hear him say or yell, stop the steal, in those

16   videos?

17   **A**   No.

18   **Q**   Does he ever mention in any of those videos or even posts

19   that he wants to stop the certification of the vote

16:36:38 20   specifically; that that's what he wants to do?

21   **A**   He doesn't say that specifically, no.

22   **Q**   How about after the fact in the recorded conversations that

23   you listened to?  In any of his dealings with individuals, did

24   anyone ever say that he said that he went there to do this?

16:36:56 25   **A**   So what he said in his article with the Atlanta Journal was

1    people there were of a like mind.  In the videos he posted

2    online, people are saying, fuck the deep state, we will go to

3    war, and other violently natured things.  I can only assume

4    from that is that those are the like-minded people he is

16:37:15  5    talking about.  But does he ever make that assertion himself in

6    those videos?  No.

7    **Q**    And you say, like-minded, but he's not acting out any of

8    that violence that you're hearing or seeing that other people

9    are doing.

16:37:36  10   **A**    Is that a question?

11   **Q**    Is that correct; that he's not acting out on those things?

12   **A**    So if the question is was he violent, no; he didn't appear

13   to be violent.

14   **Q**    Well, and that was following up saying, you know,

16:37:52  15   like-minded.  You're comparing him to individuals that are

16   saying things like that.

17   **A**    I did not.  He did in his statement to the Atlanta Journal.

18   He said that he was there with like-minded people.

19   **Q**    Okay.  I misunderstood.

16:38:04  20   **A**    I did not make that comparison.  He did.

21   **Q**    I thought you said he was with like-minded people.

22   **A**    No, ma'am.  I apologize.  In his Atlanta Journal interview,

23   he said they were like-minded people.

24   **Q**    Like-minded in thought process, political?  That could go

16:38:20  25   for a lot of things; is that correct, being like-minded with

1    someone?

2    **A**    He's -- yes, ma'am.  But he's specifically referencing the

3    folks that were at the Capitol, entered the Capitol during that

4    interview.  He's talking about what he did there and that he

16:38:37  5    was there with like-minded peep.  The people in those videos

6    are confronting a police line inside the Capitol and saying

7    things such as, like I previously stated, you know, fuck the

8    deep state; we will go war.

9    **Q**    But would you also agree that he has posts where he's

16:38:55 10    saying -- multiple posts where he's saying, I didn't see anyone

11    break anything; I didn't see anyone do any damage; everyone was

12    just walking around, admiring things?  Does he say those things

13    in his posts as well?

14    **A**    He says those things going forward from January 7th on.  He

16:39:16 15    doesn't say those things on January 6th.

16    **Q**    But we have some of his videos, and we didn't see any of

17    those things.  When he walked through the Capitol, the door was

18    open, correct?

19    **A**    The door was open and the windows were broken.

16:39:36 20    **Q**    I mean, that's assuming that he saw the windows.  There's

21    scaffolding and everything on his left and right.

22    **A**    I mean, he specifically mentions going through police

23    barricades.  And in his videos, you can see that the crowd has

24    been confronted with some kind of chemical spray, teargas,

16:39:56 25    whatever it may be.  Once he enters the Capitol, if you're

1    asking did he do any damage, no; I can't say that he did.

2    Q    And, two, you don't see anyone around him doing any damage

3    in his videos, correct?  Because that's what he says in his

4    posts; that no one around him was doing any damage, breaking

16:40:16 5    anything?

6    A    Well, no, ma'am.  He specifically mentions that people

7    around him were kicking in doors, looking for congressmen.

8    Q    Right.  But do you recall the exhibit that the government

9    entered where he is out on the lawn, on the property, and

16:40:33 10    there's a lot of people and you pointed out, like, the smoke?

11    A    Yes, ma'am.

12    Q    So do you recall him saying, we are about to break in or

13    we're about to get through?

14    A    In that instance, I don't believe he uses the words [sic]

16:40:54 15    "we."  I believe he's -- he either refers to the crowd or they.

16    I don't believe he said we at that point.

17    Q    So he says both.  He says we and then he says they to

18    follow up with.  But in several of his posts, would you say

19    that it's in the narrative format where he is describing what's

16:41:15 20    going on or what he's hearing?

21    A    That's fair.

22    Q    I think he even said at one point in one of his posts where

23    someone specifically -- he heard someone say that Nancy

24    Pelosi's door was picked in.  Do you recall that?  I think it's

16:41:39 25    government's Exhibit 420.

```
 1    A    Yes, ma'am.

 2    Q    So he's not saying that he did it, correct?

 3    A    He is not saying that he kicked in that door, no.

 4    Q    But when he says that we kicked in the door, would you

16:41:59  5    agree he is narrating what he's heard and what others have

 6    done?

 7    A    I would say he is narrating what the crowd, which he is a

 8    part of, is doing.

 9    Q    That specific crowd or what he's hearing other people have

16:42:13 10    done throughout -- I mean, again, we were not seeing any

11    violence -- we're not seeing anyone kick in a door on his

12    videos.  So is it possible that these things were going on

13    elsewhere and he's hearing about it, not visualizing it, not

14    seeing it face to face?

16:42:36 15    A    So I understand the question, it's -- are you asking me if

16    it's possible that he did not see the door get kicked in?

17    Q    Correct.  So he's not around individuals that are doing

18    that; he's hearing about it.

19         MS. MARTIN:  Objection, Your Honor.  Requiring Agent

16:42:53 20    Armentrout to speculate as to what the defendant may or may not

21    have saw.

22         He can testify as to the exhibits that were admitted

23    through him and what those say, but I don't think it's fair to

24    ask him to speculate aside from the content that's in posts.

16:43:07 25         THE COURT:  Ms. Sherman-Stoltz?
```

1          MS. SHERMAN-STOLTZ:  So he's testified that he's

2     watched and seen everything in his phone and all the social

3     media posts.  So I'm asking him, based on what he has seen and

4     those videos, if it is possible that what he is essentially

16:43:25   5     putting on social media was not something he was actually

6     seeing; that he was hearing about it.

7          MS. MARTIN:  Your Honor, I would just say that's

8     something that's ripe for defense argument as to what the

9     exhibits show and do not show.  But asking Agent Armentrout to

16:43:47   10    basically prove through evidence he doesn't have of what the

11    defendant did or didn't do is speculative at best.

12         THE COURT:  I tend to agree.  But when did the

13    testimony come in that he said Mr. Calhoun saw X, Y, and Z that

14    he posted?  You know, when in the testimony did the agent state

16:44:11   15    that Mr. Calhoun actually saw what he was posting about?

16         MS. SHERMAN-STOLTZ:  So he didn't say that he saw it,

17    but he said that he was in the crowd that was doing it.  So,

18    you know, he's in the crowd of people that are pushing up

19    against Capitol Police.

16:44:31   20         THE COURT:  I'm going to sustain the objection.

21    Obviously I know he can't see this.  I mean, he can't see for

22    sure that he's in the crowd.  He wasn't there.  So regardless

23    of what he's testified to, I'm going to be looking at the

24    exhibits; I'm going to be looking at the videos; and I'm going

16:44:52   25    to be looking at his posts.  And I don't -- to the extent you

1    want to clarify that he doesn't know for sure, I will allow you

2    to ask that question.

3        MS. SHERMAN-STOLTZ:  So I guess I'm just trying to

4    differentiate because Mr. Calhoun has two separate styles of

16:45:06  5    writing.  He's got the narrative format where he's saying that

6    certain things are taking place.  And when I referred to that,

7    it sounded like Special Agent Armentrout was essentially saying

8    that those actions were being conducted by the crowd that he

9    was with.  I think he even said that he was with.

16:45:25  10        THE COURT:  Okay.  Well, again, if you want to ask the

11    question do you know for certain, when Mr. Calhoun wrote the

12    posts, that he was writing about what he actually saw, that's

13    fine if you want to clarify that.  But I think all of this is

14    speculative.

16:45:38  15        MS. SHERMAN-STOLTZ:  Okay.

16        THE COURT:  The only one who knows is Mr. Calhoun.

17        MS. SHERMAN-STOLTZ:  All right.

18        THE COURT:  And any other videos that reflect

19    Mr. Calhoun seeing the door kicked in or -- we saw some video

16:45:53  20    of him out front, narrating what he was observing outside the

21    Capitol.  There's some of that for sure.

22        MS. SHERMAN-STOLTZ:  Right.

23        THE COURT:  But certainly you can clarify with the

24    agent that he doesn't know for sure.  But, you know, I know

16:46:09  25    that he doesn't know.  But go ahead.  Ask that question.

1          MS. SHERMAN-STOLTZ:  I know he doesn't know for sure,

2     which is why I asked is it possible.  So that -- but I will

3     move on.

4     **BY MS. SHERMAN-STOLTZ:**

16:46:20  5     Q    The video that he took where he's standing out in the lawn

6     area, would you agree, like, there are a lot of people -- you

7     could see a lot of people going, you know, pretty deep in that

8     video where the smoke is coming up; is that correct?

9     **A**    Correct.

16:46:37 10     Q    And it doesn't look like he's that close to the smoke.

11     That looks like it's quite a way from him; is that accurate?

12     **A**    It's a matter of perspective.  It is off in the distance,

13     yes, closer to the Capitol.  But then, in the video, he begins

14     moving towards it.

16:46:56 15     Q    Right.  I mean, we know that he moved towards the Capitol

16     because he ended up in the Capitol.  I understand that.  From

17     the video where he was, there's a lot of people in front of

18     him?

19     **A**    That's correct.

16:47:07 20     Q    I mean, so he's there on the grounds.  Fair to say

21     thousands of people are out there while he's there towards the

22     back?

23     **A**    Yes, ma'am.

24     Q    And the -- again, the smoke is not right up on him, so fair

16:47:29 25     to say that he's not, like, suffering from any type of smoke

1    inhalation or, like, teary eyes, things like that, correct?

2    **A**    Correct, ma'am.

3    **Q**    So you said that you were present during his arrest and

4    participated in the search of his home; is that correct?  Or I

16:47:53  5    believe it is his sister's home?

6    **A**    Correct.  To clarify, we didn't search his sister's entire

7    home.  We only searched the room in which we believed he was

8    residing.

9    **Q**    Okay.  Was he present when the search was being conducted?

16:48:08  10    **A**    At the home, yes.  He wasn't present in the room.

11    **Q**    Okay.  What was his behavior like?  How was he -- was he

12    cooperative?

13    **A**    He was.

14    **Q**    Okay.  And he consented to the search of his room?

16:48:22  15    **A**    That's correct.

16    **Q**    And then did you transport him from the home?

17    **A**    I did.

18    **Q**    What was his behavior like in the vehicle?

19    **A**    Cooperative.  I mean, I think he just sat there silently.

16:48:42  20    **Q**    Okay.  So no problems with the arrest.

21            Was he aware of the warrants?  Do you know, like, had

22    he been notified?

23    **A**    I don't think he had been notified, but I think he was

24    expecting it, if that makes sense.  I don't think he knew that

16:48:56  25    we had an arrest warrant for him, but I don't think he was

1    surprised that we did.

2    **Q**    Okay.

3    **A**    If that makes sense.

4    **Q**    Okay.  And did you have any trouble finding him?

16:49:05  5    **A**    Initially, yes.

6    **Q**    Why do you think that was?

7    **A**    I think later he claimed that there was death threats

8    against him at his residence in Americus.  We were -- we

9    believed -- we were told that he was staying at his sister's

16:49:30  10    house, but there is another sister's house in Andersonville.

11    We were not aware that he was staying as far away as Macon.

12    **Q**    But he was still practicing in the courts?

13    **A**    Correct.

14    **Q**    So he wasn't trying to avoid or hide; he was still going to

16:49:52  15    work in the courts with law enforcement?

16    **A**    Correct.  I don't believe he was trying to elude us if

17    that's what you are trying to get to.

18    **Q**    Was there any explanation given for why all the firearms

19    were at his sister's house in the room that he was staying in?

16:50:06  20    **A**    I believe he stated something to the effect that he was

21    staying there, and he didn't want to leave them in the house

22    that he wasn't staying at, meaning his residence in Americus.

23    **Q**    Okay.  Had he brought other personal belongings with him?

24    **A**    I'm not sure.  There was a small bedroom.  It was a little

16:50:30  25    bit of clothing and the firearms and a backpack.

1    **Q**    Do you know if he brought other valuables?

2    **A**    Right.  Again, we only searched the room in which we

3    believed he was residing.  There could have been things.  I

4    don't know.

16:50:44  5    **Q**    And you said that, from your understanding, he was no

6    longer at his residence due to death threats that he was

7    receiving?

8    **A**    Yeah.  I believe -- I believe he told us that.

9    **Q**    Okay.  So you didn't investigate into any of those?

16:51:00  10    **A**    No.  And I believe it's also in the phone call with

11    Mr. Lamb he claims that he's getting death threats.

12            MS. SHERMAN-STOLTZ:  Okay.  If I could just have a

13    moment, Your Honor.

14            THE COURT:  Sure.

16:51:24  15        (Discussion off the record.)

16            MS. SHERMAN-STOLTZ:  Just a couple of follow-up

17    questions.

18    **BY MS. SHERMAN-STOLTZ:**

19    **Q**    So you all are receiving multiple tips or, you know, people

16:52:54  20    calling in and screenshots of social media posts.  But, to your

21    knowledge, was he ever charged as a result of anything in his

22    social media posts?  Like, was there a crime committed in any

23    of his posts in which he was charged for?

24    **A**    No.

16:53:29  25        (Discussion off the record.)

1          MS. SHERMAN-STOLTZ:  No additional questions for this

2     witness, Your Honor.

3          THE COURT:  All right.  Thank you.  Any redirect?

4          MS. MARTIN:  Yes, Your Honor.

5                    **REDIRECT EXAMINATION**

6     **BY MS. MARTIN:**

7     **Q**   All right.  So I just wanted to clarify a few things with

8     you, Agent Armentrout.

9          So going back to your testimony about the tip you

10    received in November of 2020.

11    **A**   Yes, ma'am.

12    **Q**   Do you recall your testimony about that?

13    **A**   Yes.

14    **Q**   So I just want to clarify.  When that tip was handed off to

15    the Secret Service and they said they were taking care of it,

16    did you do anything with respect to an investigation of

17    Mr. Calhoun between then and January 6 when you received tips

18    regarding his conduct on January 6th?

19    **A**   No, ma'am.

20    **Q**   And so you -- to your knowledge, people weren't sending in

21    tips before January 6th; it was his conduct on January 6th that

22    sort of sent off those flurry of tips?

23    **A**   Outside of the initial tip, yes, ma'am.

24    **Q**   And on cross, the defendant -- or sorry.

25    Ms. Sherman-Stoltz asked you if the defendant ever mentioned on

1    social media specifically stopping the certification of the

2    electoral vote count.

3         Do you remember that question?

4    A    Yes.

16:55:12  5    Q    And you answered something to the effect of no; he hadn't

6    posted specifically about stopping the vote certification?

7    A    So I don't -- I think my testimony was he never

8    specifically said those words, like, stop the certification.

9    And he didn't say anything like that in his videos.  But I

16:55:30  10   think I clarified that he posts about stopping the steal.

11   Q    In your mind, what's the comparison between those two

12   phrases, "stop the certification" and "stopping the steal"?

13   A    It's the same.

14   Q    Why is that?

16:55:46  15   A    He's contested in his postings that the election has been

16   stolen and that, you know, they can't let that stand,

17   paraphrasing; that, you know, they had to go give the GOP

18   backbone to stop the steal or something to that effect.

19   Q    And I'm going to pull up Exhibit 503.  And this has already

16:56:04  20   been admitted with government's exhibit, but we haven't gone

21   over it specifically yet.  And just let me know when that

22   appears on your screen.

23   A    Yes, ma'am.

24        COURTROOM DEPUTY:  This has been admitted already?

16:56:29  25        MS. MARTIN:  It has.

1          THE COURT:  Is this one I'm reserving on?

2          MS. MARTIN:  No, Your Honor.  It's not.  I believe all

3    Exhibit Series 500 have been admitted except for 506, 507 and

4    505.

16:56:48  5      (Discussion off the record.)

6    **BY MS. MARTIN:**

7    **Q**   All right.  Thank you.  So, obviously, this is a long post.

8          MS. MARTIN:  We'll blow up the first half if we could,

9    Mr. Haines.

16:57:08 10   **BY MS. MARTIN:**

11   **Q**   And then I'll blow up the second half so you can read it.

12          All right.  Could you please read what's on the screen

13   in front of you?

14   **A**   In the 1800 election, the Georgia certification for its

16:57:25 15   four electors was detective and in dispute because it wasn't

16   properly certified.  The votes were for Jefferson and Burr.

17   With those votes, Jefferson would win the electoral college.

18   Without them, he would lose.  As the VP and president of the

19   Senate, Jefferson counted the votes for himself.  So this is

16:57:44 20   the precedent for Pence being authorized to count disputed

21   votes in his own election.

22          In today's Georgia presidential election, Trump is

23   behind 12,000 votes.  Giuliani has receipts proving 100,000

24   illegal Georgia votes, including, for example, 800 dead people

16:58:00 25   and 65,000 underage voters.  These are the undisputed facts.

1          The VP isn't just performing a clerical function.

2     Judgment and discretion has to be exercised where the votes are

3     contested.  That's under the Twelfth --

4          MS. MARTIN:  And just for the record, the second

16:58:21  5     portion is being highlighted.

6     **BY MS. MARTIN:**

7     **Q**   You can continue.

8     **A**   -- Amendment.  You're about to hear the case and the

9     evidence for the first time since the story has been suppressed

16:58:28  10     by the MSM.  The evidence of a stolen election is overwhelming.

11     There is more than enough evidence.  The most likely outcome

12     will probably be that the emergency audit proposed by Cruz will

13     happen.  I think that means Trump wins, but we'll see.

14          There's a link to what appears to be a YouTube video.

16:58:51  15     From the wiki.

16          When the electoral ballots were opened and counted on

17     February 11, 1801, it turned out that the certificate of

18     election from Georgia was defective.  While it was clear that

19     the electors had cast their votes for Jefferson and Burr, the

16:59:11  20     certificate did not take the constitutionally mandated form of

21     a list of all the persons voted for and of the number of votes

22     for each.

23          Vice-President Jefferson, who was counting the votes

24     in his role as president of the Senate, immediately counted the

16:59:26  25     votes from Georgia as votes for Jefferson and Burr and no

1    objections were raised.

2    **Q**    Thank you.  So in this post, Mr. Calhoun is talking

3    specifically about the electoral vote count in 1800; is that

4    right?

16:59:38  5    **A**    Correct.

6    **Q**    And, specifically, he says in this post, quote, so there is

7    precedent for Pence being authorized to count disputed votes in

8    his own election?

9    **A**    Correct.

16:59:49  10   **Q**    And, there, he doesn't appear to be referencing the 1800

11   presidential election; he appears to be referencing the 2020

12   election because that's when Pence was vice-president; is that

13   right?

14   **A**    Correct.

17:00:02  15   **Q**    And then he goes on to say that the VP's function pursuant

16   to the Twelfth Amendment and describing that function; is that

17   right?

18   **A**    Yes, ma'am.

19   **Q**    And this post was made one day before January 6, on

17:00:13  20   January 5th, right?

21   **A**    Correct.  January 5th, 2021.

22   **Q**    And just going toward Ms. Sherman-Stoltz's cross when she

23   was asking you about, you know, whether you had seen the

24   defendant do anything violent or destroy any property -- do you

17:00:32  25   recall that part of the cross?

1    A    Yes, ma'am.

2    Q    To be clear, you are aware of the charges in this case,

3    right?

4    A    Yes.

17:00:39   5    Q    Is Mr. Calhoun being charged with destroying property?

6    A    No, ma'am.

7    Q    Is he being charged with assaults any police officers?

8    A    No, ma'am.

9    Q    And you were also asked about a statement that the

17:00:50  10    defendant made regarding Nancy Pelosi's door getting kicked in.

11         Do you recall that?

12    A    Yes.

13         MS. MARTIN:  And if we could just pull up Exhibit 632.

14    **BY MS. MARTIN:**

17:01:08  15    Q    And you previously testified as to this exhibit, correct?

16    A    Correct.

17    Q    And this is a picture that was obtained from the

18    defendant's phone taken outside of Nancy Pelosi's office?

19    A    Correct.

17:01:17  20    Q    So, regardless of whether the defendant saw someone kick in

21    the door or just heard that the door was kicked in, you know he

22    was outside the office, right, because he took a picture of the

23    office, and that was obtained off his phone?

24    A    Correct.

17:01:29  25    Q    All right.  And you were also asked about the smoke that

1    was on the west front of the Capitol when Mr. Calhoun was

2    approaching.

3          Do you recall that?

4    **A**    Yes.

17:01:45   5    **Q**    And Ms. Sherman-Stoltz asked you something to the effect of

6    whether the smoke was in the distance.

7          Do you recall that?

8    **A**    Yes.

9          MS. MARTIN:    All right.    Could we please pull up I

17:01:53  10    believe it's Exhibit 601.    But I might need to look around.

11    Nope.    Could you go to 603?    Try again.    All right.

12       (Video played.)

13          MS. MARTIN:    And could you just pause it there?

14    **BY MS. MARTIN:**

17:02:22  15    **Q**    So in this video, Agent Armentrout, can you see smoke --

16    what's, quote, off in the distance?

17    **A**    Yes, ma'am.

18    **Q**    And which direction does the defendant appear to be walking

19    in?

17:02:34  20    **A**    Towards the smoke, towards the Capitol.

21    **Q**    And you testified on direct that there were actually people

22    in this video reacting to what appeared to be something, some

23    sort of a chemical in the air; is that right?

24    **A**    Correct.

17:02:48  25    **Q**    And you can see that in this video?

1    **A**    Yes.

2              MS. MARTIN:  Could you just play the video?

3         (Video played.)

4              MS. MARTIN:  Thank you.  Brief indulgence, Your Honor.

17:03:34  5    (Discussion off the record.)

6    **BY MS. MARTIN:**

7    **Q**    And, Agent Armentrout, in addition to the video we just

8    watched where it appears that people are being affected by a

9    chemical in the air, did the defendant also post on both

17:04:10 10   Facebook and Parler about mace, the crowd being maced?

11   **A**    Yes, ma'am.

12             MS. MARTIN:  No more further questions, Your Honor.

13             THE COURT:  All right.  Thank you.

14             All right.  So it's 5:00 o'clock.  I think it makes

17:04:23 15   sense to adjourn for the day.  Just curious:  Have you all

16   given thought to how you would like to proceed after the trial

17   ends tomorrow?

18             I will ask you first, Ms. Sherman-Stoltz.  Are you --

19   would your preference be to give a closing at that time and

17:04:43 20   also briefing or what -- do you feel you need both?  What did

21   you have in mind?

22             MS. SHERMAN-STOLTZ:  So, honestly speaking, I'm sure

23   that my closing if I gave one tomorrow would be duplicated in

24   my brief.  So I would likely -- I mean, I absolutely would like

17:05:05 25   to do a brief.  So I am fine with, you know, just taking care

1    of my closing within my brief.

2            THE COURT:  You're sure?  That's fine.  Just one

3    moment for you all to consider this.  There's another --

4    Ms. Sherman-Stoltz, another defense attorney did ask to file

17:05:29   5    the brief and then have argument on the brief.  I'm just -- I'm

6    flexible on this.  I think it's important for each side to get

7    a chance to give an overview of the evidence.

8            Does the government have a position on this?

9            MR. BRUNWIN:  We would like an opportunity to be heard

17:05:48  10    about the evidence in argument whether it's closing argument

11    and then briefing or briefing and closing argument.

12            THE COURT:  Why don't you all talk about it?  You

13    know, I would like to do the same, obviously.  So I don't have

14    a strong preference here.

17:06:06  15            MR. BRUNWIN:  I do think -- and I'm -- it's getting

16    late in the day, so I'm repeating myself but, again, we would

17    like to be heard.  And if there's briefing --

18            THE COURT:  Yeah.

19            MR. BRUNWIN:  -- both.

17:06:18  20            THE COURT:  Okay.  You'd like both.  Both sides would

21    like both.  So you all discuss whether you would like to

22    proceed with closing arguments after the testimony, which I

23    think will end tomorrow.  Don't you expect -- is the government

24    resting now?

17:06:30  25            MR. BRUNWIN:  Your Honor, subject to approving the

1    exhibits, the government rests -- would rest its case.

2        THE COURT:  All right.  Well, given the time of the

3    day -- and I know that court staff has been here longer than

4    normal -- why don't you all do that in the morning when

17:06:47  5    everybody is fresh.  And if you could, come at 9:45.  There was

6    a -- did you want any re-cross, Ms. Sherman-Stoltz?

7        MS. SHERMAN-STOLTZ:  No, Your Honor.

8        THE COURT:  I didn't think so.

9        MS. SHERMAN-STOLTZ:  I probably would have been rude

17:07:05  10    enough to stand up and ask.

11        THE COURT:  I thought you would speak up if there

12    were -- I didn't recall anything new except the Jefferson.

13        MS. SHERMAN-STOLTZ:  No re-cross.

14        THE COURT:  Okay.  Where was I?  Oh.

17:07:20  15        MR. BRUNWIN:  9:30?

16        THE COURT:  There was confusion -- no.  I accidentally

17    mentioned the wrong date that I needed to start late.  So it's

18    actually tomorrow.  I might be able to get here as early as

19    9:45, but I got the dates crossed.  So tomorrow the earliest I

17:07:37  20    can begin is 9:45.  May have to be 10:00 o'clock.  So why don't

21    we do this?  Why don't we have you all come at 9:45, spend a

22    few minutes with Mr. Hopkins to make sure you're all on the

23    same page about what's been admitted and what hasn't.  And I

24    know I've reserved on some issue.  But let's just make sure

17:07:53  25    you're on the same page.  And then the government can rest and

1    then you can present a case if you're going to,

2    Ms. Sherman-Stoltz.  All right?

3                MS. SHERMAN-STOLTZ:  Yes, Your Honor.

4                THE COURT:  Any other issues we should address?

17:08:07  5                MR. BRUNWIN:  Just that that would be -- the Court's

6    view of admissibility of certain things would be another reason

7    why to be heard for the government.

8                THE COURT:  Right.  Right.  But, I mean, for me, the

9    briefing would be really helpful on that as well.  But, again,

17:08:22 10    if you all want to be heard right after the case, that's

11    perfectly fine with me.  You all just confer today and try to

12    make a decision if you can.

13                MR. BRUNWIN:  And I think that may be the question of

14    the sequencing.  Does it make sense to brief first and then

17:08:38 15    have closing argument.

16                THE COURT:  Oh, I see.

17                MR. BRUNWIN:  Otherwise, we're effectively having two.

18    Or not?

19                THE COURT:  Oh, no.  I would prefer that you pick one

17:08:48 20    or the other.  Not both.  So I'm not suggesting a closing

21    argument, briefing, and then an argument on the briefs.

22                MR. BRUNWIN:  That was my point.

23                THE COURT:  Yeah.  So you all pick which one.  And I'm

24    inclined to give the defense to choice here.  Do you have a

17:09:03 25    view, or do you want time to think about it?

1              MS. SHERMAN-STOLTZ:  Well, I would much prefer the

2       brief.  That's why I said --

3              THE COURT:  No.  No.  No.  You're going to get the

4       brief, and you're going to get the argument.  The question is

17:09:13 5      whether the argument occurs tomorrow or the argument occurs

6       after I've reviewed your briefs.

7              MS. SHERMAN-STOLTZ:  Oh.

8              THE COURT:  So you can think about that.  You don't

9       have to decide now.

17:09:23 10            MS. SHERMAN-STOLTZ:  Okay.

11             THE COURT:  You all talk about it, and we'll address

12      that in the morning.  All right?

13             MS. SHERMAN-STOLTZ:  Okay.  Okay.  Thank you, Your

14      Honor.  Yes.

17:09:34 15            THE COURT:  I just don't want two arguments.

16             MS. SHERMAN-STOLTZ:  Understood.  I thought you were

17      including the brief as an argument.

18             THE COURT:  No.  No.  Written brief, and you can have

19      argument as well.

17:09:42 20            Any other issues that we need to address?

21             MS. MARTIN:  No, Your Honor.

22             Just for the record, can we excuse Agent Armentrout?

23             THE COURT:  Well, presumably he's going to be at the

24      table.

17:09:52 25            MS. MARTIN:  Yes.  But from the stand.

1          THE COURT:  Yes, of course.  Not from the trial,

2    right?  You're going to stay?  Thank you.

3        (Witness steps down.)

4          COURTROOM DEPUTY:  All rise.

17:10:01 5          THE COURT:  Thank you all.

6        (The Proceedings were recessed at approximately 5:10 p.m.

7    on March 1, 2023.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

1

2                      C E R T I F I C A T E

3

4

5            I, the undersigned, hereby certify that the foregoing

6    pages contain a true and correct transcript of the

7    aforementioned proceedings as is hereinabove set out, as the

8    same was taken down by me in stenotype and later transcribed

9    utilizing computer-aided transcription.

10           This is the 2nd day of March of 2023.

11

                         *Cheryl K Powell*

13    _____

14            Cheryl K. Powell, CCR, RPR, FCRR

15            Federal Certified Realtime Reporter

16

17

18

19

20

21

22

23

24

25