1               IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA (WASHINGTON, DC)
2

3     UNITED STATES OF AMERICA,  *
                Plaintiff,       *   21-cr-116-1
4                                *   March 2, 2023
      vs.                        *   Washington, D.C.
5                                *   10:11 a.m.
      WILLIAM CALHOUN, JR.,      *
6               Defendant.       *
      ***************************
7
                       TRANSCRIPT OF BENCH TRIAL
8                           **VOLUME II**
                BEFORE THE HONORABLE DABNEY L. FRIEDRICH
9                   UNITED STATES DISTRICT JUDGE

10

         FOR THE UNITED STATES:
11

      MS. SARAH MARTIN, ESQ.
12    DOJ-USAO
      601 D. Street NW
13    Washington, DC 20001
      202-538-0035
14

      MR. CHRISTOPHER BRUNWIN, ESQ.
15    USAO-Violent and Organized Crime
      312 N. Spring Street
16    13th  Floor
      Los Angeles, CA 90012
17    213-894-4242

18       FOR THE DEFENDANT:

19    MS. JESSICA NICOLE SHERMAN-STOLTZ, ESQ.
      Sherman Stoltz Law Group
20    P O Box 69
      Gum Spring, VA 23065
21    540-255-4365

22    COURTROOM DEPUTY: MR. JONATHAN HOPKINS

23    COURT REPORTER: CHERYL K. POWELL, CCR, RPR, FCRR

24      Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
      pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and
25    Procedures Vol. VI, Chapter III, D.2.  Transcript produced by
                      computerized stenotype.

                    ***CHERYL K. POWELL, CCR, RPR, FCRR***
                      Federal Official Court Reporter
                        155 St. Joseph Street
                          Mobile, AL 36602
                351-690-3003/cheryl_powell@alsd.uscourts.gov

1                        <u>I N D E X</u>

2        <u>EXAMINATION</u>                                <u>PAGE</u>

3  **WILLIAM McCALL CALHOUN, JR.**

4  DIRECT EXAMINATION
   BY MS. SHERMAN-STOLTZ                        206
5  CROSS-EXAMINATION BY MS. MARTIN              257
   REDIRECT EXAMINATION
6  BY MS. SHERMAN-STOLTZ                        291
   RECROSS-EXAMINATION BY MS. MARTIN            299

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

1                        **P R O C E E D I N G S**

2        (In open court.  Defendant present.)

3                THE COURT:  Good morning, everyone.

4                COURTROOM DEPUTY:  Your Honor, we are in Criminal

10:11:08  5   Action 21-116-1, United States of America versus William

6   Calhoun, Jr.

7                If I can have counsel please approach the podium and

8   state your name for the record, starting with the United

9   States.

10:11:19  10              MS. MARTIN:  Good morning, Your Honor.  Sarah Martin

11   on behalf of the United States.

12                THE COURT:  Good morning.

13                MR. BRUNWIN:  Good morning, Your Honor.  Christopher

14   Brunwin for the United States also.

10:11:29  15              THE COURT:  Good morning.

16                MR. BRUNWIN:  Also present at counsel table is Special

17   Agent Armentrout.

18                THE COURT:  All right.  Good morning, sir.

19                MS. SHERMAN-STOLTZ:  Good morning, Your Honor.

10:11:38  20   Jessica Sherman-Stoltz for the defendant, Mr. William McCall

21   Calhoun.

22                THE COURT:  All right.  Good morning.  All right.  So

23   have we reviewed the exhibits?

24                MS. MARTIN:  Yes, Your Honor, and I believe we're in

10:11:51  25   agreement.  I gave defense our list, and I was just waiting to

1    hear back.

2             MS. SHERMAN-STOLTZ:  Oh, yes.  I apologize.  I

3    notified the Court and forgot to tell you.  Everything looks

4    fine.

10:12:02  5             THE COURT:  So you're on the same page about what's

6    been admitted?

7             MS. SHERMAN-STOLTZ:  Yes.

8             THE COURT:  At the end of the day, I want you all to

9    remind me what I reserved on if that's possible.

10:12:15 10             In light of that, does the government rest?

11             MR. BRUNWIN:  Yes, Your Honor.  And to the Court's

12    point about what's been reserved, I believe that's noted in

13    what was submitted to the Court which items were reserved.

14             THE COURT:  Wonderful.  Thank you.  All right then.

10:12:39 15    Ms. Sherman-Stoltz?

16             MS. SHERMAN-STOLTZ:  Yes, ma'am.  We would be prepared

17    to move forward with Mr. Calhoun.

18             THE COURT:  Mr. Calhoun, do you want to come forward,

19    sir?

10:12:48 20        (Witness sworn.)

21             THE COURT:  Good morning, Mr. Calhoun.  Just wanted to

22    remind you of my warning yesterday to the government.  I know

23    you're an attorney and you know this, but answer the question

24    and only the question.  And I know you're going to have a

10:13:12 25    tendency to want to fill in things, particularly on cross.  But

1      your attorney will have a chance to redirect.  So really want

2      you to restrict your comments to the question asked.

3              THE DEFENDANT:  I will truly do my best, Your Honor.

4      Thank you.

10:13:29  5              MS. MARTIN:  And if I may before we start direct, I

6      understand Mr. Calhoun is a defense attorney.  Would the Court

7      be able to do an inquiry just so he knows his right not to

8      testify for the record?

9              THE COURT:  Yes, of course.  Thanks for the reminder.

10:13:42  10             Yes.  Mr. Calhoun under the Constitution, you have the

11     right not to present any defense at all and not to testify.

12     You have the right to remain silent, and I would not use that

13     against you in any way.

14             THE DEFENDANT:  Yes, Your Honor.

10:13:52  15             THE COURT:  And you're -- you've consulted with your

16     attorney about this and this is a decision you would like to

17     make?

18             THE DEFENDANT:  Yes.

19             THE COURT:  All right.  Anything else the government

10:14:00  20    wants on the record?

21             MS. MARTIN:  No, Your Honor.  Thank you.

22             THE COURT:  All right.

23                        **DIRECT EXAMINATION**

24     **BY MS. SHERMAN-STOLTZ:**

10:14:06  25    **Q**   Good morning, Mr. Calhoun.

1    **A**    Good morning.

2    **Q**    If you would, state your full name for the Court's record.

3    **A**    William McCall Calhoun, Jr.

4    **Q**    And Mr. Calhoun, as you're aware, you are the defendant in

10:14:17  5    these proceedings, but you are also an attorney; is that

6    correct?

7    **A**    That's correct.

8    **Q**    And if you could, just briefly summarize your education and

9    degrees for the Court.

10:14:32  10    **A**    I have an undergraduate degree in history.  After I

11    completed that, I went straight to graduate school and got a

12    master's degree in history.  My focus was in modern European

13    political and military history.  And then I went straight to

14    law school and passed the bar in February of 1990, graduated

10:14:57  15    that May, and I've been continuously engaged in the practice of

16    law ever since.

17            I have no disciplinary history.  I am a member of the

18    bar of the Northern District Federal Court, the Middle

19    District, the Eleventh Circuit, Georgia Court of Appeals and

10:15:15  20    the Georgia Supreme Court.

21            My focus in practice has been civil and criminal

22    litigation.  I used to handle civil cases, you know, medical

23    malpractice and even a little product liability.  But in recent

24    years, I've taken to farming those type of cases out to other

10:15:42  25    attorneys who do that every day, and primarily what I do now is

1    criminal defense.

2    **Q**    And you were born and raised in Georgia?

3    **A**    Yes.  I was born in Americus.  My grandparents lived there,

4    my mother's side.  But I kind of grew up in the adjacent county

10:16:09  5    in Marion County, which is right by Fort Benning.

6            I had a very mainstream family upbringing.  My father

7    was a physician.

8            THE COURT:  All right.  Mr. Calhoun, let's let her

9    follow up with a question.

10:16:25  10           THE DEFENDANT:  All right.

11    **BY MS. SHERMAN-STOLTZ:**

12    **Q**    So grew up in Georgia.  Came from a good family, brothers,

13    sisters, parents?

14    **A**    Yeah.  I have three sisters.  Two of them are present in

10:16:37  15    the courtroom along with my wife, Tina.

16    **Q**    And you have a daughter; is that correct?

17    **A**    That's correct.  She's 25 years old.  She lives in Athens,

18    Georgia.

19    **Q**    Very close and involved with your family; is that correct?

10:16:52  20    **A**    Yes.  Both my parents are deceased now.

21    **Q**    So you've been practicing law now for 33 years; is that

22    about right?

23    **A**    Yes.

24    **Q**    And you said that you were in good standing, no

10:17:07  25    disciplinary history?

```
 1   A   That's correct.

 2   Q   Do you have a criminal history?

 3   A   Not -- no.  I mean, just some stuff in college, I think,

 4   mainly, but nothing major.

 5   Q   Any felony convictions?

 6   A   No.

 7   Q   Any crimes involving moral turpitude?

 8   A   No.

 9   Q   And you said you practiced primarily criminal defense; is

10   that correct?

11   A   That's correct.

12   Q   And do you have your own practice, or do you work with a

13   law firm?

14   A   I have my own practice.  I worked -- when I got out of law

15   school, I clerked for the judges of the Southwestern Judicial

16   Circuit.  And I worked for a law firm for a year after that.

17   But after that point, I've been self-employed.

18           I was in a couple of different --

19           THE COURT:  Wait.  Next question.

20   BY MS. SHERMAN-STOLTZ:

21   Q   I want to kind of go back to, you know, 2020.  More so the

22   end of 2020.

23           What was it that, I guess, brought you to the decision

24   to travel to Washington, D.C.?

25   A   Well, the short answer is sometime in late December, my
```

Timestamps in left margin: 10:17:18 (line 5), 10:17:28 (line 10), 10:17:38 (line 15), 10:17:56 (line 20), 10:18:18 (line 25)

1    co-defendant, Andy Nalley, called me up and said, we're going

2    to Washington.  I said, okay; let's go.

3    **Q**   Now, was this -- can you estimate the time frame that this

4    took place?

10:18:39  5    **A**   Well, there was a number of clear markers along the way

6    that -- of course, there was the election.  And there was a

7    period in time where we were waiting in Georgia for the

8    government to deal with the concerns that were being raised.

9    And the legislature was not in session.  The legislature has

10:19:17  10    the constitutional authority to run elections, but it was not

11    in session.  The governor would not call the legislature in

12    session.

13         I believe it was around December 14th or 15th where

14    the states certified their electors.  And so there was a

10:19:43  15    perception that our government in Georgia just did not -- for

16    whatever reason, it was paralyzed.  It could not --

17         THE COURT:  All right.  Mr. Calhoun, the question is

18    around what time did you decide to come to Washington.  I think

19    that was the question.

10:19:58  20    **A**   Well, after -- after that December 14th deadline.  I

21    believe the rally was announced on the 19th by President Trump.

22    I think I've got that right.  And I -- it was sometime after

23    that that Nalley called me.  And I had to file for leave of

24    absence, which I don't have a copy of that because -- well, the

10:20:30  25    clerk's office can't --

1          THE COURT:  It's okay.  Just when?

2     **A**   It would have been in date December.  I think I filed for

3     that leave of absence before Christmas.  Right before

4     Christmas.  And probably about -- probably about the 22nd

10:20:50  5     probably is when I decided.

6     **BY MS. SHERMAN-STOLTZ:**

7     **Q**   Would that coincide with when you posted on social media

8     that you were going?

9     **A**   Yes.  That would have coincided with that.

10:21:00 10     **Q**   Okay.  So your co-defendant, Mr. Nalley, calls you up,

11    says, let's go to D.C.?

12    **A**   Well, he called me up.  His exact words were, we're going

13    to Washington.  And I said, okay.  And he didn't have to twist

14    my arm or anything, but --

10:21:15 15    **Q**   How did you get to Washington?  Did you fly or drive?

16    **A**   I drove to northeast Atlanta and -- to his house and then

17    we got in his car.  He drove us up.  That's how we got here.

18    **Q**   Did you arrive -- when did you arrive in Washington, D.C.?

19    **A**   We went -- we drove up on January 5th, stayed someplace

10:21:41 20    south of D.C. in Virginia, just a short drive out of D.C.  And

21    then we arrived that morning around 8:00 o'clock in D.C.

22    **Q**   In D.C.?

23    **A**   Yes.

24    **Q**   So before we get on to that, I wanted to lay a foundation

10:22:02 25    of how it even came to you going to D.C.

1          A lot of social media posts were entered into evidence

2    yesterday.

3          Is it fair to say that you were clearly upset with the

4    election, how things were going, and then the ultimate turnout?

10:22:18  5    A    Yes.

6    Q    And is it fair to say you expressed those feelings online?

7    A    Yes.

8    Q    Now, you said some things that bothered people; is that

9    correct?

10:22:35  10   A    Apparently, yes.  They bothered -- I mean, not -- some

11   people were bothered.  Many weren't, but --

12   Q    Well, you heard Mr. Armentrout testify yesterday that they

13   were receiving tips about you in November of 2020; is that

14   correct?

10:22:54  15   A    Right.  And I knew that -- that goes back to the Second

16   Amendment rallies that I had.  It was really one that I had.  I

17   tried to have another one.  It didn't really work out.

18   Everybody was sort of tired of it by then, including me.  But

19   it was in the courthouse parking lot of the Sumpter County

10:23:18  20   Courthouse.  There were probably what I would describe as 80

21   farmers that showed up and -- armed.  And it was done through

22   permission of the sheriff and in conjunction with the police

23   department.  But that jurisdiction -- the county courthouse is

24   technically under the jurisdiction of the sheriff.  And that's

10:23:47  25   who I set it up through, and everything was fine.  It was

1    really sort of --

2              THE COURT:  All right.  Let's get back to the

3    question.  I think we've drifted.

4    **A**    All right.

10:23:58  5    **BY MS. SHERMAN-STOLTZ:**

6    **Q**    So you had this rally or peaceful protest?

7    **A**    Yes.

8    **Q**    And is that when you believe was the start of just these

9    controversial social media posts that you were posting and

10:24:13  10   replying to?

11   **A**    Yes, it was.  If I may say what got me on to the -- well,

12   why I had the rally to start with very briefly.

13             THE COURT:  Ms. Sherman-Stoltz, you've got to elicit

14   what he wants to tell me.

10:24:30  15  **BY MS. SHERMAN-STOLTZ:**

16   **Q**    So why did you hold the rally?  What was the point of

17   having the rally?

18   **A**    Okay.  I had -- I had spent my entire adult life as a

19   democratic voter.

10:24:41  20            Then the end of 2019, I started following this gun

21   legislation that had been pre-filed in Virginia.  And I started

22   reading it, and I thought, you know, if that becomes a law, me

23   and every farmer I know are going to go to prison if that comes

24   to Georgia.

10:24:59  25            And then it rolled over into 2020.  And then all these

1    federal, what I would call, anti-Second Amendment gun bills

2    were filed by Democrats.  And I started reading those.  And I

3    was just amazed at -- I was, like, if that becomes law, me and

4    every farmer I know are going to be at risk of going to federal

10:25:24  5    prison.  And it didn't make any sense to me, you know.

6        What happened that January, 2020 -- in Virginia, they

7    have what's called legislative day, as I understand it, in

8    Richmond.  And that's where the public can show up and make

9    their concerns known about legislation.  Well, 20,000 people

10:25:44  10    showed up in Richmond basically with AR-15s and, I mean -- and

11    nothing happened as far as any problems.  But those bills did

12    get withdrawn.

13        And so that's what got me interested in that sort of

14    thing.

10:26:03  15    Q    So you described to the Court that you're a scholar of

16    history and you're very passionate about history; is that

17    correct?

18    A    Yes.  I've been sort of a lifelong -- I wouldn't say I'm a

19    scholar.  I'm not published, but I'm very much -- I spent a

10:26:23  20    lifetime studying history.

21    Q    Is it correct that you enjoy writing?

22    A    Yes.

23    Q    And is it fair to say that you have a tendency to write in

24    a narrative format?

10:26:38  25    A    Yes.  With regard to what was written here about

1    January 6th, that was absolutely a narrative.

2    **Q**    And is that typically a style that you adopt or implement

3    in your writing style, particularly social media aspects, not

4    court related?

10:26:59    5    **A**    Well, the -- yes.  In this what we're talking about now, I

6    mean -- you got to remember on social media you've got 220-word

7    limit or whatever that you can post.  And it's -- you know,

8    it's very difficult to write in that limitation.  So, I mean,

9    if you're asking me about a narrative, I mean, I've made social

10:27:30    10    media posts that were not narrative.  But as far as the

11    January 6th stuff, I mean every time I'm saying we, you know,

12    that's --

13    **Q**    And we'll get into that a little bit more.

14    **A**    Okay.

10:27:43    15    **Q**    So you're writing these posts on social media.  You

16    developed a lot of followers, particularly on Facebook; is that

17    correct?

18    **A**    I think -- well, Facebook -- you know, it's -- I think

19    Facebook had a limitation of 5,000 followers, and there were

10:28:01    20    all kinds of people with 5,000 followers.  I mean, I had --

21    that's what I had.  You couldn't have more than that.

22    **Q**    Okay.  And why do you think people were following you?

23    What was it about your posts that was attracting people to

24    follow you?

10:28:15    25    **A**    Well, it's -- there was a lot of, I guess, people who

1    agreed that it would -- obviously, had a lot of issues -- still

2    have a lot of issues -- in this country that were of great

3    concern.

4        I mean, we were -- leading up to January 6th, we were

10:28:40  5    watching entire sections of cities get burned.  And, I mean, it

6    was definitely a -- seemed to be a double standard at the

7    justice department.  Those people would not get prosecuted.

8    And, you know -- but -- and everything that we were concerned

9    about has, to some extent, come to pass.

10:29:08  10        I mean, now there's even -- we know that parents who

11    go to school boards get investigated by the FBI.  There's even

12    a memo that's been wildly reported in the media that they're

13    investigating, you know, Christians and all that sort of thing.

14        We were worried about at the time, and it's come to

10:29:29  15    pass.

16    **Q**    So you were voicing your concerns on social media; is that

17    correct, regarding those things?

18    **A**    Yes.  I'm one of these people -- and I was speaking to the

19    people -- I mean, there's a huge swath of Americans who just

10:29:45  20    want to be left alone.  I mean, we don't want to cause any

21    problems.  We don't want to be victimized or treated unfairly.

22    And that's -- I mean, I'm still one of those people.  I mean, I

23    don't -- we're not out -- we're not going to do anything

24    unlawful.  I mean, we want -- we're the law-and-order side of

10:30:11  25    things.

1   **Q**   So you're a gun owner, correct?

2   **A**   Correct.

3   **Q**   And we heard yesterday testimony of, I think it was, nine

4   guns that were confiscated from your -- the room you were using

10:30:25  5   in your sister's home; is that correct?

6   **A**   Yes.

7   **Q**   And ammunition.  A lot of ammunition; is that correct?

8   **A**   I mean, it was some ammunition, yeah.  A lot is relative.

9   You know, the safest guns are the guns that get fired a lot.

10:30:41  10  And it's -- you know, we live in a very large and diverse

11  nation.  And what's considered, you know, typical or normal in

12  D.C. or in New York or in L.A. might be very different from

13  what is considered normal in rural -- the rural south.

14       I know people that have hundreds of guns.  I know, you

10:31:09  15  know, people that, you know -- I mean, having nine guns in

16  south Georgia is nothing.  That's just routine.

17       And I mean, I didn't even own an AR-15 until I think

18  in 2018.  I had a client that, you know, owed me some money,

19  and they had an AR-15 and I -- took that in lieu of a fee,

10:31:33  20  which, in Georgia, you don't have to have any kind of

21  background check or anything to do that.  All of it is

22  perfectly legal.  And -- because I wanted to see what all the

23  hubbub was about.  And then I got one and I saw, yeah; this is

24  pretty neat because they're modifiable and they are a lot of

10:31:53  25  fun to shoot.

1    And so I took to -- I was shooting about 150 rounds a

2  week, which would be one trip to a range.  So it adds up.  I

3  mean, you know, you shooting almost a thousand rounds a month.

4  **Q**  And so is that where you were shooting your guns is at the

10:32:14   5  range?

6  **A**  Yes.  And, again, that was to -- the safest guns are the

7  ones that get fired often.  Because these people that buy guns

8  and they don't ever shoot them and they're not used to them,

9  that's an accident waiting to happen.

10:32:28  10  **Q**  So have you ever used your guns in any manner other than at

11  a range or hunting?

12  **A**  No.  I mean, the first time -- I would point out the first

13  time I shot a gun was my shotgun -- my father's shotgun that

14  the FBI seized.  But I was five years old with an uncle that

10:32:58  15  was showing me how to shoot it.

16    By the time I was 11, me and my best friend, who was

17  ten -- we would be tromping through the woods with shotguns

18  which -- unsupervised.  Which seems kind of probably hard to

19  wrap your head around today, but in the early 70s in south

10:33:16  20  Georgia, that was standard.  That was, like, no big deal.

21  **Q**  And as you testified, you live in a rural part of Georgia;

22  is that correct?

23  **A**  Yes.

24  **Q**  You mentioned that, at this rally, about 80 farmers showed

10:33:35  25  up.  So is it safe to say you're surrounded by farmland?

1    **A**    Correct.

2    **Q**    Is that primarily how the area in Georgia that you live --

3    you know, is that essentially how they make their money is from

4    farmers?

10:33:49    5    **A**    It is an agricultural economy, yes.  And in most of --

6    there was manufacturing there, but by the -- I would say the

7    70's, going into the 80's, it slowly just got all shipped --

8    was gone.  I don't know where it is now.  I guess it's in China

9    or Mexico.

10:34:10    10    **Q**    So you briefly talked about your parents.  Your dad was a

11    doctor, correct?

12    **A**    Correct.

13    **Q**    Were you raised with, you know, morals and to be a

14    law-abiding citizen?  Was that preached and taught in your

10:34:26    15    home?

16    **A**    Yes.  It was -- like I was saying, there was nothing, you

17    know, radical about our home life.  We went to First United

18    Methodist Church every Sunday, and my father was a Republican

19    and my mother was a Democrat.  That was back when there were

10:34:51    20    conservatives and liberals on both sides of it.  But there was

21    nothing, you know, extreme about any of it.

22        I am a fifth-generation lawyer.  My mother had two

23    brothers who were lawyers, and her father was a lawyer.  That's

24    where the five generations of lawyers come from.  So I had, you

10:35:12    25    know, the law and this ingrained in me my whole life.  And then

1  I was raised in what I would call polite society.

2         I mean, I spent -- I mean, I understand what -- you

3  know, the courts are slow to change.  I mean, I know that we've

4  sort of bridged this gap.  I mean, the -- most of my career as

10:35:37  5  a lawyer it was the same polite society type thing in

6  operation.  But they've -- that's been thrown out the window.

7  I mean, I still would like it to be the way things are.  And

8  they are like that in court.  They are like that to the extent

9  we can have it.

10:36:01  10         But it's hard to wrap your head around the

11  transformation that we've had in this society from a patriotic

12  sort of uniformity that covered everything to this part now

13  where we've got a large part of this country hates this

14  country.  I don't know how we get past that without some

10:36:31  15  seriously hard work.

16  **Q**   So the posts that you were writing on social media leading

17  up to January 6th, would you agree that they were aggressive

18  and said some pretty shocking things?

19  **A**   When -- no.  I wouldn't really agree with that for this

10:36:56  20  reason:  All right.  I said a lot of things about communism and

21  communists and people dying.  That was not a recitation of me

22  saying what I was wanting to happen or what I was going to do.

23  That is a statement of what happens in communist revolutions.

24  In every one of them.

10:37:26  25         And the 20th Century is full of examples where

millions of people die in Marxist or communist revolutions.
That is not what I want to happen.  I'm trying to point that
out.

If we don't turn this ship around, we are headed
toward a catastrophe.  And it's not what I want.  It's what I
am trying to avoid.

Now, in that sense, yes.  It's shocking.  But that is
the historical fact.  It happened in China.  It happened in
Russia.  It's happened in Venezuela.  It's happened in every
place that it's been allowed to come to fruition.  And there's
no reason to think it will be any different here because it's
always been the same thing.  It's always been a disaster.

Q   We heard a little bit of an interview or not an interview
but a phone conversation you had yesterday.  It was played for
the Court, a portion of it.  And you mentioned something about
trolling.

A   Yes.

Q   Can you please explain what you meant by that in that
conversation?

A   I knew I was being what I call -- at my bond hearings, I
think I called it cyberstalking.  My cyberstalkers.  I knew
that I had people who were turning me in to the FBI.  The
sheriff of Sumpter County, he is a good friend of mine.  He
said, I've got people who want you incarcerated, jailed, locked
up, and, you know, imprisoned.  And, I mean, we both started

1    laughing.  But, you know, it's -- those people went -- it -- I

2    pretty much pegged it to the time I had the Second Amendment

3    rally.  From that point forward, they were just -- I couldn't

4    do anything without being, you know, reported to the FBI.

10:39:34  5          Even -- it got so bad -- well, this was even after the

6    fact.  When I got out of jail, the chief assistant D.A. turned

7    me in to the FBI because I didn't wear a mask in court.  And I

8    know she turned me in to the FBI because there's a copy of my

9    text message to her having a discussion about it afterwards

10:39:57  10   that's in my discovery.

11          And, I mean, basically she had told me to put on a

12   mask -- asked me to put on a mask in the break of court, and I

13   said, I don't wear masks.  And then I sent her a text

14   explaining that, you know, if the judge is wearing a mask, I

10:40:15  15   wear a mask.  If the judge is not wearing a mask, I don't wear

16   a mask.  And there are a lot of defense attorneys that were

17   following that same sort of guideline because you can't hear

18   people talk.  And all that.  And I mean, basically I do what

19   the judge says do.  That was my whole point of that.  Well,

10:40:34  20   that got me turned in to the FBI.

21   Q   So if you knew you were being turned in to the FBI and you

22   were obviously upsetting people with your Facebook posts and

23   then Parler posts, why didn't you stop writing those posts,

24   those style of posts?

10:40:53  25   A   We had been -- by we, I mean the entire MAGA side, the

entire Trump supporter side from President Trump on down had
been suppressed and censored on social media, which social
media -- I mean, Twitter and Facebook -- I mean, they were the
equivalent of the public square.  If this were 1900, I guess
you could have gotten up on a stump outside the courthouse and
said what you wanted to say, but -- in this day and age, you
get on Twitter or you get on Facebook or Parler or whatever and
you have your say.

All right.  They suppressed us from having our say.
We know now that that -- like, for example, if you said Hunter
Biden, you would get banned.  If you said COVID, you would get
banned.  If you said stolen election, you would get banned.
But we know now that -- from polling that the suppression of
the Hunter Biden laptop story -- if it had not been suppressed,
it could have changed the outcome of the election.  Now, that's
not election stealing, but that's election interference.

And we've also heard that the FBI was directing the
censorship, which, I mean, that is not in their job
description.

So it -- when Parler came online, it did not have the
censorship guidelines that Facebook had, and it was like a
logjam breaking free.  I mean, there was a little overboard
aspect of it because when you've been silenced for months on
ends and all of a sudden you can say whatever you want, you
know, there's a tendency to push it, I think.

```
 1            It was just -- we were finally able to talk again.
 2       But it's -- and the other aspect of it is when somebody -- we
 3       have a First Amendment and it is -- the First Amendment -- my
 4       understanding, Your Honor -- it's always been my understanding
10:43:17 5   of it -- it does not allow you to say what is permitted.  You
 6       can say what is not prohibited.  So if you're not making
 7       terroristic threats and you're not trying to incite some act of
 8       violence, you're pretty much open to say what you want.
 9            Now, it's not the best idea to say whatever you want.
10:43:47 10  You can lose business.  You can get, you know, shunned.  You
11       could be criticized.  But that is not a crime.
12            Everything I said on social media, there is no -- no
13       crime in any of it.  So then that's -- because I am a lawyer.
14       It's ingrained in us.  I mean, every decision a lawyer makes,
10:44:11 15  you're going to be -- if it's something that's, you know,
16       getting on the edge of whether you might be breaking the law or
17       whatever, I mean, we're all extremely attuned to not crossing
18       that line, not committing a felony, not doing anything that's
19       going to, you know, go against or be adverse to continuing to
10:44:46 20  be a lawyer.  It's ingrained.
21  Q    Through these postings that you were doing and, you know,
22       any other activity that you were doing in 2020, particularly
23       towards the end of the 2020, was it on the forefront of your
24       mind to make sure that you didn't get in trouble with the bar
10:45:06 25  or didn't get charged criminally while you're voicing your
```

1   opinion?

2   **A**   Absolutely.  And I'm not in trouble with the bar.  And I'm

3   not charged with anything because I didn't commit a crime on

4   Facebook or Parler.  Now, I --

10:45:22  5   **Q**   You mean you're not charged with anything outside of these

6   charges; is that correct, in reference to your Facebook

7   postings?

8   **A**   Right.

9   **Q**   So you decide to go to this rally.  And, actually, let's

10:45:40  10   scratch that, withdraw that.

11           What is your relationship like with Mr. Nalley?  What

12   was it at the time?

13   **A**   Well, we were friends.  We both were concerned about the

14   things we were seeing happening.  And he had some spare time on

10:46:06  15   his hands, and I had the time to be bothered to go to

16   Washington, and so we decided to come up here.  But --

17   **Q**   Based on just your relationship with him and the things

18   that you saw -- you personally saw -- was he also very active

19   on social media?

10:46:27  20   **A**   Oh, yeah.  Oh, yeah.  I mean, I -- see, Andy -- I mean, he

21   graduated from high school, but he's not particularly educated.

22   He's a great person.  I like him a lot.  But he's a little

23   rough cut.  And he said things on Facebook that got him

24   banned -- he was working on his second or third 30-day ban at

10:46:58  25   the time of January 6.  And he said some things even that --

         1    and I'm not trying to disparage him.  I'm just saying -- his

         2    case is over.  I'm not doing anything to harm his case because

         3    it's over.  But he called -- he used communist and, you know,

         4    the N word --

10:47:19 5            MS. MARTIN:  Your Honor, I'm going to object to the

         6    answer.  It seems like he is not being responsive to the

         7    question.  I also don't know what his co-defendant who is no

         8    longer in this case -- what he said on social media has to do

         9    with what's going on today.

10:47:34 10           THE COURT:  Well, on the second objection, I will

        11    reserve to see where she's headed with this.  But as for the

        12    narrative, Ms. Sherman-Stoltz, you really -- that was a broad

        13    question, so I gave him some rope there.  But you know what

        14    he's trying to say.  So ask the question so he can say it.

10:47:55 15   **BY MS. SHERMAN-STOLTZ:**

        16    **Q**    So you mentioned the ban.  He was under a 30-day ban

        17    leading up to January 6; is that correct?

        18    **A**    On the second or third one, yeah.

        19    **Q**    And by ban, does that mean, like, his account wasn't

10:48:07 20   active?

        21    **A**    Correct.

        22           MS. MARTIN:  Your Honor, I'm going to object to this.

        23    Again, I don't know why it's relevant that his co-defendant was

        24    banned from Facebook.

10:48:15 25           THE COURT:  Do you want to proffer where you're headed

1    with this?

2              MS. SHERMAN-STOLTZ:  Yes, Your Honor.  Just

3    essentially drawing out the relationship between the two and

4    their social media aspect.  Him having one, being active; his

10:48:30  5    co-defendant having one but being under a ban.  And I've

6    essentially reached that point.  He wanted to be able to

7    express that his co-defendant was under a ban and that --

8    didn't have any accessible posts.

9              THE DEFENDANT:  If I --

10:48:44 10              THE COURT:  Wait, Mr. Calhoun.

11              MS. MARTIN:  I don't know why that would be relevant

12    to this case.

13              THE COURT:  Well, are you trying --

14              MS. SHERMAN-STOLTZ:  Differentiate between the two.

10:48:53 15              THE COURT:  Their relative culpability?  Where are you

16    headed?  Did he play a role in voicing for Mr. Nalley or

17    something?  What --

18              MS. SHERMAN-STOLTZ:  They both replied and commented

19    on one another's posts.

10:49:06 20              THE DEFENDANT:  The --

21              THE COURT:  Mr. Calhoun, there's no question pending.

22              I will allow it.  I will review it at the conclusion.

23    But try to link it up to the elements.

24              THE DEFENDANT:  The point --

10:49:18 25              THE COURT:  There's no question pending, sir.

**BY MS. SHERMAN-STOLTZ:**

**Q**   So you had an active presence on social media leading up to January 6th; is that correct?

**A**   Yes.

**Q**   And then your co-defendant did at one point of time but he was under a ban; is that correct?

**A**   Because he said things that were much -- well, worse than anything I said.  I mean, the same sort of anti-communist stuff but worse.

          MS. MARTIN:  Objection, Your Honor.

          THE COURT:  Okay.  Overruled for now.

**A**   And I saw it --

          THE COURT:  Stop.  There's not a question pending.

**BY MS. SHERMAN-STOLTZ:**

**Q**   Is it fair to say that you and Mr. Nalley, at least at the time, were somewhat like-minded politically?

**A**   Yes.  And, again, that's what -- I can't see what I did that was any different from what he did.  But -- on social media and at the Capitol.  That's, I think, the point of what you're asking.

**Q**   And we will talk about the Capitol actions later.

          So you decided to go to Washington, D.C. with Mr. Nalley.  He invites you.  Did you stay at a hotel overnight?

**A**   Yes.

1    **Q**   Did you reserve that hotel?

2    **A**   No.  I didn't.  He reserved it, paid for it.  I reimbursed

3    him for my half.

4    **Q**   So what was your intention in going to Washington?

10:50:38  5    **A**   My intention in going to Washington was just to go to the

6    Trump speech.  I did not even know there was going to be a

7    rally at the Capitol until I got to Washington and then we went

8    to see Trump speak and then it was like everybody is going to

9    the Capitol and I'm, like, okay.  So we, you know -- we went

10:51:10  10   over to the Capitol and -- well, we didn't actually go straight

11   to the Capitol.  We went to the -- we were trying to get

12   internet access because --

13            THE COURT:  All right.  Mr. Calhoun, stop.

14   Ms. Sherman-Stoltz, ask questions, please.  Answer the question

10:51:23  15   and then let her ask another question.

16   **BY MS. SHERMAN-STOLTZ:**

17   **Q**   What is it that -- so you go to the Trump rally.  What is

18   it that caused you to then go over to the Capitol?

19   **A**   Well, Trump said we were going over to the Capitol, for one

10:51:35  20   thing.  So the crowd started meandering over to the Capitol.

21   But we actually went to the Robert Taft Memorial area to get

22   internet access and sit down for a minute is first where we

23   went.

24   **Q**   At the point that you arrived over to the Capitol, describe

10:51:57  25   what it was that you saw.

**A**    That -- we're coming up on, I guess, the west side that

faces back toward the Washington Memorial where Trump was.

That area on the restricted area exhibit -- I think it was 101

or something with the big red line around it, Your Honor.  That

10:52:26    entire grassy area was full of people.

There were -- at the time, there were people -- you

know, we were trying to figure out how many people were there

in town in that -- on the street.  And some people were saying

there were 2.2, three million Trump voters there.  I was

10:52:44    thinking there were more like 1.5 million, but that entire

grassy area inside the red line and beyond it was full of Trump

supporters.

And as -- when we finally got over to that, which some

things happened before that, but there were no barriers --

10:53:04    there were some -- there were some -- the bike barriers that

had been described.  But there were, like, sections that were

removed, and there were so many hundreds of thousands of people

inside that fence, if I could put it that way, and there were

certain areas had been removed that you could walk through into

10:53:25    it.  I thought that was, like, where you were supposed to walk

through.

THE COURT:  All right.  Next question.

**BY MS. SHERMAN-STOLTZ:**

**Q**    So you're approaching the Capitol.  All of these people are

10:53:36    already within, as you describe, that red line.  You said

1    there's the bike racks.  There's portions missing.

2    **A**   Right.

3    **Q**   And is that where you entered through was one of those

4    areas where there was no bike racks?

10:53:52  5    **A**   Right.  Right.  I mean, in other words, there -- I didn't

6    see any signs that said do not enter.  Besides, there were

7    hundreds of thousands of people inside that area.  I thought

8    that's where we were supposed to go because --

9              THE COURT:  All right.  Next question.

10:54:11  10   **BY MS. SHERMAN-STOLTZ:**

11   **Q**   And you were going there because you said Trump said let's

12   go over to the Capitol?

13   **A**   Right.

14   **Q**   And you see areas where there's no bike racks.  And is it

10:54:21  15   safe to say you assumed that's where you entered into the --

16             THE COURT:  That's asked and answered already,

17   Ms. Sherman-Stoltz.  He's testified to that.

18   **BY MS. SHERMAN-STOLTZ:**

19   **Q**   So you said you didn't see any signs when you went through.

10:54:33  20   Did you see any signs at all while you were on the Capitol

21   grounds that said closed, no access, no entry?

22   **A**   Not -- well, again, not where all the people were because

23   that's where all the people were.  I didn't see any signs that

24   were prohibiting going into that area.  Again, I thought there

10:54:59  25   was a specific thing set up to kind of funnel the people in

1    there through certain areas instead of it just being, you know,

2    no fence at all.  And, now, I don't recall seeing any signs,

3    you know, elsewhere.

4        THE COURT:  All right.  Next question.

10:55:23  5    **BY MS. SHERMAN-STOLTZ:**

6    **Q**   How about snow fencing?  You heard the captain from the

7    Capitol Police testify yesterday that all the bike racks were

8    reinforced with snow fencing.  Did you see any snow fencing?

9    Did you cross over any snow fencing?  Move anything aside?

10:55:42  10   **A**   Is snow fencing that orange net-type material?

11       THE COURT:  You can't ask the questions.  You ask the

12   question.

13   **BY MS. SHERMAN-STOLTZ:**

14   **Q**   She didn't describe it as orange, but I think you remember

10:55:53  15   her -- she said it was backing up -- reinforcing all of the

16   bike racks.

17   **A**   I don't -- I'm not sure.  I mean, it's possible, but I

18   don't really specifically remember -- I'm not sure what snow

19   fencing is.  I know there were little sections of fence --

10:56:12  20   again, that there were sections that were not there.  But there

21   were other sections that generally reamed that green area and,

22   again, people just walking through the -- there was --

23   certainly there was no law enforcement there saying, don't

24   enter.

10:56:31  25       THE COURT:  Mr. Calhoun, let her ask the question.

**BY MS. SHERMAN-STOLTZ:**

**Q**   We saw from your videos that there was evidence that some type of, you know, like, macing was taking place.  I think, in fact, you even put a post about it.  What was your thought process when you saw those things?  Why would it be happening if you were -- if it was okay for you to be there?

**A**   Well, the -- I never got maced, for one thing.  I never got close enough to anything like that to be a part of that.  But --

THE COURT:  Wait.  Hold up for just a second.  What is the question you're asking?

MS. SHERMAN-STOLTZ:  That he saw those things, visualized those things.  What would make him think that it was okay to be there if he's seeing that.

THE COURT:  All right.  Go ahead.

**A**   Well, what -- okay.  I was under the assumption that we were entitled to be on the grassy area out going -- that led up to the steps because that's where all those people were.  And nobody was trying to prevent that.  Now, up -- and it took a long time to get there.  Again, I was -- we were at the Robert Taft Memorial.

THE COURT:  The question was:  What made you think it was okay to be in there with the sprays and other things that you were observing.

**A**   Well, I didn't see that until we got in there, until we

1    were well in there because that type of stuff was happening

2    down by -- out in the section of the crowd which was probably,

3    you know, 20 or -- there were hundreds of thousands of people.

4    And of those hundreds of thousands of people, there were

10:58:25   5    probably 20,000 right up kind of at those steps.  And that's

6    from where -- that's where I saw some macing and that sort of

7    thing happening.  I saw a flash bang grenade.

8              THE COURT:  All right.

9    **BY MS. SHERMAN-STOLTZ:**

10:58:42   10   **Q**   So at some point, you make your way up closer to the

11   Capitol; is that right?

12   **A**   Right.

13   **Q**   Do you remember approximately what time you arrived at the

14   Capitol grounds?

10:58:53   15   **A**   Well, the Trump speech ended.  We following the crowd kind

16   of up there.  We went to the Taft Memorial to sit down and

17   rest, try to get some internet access.  And at some point, I

18   said to Nalley, it looks like they're trying to go and get

19   inside.  And he said, come on, and he took off walking.  And so

10:59:23   20   I followed him.

21             THE COURT:  So you don't know what time that was?

22             THE DEFENDANT:  I don't know what time it was.

23             THE COURT:  All right.  Next question.

24   **BY MS. SHERMAN-STOLTZ:**

10:59:30   25   **Q**   So you follow or you start heading towards the front of the

1    Capitol building and, you know, make your way up the steps; is
2    that correct?
3    **A**    No.  We were walking toward -- it wasn't -- when the
4    front -- I think it was on the opposite side.  It was that west
10:59:51  5    side facing toward the Washington Memorial where the
6    scaffolding was.  But we just sort of were inching our way up
7    there because we wanted to see what was happening.  And it
8    looked, you know -- it was -- I never seen anything like that.
9    I mean, I was sort of, I guess you might say, sitting there --
11:00:12  10   I don't know gawking at it is the right word, but we were just
11   watching.  It was moving at a snail's pace to get up there.
12   But all we were doing was just getting -- all I was doing, I
13   thought, was going up there to just watch what was happening,
14   which we did for a while.
11:00:32  15   **Q**    And you took a lot of pictures and a lot of videos; is that
16   correct?
17   **A**    I mean, throughout the day, sure.  I mean --
18   **Q**    What did you think was going on inside of the Capitol?
19   **A**    I didn't think -- well, I didn't know what was going on
11:00:54  20   because I thought -- all right.  We didn't have internet access
21   because of all the people on the street.  Some people would
22   have sporadic access.
23          As we were walking, meandering from the Trump speech
24   toward the Capitol, I heard people in the crowd saying that
11:01:17  25   Pence had certified the vote and, you know, they were kind of

1    grumbling about that.  So I thought at that point the whole

2    thing may have been over with, I mean, because they had

3    certified the vote.  And so I wasn't sure, you know, what was

4    going on after that.  I was mainly trying to --

11:01:45  5            THE COURT:  Okay.  You didn't know what was going on.

6    Next question.

7    **BY MS. SHERMAN-STOLTZ:**

8    **Q**   But you thought that the vote had been certified, correct?

9    **A**   That's what was being talked through the crowd; that it had

11:01:55  10   been certified.

11   **Q**   So what caused you to enter into the Capitol building?

12   **A**   As we had made our way up to that area and, you know,

13   sitting there again just sort of gawking at -- watching all

14   this stuff, you know, these people, there were just a tiny

11:02:25  15   handful of police officers on the steps.

16            And, of course, I couldn't see everything all the time

17   because there were so many people in front of me and -- but at

18   some point, there were no police officers in sight.  I mean,

19   they just all of a sudden -- they were gone.  And the crowd

11:02:48  20   started just rushing up those steps.

21            And I was standing in front of the steps and was about

22   to get knocked over from the rush.  And I'm sitting there,

23   thinking, you know -- and this happened in a split second.  I

24   was thinking, you know, you're at the crossroads of history.

11:03:10  25   You know, you've got to go in here to witness this and to take

1    pictures and video of it because, if you don't, you're going to

2    regret it.

3         I mean, turns out probably regretted going in there.

4    But either way, at the time, I mean, I was at the crossroads of

11:03:30  5    history.  I had to go in there to witness it and to record it.

6    So I -- I didn't --

7         THE COURT:  All right.  Next question.

8    A   Well --

9    **BY MS. SHERMAN-STOLTZ:**

11:03:37  10   Q   Did you see any -- so you said at some point in time you

11   didn't see any police officers.  How about when you're getting

12   closer to the door that you went inside?  Did you see any law

13   enforcement?

14   A   No.  I didn't see any -- if I can finish the last --

11:03:52  15        THE COURT:  Ask another question, Ms. Sherman-Stoltz.

16   A   I had to go up the steps because of the rush.  I didn't

17   have to go inside, but I did have to go up the steps to not get

18   trampled.

19        THE COURT:  All right.

11:04:07  20   **BY MS. SHERMAN-STOLTZ:**

21   Q   So you go inside.  You don't see any law enforcement?

22   A   No.

23   Q   Did you --

24   A   Just in -- inside -- all right --

11:04:15  25   Q   But going inside, you didn't see any law enforcement?

1    **A**    No.  I didn't see any law enforcement.  And I walked

2    through the door.  There were --

3            THE COURT:  Wait for the next question.

4    **BY MS. SHERMAN-STOLTZ:**

11:04:27  5    **Q**    The door that you went through, did you see -- I mean, we

6    saw on a video that the windows to the left and the right of

7    the door were broken.  They were shattered.

8            Did you see that as you're going in?

9    **A**    I did not see that.  I think I was walking through with

11:04:42  10    my -- looking through my camera or something.  I didn't see the

11    broken windows.

12    **Q**    You didn't see any glass on the floor, evidence of a broken

13    window?

14    **A**    No.

11:04:50  15    **Q**    Did you see anyone break the windows while you were even,

16    like, at the bottom of the stairs?

17    **A**    You couldn't see that door from the bottom of the stairs.

18    I didn't -- didn't see any windows broken.  I don't have any

19    idea how the initial entry occurred.  I mean, when I got up to

11:05:08  20    where I could see that, it was just an open door and just

21    walked through an open door.

22            There were police officers inside.  On that video we

23    saw yesterday, you can't see them, but walking straight in the

24    door in front of us were some police officers.  I think there

11:05:26  25    were some over to the left.  To the right is a hallway but --

and so yes.  Police officers were watching us walk in.

Q    Did any police officers, as you're walking in, direct you
or direct in your general area to stop, you know, leave, turn
around, you're not supposed to be here?  Did you hear any
warnings from those law enforcement officers?

A    No.  They were just watching us walk in.  And -- which is,
you know -- I mean, I didn't see -- I didn't think it was a
problem.  I mean, that -- I was not going to confront any
police officers or go anywhere near any police officers, and --
I was not, you know, doing that.

Q    Did you hear the alarm?  You heard the captain of the
Capitol Police describe an alarm that would be going off on
that door that you went through.

A    I think there was an alarm going off at the door.  But,
again, it was -- I mean, the door was open, and people were
just walking in.

Q    So you walked through the door.  We saw what direction you
went from the videos yesterday.  You're filming; is that
correct?

A    Right.

Q    And describe to the Court where you went after that, after
you walked through.

A    Well, walked through the door, basically hung a right, and
we're just walking down the hall, you know.  I mean, it was --
it was very -- sort of quiet at some level.  I mean, it was

1    not -- it was not -- it was not, you know -- it was not violent

2    or mob-like or anything like that.  Just walking down the hall.

3    **Q**    Did you bring any weapons with you to Washington, D.C.?

4    **A**    No.

11:07:34  5    **Q**    Did you --

6    **A**    In fact, I --

7    **Q**    Did you acquire any weapons after you arrived and bring

8    them into the Capitol?

9    **A**    No.  The Court will remember I researched the D.C.

11:07:45  10    ordinance.  I spent half a day researching the ordinance to

11    just see what -- because, I think as I testified, we didn't

12    know what was going to happen here, but after reviewing the

13    D.C. gun ordinance, I mean, I told Nalley, we're not bringing

14    anything.  So we didn't.

11:08:08  15    **Q**    Did you have any chemicals like bear spray, anything that

16    could have been used defensively against another individual?

17    **A**    No.

18    **Q**    Did you have -- we saw a lot of people with flags.  Did you

19    have anything of that nature?

11:08:21  20    **A**    No.

21    **Q**    How about any type of military gear?

22    **A**    No.  I was just dressed as a civilian.

23    **Q**    We didn't see you with any body armor or helmet?  You

24    didn't have any of that in your backpack?

11:08:42  25    **A**    No.  I had water in my backpack.

1    Q    So, at some point, we saw a video that you took where you

2    were at a point -- large crowd of people -- and you can see law

3    enforcement in front of you.  Describe what's going on to the

4    Court at that point in time.

11:08:56  5    A    Are you referring to the -- I think what they call the

6    Crypt?

7    Q    Yes.  I believe that's what they have testified it was.

8    A    Well, we walked down the hall and as -- you know, we came

9    into that Crypt area.  There were already a lot of people that

11:09:17 10    had come into the Capitol before we did.  We got to the Crypt,

11    and I was basically staying -- he said one or two rows back,

12    but that wasn't correct.  I was always three or four rows back.

13    And I was videoing it.

14         I mean, I went into the Capitol -- I forgot to add to

11:09:46 15    your question -- I mean, earlier, I mean, part of the reason I

16    went in there when I was talking about the crossroads of

17    history thing was, you know, I was going in there to record and

18    witness what was happening.  So, I mean, that's why I went in

19    there.  And that's what I was doing.

11:10:08 20    Q    So inside of the Capitol, you're recording.  Did you touch

21    anything?

22    A    No.

23    Q    There's a lot of, you know, historical artwork, artifacts

24    in there.  Did you touch anything, mess with anything?

11:10:25 25    A    No.  Absolutely not.

1    Q   We saw that you took a picture over -- I guess in Nancy

2    Pelosi's -- kind of her wing, her -- the hallway leading up to

3    her office.  So you were there; is that correct?

4    A   Well, past the Crypt, there's a little stairwell.  And up

11:10:50  5    the top of that stairwell, I guess to your 2:00 o'clock, you

6    would see the speaker's office.  And then if you were to your

7    9:00 o'clock, taking a sharp left, there's a hallway that I

8    think leads to the round room with all the artwork in it.  I

9    guess that's the Rotunda.

11:11:09  10   Q   So and is that where you went?  You headed over to Nancy

11   Pelosi's area after that or before that?

12   A   After --

13   Q   Before the Rotunda or after the Rotunda?

14   A   That was before the Rotunda.  I stayed -- I never left any

11:11:24  15   area that was not normally publically accessible on a regular

16   day.  If Congress had been in session and I had been visiting

17   the Capitol, I did not enter into any area that I could not

18   have lawfully entered into as a pedestrian.

19   Q   Did you enter into her office?

11:11:45  20   A   No.  I entered -- there's a -- I saw the speaker of the

21   House.  There was an open door.  I stepped in to see.  And

22   that's her lobby area.  And I looked in that, and then I left.

23   But that -- again, that was any member of the public could walk

24   into there to that lobby and, you know --

11:12:07  25   Q   So have you ever been inside the Capitol before?

1    **A**    When I was in the seventh grade.  But I don't really

2    remember about it.

3    **Q**    Are you familiar with the procedures that the captain

4    described yesterday as far as the security, going through the

11:12:29  5    security and the metal detectors?  Are you aware that that is a

6    normal process to enter into the Capitol?

7    **A**    Not specifically.  I mean, I would assume that everywhere,

8    you know, courts, anyplace like that, that there would be metal

9    detectors.  But there weren't any metal detectors in front of

11:12:48  10    the speaker's office.  The only metal detectors would have been

11    at the initial doorway, I would think, to enter the Capitol.

12    **Q**    Do you recall seeing any there?

13    **A**    No.  There were people walking in and out of that as well.

14    But, again, you know, I didn't go into, you know, Nancy

11:13:08  15    Pelosi's office.  I stepped into the reception area just to see

16    what it looked like and then walked out and, you know, walked

17    down the hall toward the Rotunda, as it turns out.

18         THE COURT:  Ms. Sherman-Stoltz, let me clarify

19    something.

11:13:25  20         She asked you whether you recalled seeing any metal

21    detectors there.  And you said no; there were people walking in

22    and out of that.

23         Do you mean in and out of the metal detectors, or was

24    that something else you were saying?

11:13:42  25         THE DEFENDANT:  I didn't see any metal detectors.

1    THE COURT:  All right.  Just wanted to clarify.  I was

2    concerned that it was ambiguous.

3    **BY MS. SHERMAN-STOLTZ:**

4    **Q**    Okay.  You have a video that was recorded that was entered

11:13:54  5    into evidence yesterday, and you said something to the effect

6    of they're looking for them or we're looking for them.  And you

7    were referring to, I think, members of the House.

8    What did you mean by that?

9    **A**    You know, some people were, you know, saying things to that

11:14:17  10    effect or, you know, I -- you know, I -- that's a good example

11    of me narrating what I was hearing being said.  Now, I was not

12    looking for any member of the House.

13    I mean, I -- again, this gets back to I'm not going to

14    do anything unlawful.  I'm not going to attack a police

11:14:43  15    officer.  I'm not going to bust into Congress and try to

16    disrupt it.  I'm not going to break anything or do any

17    vandalism.  You know, even though I had seen the Kavanaugh

18    confirmation hearings where people busted in, yelling and

19    screaming into the Senate to try to shut that down -- I had

11:15:06  20    seen numerous instances of, you know, that sort of thing

21    happening on, you know -- but I was not going to do anything

22    like that.  And I didn't.

23    **Q**    Did you encounter anyone in an aggressive manner?  Did you

24    confront anyone at that point in time while you were inside the

11:15:28  25    Capitol?

        1    **A**    No.  I didn't.

        2    **Q**    Were you ever specifically confronted by a law enforcement

        3    officer at any point in time inside the Capitol?

        4    **A**    No.  That would be the last thing I would have done.  I was

11:15:40  5    not going to confront a police officer because I had -- I just

        6    wouldn't do that.  I'm -- you know, that would go against

        7    everything that I -- it's just ingrained in our -- you know,

        8    when you're a lawyer, there are some very bright lines you

        9    don't cross.  You don't assault anybody.  You don't break

11:16:04  10   anything.  You don't vandalize anything.  You peacefully, you

        11   know, protest.  And that's what I did.

        12          Now, we had been watching, again, for eight months --

        13   I'm not talking about the

        14   let's-go-burn-down-the-federal-courthouse kind of Black Lives

11:16:24  15   Matter peaceful protesting.  I'm talking about objectively,

        16   knowable, observable, nonviolent, peaceful protesting, which is

        17   just walking around.

        18   **Q**    At any point in time, were you chanting or yelling

        19   anything?

11:16:43  20   **A**    No.  I didn't even raise my voice the whole day.

        21   **Q**    Did you talk to anyone inside of there other than your

        22   co-defendant?

        23   **A**    Not -- I may have -- maybe in passing, hey, how's it going

        24   or something like that.  But no -- I didn't have any

11:17:03  25   discussions.

1          You got to remember we saw probably an hour's worth of
2    video yesterday, but I was only in there for 15 minutes -- from
3    the time I walked into the Capitol until I left the Rotunda,
4    that's 15 minutes.  It took as much time to get out as it did
11:17:27  5    to get to that point.  So half the time I was in there, I was
6    just trying to get out.
7    Q    And we saw where you ultimately did get out.
8          Had you tried other avenues of getting out before you
9    reached that one?
11:17:42  10   A    Not other avenues per se, but you will notice -- I think
11   there's a video where it shows us walking down from the Rotunda
12   back to the steps and then we turned around and came back.
13         Well, once we were in the Rotunda -- we were only in
14   there for, you know -- I think it couldn't have been more
11:18:03  15   than -- again, ten minutes just to get to the Rotunda.  I think
16   we weren't in there but five minutes just looking at artwork
17   and, you know, looking around and then we decided to leave.  I
18   said -- then I was the one that said let's get out of here.
19         So we walked back to the steps.  And there were so
11:18:22  20   many people at the bottom of the steps, coming in, it was like
21   a -- it was just like a sardine pack.  It wasn't moving.  So we
22   went back to the Rotunda to see if there was an exit out of
23   there.  We got there.  There were obviously -- I was like, no.
24   Let's go back.  So we went back and went down the stairs and,
11:18:41  25   slowly but surely, we went out by -- we couldn't -- we didn't

go back the way we came in.  That would have been going to our
left.  We took a right.  Somebody told us that's the way out,
and we just made our way out.

But half our time in the Capitol was spent trying to
get out, you know, give or take.

Q   What did you do after you left the Capitol, after you
exited?

A   We made our way across the, you know, lawn area, back
toward the Taft Memorial.  And when we were out on the lawn,
somebody said, hey.  They shot some girl in there.  And we
didn't know anything about that.  We didn't hear it.  We didn't
see it.  I mean, that was -- we made our way to our car, which
was several blocks past the Taft Memorial, got in it, and left.
By -- I would say by, you know, 3:15, 3:20 -- I mean, we were
out of town by then.

Q   And by out of town, were you spending another night and
going back to that hotel in northern Virginia, or you were
leaving, headed home?

A   We drove straight back to Georgia.

Q   The government introduced an exhibit yesterday of a post
that you made at 2:39 p.m.  And that would have been while you
were inside the Capitol.

Were you posting inside of the Capitol on social
media?

A   I don't think I did, no.  I took videos.  I wasn't posting

1    on social media.

2    **Q**    So do you have any explanation for that post at 2:39 p.m.?

3    **A**    It could have been -- maybe I could have been standing

4    outside of the Capitol and -- when it actually posted or

11:20:38  5    something.  I don't know.  But I did not -- I don't have any

6    recollection of posting anything inside the Capitol.

7        In fact, I was -- again, we were in and out so

8    quickly, I was trying to take videos and pictures, not sit

9    there and write posts.  I mean, it was only a -- like I said,

11:20:57  10    it was 15 minutes of walking and getting to the Rotunda, and

11    then we were on our way out, which took about, you know,

12    another 12 minutes, I guess, or so.

13    **Q**    You have testified before under oath in these proceedings

14    that, you know, you would be -- might be guilty of or you would

11:21:22  15    only be guilty of a misdemeanor.  You know, trespass I think is

16    what you said.  What made you think that you, you know, had

17    trespassed?

18    **A**    Well, I wasn't sure.  I mean, it's -- you know, again,

19    it's -- we're -- I'm watching the police, you know, there that

11:21:50  20    have --

21        THE COURT:  Wait.  Mr. Calhoun, the question is:  What

22    made you think at the time of the detention hearing that you

23    had trespassed?

24    **A**    Well, that's what I'm getting at.  There is a police line

11:22:08  25    there at the bottom of the stairs, and that tells me that

1    you're not supposed to go past that, which I didn't.  But

2    15 minutes later or whatever, there's no police there and

3    there's no line and all these people are running up the steps.

4    And I was, like, well -- and so -- and I get around to the

11:22:27  5    door.  There's no -- the door is open.  The police are watching

6    people walk in.

7            I mean, it was unclear -- I mean, I -- I don't know.

8    I wasn't sure whether I was trespassing or not.  I mean -- I

9    mean, I could have been, but I don't know.  And I certainly

11:22:51  10    didn't think anything beyond that was a problem.

11    **BY MS. SHERMAN-STOLTZ:**

12    **Q**    At any point of time -- you testified that you thought that

13    the vote had been -- I'm sorry.  The count had been certified

14    prior to going in.

11:23:10  15            At any point in time, did you make any kind of steps

16    to interfere with something else that may have been going on --

17    **A**    No.

18    **Q**    -- in Congress?

19    **A**    No.  No.  I would -- I would not do any interference with

11:23:28  20    Congress.  I did not.

21    **Q**    Why wouldn't you?  Why wouldn't you?  You've got some very

22    aggressive posts about stop the steal.  Why wouldn't you do

23    anything to stop Congress?

24    **A**    Well, for one thing, again, I'm an attorney and, you know,

11:23:44  25    that's just a line I wouldn't cross.  And I did not cross it.

1    I mean, there was -- stopping the steal is a slogan and, you

2    know, there had been -- I mean, there was not -- that wasn't

3    going to stop the steal, if we want to call it that.  I mean,

4    the vote had been certified.  So I thought it was over with.

11:24:15    5    There's nothing that could be done at that point.  That was

6    before we even got to the, you know -- by the time we were

7    halfway from the Trump speech to the Capitol, the word on the

8    street there was that the -- that Pence had certified the vote.

9    So it was -- I thought it was -- that was the end of it.

11:24:45    10    But we did -- you know, the whole point of the protest

11    was to be -- you know, your body being there is expressing your

12    dissatisfaction with the way the system seemed to have failed.

13    I mean --

14    Q    So being physically present in a manner in which you could

11:25:05    15    be recognized -- is that what you're saying?

16    A    Right.  I mean, it's not -- if you're not physically

17    present, there's no protest.  So you've got to be physically

18    present.

19    Q    So you head home -- straight home, you said?

11:25:22    20    A    Correct.

21    Q    And when do you -- when does it come to your attention --

22    when do you realize that, you know, you've entered into -- you

23    had entered into a building that was closed to the public?

24    A    I'm not sure I understand what you're asking, but --

11:25:51    25    Q    Well, at some point of time, is it safe to say you would

1  have learned that no one should have been on the grounds or in

2  the Capitol?  At some point of time, did you learn that; that

3  it wasn't even okay to have been on the grounds?

4  **A**   Well, I learned in court yesterday that the grounds were

11:26:12  5  restricted.  That's the first I knew about that.  You know, as

6  far as the entry into the Capitol, you know, I thought that I,

7  you know, could have been trespassing, like, in the common law

8  sense.  I mean, and I -- up until very recently, really, I

9  didn't understand how it could be anything other than that.  I

11:26:38  10  really still don't understand it.  But, I mean, when -- I

11  didn't see how it could be anything worse than a ticket.

12      I thought even when the FBI arrested me that day --

13  even then, I thought, well, I'm probably going to be taken down

14  and given a citation to appear in court and set free.  I mean,

11:27:08  15  that's literally what I thought.

16      I had no idea that I was going to be charged with

17  interference with Congress because I don't see, you know -- I

18  mean, I don't see what I did that was any different from the

19  other what I estimated to be at least -- at the rate the people

11:27:28  20  were going into the Capitol, there had to have been at least

21  10,000 people that went in there that day.  At least.  And

22  they're not all charged with interference of Congress.  I mean,

23  I don't know what I did that was any different.

24  **Q**   So you weren't expecting the charges that you received?

11:27:48  25  **A**   Absolutely not.

**Q**   After you get back home, you have mentioned a couple of times in a couple of areas that you've been receiving death threats.  What were those as a result of?

**A**   Well, I posted -- again, this sort of goes into the fact that I didn't realize that there was any major problem with what I did.  I posted all my videos, and I posted a lot of pictures.

By the time I got back to Americus, I -- you know, I was getting threatening, you know, emails and phone calls.  That was on a -- well, not sure what day that was we got back, but we went straight back to Atlanta.  And then the next day, I got up and drove back to Americus.

And by the time I had gotten back to Americus, there were death threats.  And there was even one individual who apparently was on the front porch of my law office on his phone, you know, saying things.  And it got so bad that the FBI, as I understand it, wanted to arrest me in open court that Wednesday.  But I was not at court that Wednesday because my assistant had -- she was so scared, she quit, and it wasn't calendared.

That was when the Court will remember I had gone to court that Monday.  I had gone to superior court Monday.  Then I went to superior court on Tuesday.  Wednesday, I was -- had -- did not go to court.  That's the time they wanted to arrest me, I think.  And then that Thursday -- I did make

announcement by email to the D.A. and the judge.  And then that

Thursday, I was in Macon, you know, to get away from all the

threats.  I was staying at my sister's house.  And then that

Friday, I got arrested in Macon.

**Q**   Why did you bring all of your guns to your sister's house?

**A**   I didn't know, you know, what was going to happen to my,

you know, residence.  I didn't want guns to get stolen.  I just

brought them with me for that reason.

**Q**   Did you bring any other valuables with you?

**A**   Well, I didn't really have any, you know.  I mean, I was

just trying to secure the firearms.  I mean, that's why they

were with me.  I had some clothes and that sort of thing.  I

wasn't living in Macon.  I was just staying there temporarily.

And I was back and forth.  I mean, I wasn't -- I didn't move to

Macon, in other words.

**Q**   In one of your bail hearings, you testified to the Court

that, you know, if you could -- if you did it again, you

probably wouldn't go into the Capitol.  And then a few months

later, you testified in court in Georgia after your release

that you would do it all over again.  Why the disparity between

the two statements that you made?

**A**   Well, that statement in Cordele, I was not testifying.

That was just an argument made in court.  But it's -- what's

important here is, you know, I -- in Macon -- I mean, excuse

me.  In Cordele in that hearing, even then, I did not think

1    there was any possible way I had committed a felony.

2         I mean, I understand that the Court has ruled that

3    that statute applies, but if somebody had said to me on

4    January 6th, if you go into this building, you're going to be

11:32:16  5    prosecuted under the document shredding statute, I would have

6    said, no, I'm not.  I mean, I wouldn't have believed it.

7         And there is -- it's -- I did not and, even now, I

8    don't believe I did violate any felony statute because there's

9    nothing -- there's no act involved to commit a felony.  I mean,

11:32:45  10   there's not anything I did except walk through the Capitol.

11   And I mean -- but that was still -- that was my mindset in

12   Cordele.

13        Now, only very recently have I finally figured out

14   what their theory is for the felony.  But -- so I'm not -- I

11:33:23  15   was trying to also, you know -- the judge in that case, you

16   know -- I mean, she's sympathetic to January 6th defendants, I

17   think.  I was really -- I was frustrated with the defendant who

18   this man -- gentleman had -- he was on --

19   **Q**   And Mr. Calhoun, we don't need to go into --

11:33:51  20        THE COURT:  Wait.  Wait.

21   **A**   I'm trying --

22   **BY MS. SHERMAN-STOLTZ:**

23   **Q**   We don't need to go into the specifics of his case and his

24   charges or anything like that.

11:33:59  25   **A**   Okay.

1    Q    Just looking for clarification on why you said what you

2    said in court in May as far as doing it again versus what you

3    told Your Honor; that you wouldn't.

4    A    Okay.  Yeah.  Well, the -- all right.  The defendant was --

11:34:16    5    he was -- the client was upset with -- he was trying to raise

6    January 6th as a reason for I guess -- I don't know.  Trying to

7    get a new lawyer or be -- get his case continued.  It was a

8    revocation.  And I was frustrated with that.  January 6 didn't

9    have anything to do with his case.  And I had -- actually was

11:34:46   10    incarcerated at his first hearing, so it had been continued.

11    And I was just trying to curry favor with the judge at some

12    level.

13        I mean, I don't want to just keep changing, you know,

14    on that.  I mean, that was -- that was not testimony.  That was

11:35:10   15    an argument and, you know, I don't believe I would go back

16    in -- I don't believe I would come back to Washington, much

17    less go into the Capitol if I had may way about things.

18        MS. SHERMAN-STOLTZ:  On that note, I don't have any

19    additional questions for the defendant, Your Honor.

11:35:35   20        THE COURT:  All right.  Let's take a five-, ten-minute

21    break.  And, after the break, we will proceed until about

22    12:45, break for lunch.  All right?

23        COURTROOM DEPUTY:  All rise.

24        (Short recess.)

11:48:02   25        THE COURT:  All right.  So we will go for one more

1    hour and then we will break.

2              Mr. Calhoun, are you ready to get back on the stand?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Do you have water there?

11:48:12  5    THE DEFENDANT:  I do not.

6              THE COURT:  Would you like some water?

7              THE DEFENDANT:  Please.

8              COURTROOM DEPUTY:  I will take care of it.

9              THE COURT:  Will you take care of it?  What about

11:48:30 10   cups, though?

11             COURTROOM DEPUTY:  I will take care of it all, Your

12   Honor.

13             THE COURT:  Okay.  Sorry.  There should have been that

14   where you are.

11:48:37 15   THE DEFENDANT:  Thank you.

16             THE COURT:  We haven't been in the courtroom for a

17   while, so . . .

18             MS. MARTIN:  Do you want me to wait until he gets

19   back, Your Honor?

11:48:51 20   THE COURT:  Yes.

21             COURTROOM DEPUTY:  No pressure.

22             THE COURT:  No pressure.

23             Thank you, Mr. Hopkins.

24             COURTROOM DEPUTY:  My pleasure, Your Honor.

11:50:52 25   THE DEFENDANT:  Thank you.

1          THE COURT:  Ms. Martin.

2          MS. MARTIN:  Thank you, Your Honor.

3                    **CROSS-EXAMINATION**

4    **BY MS. MARTIN:**

11:51:09   5    **Q**    Mr. Calhoun, so we talked -- it's been on the record

6    multiple times that you're a practicing criminal defense

7    attorney, right?

8    **A**    Correct.

9    **Q**    And you've been a practicing attorney for decades?

11:51:22  10    **A**    Correct.

11    **Q**    All right.  And you've said you've moved away from civil

12    cases.  You're now focusing on criminal cases; is that right?

13    **A**    No.  What I said I was -- if I get a big damage case these

14    days, I tend to farm that out, but I still do civil cases.

11:51:41  15    **Q**    All right.  But your focus is on criminal cases?

16    **A**    By and large, yes.

17    **Q**    And what kinds of criminal cases do you work on?  What

18    kinds of offenses?

19    **A**    Primarily state cases, misdemeanor and felony.  Everything

11:52:03  20    from, you know, minor misdemeanors to murder cases.  Every now

21    and then, maybe a federal case, but that's pretty rare these

22    days.

23    **Q**    Would it be fair to say that some of the cases you work on

24    intent is an issue at trial?

11:52:26  25    **A**    Intent is an issue in every criminal case.

Q   So we agree intent would be something you would normally
encounter when you're going through and defending a criminal
case?

A   Yes.

11:52:41   Q   Would you agree that someone's statements prior to and
while committing a criminal offense would be probative of their
intent?

A   No.

Q   Explain that.

11:52:51   A   Depends on the case.

Q   All right.  So if somebody says a week before they have
murdered somebody else, I want to kill this person, do you
think that that would be probative of their intent at their
trial for murder?

11:53:07   A   It could be.

Q   If somebody said, I'm going to the Capitol to stop the
certification of the vote, and then, a week later, they show up
to the Capitol and they storm it and the vote is stopped, do
you think that statement would be probative of intent?

11:53:32   A   Who -- I didn't say that.

Q   No.  I'm asking you a question.

    Do you think under that hypothetical that statement
would be probative?

A   I don't know.

11:53:42   Q   You don't know.  You're a criminal defense attorney, you've

1    been practicing for decades, but you're not able to tell us if

2    a statement would be probative of intent?

3    A    Based on that narrow fact you just gave us, I said it could

4    be, but I don't know.

11:53:59  5    Q    All right.  And you're required, you testified, to maintain

6    a bar license in Georgia, right?

7    A    I'm sorry?

8    Q    You testified on direct that you're required to maintain a

9    bar license in Georgia, and you have an active bar license?

11:54:14  10    A    Yes.

11    Q    All right.  And if you were convicted of a felony, that

12    could affect your ability to maintain a bar --

13    A    Yes.

14    Q    And that's not something you want, right?

11:54:25  15    A    Correct.

16    Q    Okay.  And as an attorney who is practicing before a Court,

17    any time you're before the Court, you know that you have an

18    ethical responsibility to be candid; is that right?

19    A    Yes.

11:54:37  20    Q    Okay.  So when you were testifying on direct that your

21    statement to the Georgia Court was not under oath; it was

22    argument, you understand you were still under a duty to be

23    candid to that Court, right, regardless of whether you were

24    under oath or not?

11:54:59  25    A    Yes.

| | |
|---|---|
| 1 | **Q**   Okay.  So let's pull up -- |
| 2 | **A**   But that was not a lack of candor. |
| 3 | MS. MARTIN:  All right.  Can we pull up Exhibit 206, |
| 4 | please?  And is the -- |
| 11:55:17   5 | COURTROOM DEPUTY:  Yes. |
| 6 | MS. MARTIN:  Awesome.  Thank you.  All right.  Could |
| 7 | you go to Page 2, please? |
| 8 | **BY MS. MARTIN:** |
| 9 | **Q**   So, again, before this Court in Georgia, you said, he |
| 11:55:51  10 | cannot get past the fact that I was in federal detention for |
| 11 | two months for entering the Capitol, and I have had enough.  My |
| 12 | position on that is somebody had to do it.  Okay?  I would do |
| 13 | it again a hundred times if I were in the same situation. |
| 14 | That's just how I feel about it. |
| 11:56:08  15 | Do you see that? |
| 16 | **A**   Yeah. |
| 17 | **Q**   All right.  And so is it your testimony today that that was |
| 18 | just argument to that Court?  That's what you said on direct. |
| 19 | **A**   That's an argument. |
| 11:56:25  20 | **Q**   Why is that an argument? |
| 21 | **A**   Because I'm arguing as -- in a case.  That's -- |
| 22 | **Q**   But you're stating that if you had to do it -- I would do |
| 23 | it again 100 times.  And that's different than what you told |
| 24 | this Court when you testified. |
| 11:56:45  25 | **A**   I testified before this Court under oath in my own case. |

1      This is an argument.  You can tell there's been a lot
2   going on before this in this case in Cordele.  It was
3   frustrating.
4      And -- and as I explained in my direct answer, you
5   know, that my understanding of my charges since you wouldn't
6   disclose what I've done -- and you still haven't even at this
7   moment -- to interfere with Congress -- I now understand the
8   theory of your case, but I didn't at that time.
9   Q   But you would agree that the statement that's here in front
10  of you is different than how you testified in front of the
11  Court?
12  A   That's not testimony.
13  Q   Okay.  Let's move on.  All right.  So let's talk about --
14  you're talking about the government's theory of the case.
15  Let's talk a little bit about why you went to the Capitol on
16  January 6th.
17      Now, it's your claim that the 2020 election was
18  fraudulent; is that right?  Is that fair to say?
19  A   The 2020 election has problems.
20  Q   Okay.  And it's your claim that it was stolen?
21  A   It's a fact that the FBI directed the censorship at Twitter
22  and at Facebook by suppressing the Hunter Biden laptop story,
23  which polling shows affected the outcome of the election.  Is
24  that fraud?  It is interference.
25  Q   Okay.  So just to go back to the question that I asked, I

```
 1  asked you:  It's your claim the election was stolen?
 2  A   It's not my claim.
 3  Q   But you subscribe to that belief; is that fair to say?
 4  A   Yes.
 5  Q   Okay.
 6  A   Stolen, interfered with, you know, not a clean election.
 7  Q   All right.  And, in fact, you posted on social media
 8  multiple times before January 6th something to the effect of
 9  stop the steal; is that right?
10  A   That was the campaign slogan.
11          MS. MARTIN:  All right.  Could we pull up Exhibit 405,
12  please?
13  BY MS. MARTIN:
14  Q   All right.  So in this post, you say, stop the steal.
15  Biden lost.  Accordingly, the 80 million Americans who voted
16  for Trump aren't going agree, follow, acquiesce to, and we damn
17  sure aren't going to obey any policy coming from a fraudulent
18  Biden-Harris administration.  Trump is going back for four more
19  years anyway based on massive and compelling evidence.  These
20  are the facts of life.
21          So based on this post, you're not just quoting a
22  campaign slogan, right?
23  A   It says what it says.
24  Q   All right.  And the stolen election is the reason you went
25  to Washington, D.C., right?
```

11:58:39
11:58:55
11:59:15
11:59:35
11:59:50

**A**    I went to the Trump rally to hear him speak about the

problems with the election.  I did not know I was going to the

Capitol.

          MS. MARTIN:  All right.  Could you pull up

Exhibit 407, please?

**BY MS. MARTIN:**

**Q**    All right.  So December 29th, you post, being physically

present in Washington on January 6 is of key importance.  We,

the people, have no other realistic option to communicate our

unwavering intent to demand fair elections for now and forever

or else.  I'll see you there.

          So you said being physically present in Washington,

D.C. on January 6 is of key importance, right?

**A**    How else can you have a protest?

**Q**    And you wanted to go to D.C. on January 6 because you knew

that was the day the electoral certification was going to be

happening; is that right?

**A**    No.

**Q**    You didn't know that that was the day that the

certification was going to be happening?

**A**    No.  I didn't want to go to Washington, but I felt like

there was some civic responsibility to stand up and be there.

**Q**    You said you didn't want to go, but you did, right?  I

mean, that's why we're here.

**A**    Yes.

```
 1   Q   All right.  And so my question was:  Did you know the
 2   certification was happening on January 6th?
 3   A   Yes.
 4   Q   You did?
 5   A   That's what we were told.
 6   Q   All right.  And, again, another thing that you've mentioned
 7   on direct and on cross is that you were attending the Stop the
 8   Steal rally on the Ellipse, correct?
 9   A   Yes.
10           MS. MARTIN:  Okay.  And could you pull up Exhibit 408,
11   please?
12   BY MS. MARTIN:
13   Q   But the rally wasn't your sole purpose, right?
14   A   That was my -- no.  That's incorrect.
15   Q   So it had nothing to do with the fact that the electoral
16   certification was going on on January 6th?
17   A   Well, the whole -- that's -- that was -- well, what exactly
18   are you asking me?
19   Q   Your reason for going to D.C. on January 6th was not just
20   the Trump rally; it was also because that was the day the
21   certification of the electoral vote was happening; is that
22   right?
23   A   Well, they were both happening on the same day.
24   Q   Right.  So the reason you went was not only for the rally
25   but also because you knew that was the day the certification
```

1    was happening?

2    **A**    The reason of the rally was to stop the steal.  I mean,

3    that's what Trump called it.

4    **Q**    All right.  And what does that statement mean to you?  What

12:02:57  5    does stop the steal mean?

6    **A**    It meant to get President [sic] Pence to do what was

7    requested of him.

8    **Q**    And what was requested of him?

9    **A**    To comply with the wishes that were put in writing by

12:03:23  10    various senators and representatives to -- who had said, there

11    are problems with our electoral votes; send the votes back to

12    our states; let us fix it; and we will send it back to you.

13    Then you can to your certification of those electoral votes.

14    That's all it was about.

12:03:44  15    **Q**    All right.  And so when you said in Exhibit 408, headed to

16    D.C. to give the GOP some backbone to let them know this is

17    their last chance to stop the steal -- do you see that?

18    **A**    Yeah.

19    **Q**    And you used the statement "last chance."  And that's

12:04:02  20    because you knew that was the day the electoral vote was

21    happening?

22    **A**    That was the last chance because that was the last check

23    and balance in the system of checks and balances to, you know,

24    fix the problems with the election.

12:04:21  25    **Q**    And, again, by last chance because of the checks and

             1   balances, you mean because that was when Congress was going

             2   through the certification?

             3   **A**   Correct.

             4   **Q**   All right.  And at a hearing before this Court on March 5th

12:04:40     5   of 2021, you again reiterated that the reason that you entered

             6   the Capitol on January 6th was because the election was stolen,

             7   right?

             8   **A**   I don't think I said that.

             9            MS. MARTIN:  All right.  Could we pull up Exhibit 209,

12:04:53    10   please?  And I apologize.  It's going to be Page 308.  So 308.

            11   I might have gotten that wrong.  It could be 108.

            12            THE COURT:  I don't think there are that many.  It's

            13   98 pages or 100 pages.

            14            MS. MARTIN:  I jotted it down wrong.  Let me just

12:05:36    15   find.

            16            THE COURT:  You talking about Page 38?

            17            MS. MARTIN:  Yes, I am.  Thank you, Your Honor.  Could

            18   you go to Page 38?

            19   **BY MS. MARTIN:**

12:06:08    20   **Q**   All right.  And I will just direct your attention to Lines

            21   13 through 21.

            22            MS. MARTIN:  If we could blow that up.

            23   **BY MS. MARTIN:**

            24   **Q**   So you said to this Court:  Look.  Why were regular, normal

12:06:24    25   Americans entering the Capitol?  That's the question.  We're

1    not going to be turned into criminals.  We're not criminals.

2    What did the government do to make us enter the Capitol?

3    That's what really I would be asking.

4            And then the AUSA asked you:  I'm curious.  So what

12:06:40  5    did the government do to make you enter the Capitol?

6            And you said, well, apparently 80 percent of

7    Republicans think they stole the election.

8    **A**   Well, I thought you were asking me about what I said in

9    Cordele in court.

12:06:55  10   **Q**   No.  I'm asking you what you said in front of this Court

11   under oath.

12   **A**   Well, that's what I said.

13   **Q**   So you would agree that you told this Court that the reason

14   you went to the Capitol was because you believed the election

12:07:20  15   was stolen?

16   **A**   Yes.

17   **Q**   I'm going to move on to the next question.

18           Going back to the fact that you knew the certification

19   was happening on the Sixth, you also knew it was happening in

12:07:29  20   the Capitol building, right?

21   **A**   I didn't know that.

22   **Q**   You did not know that?

23   **A**   No.

24   **Q**   You did not know that the electoral certification was going

12:07:35  25   on in the Capitol building?

1    **A**    No.  I mean --

2    **Q**    So you testified on direct that you're a historian, right?

3    **A**    I have a master's degree in history.  I don't know if that

4    makes me a professional historian, but yes.

12:07:52  5    **Q**    All right.  A master's degree in history.  And do you know

6    where the seat of the legislature of the United States is

7    located?

8    **A**    You talking about the Congress?

9    **Q**    Yes.

12:08:07  10   **A**    It is my understanding that the Senate meets sometimes in

11   the place called the Hartman [sic] Building.  I don't know

12   where that is.  But I know that, often, it meets in the

13   Capitol.

14   **Q**    All right.  So you know Congress meets in the Capitol?

12:08:22  15   **A**    Sure.

16   **Q**    All right.  And you knew that the electoral

17   certification -- that was an act that was happening before

18   Congress, right?

19   **A**    Yes.

12:08:33  20   **Q**    So would it be fair to say that if you knew something was

21   happening before Congress that it was happening in the Capitol

22   building?

23   **A**    No.

24   **Q**    It wouldn't be fair to say that?

12:08:43  25   **A**    It doesn't always happen in the Capitol, does it?

                      MS. MARTIN:  All right.  So could we pull up

2    Exhibit 503, please?

3    **BY MS. MARTIN:**

4    **Q**   So this is a post you made the day before January 6th, And

12:09:01  5    you're talking about the 1800 election and Georgia's electoral

6    votes.

7                      Do you recall this?

8    **A**   Yes.

9    **Q**   All right.  And at one point, you're talking about the fact

12:09:15  10    that this is precedent for Pence being authorized to count

11    disputed votes in his own election.

12                      Do you see that part?

13    **A**   Yes.

14    **Q**   And then it goes on to say, the VP isn't just performing a

12:09:27  15    clerical function.  Judgment and discretion has to be exercised

16    where the votes are contested.  That's under the Twelfth

17    Amendment.

18                      Do you see that?

19    **A**   Yes.

12:09:35  20    **Q**   So it's fair to say that you know quite a bit about this

21    process, right?  I mean, that's what you're writing about?

22    **A**   I mean, it is an ongoing learning process, but I don't

23    know -- I couldn't tell you where the Senate is located.  I

24    couldn't tell you where the House is located.  I mean, I know

12:09:56  25    they're somewhere in the Capitol, but I have -- even now, I

 1    don't know where they're located.

 2    Q    All right.  But you know the Senate and the House are

 3    somewhere in the Capitol?

 4    A    Yes.

12:10:05  5    Q    And you've testified on direct that you did go into the

 6    Capitol on January 6th, right?

 7    A    Yes.

 8    Q    Okay.  And when you testified on direct, you said you

 9    weren't going to do anything unlawful; is that right?

12:10:31 10    A    That's correct.

11    Q    But you've also stated that you knew you were guilty of

12    criminal trespass; is that right?

13    A    I believe in court I think I said I may have been.

14    Q    You may have been guilty of criminal trespass?

12:10:46 15    A    I don't know.  There's -- I don't know.  I mean, that's up

16    for the Court to decide.  I mean, I accept the Court's decision

17    on that.

18    Q    All right.  So let's talk a little bit about why you knew

19    that you shouldn't have been at the Capitol on January 6th.

12:11:02 20    Okay?

21         So when you were walking toward the Capitol, in a

22    video that you were shooting, you can see smoke coming up in

23    the background.

24         Do you recall that?

12:11:10 25    A    The one you showed yesterday?

1    Q    Yes.

2    A    That smoke way off?  Yeah.  In the distance.

3              MS. MARTIN:  Could we pull up Exhibit 603, please?

4         (Video played.)

12:11:32  5              MS. MARTIN:  Could you pause it there?

6    **BY MS. MARTIN:**

7    Q    So you see the smoke in that frame?

8    A    Yes.

9              MS. MARTIN:  And could you continue playing?

12:11:37 10        (Video played.)

11              MS. MARTIN:  And could you pause there?

12   **BY MS. MARTIN:**

13   Q    Now, you can see in this frame people are covering their

14   faces, right?  In this video, you can see people coughing;

12:12:07 15   they're covering their faces?

16   A    Uh-huh.

17   Q    As if they're being affected by something, right?

18   A    I don't know.  I guess.

19   Q    You don't know?

12:12:15 20   A    I wasn't affected by anything all day long.  Maybe they

21   were up in it and were walking out of it.  I don't know.  I

22   wasn't walking into it.

23   Q    Now, the smoke that you said was far off into the distance,

24   is it fair to say in this video you're walking toward it?

12:12:28 25   A    No.  I'm not walking.

1    **Q**   You're not walking in this video?

2    **A**   Well, play it.  Am I walking?

3          MS. MARTIN:  Yeah.  Let's rewind and play it from the

4    beginning.

12:12:40  5       (Video played.)

6    **BY MS. MARTIN:**

7    **Q**   So it's your testimony that, in that video, you're not

8    walking toward the smoke?

9    **A**   Well, I'm standing up.  I mean, obviously, it looks like

12:13:23  10   what I was doing was filming something that was going on at the

11   steps of the Capitol.  I'm talking about that.  Apparently they

12   had gotten, you know -- gone up the steps or something.  I

13   don't know.  But I'm -- I mean, I'm out on the grass, you know,

14   just witnessing what's happening.

12:13:44  15  **Q**   And in that video, you said they've stormed across the

16   barricade.  You heard that?

17   **A**   Yes.

18   **Q**   Okay.  But on direct when asked by your attorney, you said

19   you didn't see any barricades?

12:13:57  20  **A**   You got to know what -- barricades -- and this is -- we say

21   barricades -- you know, that's a very loose term I'm using.  I

22   mean, that -- were there -- to my mind, a barricade is

23   something that is typically going to involve some type of

24   fencing or something, although not necessarily, because at

12:14:24  25  times it was just maybe officers standing there with not any

1   fence.

2         MS. MARTIN:  All right.  Could we pull up Exhibit 414?

3   **BY MS. MARTIN:**

4   **Q**   Now, later in the day on January 6th, you say, patriots

12:14:49  5   have taken the Capitol building.  We overran multiple police

6   barricades and busted through.  That's what you wrote.

7   **A**   That's on the exhibit, yeah.

8   **Q**   And you testified that you also saw cops trying to repel

9   rioters with mace; is that right?

12:15:12  10   **A**   I saw cops using some mace -- I'm not sure.  When mace is

11   used on a crowd, typically if you're trying to push the crowd

12   back, mace is used at the front of the crowd to push it back.

13   But these officers that I saw were throwing it back behind the

14   crowd to push them forward.  So, I mean, they may have been

12:15:52  15   using it to repel them at certain times.  I mean, I didn't, you

16   know -- there's all kinds of dust or smoke in the air, based on

17   that video we just saw.

18         MS. MARTIN:  Could we pull up Exhibit 411, please?

19   **BY MS. MARTIN:**

12:16:12  20   **Q**   So this is during the day on January 6th you post, the cops

21   are using mace on us at the front of the Capitol?

22   **A**   Yeah.  But not me personally.  But, yes.

23   **Q**   By us, you didn't mean me and other people; you meant other

24   people?

12:16:30  25   **A**   I did not get maced or any teargas on me the entire day.

1  Q   All right.  But did you see people being maced?

2  A   What do you mean?

3  Q   Why else would you write, the cops are using mace on us at

4  the front of the Capitol?

12:16:47  5  A   Well, yeah.  Like, again, if you were -- you got to

6  remember -- okay.  There were very few police there for some

7  reason.  Now --

8  Q   Well, according to this statement, there were police there,

9  and they were using mace because that's what you wrote?

12:17:03  10  A   Right.  And they -- you know, I mean that's true.  They

11  were using mace on the crowd at some certain places, yes.  But

12  not me.

13  Q   Okay.  And you said on direct that when you approached what

14  you now know as the restricted grounds of the Capitol, which

12:17:30  15  apparently you didn't know before, that you thought you were

16  allowed to be there because there were people on the lawn,

17  right?

18  A   Hundreds of thousands of people were on the lawn.  Nobody

19  was trying to make them leave.  You know --

12:17:42  20  Q   Well, then why would cops be using mace?

21  A   That was at the very front of the crowd by the steps.  That

22  was -- there was -- you know, there were not a few thousand

23  people.  There were hundreds of thousands of people on that

24  lawn.  There were a million and a half Trump voters there.

12:18:00  25  Q   Now, I'm not asking --

1    **A**    There was nowhere for them to go, okay, except Trump said

2    we're going to the Capitol.  People started walking to the

3    Capitol.  When I got to the lawn area in front of the Capitol,

4    I was certainly not the first one to get there.  It was already

12:18:18    5    just hundreds of thousands of people on that grass.  There

6    were -- fencing that we've heard talked about, but there were

7    sections of the fence that were gone that I thought that that's

8    where you walked through to get onto the lawn.

9         THE COURT:  Okay.  Mr. Calhoun, the question was

12:18:38    10   then --

11        MS. MARTIN:  Well, actually I would like to address

12   something that he just said.

13   **BY MS. MARTIN:**

14   **Q**    So you said there was fencing; at parts, it had been broken

12:18:45    15   through.  Is that right?

16   **A**    No.  I didn't say it had been broken through.

17   **Q**    But you said there was fencing?

18   **A**    Well, like, any -- like, okay.  If you're at a football

19   game, there's going to be some fencing that delineates the

12:18:59    20   public walkways, for example.

21   **Q**    Okay.

22   **A**    That's what I'm talking about.

23   **Q**    So you did see fencing?

24   **A**    Yes.

12:19:05    25   **Q**    Okay.  And I'm not talking about how many people were

1    there.  All I was asking you about was whether the fact that

2    cops were using mace was an indicator to you that you were not

3    supposed to be there.

4    **A**    You couldn't see where the mace was being used.  There were

12:19:24  5    so many people there you would have to get into the area to

6    even get to be able to see that.

7    **Q**    All right.  So regardless of your answer to that question,

8    you continued to walk up the west front to the Capitol

9    building, right?

12:19:39  10   **A**    Yes.

11   **Q**    All right.  And when you entered the building, you heard

12   alarms going off, right?

13   **A**    Yes.

14   **Q**    Okay.

12:19:51  15   **A**    Well, that alarm at that door was going off; yes.

16   **Q**    And was that an indicator to you that you weren't supposed

17   to be there?

18   **A**    I mean, it's -- I guess, you know, it's a factor to

19   consider.  But everybody was just walking in, and the police

12:20:09  20   were watching them.

21   **Q**    All right.  And you said on direct that, you know, you saw

22   police.  They were just standing there, but they didn't seem to

23   be confronting people; is that right?

24   **A**    Where?

12:20:23  25   **Q**    When you first entered and then when you were inside.

1    **A**    Correct.

2         MS. MARTIN:   Okay.  Could we pull up Exhibit 607?

3         (Video played.)

4         MS. MARTIN:   And if you could just pause there.

12:20:43    5         THE WITNESS:   See --

6    **BY MS. MARTIN:**

7    **Q**    I haven't asked a question, Mr. Calhoun.

8         Now, what we're seeing in this frame, there's a line

9    of police officers there, right?

12:20:51    10    **A**    I don't know that it's a line.  There's a picture.  What

11    you're showing right there, it looks like an officer standing

12    beside somebody in a red hat, talking to them.  And then there

13    are two officers, looks like, across the way that are looking

14    the other direction.

12:21:12    15    **Q**    All right.  But there appears to be an area where the

16    rioters are and then where the police are, and there's no

17    rioters behind them?

18    **A**    I don't -- you will have to show me that.  I don't know.  I

19    don't see that right there.

12:21:24    20    **Q**    But, again, you said on direct that you were not confronted

21    by officers; is that right?

22    **A**    I wasn't.

23         MS. MARTIN:   Could you play the exhibit?

24         (Video played.)

12:21:41    25    **BY MS. MARTIN:**

1    Q    And you said in that video -- we just heard -- we're about

2    to push through these cops?

3    A    Again, as I said, I was narrating.  I was reporting on what

4    I was witnessing.

12:22:17  5    Q    All right.  But what you were witnessing was people who

6    were about to push through a line of cops?

7    A    Yeah.  You were asking about when I first came in.  That's

8    not when we first came in.  That's at the Crypt, isn't it?

9    Q    Sure.  So looking at this video, is it your testimony that

12:22:34  10    those are not police officers confronting you?

11    A    Yeah.  There are police officers there, but that's not

12    where we first came in.  You were asking me about when we first

13    came in.

14    Q    I'm asking you about this now.

12:22:48  15    A    Yes.

16    Q    All right.  So in this exhibit that I just showed you when

17    you were in the Crypt, is it your testimony that those officers

18    were not confronting you?

19    A    They weren't confronting me because I wasn't confronting

12:23:02  20    them.  I was standing there -- you saw Andy Nalley right there

21    in that picture with his little yellow scarf on.  We were just

22    standing there.  I was videoing, and I was recording what was

23    happening.  I was witnessing what was happening.

24    Q    All right.

12:23:17  25    A    I was not confronting anybody.

**Q**   And you heard Captain Mendoza's testimony the first day of trial where she said this line of police officers was ultimately overrun?

**A**   Yes.

**Q**   But it was your testimony that you saw this police line and then, 15 minutes later, they were gone?

**A**   No.  That was at the bottom of the steps outside the Capitol that I was talking about.

You skipped from entering the Capitol to being inside the Capitol.

**Q**   All right.  So I'm asking you now about in the Crypt.  You said, we're about to push through these officers; is that right?

**A**   That's what was, you know -- I mean, that -- again, that was what -- the murmuring that I was listening to, that's what I was hearing.

**Q**   And --

**A**   Don't mean -- that don't mean that I was about to push through any officers.  I never pushed through any officers.

**Q**   Okay.  Now, when you testified on direct, you were talking about the crowd, and you said they were not mob-like; is that right?

**A**   That was at a particular other instance, I believe.  I can't recall what the place was.  You've got to remember I can only talk about what I saw and heard that day.  The Capitol is

1    a very big place.  There was a lot going on that I had no

2    knowledge about.

3    **Q**    So, at any point, did you see people around you acting as

4    if they were in a mob?

12:25:05  5    **A**    The only time that really seemed to be the case was at the

6    very outset at the -- down by the bottom of the scaffolding

7    steps where the people were -- that's where they were getting

8    maced.  And I was sitting there, watching it, you know.

9    **Q**    So when you were inside the Capitol, you would describe the

12:25:25  10    people around you as not mob-like?

11    **A**    I'd say for the most part.  I mean, there was, you know --

12    again, it's -- yes.  Because -- all right.  At that -- when

13    these people were going to push through whatever at the Crypt,

14    even that was -- it was not, you know -- I mean, I'm standing

12:25:53  15    there, watching it, videoing.  And, you know, at some point

16    some young guy somewhere out there said, you know, okay.  Push

17    through and they started -- tried to walk around the police

18    officers.  Okay?  I didn't see anybody attack a police officer.

19    **Q**    That's not the question I asked you.

12:26:17  20    **A**    Well, you asked me if it was mob-like.

21    **Q**    Right.

22    **A**    It was not -- I mean, you know, 1.5 million people on the

23    Capitol lawn -- that, in itself, is kind of a mob.  I'm not

24    sure what mob-like is.

12:26:35  25    **Q**    Okay.

```
 1   A   But it was not -- I didn't see anybody violently attack a

 2   police officer.  I saw people try to walk around police

 3   officers.  Police officer might try to grab them for a few

 4   seconds, and then they'd let go.  And then, finally, the rest

12:26:51  5  of the crowd just walked through.

 6   Q   That's not question I asked.

 7   A   Well, you asked me about mob-like.

 8   Q   We're just going to go back.

 9        Regardless of whether they were mob-like or a mob,

12:27:01 10  would you agree people around you were angry?

11   A   Why would 1.5 million people leave their comfortable lives

12   to come up here if they weren't angry?

13        MS. MARTIN:  All right.  Could we please pull up 608?

14   (Video played.)

12:27:23 15  BY MS. MARTIN:

16   Q   All right.  Now, in that video, you're amongst rioters who

17   are yelling; they're banging on doors as they appear to be

18   walking through a hallway that has offices of Congress people.

19   Is that right?

12:28:34 20  A   Yes.

21   Q   Okay.  And you said --

22   A   Well, I don't know whether it has offices of Congress

23   people, but yeah.  They -- people were walking through the

24   hall, yelling right there.

12:28:44 25  Q   And banging?
```

1       A    Yeah.  Sounded like it.

2       Q    And at the end of the video, you say, it's on.

3       A    Well, the people in front of me weren't banging.  There was

4       some banging going on, but I -- you will notice on my video it

12:28:58  5     doesn't really depict any banging at all.

6       Q    All right.  But in the video --

7       A    Somebody was banging on something.  You could hear it.

8       Q    In the video -- that's not the question I asked.

9            In the video, at the end of the video, you say, it's

12:29:12 10   on?

11      A    Yeah.

12      Q    All right.

13      A    I'm narrating what I'm seeing.

14      Q    And what were you seeing?  What provoked you to say, it's

12:29:26 15   on?

16      A    You get all those people together, they think the election

17      is stolen, they had had enough, and there they were.

18      Q    And there you were with them?

19      A    Videoing and recording it.

12:29:39 20   Q    All right.  And you actually made it to Speaker Pelosi's

21      office, right, right outside her office?

22      A    I did not go in her office.

23      Q    I didn't say that.  I said:  You made it to the outside of

24      her office?

12:29:56 25   A    There is a lobby area right there, yes.

1    **Q**   So you would agree you made it to the outside of Nancy

2    Pelosi's office?

3    **A**   I went into the lobby area that anybody who is a member of

4    the public is entitled to go into any day that their office is

12:30:11    5    there.

6    **Q**   Now, you say that, but you heard Captain Mendoza's

7    testimony that the Capitol had been closed, because of the

8    pandemic, to the public since March of 2020.

9    **A**   I don't remember that specifically, but --

12:30:25    10   **Q**   All right.  Now you said, before coming to D.C., you

11   researched D.C. ordinances regarding the gun laws here; is that

12   right?

13   **A**   Yes.

14   **Q**   Did you at that -- did you check to see if the Capitol was

12:30:40    15   open to visitors at that point?

16   **A**   I didn't have any clue I was going to the Capitol, so no.

17   **Q**   Okay.

18   **A**   I mean, it was not on the radar.

19   **Q**   All right.  So when you say it was normally open to the

12:30:53    20   public and people could just go there, what are you basing that

21   off of?

22   **A**   I guarantee you right now you could walk over to the

23   Capitol, and, if it's open, you can walk into the lobby of the

24   speaker of the House's office and say, I want to see the

12:31:08    25   speaker or I want to leave this message or I want to, you know,

1    get help with this problem.  It's the people's House.  That's

2    the lobby to the speaker of the House.

3    **Q**    So --

4    **A**    A member of the public can absolutely walk in there.

12:31:23  5    **Q**    So let's talk about that.

6              When you go to a federal building or Congress to voice

7    your concerns, you know -- Ms. Sherman-Stoltz was asking you

8    about the procedures of entering a building like that.

9              Do you remember that?  When you had to go through a

12:31:48  10    metal detector, for example?

11    **A**    Yeah.

12    **Q**    And would you agree that in most federal buildings that you

13    have to be in, including this one, that you go through

14    security?  You go through a metal detector, and there are

12:31:59  15    certain things that they search you for?

16    **A**    I assume --

17    **Q**    Would you agree with that?

18    **A**    Probably, yeah.

19    **Q**    Did it strike you that on January 6th that you didn't

12:32:10  20    appear to have to do that?

21    **A**    You talking about going into the Capitol?

22    **Q**    Yes.

23    **A**    It was -- I mean, I didn't think about it, going through a

24    metal detector, if that's what you're asking.

12:32:33  25    **Q**    You didn't think it was odd that you didn't have to go

1    through a metal detector to go into the Capitol building?

2    **A**    Again, is it trespassing or is it not trespassing when the

3    police are watching you walk in?  The police vacate the area,

4    back up, and they're watching you walk in -- is that

12:32:55 5    trespassing?  Or are you supposed to go, you know, think about

6    metal detectors?  I don't -- you know -- I mean, that's --

7    **Q**    That's not what I asked you though.  I asked you:  Did it

8    seem odd to you?

9    **A**    Did what seem odd?

12:33:11 10    **Q**    That you didn't have to go through security or a metal

11    detector when you went into the Capitol building.

12    **A**    No.

13    **Q**    It didn't seem odd?

14    **A**    Not in that time and place.

12:33:23 15    **Q**    All right.

16    **A**    The whole thing was odd.  I had never seen anything -- I

17    had never been -- I had never been to anything like this.

18    **Q**    All right.  And during your direct testimony, you stated

19    that, at some point while you are inside the Capitol, you

12:33:40 20    turned to Nalley and you said something to the effect of, okay;

21    let's get out of here.

22         Do you remember testifying about that?

23    **A**    Yeah.

24    **Q**    Why did you say that?

12:33:49 25    **A**    That was about the -- you know, I had been in there about

1    15 minutes.  We had walked in, took a right, walked down.  I

2    think that was where the Crypt was.  I think.  And then we went

3    up the stairs.  That's where Pelosi's office was.  And we hung

4    a left, walked down to the -- I think it's the Rotunda where

12:34:12   5    all the artwork is.  Hung around in there for a minute.  And

6    then I was like, you know, let's get out of there.

7          That entire sequence of events was no more than

8    15 minutes.  It took almost as much time just to get out as it

9    did to get to that point.

12:34:28  10   Q   So the question I asked was:  You turned to Nalley and you

11   said let's get out of here.  Why did you say that?

12   A   Because it was -- it was just over with.  There wasn't

13   anything -- it was not anything to do.  I mean, we made our

14   point.  We walked in; we had walked down the hall; we had

12:34:47  15   walked up the steps; we had walked down to the Rotunda; we

16   looked at the artwork; and, you know, our presence was known.

17   You know, we left.

18   Q   Now, you also testified on direct that you thought the

19   certification was already over when you went inside the

12:35:05  20   Capitol; is that right?

21   A   Yes.

22          MS. MARTIN:  All right.  Could we pull up Exhibit 506,

23   please?

24   A   I mean, I think I testified I was pretty sure.  I didn't

12:35:17  25   really know, but I assumed it was probably over.

**BY MS. MARTIN:**

**Q**   So looking at Exhibit 506 -- and this is the third

paragraph down -- you said, we occupied the Capitol and shut

down the government.  We shut down their stolen election

shenanigans.

Do you see that?

**A**   Yeah.

**Q**   So when you say that you thought the certification was

over, that's not what you said on January 6th.

**A**   That doesn't -- no.  You're incorrect.  That's not --

that's not what you're -- that doesn't have anything to do with

that.

**Q**   All right.  So what did you mean when you said, we occupied

the Capitol and shut down the government; we shut down their

stolen election shenanigans?

**A**   You will notice that was made on January 6.  That was made

after all this was over.  I had been cyber stalked by a bunch

of, you know, people with nothing better to do.  They were

turning me in to the FBI.  And they were, you know, harassing

me.  And I was trolling them.  And I mention that.  I mention

that in other -- some other video, that conversation with the

D.A. before I even knew I was going to be arrested.  I was

trolling them.  I said it then.  I'm saying it now.  That's

what I was doing was trolling my cyberstalkers.

**Q**   So it's your testimony today that the only reason you

1    wrote, we occupied the Capitol and shut down their government,

2    we shut down their stolen election shenanigans was to troll

3    people on Facebook?

4    **A**    Yeah.  I didn't know -- I didn't know whether we had shut

12:37:01  5    down anything.  I didn't think anything was going on.  In other

6    words, I was trolling.

7    **Q**    All right.  And when you said you didn't know anything was

8    going on, you previously testified on cross that you knew the

9    certification was happening that day.

12:37:16  10    **A**    But I also said I thought it was over with.

11    **Q**    All right.  But you thought it was over with, but you knew

12    it was happening that day, right?

13    **A**    It had happened.

14    **Q**    Why did you think it was over?

12:37:35  15    **A**    Because Pence certified it is what I heard.

16    **Q**    And this is just from people in the crowd?

17    **A**    Yes.

18    **Q**    All right.  And so when you went to the Capitol, did you

19    think that it was odd that hundreds of thousands were -- of

12:37:48  20    people were going to the Capitol even though you knew that

21    maybe shortly before there was a joint session of Congress

22    going on?

23    **A**    Trump said go to the Capitol.  We went to the Capitol.

24        MS. MARTIN:  All right.  Could we pull up 506, please?

12:38:07  25    Oh, sorry.  This is the same one.  If you could just, yeah,

1    take that down.  All right.

2    **BY MS. MARTIN:**

3    **Q**   So just going to the second line here, you said, we

4    physically took control of the Capitol building in a

12:38:20   5    hand-to-hand hostile takeover.  You wrote that?

6    **A**   Trolling.

7    **Q**   Your testimony --

8    **A**   Did you see me do any hand-to-hand hostile takeover?  No.

9    **Q**   All right.  And so, just to be clear, your testimony is

12:38:37   10   that you didn't actually physically take control of the Capitol

11   building in a hand-to-hand hostile takeover; you only wrote

12   that because you were trolling people?

13   **A**   We didn't take -- did we take over the Capitol?  I was

14   staying in the publically accessible hallways.  I did not take

12:38:58   15   over the Capitol.  There was obviously some, you know -- you

16   know, things going on that day, but, you know, again, I was

17   just recording and witnessing them.  I did not take control --

18   we didn't -- even -- we didn't take control of the Capitol.

19   Okay?  This is just, you know, political rhetoric to troll my

12:39:29   20   stalkers, trying to drive them crazy, which I, obviously, was

21   too successful at.

22        MS. MARTIN:  All right.  Just Court's indulgence.

23      (Discussion off the record.)

24        MS. MARTIN:  All right.  And if we could just pull up

12:40:11   25   408, please.

**BY MS. MARTIN:**

**Q**    All right.  Now, it was your testimony that you didn't know before January 6th that you were going to go inside the Capitol; is that right?

**A**    Correct.

**Q**    Okay.  But on January 4th, you wrote, D.C. announced it is banning guns when we storm the Capitol tomorrow.

**A**    This is the Capitol.  Washington, D.C. is the Capitol.

**Q**    So it's your testimony that when you say, Capitol, you were just talking about Washington, D.C. and not the building?

**A**    Yes.

MS. MARTIN:  Okay.  Your Honor, that's all that I have.  Thank you.

THE COURT:  All right, Ms. Martin.

So, Ms. Sherman-Stoltz, how much redirect do you think you have?

MS. SHERMAN-STOLTZ:  Probably more than four minutes, Your Honor.

THE COURT:  Okay.  If it's ten or so, we might just do it.  But if you think you're going to go longer than that, we will wait until after lunch.

MS. SHERMAN-STOLTZ:  I mean, I think we could do it in ten to 15 minutes.

THE COURT:  Okay.  Well, let me check.

Mr. Calhoun, how are you doing?

1          THE DEFENDANT:  I'm ready to keep going, Your Honor.

2          THE COURT:  What about court staff?

3          All right.  Then you can go ahead and proceed,

4     Ms. Sherman-Stoltz.

12:42:03  5          MS. SHERMAN-STOLTZ:  Thank you, Your Honor.

6                         **REDIRECT EXAMINATION**

7     **BY MS. SHERMAN-STOLTZ:**

8     **Q**   You testified that at some point you knew that the

9     certification was happening on January 6th, and you just

12:42:24 10   testified to that to the government.

11         Did you know that the certification was happening on

12    January 6th in November of 2020?

13    **A**   Yes.  It's my understanding that the certification was

14    going to happen on January 6th.

12:42:44 15   **Q**   So when you're making those posts in November and early

16    December, you knew that it was happening on January 6th.  You

17    knew that was the designated date?

18    **A**   No.  Well, if designated date was -- it was only after the

19    electoral votes were certified by the states in December --

12:43:06 20   14th or 15th -- only then was it clear that January 6th was

21    going to happen the way it did I think is my thoughts at the

22    time -- were my thoughts.

23    **Q**   So when you decided to go to D.C. or when Nalley said,

24    we're going D.C., you knew at that point that the rally was

12:43:30 25   taking place on the same day; is that correct?

1    **A**    That's correct.

2    **Q**    What was your understanding of why the rally was taking

3    place on that day?

4    **A**    President Trump was having a rally to speak about the

5    election being stolen and all that and the state of the country

6    and so forth.

7        And that -- at some -- after -- at the end of his

8    speech, as it turned out, they were voting.  And that's when we

9    heard that Pence had certified the election.  And we had

10   said -- you know, everybody was going to the Capitol, so we

11   went to the Capitol; that being the grounds.  You know, we got

12   to the grounds, and all these hundreds of thousands of people

13   are on the grass out there.  And we went to the Taft Memorial,

14   and we watched it for a minute.  And then we went over there

15   just to watch it.

16   **Q**    So you believe it was intentional that the rally was on the

17   same day as the certification; that that was the point?

18   **A**    Yes.  That was the whole point of it.

19   **Q**    Okay.  So you're aware that this is happening.  But in

20   November of 2020, you weren't aware that it was happening

21   specifically on January 6th; is that correct?

22   **A**    I mean, I don't -- I can't say --

23   **Q**    Were you even thinking about it?

24   **A**    I knew that there was a process.  It was going to be the

25   states certifying their electoral votes.  Then there would be a

                date in January where it was certified or not certified by the
                vice-president.  And that -- I mean, I knew that was going to
                happen.  I can't say right now I knew the exact days.  But, I
                mean, I could have.  I don't know.

12:45:22   **Q**   And did you know in November and early December that you
                were going to Washington, D.C. on January 6th?

           **A**   No.  I didn't -- there was no January 6 happening as far as
                a Trump rally until after the state electoral certification
                process had exhausted itself.  That was in, you know,
12:45:45        mid-December, the 15th.  I keep going back.  It was either the
                14th or 15th.  It may have been slightly different.  In any
                event, before Christmas.  At that point, the state process had
                exhausted itself, and it was on its way to Washington.

           **Q**   Have you ever been to Washington, D.C. before when any
12:46:03        other vote has been certified or count has been certified?

           **A**   No.  I've never had occasion to follow this.

           **Q**   Would you have gone -- do you believe that you would have
                gone if there had not been a Trump rally?

           **A**   No.  I wouldn't have gone.  No.  Absolutely not.

12:46:24   **Q**   When you say us and we in your posts, what do you mean?
                And I'm referring to the posts specifically about the Capitol
                building.

           **A**   I'm referring to the crowd, which, I mean, I was in the
                crowd, but I was performing a journalistic function, as I've
12:46:51        testified to.  When I say we did this, we did that, that

1    doesn't mean I did it.  It meant I saw people doing it.

2    **Q**    So we, meaning the group of people, the Americans, people

3    that were there?

4    **A**    Yes.

12:47:05  5    **Q**    Is that correct?

6    **A**    Correct.  I mean, to give you an example, when I said we

7    kicked in Pelosi's door, they know I didn't kick in Pelosi's

8    door.  For one thing, it was already open when I got up there.

9    The other thing, my feet were in such bad condition, I couldn't

12:47:30  10    hardly walk, much less kick in doors because I've had two

11    surgeries in the interim on my feet, which they're doing great

12    now.

13    **Q**    The government pointed to a post where you talked about how

14    can't bring guns into D.C.; that it's illegal; and then you

12:47:45  15    refer to the Capitol.  Prior to actually coming to Washington,

16    D.C. and being on the grounds of the Capitol building, did you

17    talk about the Capitol building in any of your posts?

18    **A**    No.  Again, I didn't -- I didn't know we were going to the

19    Capitol until, you know, we're getting into Washington or

12:48:14  20    whatever.  Nalley was actually telling me that, well, yeah.

21    There's going to be a Trump rally, and then we're going over to

22    the Capitol.  And that was the first I heard about it.

23    **Q**    So when you refer to the Capitol in posts prior to

24    January 6th, what does that mean?

12:48:30  25    **A**    That means Washington, D.C.

1    **Q**   The government asked you if at any point if you saw anyone

2    around you acting like a mob.  What is your definition of a mob

3    or mob-like?  What do you think of when you hear that word?

4    **A**   Well, it's -- that's a very broad category.  Certainly a

12:49:02  5    crowd.  Usually it implies a crowd is angry.  I would say

6    that's generally the definition of a mob.

7    **Q**   Are they doing anything?

8    **A**   When?

9    **Q**   When they're acting like a mob, are they doing anything?

12:49:25 10    **A**   Well, yeah.  It means, you know, like maybe when they're

11    yelling and being disorderly or something like that.  That's --

12           THE COURT:  Sorry to interrupt.  Let me clarify.  Are

13    you talking about on January 6 or just in general when defining

14    the term "mob"?

12:49:39 15           MS. SHERMAN-STOLTZ:  In general, what does he think of

16    when he hears somebody say mob or mob-like.

17    **A**   I say a mob is sort of disorderly.  The crowd is disorderly

18    in some sense.

19    **BY MS. SHERMAN-STOLTZ:**

12:49:50 20    **Q**   Okay.  When you walked up to the front -- by the time you

21    got there and you got to the steps, were there any officers

22    using mace when you got up there?

23    **A**   It looked like there were -- I couldn't see the actual

24    bottom of the steps because there was just so many people

12:50:16 25    there.  But they did use -- looked like they were using mace

1    back behind the people to push them forward.

2         I mean, it was not the way I would think officers were

3    trained to use that sort of thing.  If you were trying to push

4    them back, the officers should have retreated out of the firing

12:50:37  5    range -- out of the mace line or whatever and dumped the mace

6    at the front of the crowd to push the crowd back.  Instead,

7    they were throwing it out into the crowd, pushing them forward.

8    That's what I saw happening.

9    Q    So when you got up there to the stairs, was there any

12:50:52 10    macing taking place at the stairs where you were?

11    A    I didn't see it.  You know, I saw some evidence that it

12    happened because I saw somebody looked like they had been maced

13    in the face.  I did see -- she talked about the flash bang

14    grenades.  Again, because I was far enough back -- I couldn't

12:51:15 15    see at the front, but I saw an officer throw flash bang grenade

16    way back into the crowd; it blew up; and somebody just

17    immediately fell to the ground and started having a heart

18    attack or something, and the crowd was calling for a medic and

19    all this stuff.  That --

12:51:31 20    Q    Where were you when that happened?

21    A    They were egging the crowd on with this mace stuff and that

22    flash bang.  The crowd really got mad when that person got

23    hurt.

24    Q    Where were you when that happened?

12:51:46 25    A    I was back 30 yards or so just kind of -- I couldn't see,

1    you know, above.  You know, some people were taller than me in

2    the crowd or whatever.

3    Q    So you weren't up at the stairs yet?

4    A    No.

12:51:57 5    Q    Sorry.  That's what I'm talking about is what was going on

6    when you were at the stairs.

7    A    Oh.

8    Q    Or going up the stairs.

9    A    When I got to the -- we were sort of inching our way

12:52:09 10    forward -- again, I was just more or less trying to see what

11    was happening.  And when we got to the -- right in front of the

12    stairs, all of a sudden, just in a moment's time, it seemed i

13    just noticed there were no police officers to be seen, and the

14    crowd was rushing up the stairs.  And I was standing there, you

12:52:30 15    know, getting knocked about sort of.  I mean, I had to do

16    something.

17    Q    Okay.

18    A    There were a lot of people that were running up the stairs.

19    I mean, it's --

12:52:37 20    Q    So no police officers, no mace?

21    A    No police officers to be seen.

22    Q    When you walked through the door, you said you heard the

23    alarm.

24    A    Uh-huh.

12:52:50 25    Q    Were you thinking at that time, oh, that's an alarm;

1    maybe -- like, maybe that means I don't go in?

2    **A**    I wasn't sure.  I mean, I heard the alarm.  I mean, I --

3    and, you know, I -- I'm not even -- I mean, I know, Your Honor,

4    that that, you know -- I'm not -- I don't know that -- I'm not

5    trying to tell -- pull the Court's leg or anything and act like

6    I knew we could go into the Capitol.  I don't know if we could

7    have.  I'm pretty sure I know we couldn't have gone in.

8         I'm just telling Your Honor my honest opinion, but, I

9    mean, obviously, for an attorney to hear an alarm going off,

10   that should be some indication that, you know, maybe you

11   shouldn't go in.

12        But, then again, it was very confusing because police

13   officers were watching people walk in.  They weren't trying to

14   stop anyone from going in, you know.  And I knew I wasn't going

15   to cross those bright lines we talked about.  I wasn't going to

16   do anything, you know, bad.  I wasn't going to do anything

17   except walk in, which is what I did.

18   **Q**    So did you go to or enter into the Capitol with the intent

19   to impede the orderly conduct of a session of Congress?

20   **A**    No.  I did not go in there to do that.  I just went in

21   there to record and witness what was happening because it was a

22   historic event and somebody had to record it and witness it.

23   And, you know, lawyers do a lot of different -- wear a lot of

24   different hats.  We can sell real estate.  We can file tax

25   returns.  We can be journalists.

1    **Q**    Did you go to or enter into the Capitol with the intent of

2    disrupting the orderly conduct of a session of Congress?

3    **A**    Absolutely not.  That is a bright line that I've discussed

4    I would not cross.

12:54:57  5    **Q**    Did you go into the Capitol with the intent to disturb

6    Congress?

7    **A**    No.

8    **Q**    Did you go in --

9    **A**    I didn't know that Congress was even in session there,

12:55:07  10    okay, at that point.  I mean, I didn't -- you know, I thought

11    that it was over with.

12    **Q**    So did you go in with the intent to impede any session of

13    Congress or anything else?

14    **A**    No, I did not.

12:55:34  15             MS. SHERMAN-STOLTZ:  I have no additional.

16             THE COURT:  All right.  Thank you, Mr. Calhoun.

17             MS. MARTIN:  Your Honor, I actually have a few

18    follow-up questions.

19             THE COURT:  Is it based on something new?

12:55:45  20             MS. MARTIN:  Based off the redirect.

21             THE COURT:  All right.  Briefly.

22                          **<u>RECROSS-EXAMINATION</u>**

23    **<u>BY MS. MARTIN:</u>**

24    **Q**    Now, Mr. Calhoun, we heard -- you know, we've heard on your

12:56:08  25    direct and in your prior proceeding when you say you were just

1  narrating when you were writing these posts, right?

2  **A**   What I was witnessing, yes.

3  **Q**   And on redirect, you said you were performing a

4  journalistic function; that's what you said?

12:56:30  5  **A**   Yes.

6  **Q**   Do you work for a news organization?

7  **A**   No.

8  **Q**   Did any news organization or any media organization send

9  you to the Capitol on January 6th?

12:56:41  10  **A**   I'm a citizen.  I have a First Amendment right to make

11  political commentary.  That's what I did.

12  **Q**   All right.  So my question was:  Did a news organization

13  send you to the Capitol on January 6th?

14  **A**   No.

12:56:58  15  **Q**   Now, you said earlier, in your posts on January 4th when

16  you said you were storming the Capitol that you just meant D.C.

17  generally, correct?

18  **A**   Correct.

19        MS. MARTIN:  All right.  Could we pull up Exhibit 604?

12:57:23  20     (Video played.)

21        MS. MARTIN:  You can stop there.

22  **BY MS. MARTIN:**

23  **Q**   Now, here, you say as you're walking toward the Capitol,

24  we're storming the Capitol?

12:58:01  25  **A**   Well, we're physically, you know, on the Capitol steps

1  there.  That was at the begin -- that was after the huge rush

2  of people had gone up and it had kind of, you know, somewhat

3  cleared.  And, you know, at that point, I was, you know -- it

4  was not the mad rush at that point.  But it had -- that was

12:58:26  5  after that mad rush had happened.  And you can see, when I

6  turned back, there was just people as far as you could see back

7  behind us.  And that was -- we were headed up, up the steps at

8  that point.  That was almost at the top of them.

9  Q   Now, you said there was a mad rush before you.  That's what

12:58:48  10  you just said?

11  A   Oh, yeah.

12  Q   Right.  But in your own words, you were among the first 200

13  people to enter the Capitol.

14  A   I was probably more like in the first 300.  I don't know.

12:59:02  15  But I was not in the, you know -- I didn't see how we got in.

16  I did not know until this trial actually how that door that I

17  went through was opened.

18      I mean, I've seen on television -- not on television

19  but probably on the internet I've seen doors -- one door opened

12:59:23  20  where the police are there and people with cameras waiting and

21  they like, okay, and they open the door and then people come

22  in.

23      I mean, I didn't know if that had happened up there.

24  I didn't know, you know, if it got -- I can see -- I learned

12:59:38  25  during this trial that the actual panes beside the door got

1    broken and he got in that way.  But I didn't have a clue any of

2    that had happened.

3    **Q**    And earlier in your testimony today, you were talking about

4    your degrees and what you studied at school.  And I believe one

12:59:54  5    of them is you studied military history; is that right?

6    **A**    Correct.

7    **Q**    In a lot of the posts we see from January 6, you

8    specifically use the term "vanguard;" is that right?

9    **A**    Yeah.

13:00:04  10    **Q**    All right.  And you know what that means?

11    **A**    Yeah.  Now, and that's -- well, you will also notice that I

12    said the vanguard as in talking about somebody else.  That -- I

13    was using, like, 19th Century military jargon kind of

14    written -- and this was on a lot of this trolling stuff, but

13:00:28  15    kind of written in the style of a Robert E. Howard novel who --

16    Robert E. Howard wrote all those Conan stories back in the 20's

17    and 30's, so it's kind of got this heroic aspect to it.

18        And I'm using this 19th Century military jargon like

19    barricades and vanguard and all this kind of business.  And it

13:00:48  20    was just satire, you know.  Satire only works if it has an

21    element of truth to it.

22        THE COURT:  All right.  Ms. Martin, how much more?

23    This seems to be getting back into direct.

24        MS. MARTIN:  Yep.  Just one more thing he said.

13:01:04  25        He said he wasn't aware of how the door was open when

1    he went through it, so I would just like to play Exhibit 605.

2         (Video played.)

3         MS. MARTIN:  Can you pause there?

4    **BY MS. MARTIN:**

13:01:23  5    **Q**   This is a video from your cell phone, right?

6    **A**   Yeah.  That's Nalley, back of his head right there.

7    **Q**   Right.  And in this video, this is when you're walking

8    through the door to the Capitol?

9    **A**   I think so.  If you say so.  Looks like it.

13:01:37 10    **Q**   And you can hear the alarm in the background?

11    **A**   Yeah.  We've covered that.  Yeah.

12    **Q**   And you can see that the door here is broken?

13    **A**   I didn't notice that.

14    **Q**   You didn't notice it when you were walking through?

13:01:51 15    **A**   I'm sitting there with a camera.  I'm not -- I didn't

16    notice -- honest, I did not see any broken windows until I was

17    exiting the building, and I saw one broken window that had

18    people coming in it and then people walking through the door.

19    But there were so many people crushing in that, again, it took

13:02:13 20    forever to get out.

21         MS. MARTIN:  All right.  I have no further questions.

22         THE COURT:  Any brief follow-up?  No?  All right.

23    Mr. Calhoun, you may have a seat.

24         (Defendant steps down.)

13:02:22 25         THE COURT:  We can take the lunch break now.

1          I'm just wondering, Ms. Sherman-Stoltz, do you

2     anticipate putting on more evidence or do you need time to

3     think about this?

4          MS. SHERMAN-STOLTZ:  No.  I don't believe that we will

13:02:36  5     have any additional evidence, Your Honor.

6          THE COURT:  All right.  Have you all had a chance to

7     talk about, confer about the briefing and the argument and all

8     of that?

9          MR. BRUNWIN:  We have, Your Honor.  We've discussed

13:02:51 10     defendant's wishes and the government's in agreement.

11          There is just one issue that I think defense wanted to

12     raise, the idea of if we're going to do briefing, it makes

13     sense to have argument in a way that the parties could address

14     any questions the Court may have after briefing.  That does

13:03:12 15     make sense.

16          If I may -- not speaking for defendant, but the only

17     concern was defendant's ability to travel.  If we schedule

18     another hearing, would the defendant's presence if this is in

19     the form of argument -- would his physical presence be

13:03:33 20     required.  And I will leave that to defense counsel to address.

21          MS. SHERMAN-STOLTZ:  He is on a no-fly list, Your

22     Honor.  He has to drive here.  So our question would be if --

23     we would prefer to do the briefing and then, like, a follow-up

24     type of --

13:03:51 25          THE COURT:  So you would rather you -- the defense

1    would rather do that by an argument now followed by briefing?

2    That's your preference as well --

3           MS. SHERMAN-STOLTZ:  Correct.  Briefing and then

4    argument.  But only if we're allowed to facilitate that.

13:04:04  5           THE COURT:  So my only concern -- I don't see the need

6    to insist on Mr. Calhoun returning.  However, this is just a

7    temporary adjournment of the trial.  And I just don't know that

8    I have the authority to conduct any portion of a trial

9    without -- I guess you could -- the defendant can waive their

13:04:26 10   appearance, can't they?

11          MS. MARTIN:  Your Honor, I would have to consult --

12          THE COURT:  I just want to make sure procedurally it's

13   authorized.  If it is, I'm willing to do it, I think.

14   Sometimes defendants excuse themselves from the courtroom and

13:04:40 15   the trial goes on with witness testimony.  So I think that you

16   can waive it.  I just want to make sure.

17          MS. MARTIN:  Can we have just one minute to consult?

18          THE COURT:  Sure.

19          MS. SHERMAN-STOLTZ:  I know in the federal courts in

13:04:50 20   Virginia -- I'm not familiar with the policy here in D.C., but

21   defendants are allowed to waive their presence for sentencing.

22   So I would think that --

23          THE COURT:  I think for -- like I said, for trial,

24   they could excuse themselves in the middle of trial and not be

13:05:03 25   there for jury selection and et cetera.  So I just want to make

1    sure both sides are in agreement that that's permitted.

2         MR. BRUNWIN:  Thinking off the top of my head, which

3    is not always a good idea, but we could go back and come up

4    with an answer and then come back.

13:05:24  5         THE COURT:  All right.  Yeah.  I think it would be

6    smart to get this in writing.  Ms. Martin?

7         MS. MARTIN:  Yeah.  I think we just need to consult

8    internally and have an answer this afternoon.

9         THE COURT:  Well, I'm certainly happy to accommodate

13:05:42 10   this request if I have the authority to do it.  I think we do.

11   I think I need a written consent form from Mr. Calhoun.

12        And, Mr. Calhoun, since I have you here in person,

13   understanding that this isn't resolved, but I just want to make

14   sure that you personally agree with your counsel that your

13:06:00 15   preference would be, first of all, that the Court not hear

16   argument now but, instead, wait to hear argument after briefs

17   are filed.  Is that your preference?

18        THE DEFENDANT:  That's correct, Your Honor.

19        THE COURT:  All right.  And then, secondly, is it also

13:06:15 20   your preference that, if the Court determines it has the

21   authority to hear that argument and render a decision without

22   you present, you would prefer not to come back to court?

23        THE DEFENDANT:  That's correct, Your Honor.  It would

24   be -- I really would -- I don't know that I could -- I mean, I

13:06:34 25   will do anything I have to do, but it would be a hardship.

1          THE COURT:  Well, I understand.  For health reasons, I

2     think this is preferable for everyone.  So I'm willing to do

3     it.

4          Again, just you all double check, and let's prepare a

13:06:48  5     written waiver that I will review again with you on video if we

6     proceed this way, Mr. Calhoun.  All right?

7          THE DEFENDANT:  Thank you.

8          THE COURT:  Is there anything else we need to address

9     at this point?

13:06:58 10          MR. BRUNWIN:  Should we plan to -- maybe what we could

11     do is take a lunch break and come back and report to the Court.

12          THE COURT:  Sure.  We can do that.  Or you could file

13     something later today.

14          MS. MARTIN:  I don't personally see a need to come

13:07:13 15     back.  We're happy to notify the Court.

16          THE COURT:  All right.  Well, why don't you all -- the

17     government can take the lead but have the consent of the

18     defense to file something.

19          Let's talk about the briefing schedule.  How much

13:07:24 20     time, Ms. Sherman-Stoltz, do you need to brief this?

21          MS. MARTIN:  And I apologize, Your Honor.  I think

22     we're --

23          MR. BRUNWIN:  The only issue would be if we were to

24     determine that we can't do it that way and we were going to

13:07:36 25     have closing argument, we would need to come back to do that.

1          THE COURT:  Understood.  Well, let's assume that we're

2     not.  And I won't leave the courthouse for the next hour and a

3     half.  All right?

4          MR. BRUNWIN:  Yes.

13:07:50  5          THE COURT:  We can come back.  But this won't be -- is

6     that the case; that Mr. Calhoun would then want to proceed with

7     argument?  Or would he just simply want to try to figure out

8     how to get back up here at a later date?

9          THE DEFENDANT:  I don't -- it would be hard to come

13:08:09 10     back.

11          THE COURT:  Really?  Okay.  All right.

12        (Discussion off the record.)

13          THE COURT:  So I think I have authority to do this.

14     But you will let me know in the next hour if we don't.

13:08:23 15          Let's assume that I have the authority to do it.  When

16     would you prefer to file your brief?

17          MS. SHERMAN-STOLTZ:  I think Your Honor had previously

18     mentioned something about either not being available or being

19     gone next week.  I guess -- so it would depend -- does the

13:08:40 20     Court want the briefs prior to departure or would --

21          THE COURT:  Oh, no.  No.  No.  Not before departure.

22     In all likelihood, I'm going to have to be here anyway.  So is

23     a week long enough for you to file your brief?

24          MS. SHERMAN-STOLTZ:  That's what I was hoping for.

13:08:55 25          THE COURT:  So let's have simultaneous briefs filed on

1    March -- on or before March 9th.  And then if you would like to

2    respond to the other side, you need to do so by March 14th.

3              MS. SHERMAN-STOLTZ:  Yes, Your Honor.

4              THE COURT:  And then why don't you all confer and

13:09:16  5    propose three different options for the hearing date,

6    preferably sometime the week of March 20th, if possible.

7              MS. SHERMAN-STOLTZ:  Does the Court have any

8    availability on the 20th?

9              MS. MARTIN:  I think we would prefer to just confer

13:09:43  10   amongst ourselves because Mr. Brunwin is not from -- he is

11   visiting from L.A.

12             THE COURT:  Well, but if this is by zoom -- right?

13             MR. BRUNWIN:  I will be here on the 20th if that's

14   acceptable.

13:09:54  15             THE COURT:  Are we talking about doing this in person

16   just without Mr. Calhoun present?

17             MR. BRUNWIN:  Yes, Your Honor.

18             THE COURT:  Is that what you want, Ms. Sherman-Stoltz?

19             MS. SHERMAN-STOLTZ:  I'm fine to be present -- I'm

13:10:03  20   only two hours away -- if the Court would prefer that.

21             THE COURT:  All right.  Well, let me give you all a

22   sense of what I have available.

23             I could do this Monday afternoon at 3:00 o'clock.  I

24   could do it Tuesday afternoon at 3:30.  Same for Wednesday,

13:10:35  25   3:30.  My preference would be to do it one of those three days,

          1    if possible.  But if not --

          2            MS. SHERMAN-STOLTZ:  I can be available Monday or

          3    Wednesday afternoon, Your Honor.

          4            THE COURT:  Either date work for the government?

13:10:56  5            MR. BRUNWIN:  Monday is just fine.

          6            MS. MARTIN:  One second.  I just want to verify.

          7    Yeah.  That should be fine, Your Honor.

          8            THE COURT:  Monday at 3:00 p.m.?

          9            MS. MARTIN:  Yeah.

13:11:06  10           THE COURT:  Well, wait.  Let me check.

          11       (Discussion off the record.)

          12           MS. SHERMAN-STOLTZ:  That's not a holiday or anything,

          13   is it?  No?  I don't think so.

          14       (Discussion off the record.)

13:11:25  15           THE COURT:  All right.  So Monday at 3:00 o'clock.  Is

          16   that what we said?

          17           MS. SHERMAN-STOLTZ:  Yes, Your Honor.

          18           MS. MARTIN:  And that's on the 20th?

          19           THE COURT:  On the 20th in person with Mr. Calhoun

13:11:40  20   available remotely.  And you're going to let me know in the

          21   next hour if you have concerns about proceeding that way.

          22           MS. MARTIN:  Thank you, Your Honor.

          23           THE COURT:  All right.

          24           MS. SHERMAN-STOLTZ:  Yes, Your Honor.

13:11:51  25           THE COURT:  All right.  Thank you all.  Appreciate

1    your organization and working collaboratively.  It made it very

2    easy for the Court, and I appreciate that.  All right.

3              MS. SHERMAN-STOLTZ:  Thank you, Your Honor.

4              COURTROOM DEPUTY:  All rise.

13:12:05  5        (The Proceedings were concluded at approximately 1:12 p.m.

6    on March 2, 2023.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

1

2                              C E R T I F I C A T E

3

4

5            I, the undersigned, hereby certify that the foregoing

6    pages contain a true and correct transcript of the

7    aforementioned proceedings as is hereinabove set out, as the

8    same was taken down by me in stenotype and later transcribed

9    utilizing computer-aided transcription.

10           This is the 3rd day of March of 2023.

11

13    _____

14             Cheryl K. Powell, CCR, RPR, FCRR

15             Federal Certified Realtime Reporter

16

17

18

19

20

21

22

23

24

25