<pre>
 1                BEFORE THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,      .
                                    .  Case Number 21-cr-116-1
 4            Plaintiff,            .
                                    .
 5       vs.                        .
                                    .  Washington, D.C.
 6   WILLIAM MCCALL CALHOUN, JR.,   .  August 4, 2023
                                    .  11:51 a.m.
 7            Defendant.            .
     - - - - - - - - - - - - - - - -

 8

 9               TRANSCRIPT OF SENTENCING HEARING
              BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                 UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the United States:       SARAH MARTIN, AUSA
                                  United States Attorney's Office
13                                601 D Street Northwest
                                  Washington, D.C. 20001
14
                                  CHRISTOPHER BRUNWIN, AUSA
15                                United States Attorney's Office
                                  312 North Spring Street
16                                13th Floor
                                  Los Angeles, California 90012
17

18   For the Defendant:          JESSICA SHERMAN-STOLTZ, ESQ.
                                  Sherman-Stoltz Law Group, PLLC
19                                P.O. Box 69
                                  Gum Spring, Virginia 23065
20

21   Official Court Reporter:    SARA A. WICK, RPR, CRR
                                  333 Constitution Avenue Northwest
22                                U.S. Courthouse, Room 4704-B
                                  Washington, D.C. 20001
23                                202-354-3284

24
     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
</pre>

P R O C E E D I N G S

COURTROOM DEPUTY:  Your Honor, we are in Criminal
Action 21-116, United States of America versus William Calhoun,
21-116-1.

If I can have counsel please approach the podium and state
your names for the record, starting with the United States.

MS. MARTIN:  Good morning, Your Honor.  Sarah Martin
on behalf of the United States.

THE COURT:  Good morning, Ms. Martin.

MR. BRUNWIN:  Good morning, Your Honor.  Christopher
Brunwin for the United States.

THE COURT:  Good morning.

MS. SHERMAN-STOLTZ:  Good morning, Your Honor.
Jessica Sherman-Stoltz on behalf of Mr. Calhoun.

THE COURT:  All right.  Good morning,
Ms. Sherman-Stoltz and Mr. Calhoun.

So we are here for sentencing --

COURTROOM DEPUTY:  Your Honor, forgive me.  We also
have Mr. Robert Walters, who is for Probation, standing in for
Ms. Gavito.

THE COURT:  All right.  Thanks for being here,
Mr. Walters.

We are here for sentencing.  I've reviewed the final
presentence report and the recommendation of Probation.  I've
also read the parties' sentencing memoranda and the exhibits.

1        Ms. Sherman-Stoltz, I know that you had an interest in

2    having five family members of Mr. Calhoun testify.  Did you see

3    the minute order I posted on that?

4             MS. SHERMAN-STOLTZ:  I did last night, Your Honor,

5    yes, ma'am.

6             THE COURT:  How would you like to proceed?

7             MS. SHERMAN-STOLTZ:  I believe that they've been

8    writing down just a brief proffer.  By the time we got your

9    order, there wasn't enough time for them to write a letter.  So

10   I think --

11            THE COURT:  All right.  So you'll present on their

12   behalf?

13            MS. SHERMAN-STOLTZ:  Correct, Your Honor.

14            THE COURT:  Does the government have any objection to,

15   if we run out of time, the family members coming to the podium

16   just to say what they intended to say?

17            MS. MARTIN:  No, Your Honor, if it's just a brief

18   proffer.

19            THE COURT:  Okay.  All right.  This is not a factual

20   dispute about specific evidence that was presented in the case;

21   correct, Ms. Sherman-Stoltz?  This is more character evidence?

22            MS. SHERMAN-STOLTZ:  That's correct, Your Honor.

23            THE COURT:  All right.  And with regard to the

24   presentence report -- well, let me ask the government, given

25   that this Court tried this case, you're not going to show any

1    videos today; is that right?

2              MS. MARTIN:  No, Your Honor.

3              THE COURT:  All right.  And are there any victims from

4    January 6 who seek to be heard today?

5              MS. MARTIN:  No, Your Honor.

6              THE COURT:  Okay.  All right.  Ms. Sherman-Stoltz,

7    you've reviewed the presentence report with Mr. Calhoun?

8              MS. SHERMAN-STOLTZ:  Yes, Your Honor.

9              THE COURT:  And are there any additional objections

10   other than the ones that you've mentioned already in your

11   papers?

12             MS. SHERMAN-STOLTZ:  Nothing in addition, Your Honor.

13             THE COURT:  All right.  Mr. Calhoun, did you read the

14   presentence report carefully with your attorney?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  All right.  You hesitated a little bit.

17   Did you have a chance to review her objections to the report?

18             THE DEFENDANT:  Well, really, Your Honor, honestly, at

19   this point, I'm -- when I started reading the government's

20   presentence report, I mean, it was -- it struck me as -- I

21   couldn't even finish reading it.  I've almost turned it off.

22             THE COURT:  All right.  Well, it's important -- if you

23   can sit down just because the microphone will pick you up better

24   seated, but thank you for standing up.

25             THE DEFENDANT:  Yes.

1          THE COURT:  It's important that I'm confident that

2     you've adequately reviewed the presentence report for its

3     accuracy, because typically the Court would adopt the facts

4     therein under Rule 32 as the factual record here.

5          So this is unique, because we do have a trial here, and of

6     course, the trial record speaks for itself.  But I do want to

7     make sure that if there are inaccuracies in there -- the legal

8     objections, your attorney can take care of.  But if there are

9     any factual inaccuracies in there that I know, that we can fix

10    them, because this is a report that will follow you.

11         THE DEFENDANT:  I haven't read the amended report.  I

12    read the first one and sent an e-mail suggesting some changes on

13    that, but I haven't read the amended one, Your Honor.

14         THE COURT:  All right.  Well, I think it's worth

15    taking just a few minutes.

16         Do you have the amended one with you, Ms. Sherman-Stoltz,

17    that you can review with Mr. Calhoun?  I just want to make sure

18    that it's accurate factually.  All right?

19         And Ms. Sherman-Stoltz, in terms of your objections, I know

20    you had one objection that dealt with the government providing a

21    subsequent letter to Probation that resulted in the guidelines

22    being altered.

23         Aside from that objection -- and I presume, based on

24    Probation's response, that what drove the Probation Office's

25    calculations are the guidelines themselves, and their effort to

1    apply the facts accurately to the guidelines, that's what drove

2    their final recommendation, but I can get confirmation from

3    Mr. Waters on that.

4        But other than the obstruction enhancement, what are the

5    other legal objections that you think the Court needs to

6    address?

7        MS. SHERMAN-STOLTZ:  Those are the only two legal

8    objections, Your Honor.  The rest of them just had to do with

9    just factual errors regarding his, you know, demographics,

10   family, e-mail, stuff like that.

11       THE COURT:  I'll give you five or ten minutes to

12   review that.  I do want to make sure he's had adequate time to

13   review the presentence report.

14       And, Mr. Calhoun, I get it.  You're frustrated and tired

15   about this case.  But this is something I do need you to have

16   reviewed thoroughly, and if you need more time, I will give you

17   more time, but I won't proceed to sentence you until you've had

18   adequate time to review the presentence report.

19       So I've got time today to give you that time to do it, and

20   it is an essential part of the process before we can proceed.

21       Do you understand?

22       THE DEFENDANT:  Thank you, Your Honor.  Yes.

23       THE COURT:  All right.  Okay.  So I will just take a

24   brief recess.  I will be in the jury room.

25       Yes?

```
 1              MS. MARTIN:  Your Honor, I just wanted to clarify one
 2      thing.  You noted that the defense objected to Probation's new
 3      calculations.  I just wanted to clarify, I wasn't aware of an
 4      objection from the defense on their revised recommendation,
 5      which apparently was just due to a typo.
 6              THE COURT:  All right.  Okay.  And I didn't mean to
 7      suggest that.  I think they objected to the government providing
 8      guideline calculations; correct?
 9              MS. MARTIN:  Correct.  And I don't think that our
10      letter resulted in a change of the guidelines calculation,
11      because we provided the letter before they had filed the PSR.
12              THE COURT:  I see.  All right.  Thank you for
13      clarifying that.
14          Anything else before I take a brief recess?
15              MS. MARTIN:  No, Your Honor.
16              THE COURT:  Okay.  All right.  I will be right
17      outside.
18          (Recess taken from 11:58 a.m. to 12:19 p.m.)
19              THE COURT:  All right.  Ms. Sherman-Stoltz, did you
20      review the final PSR with Mr. Calhoun?
21              MS. SHERMAN-STOLTZ:  We have, Your Honor.
22              THE COURT:  And, Mr. Calhoun, you had adequate time to
23      review --
24              THE DEFENDANT:  Yes, Your Honor.
25              THE COURT:  -- the final PSR?
```

```
 1                THE DEFENDANT:  Yes.

 2                THE COURT:  And make any necessary corrections?  You

 3      brought them to your attorney's attention?

 4                THE DEFENDANT:  Yes, Your Honor.

 5                THE COURT:  All right.  Is there anything else,

 6      Ms. Sherman-Stoltz, you would like to add to the record that you

 7      haven't already in terms of your objections?

 8                MS. SHERMAN-STOLTZ:  Your Honor, there are a couple

 9      more, more just informational errors.

10                THE COURT:  Why don't you come up to the podium, and

11      let's just go through them quickly right now, please.

12                MS. SHERMAN-STOLTZ:  Yes, Your Honor.

13                THE COURT:  Okay.  Include the ones that Mr. Calhoun's

14      given you now and the ones previously.

15                MS. SHERMAN-STOLTZ:  The ones previously have been

16      corrected.  So we did verify that.

17                THE COURT:  All right.

18                MS. SHERMAN-STOLTZ:  Do you want me to still include

19      them?

20                THE COURT:  No, only the ones that remain.

21                MS. SHERMAN-STOLTZ:  All right.  Page 15, and that's

22      paragraph 65, the last name Chapell is misspelled.  It just

23      needs an additional "L" on the end.

24                THE COURT:  Okay.

25                MS. SHERMAN-STOLTZ:  Page 15, paragraph number 68,
```

1    they have the home that is his approved place of residence by

2    the Court, they have that as 300 West Ellavile Street, which is

3    correct, but they have it as being the defendant's wife's

4    residence, and that is not correct.  That's his sister Mary

5    Calhoun's home.  She owns that.

6            THE COURT:  Okay.

7            MS. SHERMAN-STOLTZ:  And we have on -- same page, page

8    15, paragraph number 66, and he has -- so they corrected his

9    daughter's middle name.  It was Barron; it's now correctly as

10   Barrow.  But then later on in that same paragraph, it says

11   Ms. Barron Harper.  So her first name is Angela.  Barrow is the

12   middle name.  And her last name is actually Harper-Calhoun.  But

13   they corrected it -- the middle name Barrow in that one

14   sentence, but then when they reference her again, it is

15   incorrect, and now it's missing her first name.

16           THE COURT:  Okay.

17           MS. SHERMAN-STOLTZ:  And the only other thing is on

18   page 17 where it lists his assets.  Mr. Calhoun has just

19   indicated that due to not being able to take new clients, that

20   those numbers have changed.  Those numbers were provided three

21   to four months ago.  He doesn't have the ability to be able to

22   take new clients or generate new income.  So he's been using his

23   money in his checking account and savings account.

24       So I'm not sure -- I mean, that was correct at the time.

25           THE COURT:  Understood.  If it was correct at the

1    time, I can take that into account today.

2        But on that point, Ms. Sherman-Stoltz, I understand from

3    the presentence report -- and I have not met with Probation

4    ahead of time.  But I understand from the report that

5    Mr. Calhoun did not return the requested disclosure forms.

6        Can you explain why?

7        MS. SHERMAN-STOLTZ:  There were forms that -- oh, they

8    wanted his bank records.  So there were release of information

9    forms that were provided to Mr. Calhoun for various things.  I

10    believe some of it was his bank records.  It may have been his

11    medical records.  And Mr. Calhoun preferred that they not

12    have -- because he has his personal bank accounts and then he

13    has his business accounts, which at the time had income in

14    trust, and he preferred them not to have all of his bank account

15    records.

16        So he provided that information.  We asked the probation

17    officer to give --

18        THE COURT:  But regardless, that doesn't explain why

19    he didn't provide at least some of them and --

20        (Defense counsel and defendant conferred.)

21        MS. SHERMAN-STOLTZ:  So I e-mailed the probation

22    officer about it and asked her if it would be acceptable for us

23    to provide the bank statements in a redacted form, and she

24    agreed, and we sent those over to her.  So he did not sign the

25    release, but we provided the information in a redacted format.

1          THE COURT:  What about the medical records?

2          MS. SHERMAN-STOLTZ:  The medical records, he did not

3     sign the release to, and he just preferred that they not have

4     access to all of his medical records.

5          THE DEFENDANT:  I --

6          THE COURT:  Just a minute, Mr. Calhoun.

7      Mr. Waters, can you confirm any of this in terms of

8     Probation?

9          MS. SHERMAN-STOLTZ:  Do you want me to step aside,

10    Your Honor?

11         PROBATION OFFICER:  Your Honor, I spoke to Officer

12    Gavito before the hearing.  She confirmed that we never received

13    releases, which are the typical releases.  And of course, that

14    also means that without the releases, we can't get things like

15    medical records, but there's also a Equifax look that we do to

16    see outstanding debts, outstanding liabilities, things like that

17    that without releases we can't get.  As you know, they are the

18    standard releases, and we use it to verify information for the

19    Court.

20         THE COURT:  What does Probation do in a situation

21    where an attorney has business and personal accounts?  Does

22    Probation insist on releases being signed for all accounts, or

23    does Probation draw a distinction or do something to protect

24    what would be, perhaps, privileged information in any of those

25    business accounts?

1          PROBATION OFFICER:  So we usually have kind of an

2      in-house questionnaire that we send out.  That kind of asks the

3      question or kind of asks the nature of the business.  We're not

4      looking for specific, you know, client information, especially

5      since we're talking about an attorney, something that may be

6      privileged.  But that does give us an idea, if we can have that

7      information, of what assets are available to the defendant.

8          The Court has to make the determination as to whether or

9      not to fashion a fine, what the restitution should be.  Without

10     having the full scope of the defendant's finances, which he has

11     access to that money, it's his money, we can't fully present the

12     Court with the picture of what all he has access to.

13         THE COURT:  Okay.  But even based on the financial

14     information that was provided, it appears that in paragraph 91

15     Probation is recommending a fine in addition to the restitution.

16         PROBATION OFFICER:  Yes, Your Honor, which is

17     typically the case.  If they don't -- so when we get the

18     records, it may not necessarily -- it could show an inability to

19     pay a fine.  And without them showing that they can't pay a

20     fine, we can't say that a fine isn't warranted.

21         THE COURT:  Well, I'm wondering, is the recommendation

22     based on the fact that the releases weren't provided, or is it

23     based on the fact that even given what Mr. Calhoun disclosed, in

24     Probation's view, he could still afford to pay a fine?

25         PROBATION OFFICER:  Even with what he's disclosed,

because looking at what Officer Gavito wrote he's still showing a positive cash flow without considering other moneys that may be there.

THE COURT:  Can you make any statement to the Court regarding Ms. Gavito's reaction to Mr. Calhoun's willingness to provide redacted records but not release forms?

PROBATION OFFICER:  I can't speak to her reaction.  In a lot of these cases, we tend to run into that, and we try to put together what we can with what we have.

THE COURT:  Regardless, the release to run the Equifax report was not provided?

PROBATION OFFICER:  It does not appear so, Your Honor.

THE COURT:  All right.  Thank you very much.

While I have you up here, let me ask you one other question.  The defense has also objected to, as I noted, the United States providing a guideline calculation sheet to Probation, and the response from Probation is that, as I read it, Probation calculated the guidelines independently and in accordance with Rule 32(c) and (d) of the Federal Rules of Criminal Procedure, as well as the judiciary policy.

Is that correct?  Can you confirm that?

PROBATION OFFICER:  Your Honor, that is our practice. The government in these cases, in just about all of them where there's been a trial, has sent a letter outlining the facts, and they typically include what they see the guidelines to be.

1    That's not something -- Probation, of course, looks at them, but

2    we do our own independent assessment of what is -- what the

3    facts of the case are and how the guidelines apply.

4        And then we rely on the Court, having been present for the

5    trial, to determine from there what is appropriate.

6            THE COURT:  All right.  Okay.  Thank you, Mr. Waters.

7        Ms. Sherman-Stoltz?

8            MS. SHERMAN-STOLTZ:  Yes, Your Honor.

9        I've brought up the e-mail I have with her, if the Court

10   would like.  I'm happy to e-mail a copy --

11           THE COURT:  I'm not questioning on the bank records,

12   but it still doesn't answer the question with regard to the

13   other information that was requested.

14           MS. SHERMAN-STOLTZ:  The Equifax, Your Honor, when you

15   asked the probation officer about that, I've gone back through,

16   and I'm looking at my e-mails that I received from her, because

17   I don't recall that there was an Equifax release form, I don't

18   recall, which is why I'm trying to find the initial e-mail that

19   she sent with all of the information that needed to be filled

20   out.

21           PROBATION OFFICER:  If I may, Your Honor.

22           THE COURT:  Uh-huh.

23           PROBATION OFFICER:  The e-mail would have been the

24   very first e-mail sent from Renee Moses-Gregory that has a

25   standard package of releases, a questionnaire, and the financial

1  forms he would fill out, and there's a disclosure in there for

2  release of financial information.  It doesn't specifically say

3  Equifax, but that's what we have to have for it.

4       MS. SHERMAN-STOLTZ:  So is it one and the same as what

5  the Court has asked about, just being the release for the

6  financial documents?

7       PROBATION OFFICER:  Yeah, it's a packet.  There's

8  several releases in this packet.  It would have been from Renee

9  Moses-Gregory really the day or two after judgment even before

10  the case was assigned.

11      MS. SHERMAN-STOLTZ:  If it's that same form --

12      THE COURT:  No, he says it's separate forms that are a

13  part of a single package.  Ms. Sherman-Stoltz, can I have you

14  look at that while the government is speaking later.

15      Have you gone through all the factual inaccuracies?

16      MS. SHERMAN-STOLTZ:  Yes, Your Honor, that was it.

17      THE COURT:  Mr. Calhoun, is that correct?  With the

18  exception of those corrections, which I will ask the Probation

19  Office to correct in the report, you agree that what's stated in

20  the PSR, the final PSR is true and accurate?

21      THE DEFENDANT:  Yes, Your Honor.

22      THE COURT:  All right.  Other than the objections

23  noted, does the government -- noted by the defense, does the

24  government have any objections to the presentence report?

25      MS. MARTIN:  No, Your Honor, only to note that I

believe one of the defense objections was to -- or one of the

defense notes in their memo was that the time that Calhoun

exited the Capitol was listed in the PSR as 2:36 p.m.  And that

is not accurate.  It is 2:43 p.m.  And so --

THE COURT:  So the total time he was in the Capitol

was how long?

MS. MARTIN:  Your Honor, one moment.

Your Honor, I believe it was about 20 minutes

approximately.

THE COURT:  All right.  I would again direct Probation

to make those corrections.

I take it that the defense doesn't dispute the government's

representation here, Ms. Sherman-Stoltz, in terms of the time

Mr. Calhoun entered and left the Capitol building?

MS. SHERMAN-STOLTZ:  No, Your Honor, and I think as

the government said, that I included mention of that, yes.

PROBATION OFFICER:  What was that paragraph and time

again?

MS. MARTIN:  One moment, Your Honor.  Let me get the

paragraph number.

It appears that it was on page 2 of the presentence -- it

was on page 2 of our letter to the U.S. Probation officer.

Ms. Sherman-Stoltz, do you have a paragraph number for what

you were objecting to?

THE COURT:  You all can provide that later.  I've got

1    an arraignment that's set for 1:30.  So I'm trying to get as far

2    as we can with the sentencing.  We will certainly, in all

3    likelihood, have to come back, but I do want to move things

4    along.

5        So what I will say is given the agreement here on these

6    corrections, I direct the Probation Office to make the

7    corrections and work with the parties to ensure that the right

8    paragraph numbers are given to the probation officer to do so.

9        With those edits, the Court will accept the presentence

10    report as my findings of fact pursuant to Rule 32 of the Federal

11    Rules of Criminal Procedure.

12        All right.  Now, starting with the legal objection, and

13    that is whether or not the enhancement under 3C1.1 of the

14    guidelines applies, the Court is inclined to apply that

15    enhancement based on what the Court noted in its verdict that it

16    announced in which it questioned Mr. Calhoun's credibility based

17    on the manner in which he evaded questions and shaded his

18    testimony in certain ways, and as a result, the Court questioned

19    his credibility in a number of areas, which I'm not going to

20    review in detail now in the interest of time.  But I will apply

21    that adjustment under 3C1.1 over the defense's objection.

22        Turning to the guideline calculations on pages 11 through

23    14 of the presentence report, I understand that the parties are

24    in agreement, in light of the Court's ruling, that the base

25    offense level is a level 14.  Plus 3 applies under the

1    substantial interference with the administration of justice

2    provision under 2J1.1(b)(2).  In addition, the obstruction of

3    justice enhancement under 3C1.1 applies.  That equals a adjusted

4    offense level of 19.

5        Although Mr. Calhoun has at times, including in his

6    presentence report, accepted responsibility for the trespass,

7    he's not fully demonstrated acceptance of responsibility, and

8    therefore, he's not entitled to a reduction, in the Court's

9    view, under 3E1.1.  So the total offense level remains a level

10   19.

11       His criminal history, though he has some very minor

12   criminal history, it's not scorable.  So there's a criminal

13   history category I.  And at a total offense level of 19 and a

14   criminal history category of I, the guideline range is 30 to 37

15   months.

16       Does the government agree with that?

17           MS. MARTIN:  Yes, Your Honor.

18           THE COURT:  And the defense as well?

19           MS. SHERMAN-STOLTZ:  Yes, Your Honor.

20           THE COURT:  All right.  The Court's independently

21   calculated the guidelines and believes that the guideline range

22   is 30 to 37 months, but of course, that range is not binding on

23   the government -- I mean on the Court.

24       So I will now give each side an opportunity to allocute.

25   I'll start with the government.

1          MS. MARTIN:  Yes, Your Honor, and I'm happy to address

2     all of the factors, but if Your Honor has anything specific that

3     she would like --

4          THE COURT:  I think you know what the Court's most

5     significant concern is, and this is the extent to which there is

6     unwarranted sentencing disparity in this case, particularly

7     given that Mr. Calhoun's co-defendant, Mr. Nalley, who is

8     similarly, if not identically, situated except for the trial

9     testimony and the acceptance issue, why the --

10         MS. MARTIN:  Your Honor, those are the exact factors

11    that make him not similarly situated to this defendant.

12         THE COURT:  I said almost identical except for.  So do

13    you agree that those are the two factors that distinguish

14    Mr. Nalley and Mr. Calhoun, are those two factors?

15         MS. MARTIN:  No, I mean, in the government's view,

16    Your Honor -- and I know the Court may not agree with this, but

17    our view is that Mr. Calhoun has been convicted of a felony.

18    Evidence was presented that constitute a felony.  And that's

19    what distinguishes Mr. Calhoun from Mr. Nalley.  His conduct was

20    more serious because of his premeditation prior to January 6 and

21    the evidence that we had.

22         And --

23         THE COURT:  Don't you think you had similar evidence

24    for Mr. Nalley that you could have proven at trial?

25         MS. MARTIN:  We did not have similar evidence for

1    Mr. Nalley, and that's why he was not charged with a felony.

2            THE COURT:  That's what the AUSA said to me at the

3    time of sentencing.  Have you reviewed that sentencing

4    transcript, and have you reviewed the Statement of Facts for

5    Mr. Nalley in which he admits that he knew about the

6    certification?

7            MS. MARTIN:  Your Honor, whether or not we could have

8    charged him with a 1512, we didn't.  We didn't have the strength

9    of the evidence that we had in Mr. Calhoun's case, regardless of

10   whether Mr. Nalley said when he accepted responsibility that he

11   knew about the certification.  We decided -- it's within our

12   purview to charge defendants with a felony.

13           THE COURT:  Understood, you can charge, and it's

14   within the purview of the Court and, in fact, the Court is

15   required under 3553(a)(6) to consider unwarranted sentencing

16   disparity, and that's tied to the conduct and not the offense

17   charged.

18       So as I look at these two defendants, tell me why their

19   conduct, putting aside the trial, and that's another issue, but

20   January 6, before, during, after.  I understand you have more

21   incendiary statements from Mr. Calhoun.  The only evidence

22   before the Court on what Mr. Nalley posted online was what the

23   government brought to my attention, which was a statement he

24   made immediately after that he, like Mr. Calhoun said, was going

25   to return to Washington in a couple of weeks with guns, if

necessary, something to that effect.  I don't have the statement in front of me right now.  So that was evidence that the government had.

The testimony at trial, which was unrebutted, which the Court can consider, and the standard here is probable cause, not beyond a reasonable doubt, but Mr. Calhoun testified at trial that Mr. Nalley recruited him, that he made the plans, that he made worse statements online, and that Mr. Nalley was taken down off Facebook and maybe Parler because of how incendiary his remarks were.

So does the government have evidence to rebut that for the Court to consider?

MS. MARTIN:  Your Honor, we would like to focus the Court's attention on the fact that the 1512 not only requires conduct, what puts it above the 1752 and the other misdemeanor charges is the intent.

THE COURT:  Understood.

MS. MARTIN:  So that's what we would like the Court to focus on.  Although the overt conduct, the actus reus might have been similar between these two defendants in that they traveled to the Capitol together, they went inside for the same amount of time, the intent was different for Mr. Calhoun.  And we have that through statements.

THE COURT:  You certainly had probable cause to prove that intent before the grand jury, or you wouldn't have indicted

```
 1    him for 1512(c)(2).

 2              MS. MARTIN:  Mr. Nalley?

 3              THE COURT:  Right.

 4              MS. MARTIN:  So Mr. Nalley -- what I would like to

 5    focus the Court's attention again --

 6              THE COURT:  No, no, I understand what the government

 7    wants to focus on.

 8              MS. MARTIN:  Without getting --

 9              THE COURT:  But the point is, the government brought

10    that charge before the grand jury because it believed it had

11    evidence to indict him on that charge.  It indicted both

12    defendants on that charge.  At some point, it made the decision

13    to drop that charge and let him plead to a class A misdemeanor.

14    That's entirely out of the Court's hands.

15              MS. MARTIN:  And the reasoning for that is also not

16    known to the Court and shouldn't be because it's within the

17    government's purview on why it pursues certain charges.  We have

18    prosecutorial discretion.

19              THE COURT:  Agreed.  But the Court has the record

20    before it.  So I'm asking you questions that might alter the

21    Court's view.

22        As the Court looks at these two defendants, putting aside

23    Mr. Calhoun's less than truthful testimony which the Court had

24    found at trial, putting aside his lack of full acceptance and

25    remorse, the Court is looking at these two defendants
```

1    identically really.  I mean, they traveled from Georgia

2    together.  They were with each other the entire time, so far as

3    the Court is aware, based on the testimony and the evidence the

4    Court has heard.  They walked through the Capitol together.

5    They did everything together.

6         The Court also knows that Mr. Nalley made this statement

7    afterwards.  It's very similar to what Mr. Calhoun said.  And

8    the Court knows from Mr. Calhoun's testimony that there's no

9    social media before because it was taken down.

10        So tell me what -- you don't have to share with me why you

11   charged what you charged.  But Ms. Arco told me at the time of

12   the sentencing hearing -- I'll find the colloquy, but she said,

13   We believe we can prove this at trial; nonetheless, we are

14   allowing him to plead to a misdemeanor.

15        So don't stand here and say you couldn't prove it when you

16   brought it before the grand jury.  And you don't indict cases

17   you don't think you can prove at trial.

18        So you can't have it both ways.  You can't have it -- the

19   government doesn't get to decide the sentence for defendants,

20   and courts are required to look at the conduct.

21        So tell me why their conduct is different.  And if you

22   don't want to, understand that, from the Court's perspective

23   based on the record before the Court, the Court is viewing those

24   two individuals' conduct as highly similar, if not identical.

25             MS. MARTIN:  And, Your Honor, as to Mr. Calhoun's

testimony that his social media was -- the only reason we don't
have those statements is because his social media was shut down
is just another attempt of this defendant to further exculpate
himself in this case.

Just because -- that's a hypothetical --

THE COURT:  Rebut that.  That's the only evidence I
have.

MS. MARTIN:  It's a hypothetical.  We're saying that
Mr. Nalley didn't produce more inculpating evidence because he
didn't have a Facebook.  We don't know that he would have.
We're taking Mr. Calhoun's word for it, which --

THE COURT:  He testified under oath, and part of his
testimony -- look, I'm the fact finder.  I didn't find his
testimony completely uncredible.  I did not.  And I credit some
of his testimony.  I don't credit all of it.

But hearsay is admissible.  That was an under oath
statement.  I'm allowed to consider it.  You can disagree about
whether I should consider it, but I'm allowed to consider it.
And if the government wants to present something else to me and
wants a continuance in order to do so, I will give you that
chance.

I'm not trying to equate these defendants if they're not
equal, but you can't stand there and just tell me to disregard
evidence that rings true to me, particularly given the comments
he made after the fact and the fact that I was told there's no

1    social media for him beforehand.

2            MS. MARTIN:  Your Honor, we're taking Mr. Calhoun's

3    word for the fact that Mr. Nalley would have produced additional

4    statements on social media prior to January 6 had his Facebook

5    not been cut off.  We're taking his self-serving word that

6    Nalley was the one who apparently planned this entire trip,

7    despite --

8            THE COURT:  No, I'm looking at them as equal.  So I

9    don't -- Mr. Calhoun strikes me, based on again Mr. Calhoun's

10   testimony that rings true to me on this point, that he's

11   probably as a lawyer the more sophisticated of the two, based

12   upon what I know from Mr. Nalley, who I also sentenced.  All

13   right?

14       So I'm not necessarily crediting that Mr. Nalley planned.

15   I'm guessing he could have made -- I think it's fair to say he

16   might have made some arrangements.  I'm not saying I'm putting

17   Nalley up here and Calhoun down here.

18       What I'm telling you is I'm looking at them similarly.  And

19   if you want to present Mr. Nalley and have him testify before

20   this Court, I'm not stopping you from doing that.  We will stop

21   this matter for you to do that.

22       The point is, you have to put evidence before me.  You

23   can't just say the government gets to decide what's charged and

24   you have to swallow it.  I look at the conduct and the evidence

25   that's before me.  And if you want to put more evidence before

1    me, do it.

2           MS. MARTIN:  Well, and within the context of

3    3553(a)(6), Your Honor, if the Court were to sentence

4    Mr. Calhoun as if he were a misdemeanor defendant, you would be

5    basically saying that he stands apart from every other felony

6    defendant in the country who didn't take responsibility for his

7    actions, continues not to express remorse for his conduct, has

8    continued to obstruct the government, lied on the stand.  You

9    would be placing him separately from all of those defendants,

10   and not just misdemeanor defendants, who accepted responsibility

11   for their actions and didn't take the stand and lie.

12          THE COURT:  Did Mr. Nalley agree to cooperate?  Can

13   you give me some additional information that might explain the

14   deal that was offered to him relative to Mr. Calhoun here?

15          MS. MARTIN:  Your Honor, we can't provide any

16   additional information other than what's on the court record.

17   That's not within -- that's not relevant to this hearing.

18   What's relevant to the Court's --

19          THE COURT:  I just agree to disagree with you that the

20   Court considering the relative culpability of these two

21   defendants is not a factor this Court should consider.

22          MS. MARTIN:  Your Honor, I understand the Court's

23   reservation on this.  Obviously, I'm not at liberty to discuss

24   the government's charging decisions.  The fact remains that

25   Mr. Calhoun has been charged with a felony.  The Court has found

beyond a reasonable doubt that he's guilty of that felony.  And
if you were to sentence him like a misdemeanor defendant who is
just guilty of the 1752s and the 5104s, you would be creating a
sentencing disparity between Mr. Calhoun and all of the
misdemeanor defendants.

The Court has only sentenced misdemeanor defendants who
have pled guilty, which means that those defendants have
accepted responsibility and they haven't lied on the stand like
Mr. Calhoun.

So I understand the Court has misgivings about the conduct
in this case.  The government would just continue to point to
the fact that Mr. Calhoun has been convicted of a felony.  He's
guilty of the 1512.  Congress has made that a felony, not just
because of the conduct but because of the intent that's
required.

And that's present throughout criminal law, that defendants
are given more serious punishment if there is more intent
evidence than just the conduct.  I think the government cited to
the homicide versus manslaughter example in its brief, but it's
present throughout the criminal law that Congress has decided
that a heightened punishment is necessary for individuals where
evidence exists of their intent.  And that exists in this case.

THE COURT:  The government has got to understand that
puts the judge in a very difficult position.  You see this all
the time in drug conspiracies and other conspiracies, when you

1    put two defendants before a court that are engaged in very

2    similar, if not identical, conduct, and one of the defendants

3    who pleads guilty to a lesser charge admits the intent for the

4    felony conduct.  You have to appreciate the position you're

5    putting a court in when you're asking to sentence a co-defendant

6    to a nearly three-year sentence and you're asking for the Court

7    to sentence the other to a 14-day sentence.

8        I mean, it's -- certainly, the government has the

9    discretion to make the charging decisions, but you have to

10    appreciate what the impact is on a sentencing judge who is faced

11    with sentencing a co-defendant a year later.  This is -- there's

12    a practical concern here that seems to escape the government

13    here in its charging decisions.

14        And when you have two defendants in the same case treated

15    so dramatically differently, a court is going to want an

16    explanation.  I don't think I'm the only judge on this court who

17    would be asking for an explanation.

18        And I get it that you don't want to give the explanation,

19    but you do have to understand that that's going to impact the

20    sentence of another defendant.  It just is.  We're humans.  All

21    right?  We've got two defendants who come into the case charged

22    with the same things, and one walks out with a 14-day

23    recommendation and the other with a nearly three-year.

24          MS. MARTIN:  Your Honor, I would just posit that

25    Mr. Calhoun in this case has acted extremely different than

Mr. Nalley.  Mr. Calhoun was always free to plead to the indictment, if he wanted to, without a plea agreement.  He was always free to accept responsibility.

THE COURT:  He said on the record many times he was ready to plead to a misdemeanor.  But, I take it, that was never offered; correct?

MS. MARTIN:  Correct.  And, Your Honor, he has conveniently said that he accepts responsibility for his conduct and says that he would plead guilty to a misdemeanor but then continues to question the underlying facts of the case to the extent that he's lied to the Court throughout his testimony.

So even though he says he's accepting responsibility, what we've seen through his actions --

THE COURT:  I'm not giving him acceptance.  So I agree, the lack of acceptance and remorse and his testimony under oath is a problem for him and will result in a different sentence for him than Mr. Nalley for sure.  All right?  Let me assure you of that.

The question is, how much more?

MS. MARTIN:  Your Honor, again, we've discussed at length in our memo, but I understand the Court wants an explanation for why we charged differently.

THE COURT:  I'm just telling you, if you don't give one, the struggle I'm having.  I'm not trying to be difficult here.  I'm not trying to get into the government's charging

1    decisions.  I'm just trying to help you understand how, if there

2    isn't some explanation, if there isn't evidence you want to put

3    on, you're putting the Court in a really difficult position to

4    ask for the sentence you're asking for.

5         MS. MARTIN:  While Mr. Nalley, there might have been a

6    statement with respect to intent, while we could have maybe

7    charged him or gone to trial on the 1512, Your Honor, the volume

8    of evidence present in Mr. Calhoun's case was so strong, there's

9    decisions that we make about cases we want to take to trial

10   versus -- and the Court's not entitled to an explanation on why

11   we decide --

12        THE COURT:  To be clear, I'm not asking.  I'm saying,

13   if you want to rebut the only testimony the Court has about --

14   you're putting a lot of weight on his pre-January 6 comments,

15   and I understand why.  Those are very helpful for the Court --

16   to the government in proving its case against Mr. Calhoun.  And

17   you still had after-the-fact comments from Mr. Nalley which were

18   very incriminating.

19      And there's this explanation that the Court's been given

20   that rings true why there's nothing before.  And if you have

21   something to rebut that, I wish you would put it on.

22        MS. MARTIN:  We can't present the Court with evidence

23   that doesn't exist.  Mr. Nalley didn't create statements.  So we

24   don't have that to present to the Court.  If anything --

25        THE COURT:  If that's a lie what Mr. Calhoun said on

the stand, you absolutely can come in with him and present

testimony that it's not true that his social media accounts were

taken down because of the incendiary comments he was posting.

You can absolutely do that.

MS. MARTIN:  That's not what I'm saying, Your Honor.

I'm saying we can't present the Court with Mr. Nalley's

statements because they don't exist.

THE COURT:  I'm not asking for that.  Do you see what

I do think could be relevant here?  Mr. Nalley coming in and

saying it wasn't true, I wasn't on social media until after

January 6.  That would be evidence this Court would like to

hear.  If you don't have it, you don't have it.

MS. MARTIN:  And, Your Honor, I mean, with respect to

Mr. Calhoun's statement, I don't doubt that his Facebook was

taken down because he was making comments.  Mr. Calhoun's

account should have certainly been taken down quicker than it

was because of all the statements that he made.  They were

against Facebook's policy.  They should have found it earlier,

and they should have taken it down.  But they didn't, and that's

why we had the strength of the evidence that we did in this

case.

THE COURT:  But a moment ago, you suggested I should

just write-off Mr. Calhoun's statements with regard to Nalley

and his e-mails.  And now you're basically saying you're willing

to accept that.  That's not really --

1          MS. MARTIN:  Even if we assume what he testified about

2     is true, that Nalley -- what he's saying is Nalley would have

3     made these statements --

4          THE COURT:  Do you know it to be true?

5          MS. MARTIN:  I don't know, hypothetically speaking --

6          THE COURT:  Not hypothetically.  Do you know whether

7     Nalley's accounts were taken down?

8          MS. MARTIN:  We didn't receive Facebook returns for

9     that specific time frame, which would indicate to us that it

10    probably was, but we haven't been able to verify it.  Facebook

11    doesn't tell us why the accounts were taken down.

12         THE COURT:  Did you ask Nalley?

13         MS. MARTIN:  Your Honor, again, that's all outside of

14    the trial testimony.  We can't --

15         THE COURT:  Fair enough.  I can't insist on it.  But

16    you also can't encourage the Court to disregard his testimony

17    when it rings true, because everything you're telling me here

18    suggests that that testimony is true on that fact.  So don't

19    suggest to this Court that it should disregard testimony that

20    you can't prove isn't true.

21         MS. MARTIN:  I'm not saying what he's saying about the

22    Facebook account being taken down wasn't true.  It may be true.

23    What I'm saying is, to allow Calhoun to opine about what Nalley

24    would have said had his account not been taken down is --

25         THE COURT:  No, no.  Look --

1          MS. MARTIN:  What Mr. Calhoun said is, "The only

2     reason I was charged was because Facebook didn't take my account

3     down earlier than it did, and had Nalley's account not been

4     taken down, he would have made the same statements."  That's

5     exactly what he said.

6          THE COURT:  I don't think that's what he said.

7          MS. MARTIN:  That is what he said.

8          THE COURT:  I think he said he was making the same

9     statements.

10          MS. MARTIN:  No, Your Honor.  I think he's said this

11     to the press, but he told the press that he was given the,

12     quote, Osama bin Laden deal, which apparently to him was that he

13     was being charged with a felony over a misdemeanor because

14     Facebook took his account down later.

15          THE COURT:  Tell me when Facebook took the account

16     down.

17          MS. MARTIN:  Your Honor, I would have to refer to the

18     returns.  I don't know exactly when we stopped getting returns.

19          THE COURT:  If Facebook took the account down in

20     December, late December, that's different than if Facebook took

21     the account down in June.  I agree if Facebook took the account

22     down in June.

23          My point is, you just want me to discount everything he

24     says under oath and --

25          MS. MARTIN:  I don't want the Court to discount what

1    he says under oath.  What I want is for Mr. Calhoun to be

2    punished for the felony that he's been convicted of.  And if the

3    Court believes that Nalley should have been charged with a 1512

4    and should have received a higher sentence, then the Court is

5    allowed to have that opinion.  But the matter remains that he

6    took a misdemeanor plea for whatever -- we're not going to get

7    into the government's charging decisions.

8        But the Court's whole argument would err on the side of

9    giving Mr. Nalley a higher sentence because of his intent, not

10    giving Mr. Calhoun --

11          THE COURT:  We are where we are now.  That can't be

12    done now.

13        But the point is this:  I'm sentencing Mr. Calhoun

14    according to the felony.  I'm starting at a 30 to 37 guideline

15    range.  And what the Court is trying to figure out is how far --

16    first of all whether it varies, and I think it absolutely does

17    vary under (a)(6).  I think it does.  How far I vary, all right,

18    so that's the discussion.

19        To be clear, I'm not sentencing him according to a class A

20    misdemeanor.  I'm just -- in trying to tether my variance to

21    something logical, these kinds of facts matter to me.  But I'm

22    not sentencing him according to a class A misdemeanor.  I'm

23    sentencing him under the guidelines, which start at 30 to 37

24    months' sentence.

25          MS. MARTIN:  Obviously, the government disagrees with

the Court's perspective on that.  I think assuming the Court's
going to do what it's going to do, (a)(6) is just one factor to
consider.  Our argument on the unwarranted sentencing
disparities is that if the Court were to deviate below the 30 to
37 guidelines range, you would effectively be creating a
disparity with all other felony defendants that have acted
similarly to Mr. Calhoun, and you would really be doing
something that's unfair to all the misdemeanor defendants who
have accepted responsibility and didn't lie and obstruct at
every turn.

THE COURT:  I disagree.  I mean, some of the --
Mr. Nalley's not the only one who was charged with 1512(c)(2)
and pled down to a misdemeanor.  All right?  So there's -- there
are a number of people who the government brings a case before
the grand jury because it can prove this higher charge and
brings the case down.  Some of those -- those folks are violent.
And it's really hard, as we sit here in trying to make sure
we're treating defendants fairly, to do our job.

MS. MARTIN:  I understand the burden on the Court, and
I understand that the Court has a concern on that conduct.  But
that's only one factor for the Court to consider.  All the other
factors under 3553 weigh in favor of a lengthy term of
incarceration for Mr. Calhoun.  So even if the Court is going to
consider their conduct as similar, which obviously we would
object to, every other factor weighs in favor of a lengthy

sentence for Mr. Calhoun.

THE COURT:  Let me back up, because I want to make sure I understand the government's position.

You're objecting to me considering their conduct as similar because of the intent factor that wasn't proven at trial, but I have a statement under oath before me in the plea that has the intent factor.

So what is -- why can't I treat them maybe not identical, putting aside the testimony -- and I'm going to deal with that. His failure to accept responsibility, his failure to show remorse, all that is troubling.

Under (a)(6), I look at the conduct.  As I look at the conduct of these two individuals, why can't I consider them similar, in the government's view?  That part I don't get.

MS. MARTIN:  Mr. Nalley didn't go to trial.  The reason we have that statement is because he accepted responsibility.  We don't know, had Mr. Nalley gone to trial, whether he would have testified to that fact.  Probably not.  He probably would not have testified at all.

THE COURT:  The trial penalty is the acceptance.  The plea to -- he said multiple times throughout two years, I'll take a misdemeanor plea right now.  That's not a --

MS. MARTIN:  Again, the Court is going to -- apparently going to be frustrated with our lack of charging Mr. Nalley with the 1512 as well or not having him plead to the

1    1512.  But the fact remains --

2              THE COURT:  It's just a lack of consistency.  That's

3    all.  And it stems beyond this case.

4              MS. MARTIN:  And, obviously, Your Honor is entitled to

5    that opinion.  A lot goes into what we consider when we offer

6    plea agreements, when we decide to take a case to trial that is

7    not going to be presented to the Court and shouldn't be, because

8    that's within our purview, and that's our prosecutorial

9    discretion.

10            So having the Court sort of say in every case oh, well,

11    even though they pled to something, they could have been charged

12    with this, shouldn't that affect other defendants --

13             THE COURT:  What I'm doing is not extraordinary.  You

14    know this happens in conspiracy cases all the time.  Judges want

15    to know who is the heavy, who is least culpable, how do they

16    stack up.  And it doesn't matter.  It can tie your hands when

17    there's a mandatory minimum.  But if you charge one with

18    possession with intent to distribute and one with money

19    laundering, judges are always going to be looking at that.

20    That's not -- I'm not unique.

21             MS. MARTIN:  I understand that, and with all due

22    respect, these defendants aren't being charged with conspiracy.

23    But when Your Honor gets into these hypotheticals, you sort of

24    open Pandora's box as to like well, we could have proven other

25    charges, should the defendants be then --

1          THE COURT:  But when you get into like the government

2     holds the keys to the sentence effectively by saying, if we in

3     our sole judgment decide this is the right charge, you have to

4     just swallow it, that can't be right either, especially when

5     3553(a) tells the Court to make comparisons to similar conduct.

6          And here, I think we've got identical conduct or pretty

7     close to it.

8          MS. MARTIN:  The government's argument is if you do

9     compare these cases across the board, Mr. Calhoun would be --

10    you would be creating a disparity by sentencing him similar to a

11    misdemeanor sentence and similar to his co-defendant in this

12    case, because his case is different.  And what 3553 tells us is

13    that the unwarranted sentencing disparities, first, it has to be

14    unwarranted.  It's just not the fact that it's a sentencing

15    disparity.  It has to be unwarranted.

16         That's just one factor to consider.  All the other factors

17    in this case weigh in favor of giving Mr. Calhoun a lengthy

18    prison sentence.

19         THE COURT:  And are you arguing this isn't unwarranted

20    because the strength of the evidence is stronger?  Is that

21    basically where you and I are parting ways?  The strength of

22    evidence results in a warranted disparity of three years?

23         MS. MARTIN:  Your Honor, the government's position

24    respectfully is that Your Honor would be creating an unwarranted

25    disparity if she were to depart in a way that would be

1    sentencing similar to a misdemeanor defendant, because he would

2    then be set apart from -- you would basically be telling him

3    okay, you didn't take responsibility for your actions, you've

4    obstructed not only the government but this Court --

5            THE COURT:  He's going to serve a prison sentence for

6    those reasons.  Okay?  Let me assure you that.  All right?  So

7    we're not talking about a 14-day sentence for him.  All right?

8    He's going to be sentenced to a term of imprisonment.

9        But what I can't get close to is this three-year number

10   you're throwing around or 43 months.

11           MS. MARTIN:  I can reiterate what 1512 requires versus

12   the 1752, but the Court, it sounds like, just wants an

13   explanation for why Mr. Nalley wasn't --

14           THE COURT:  No, I just want you to present evidence,

15   if you really think that I'm viewing two defendants similarly

16   who aren't for reasons other than what we've discussed.  All I'm

17   saying is if you have that evidence, present it, because I

18   really don't want to give a defendant a benefit when the

19   disparity is not unwarranted.  Does that make sense?  If you say

20   it's unwarranted disparity.

21       So I'm asking you what, in the government's view, makes

22   this warrant, and you've given me a couple different things.

23   One is the intent.  And that one just doesn't go very far for me

24   other than the strength of the evidence argument, because I

25   think you had the intent.  You brought it before the grand jury.

1    The AUSA said to me at sentencing you could prove it.  That

2    one -- it's really a strength of the evidence argument.  So

3    you've given me intent, and you've given me failure to accept

4    responsibility, remorse, and not entirely truthful testimony,

5    and I'm telling you absolutely as to those I'm going to consider

6    all those.

7        So if there's something more that makes them not similar,

8    I'm begging you to provide it, because it would help me

9    understand your 34-month recommendation.

10        MS. MARTIN:  And, Your Honor, again, I don't want to

11   go through the trial testimony ad nauseam in this case, but with

12   Mr. Nalley, he gave that statement to the Court because he was

13   accepting responsibility.  That's why he said what he said, that

14   he knew the certification was going on.

15        Mr. Calhoun has lied to the Court, saying that he thought

16   the certification was over, despite the fact that he was

17   simultaneously posting things on Facebook and taking cell phone

18   videos of himself that told us that he was going there

19   specifically to stop the certification.  And Calhoun, not only

20   in addition to the social media statements, but we have cell

21   phone videos of him proceeding to the Capitol at every turn.

22        THE COURT:  And I'm going to hit him for the

23   untruthful testimony.  Like I said, I'm going to impose a prison

24   sentence.

25        MS. MARTIN:  We can't hold Mr. Calhoun's statements

1    against Mr. Nalley.  So I understand that the overt conduct of

2    these two individuals is similar.

3              THE COURT:  And the intent is similar.  You've got to

4    agree with me on that.

5              MS. MARTIN:  Your Honor, whether or not Nalley knew

6    about the certification is -- and that just blanket statement

7    when he pled guilty is just one factor that goes to intent.

8    With Mr. Calhoun, we have voluminous evidence of intent.

9              THE COURT:  But that's a strength of the evidence

10   argument.  You have the evidence --

11             MS. MARTIN:  But doesn't that set defendants apart?

12             THE COURT:  If you say a thousand times versus you say

13   one, I don't know.  He's got a big mouth, obviously.

14             MR. ROMANO:  Your Honor, might we have a minute?

15             THE COURT:  Yes.

16             UNIDENTIFIED SPEAKER:  Can we step out?  Would that be

17   all right?

18             THE COURT:  Of course, yes.

19          (Government counsel conferred.)

20             THE COURT:  Okay.  You may proceed.

21             MS. MARTIN:  Thank you for the time, Your Honor.

22             THE COURT:  Of course.

23             MS. MARTIN:  In response to our discussion on the

24   unwarranted sentencing disparity, obviously, we've made our

25   position known on that.  I would just add that, you know, part

1    of the sentencing disparity is that if Mr. Calhoun -- when the

2    Court's looking at comparator cases when it's considering the

3    (a)(6) factor, the Court seems to be focused mainly on Calhoun

4    and Nalley as the only two comparator cases.  But there were

5    hundreds of people at the Capitol who have been charged and

6    sentenced.  And so the relevant comparator cases are not just

7    Mr. Nalley.

8              THE COURT:  No, I understand that.

9              MS. MARTIN:  So that is what the government sought to

10   bear out in its exhibits when it laid out not only the Court's

11   misdemeanor defendants --

12             THE COURT:  And I'm looking at those.  You have the

13   four-year Howell.  I think McFadden had one.  So I get that

14   there's a range.  It's just very hard, when this is in the same

15   case, not to focus on, given the high similarity between those

16   two.

17        These other defendants, I can read the government's

18   sentencing memos.  I read the transcript when they're on the

19   docket.  But I know this case, unlike many of those.

20             MS. MARTIN:  And as to Mr. Nalley's case and as to why

21   he wasn't charged with a 1512, the Court has emphasized --

22             THE COURT:  He was charged with a 1512.

23             MS. MARTIN:  Sorry, Your Honor, why he was not taken

24   to trial on the 1512, the Court has focused on the fact that his

25   Statement of Offense as a part of his plea agreement would bear

out intent under the 1512.  The statement that he made -- while

the underlying social media post he made after January 6 might

well go to intent, the statement that Mr. Nalley made wouldn't

have been obtained outside of a plea agreement.  So the

government wouldn't have had his statement of acceptance of

responsibility had it decided to take Mr. Nalley to trial on the

1512.

THE COURT:  Right.

MS. MARTIN:  With respect to why the government, the

government certainly considers the strength of the evidence when

it offers plea agreements.  In this case, it was not willing to

look past the voluminous, overwhelming evidence of the 1512 of

Mr. Calhoun to cut him a deal on the misdemeanor.

THE COURT:  Often in these situations, the government

goes to trial on two defendants, and they were lock step, and

one might be acquitted of certain charges and another not, but

you went to trial anyway.  There was a trial in this case.  And

you did think and Ms. Arco made clear that you thought you could

prove -- and I don't know and I don't want to know all the

specifics, but there was a decision that we have the evidence to

prove this case beyond a reasonable doubt, or you wouldn't have

filed it in the grand jury.

MS. MARTIN:  With all due respect, Your Honor -- first

of all, the grand jury only requires probable cause.

THE COURT:  Do you bring cases where you can't prove

1  the case?  That's not my understanding of how the government

2  works.

3          MS. MARTIN:  I can't speak to that as --

4          THE COURT:  Is it not policy you don't indict cases

5  you don't think you can prove at trial?

6          MS. MARTIN:  What I am saying is, with respect to

7  Mr. Nalley, the government decided to give the plea deal it gave

8  because it didn't have the strength of the 1512 evidence.

9          THE COURT:  Back to a strength of evidence argument,

10  and that's not really the Court's problem here.  It's weighing

11  two defendants as they sit here now.  And I get -- don't take

12  all of this necessarily as a criticism of the government, but

13  also understand, as you get frustrated with me, why I'm doing

14  what I'm doing, because I'm assessing these defendants now, and

15  I'm looking at the fact that you indicted them both on the same

16  charge before the grand jury.

17      In my experience, you never indict a case you don't think

18  you can prove at trial.  I don't think the government operates

19  that way.  So even thin cases are indicted sometimes.

20  Particularly, you could charge a conspiracy.  This certainly was

21  a conspiracy.  And maybe had they both gone to trial, you would

22  have charged conspiracy.  I'm not trying to analyze all of that.

23      It's just you can't stand here and ask me to just divorce

24  myself from what I know about Mr. Nalley in assessing what I

25  think an appropriate variance might be in this case.

1       So that's the only point I want to make.  I've read your

2  sentencing memoranda thoroughly.  Are there any other -- we

3  focused on my concern.  Are there any other portions of that

4  memo that you feel strongly about?

5       I will give you five minutes to emphasize.  But please

6  know, I've read the memo.  It's not that I haven't looked at

7  other issues beyond this one.  This is just the most difficult

8  one for me.

9       MS. MARTIN:  I understand, Your Honor.  And I respect

10  the Court is obviously making -- sentencing a defendant, and

11  it's not an easy job, and the government understands that.

12       Just with respect to one point the Court made previously

13  about that it was struggling with the fact that the disparity is

14  so high as to Mr. Calhoun that it would be three years, had

15  Mr. Calhoun accepted responsibility and not lied, his range

16  would have been 15 to 21.  So the fact that -- I think the

17  government would --

18       THE COURT:  Fair enough.  You would be making an

19  18-month recommendation here, mid-range of that, had he accepted

20  responsibility.  That's fair.

21       MS. MARTIN:  Correct.

22     That's it, unless Your Honor has any other questions.

23       THE COURT:  That's a good point.  Thank you for making

24  that.

25       MS. MARTIN:  Thank you.

```
1              THE COURT:  Ms. Sherman-Stoltz, I will hear briefly

2     from you while we're waiting for the next case to be ready.

3         Just so you all know, we're going to need to take a break.

4     I'm going to need to eat.  I assume you all might as well.  And

5     we will, depending on the time, likely come back around 3:00.

6         Is that going to create a problem for anybody?

7         Come on up, Ms. Sherman-Stoltz, with your allocution.

8         Oh, you've got more?

9              MR. BRUNWIN:  No, no.  Your Honor, if it's possible to

10    maybe start a little bit earlier.  I do have travel plans,

11    but --

12             THE COURT:  What time do you have to leave?

13             MR. BRUNWIN:  Not that it will affect -- I'm flying

14    out at 6:30 this evening.

15             THE COURT:  Okay.  I will try.  I've just got some

16    other matters in chambers, too.  But are you -- I know you'd

17    like to be here, but so long as your co-counsel can be here, if

18    you need to leave at any point during the continuation, I will

19    know why you're leaving, and feel free to leave.  You're not

20    required to stay here for the duration of the hearing.

21             MR. BRUNWIN:  Very well, Your Honor.

22             THE COURT:  Ms. Sherman-Stoltz?

23             MS. SHERMAN-STOLTZ:  I'm sure the Court knows the

24    time, but I would prefer to --

25             THE COURT:  I'm sure you would, but I would prefer to
```

1    keep moving.

2          I'm sorry.  I didn't realize that the defense attorneys

3    were ready in this case.  So you can have a seat.  We will call

4    that case.

5          Ms. Sherman-Stoltz, when we come back, it would be very

6    helpful for me -- I've read all of your filings as well -- when

7    we come back at 3:00 that you focus on the back and forth I've

8    had on the unwarranted disparity.

9          And I don't think -- as I've said, I don't think

10   Mr. Calhoun was fully truthful at trial, nor do I think he's

11   accepted responsibility or shown remorse.  And these are other

12   factors that the Court is comparing when it does its analysis,

13   even under (a)(6).  So he's in a different spot than Mr. Nalley.

14   And I am taking the government's point that it's not just

15   Mr. Nalley.  It's all the defendants and not just January 6 but

16   all the obstruction defendants.

17         So I'm not just focused on Nalley, but for purposes of the

18   argument, that would be most helpful, for you to structure your

19   argument around those three issues.  All right?

20              MS. SHERMAN-STOLTZ:  Yes, Your Honor.

21              THE COURT:  If we could have you all come back at 3:00

22   so I can handle this and grab some lunch and deal with another

23   matter and be back at 3:00.

24         (Recess taken from 1:31 p.m. to 3:09 p.m.)

25              COURTROOM DEPUTY:  Your Honor, we are still in

1  Criminal Action 21-116-1, the United States of America versus

2  William Calhoun, Jr.

3      Your Honor, all the parties who were previously before the

4  Court are currently before the Court, with the exception of

5  Ms. Gavito, who is representing Probation.

6          THE COURT:  All right.  Ms. Sherman-Stoltz, are you

7  ready to proceed?

8          MS. SHERMAN-STOLTZ:  Yes, Your Honor.

9      The Court and the government have spent a lot of time

10  discussing remorse and Mr. Calhoun's perceived lack thereof.  I

11  think as an explanation as far as the remorse aspect is

12  concerned, the dictionary definition says that "remorse" means a

13  deep regret or guilt for a wrongdoing.

14          THE COURT:  And let me tie that to acceptance of

15  responsibility.  It's both.

16          MS. SHERMAN-STOLTZ:  And that's -- yes, Your Honor.  I

17  was going to kind of go into that.

18      But in the government's presentence memoranda, they cite to

19  his Georgia Bar proceedings, and they provide a copy of the

20  transcript.  And they reference the part where he's asked by the

21  Georgia Bar attorney and then by his own attorney about remorse.

22  And what they left off is something that I feel is very

23  important for the Court to consider.  They put in their

24  presentence memoranda, "Why should I have remorse?" was his

25  response.  But they failed to include that Mr. Calhoun followed

up by saying, "To feel remorse requires that the person had to have done something inherently wrong.  It is not wrong to engage in civil disobedience to fight for civil rights."

And I describe that to show the differences in the definition between what the dictionary definition of remorse is and what Mr. Calhoun perceives to be the definition of remorse, that he has to have done something --

THE COURT:  This is what troubles me most about Mr. Calhoun.  I mean, after all, he is a lawyer, and his entire profession hinges on respect for the rule of law.  And as a lawyer, he knows full well how elections are challenged. Challenges were brought to the 2020 presidential election all over the country.  And I suspect he knows that they all failed miserably.

And the fact that Mr. Calhoun, as an educated lawyer, instead of proceeding with some legal challenge, decides to in effect take the law in his own hands and storm the Capitol building and encourage others to do the same is very concerning.

To this day, he's understating the severity of his conduct, and that is extremely concerning for someone like him who is engaged with the rule of law on a daily basis, that he can't grasp the wrongness of entering the Capitol building and trespassing and watching hoards of people mow down police officers who were standing there defending that building on that day, and then get on the stand here and say to this Court, it

offends me, that well, nobody stopped me, as he watched a steady stream of people from the time the line of officers was overrun enter the building.

The fact that he to this day persists in this perception is concerning in terms of his failure to appreciate the severity of what he did and what he might do in the future.

This is no like standard civil disobedience on a road where you're protesting this or that. He stormed the Capitol of the United States.

MS. SHERMAN-STOLTZ: If Your Honor means when inside the Capitol building as far as storming it, then yes, that's exactly what he did.

THE COURT: He followed the train of people who stormed, and he flat out watched it, and he watched, you know, pepper spray and all kinds of chaos, and he saw blood on people. He knew full well that this was a violent attack on the Capitol. Simply because he walks through not engaging in violence himself doesn't mean he didn't or shouldn't have appreciated the severity of what he was doing by being there and contributing to that mob on that day when there were innocent people trying to do their jobs inside that building.

And the fact that he persists now -- and this is one of the most aggravating aspects of his case. As a lawyer, attacking an institution, a legal institution in the way in which he did is appalling.

1          And we can quibble about the meaning of remorse, and he's

2     kind of sort of accepted responsibility for trespassing.  But

3     the fact that he persists to this day with this view that what

4     he did was okay because he just walked through the Capitol,

5     it's --

6          MS. SHERMAN-STOLTZ:  I think we see that in every type

7     of protest regarding any issue.  You see people that are going

8     excessive and beyond what a protest, peaceful protest would be,

9     and then you see people that are peacefully protesting all in

10    the same setting.

11         THE COURT:  He wasn't out here on the public part of

12    the land surrounding the Capitol.  He was in the Capitol when

13    people were going toe-to-toe with officers, getting in their

14    face and yelling at them, pushing by them.

15         Simply because he's there, he's just a journalist?  That's

16    preposterous.

17         MS. SHERMAN-STOLTZ:  That would mean that every single

18    person that walked into the Capitol building did the same thing.

19         THE COURT:  Understood.  But one expects more from a

20    lawyer whose entire profession depends on the respect for the

21    rule of law.  He should know better.  And he's losing -- in all

22    likelihood, he's losing his Bar license because of it, and

23    that's a severe penalty.

24         MS. SHERMAN-STOLTZ:  Absolutely.  That's a most severe

25    penalty.

1          THE COURT:  But the fact that he stands before this

2     Court and wants to be cute about he didn't do anything wrong --

3          MS. SHERMAN STOLTZ:  How is it --

4          The COURT:  -- it's offensive.

5          MS. SHERMAN-STOLTZ:  -- fair to hold him to a higher

6     standard when every human being makes bad choices, no matter

7     what their position in life is.  President all the way down to,

8     you know, homeless individuals, everybody makes a bad decision,

9     bad decisions.

10          THE COURT:  I might be more sympathetic to that

11     argument if he were sitting here today saying you know what,

12     Your Honor, I got carried away, it was during the pandemic, and

13     I was all worked up, and I did these things, and I'm really

14     sorry, and this wasn't good for our country, and it's never

15     going to happen again.  But that's not what I'm hearing.

16          MS. SHERMAN-STOLTZ:  He has said from day 1, he has

17     taken responsibility and accepted the fact that he trespassed

18     from day 1.  The first time that Your Honor had an interaction

19     with him was in one of his bail hearings.

20          THE COURT:  At trial, he backed off that, and he

21     eventually came right around when he realized he had told me the

22     opposite multiple times, and he kind of retracted his

23     unwillingness to admit trespass.

24          I mean, I get that he disagrees with my legal ruling in the

25     case, and that's an issue this Court has decided, and it's on

1    appeal, and it will be worked out in the appellate process.  I

2    can appreciate how someone in his shoes is frustrated with that

3    decision and thinks it's unfair that this -- he made a

4    calculated choice.  He went into the Capitol thinking, I'm

5    willing to -- he probably said they're not going to prosecute

6    all these people, just like a lot of January 6 defendants said,

7    there's no way in the world that they're going to prosecute

8    2,000 people.  That's wrong.  But number 2, if they do, I'm just

9    committing trespass.  He didn't think through the charge that

10   was brought here.

11       And I get that that was not something that he contemplated

12   and that's frustrating to him.  And yet, I just can't say enough

13   that his inability to be more willing to accept what he did was

14   wrong at this stage really understates the severity of what he

15   did and really concerns the Court about what he might do in the

16   future.  He really is, I would think as a lawyer, someone who

17   can be a model and can demonstrate to people what's appropriate

18   to do.  But walking, trespassing on Capitol grounds when

19   officers are engaged in hand-to-hand combat with people trying

20   to get in, that's a different level of trespass.  That is not

21   a --

22          MS. SHERMAN-STOLTZ:  And that would be something that

23   every single person would be guilty of, Your Honor.  Every

24   single person that walked through the Capitol grounds, pushed

25   down by --

```
 1              THE COURT:  But that's not what you're saying here.

 2       The impression I'm getting is that Mr. Calhoun sits here and

 3       still thinks what he did wasn't wrong, it was justified.

 4              MS. SHERMAN-STOLTZ:  No, and that's not what I'm

 5       trying to say to the Court.

 6              THE COURT:  Well, why did he say to another court that

 7       he would do it a hundred times again if he could?  Didn't he say

 8       that?

 9              MS. SHERMAN-STOLTZ:  Because he was being challenged

10       by a client who wanted to fire him because he had been detained.

11       So he is having to be accountable for what he did.

12          Also, he didn't say I would do it a hundred times over

13       again as far as going inside of the Capitol building and walking

14       around.  This was when they were referencing the fact that he

15       even went to Washington, D.C., the capital of the United States

16       of America, which is another thing that keeps getting tossed

17       around, his perception of when you use the word capital, going

18       to the capital, he meant the United States --

19              THE COURT:  Ms. Sherman-Stoltz, it's not a productive

20       argument for you to quibble with me on what he meant when he

21       said "Capitol" with an O or with an A or when he used "we."

22       That wasn't compelling at trial, and it's not going to be

23       helpful to him at sentencing.

24              MS. SHERMAN-STOLTZ:  So the Court does not believe

25       that he had no plans to go to the Capitol building prior to
```

1    coming to Washington, D.C.?

2            THE COURT:  I just read his posts before January 6 and

3    all the details about the certification, and I don't find it --

4    I'm not sure the government could prove beyond a reasonable

5    doubt, but I don't find it truthful that he thought the vote was

6    over at that point, no.  Certainly, when I'm looking at a

7    preponderance standard, I don't find that to be true.

8        I just think he's having a really hard time accepting that

9    what he did was wrong, and it was.  He can say well, there were

10    all these other events happening in 2020 and those should have

11    been charged, too.  Okay.  But again, he's attacking -- he's not

12    personally engaged in combat, but he's watching the Capitol be

13    attacked.  He's watching police officers be attacked.  And he

14    strolls through there and wants the Court to believe he's acting

15    in some journalistic fashion.

16        It's offensive that he doesn't appreciate as a lawyer that

17    what he did that day was wrong.

18            MS. SHERMAN-STOLTZ:  Mr. Calhoun doesn't believe that

19    his acts rose to a felony.  So yes, he's having a hard time

20    struggling with the concept of my conduct rose to the level of a

21    felony.

22            THE COURT:  But that's different.

23            MS. SHERMAN-STOLTZ:  I'm sure if anyone told him if

24    you go inside the Capitol building or on the grounds that's

25    going to be considered A, B, C, D, E, F and it's a felony --

```
 1            THE COURT:  But he knows ignorance of the law is not a
 2    defense.  He knows civil disorder is not a defense.  He assumed
 3    the risk by setting foot in the Capitol that day.  Too bad for
 4    him that he didn't realize that the government could come up
 5    with this charge that at least 14 judges on this court have
 6    upheld.  And again, it may be reversed.  We'll see.  But that's
 7    too bad for him.
 8            MS. SHERMAN-STOLTZ:  But that's a difference between
 9    not being able to accept it as an individual, that his
10    actions -- ignorance of the law is completely different than
11    okay, I was ignorant of the law, so I broke the law, and now I'm
12    having a hard time accepting the fact that I've done something
13    in which I'm going to lose my Bar license, something that I
14    worked incredibly hard for, spent 30 years building a successful
15    practice, helping probably thousands of defendants, and then he
16    has to accept the fact that his conduct on January 6 alone
17    amounted to a felony.
18            THE COURT:  I get the felony part.  I get that that's
19    hard for him to accept.
20            MS. SHERMAN-STOLTZ:  And that's all that he struggles
21    with, Your Honor.  He's admitted from day 1 that he committed
22    what would be considered misdemeanor trespass.  He's asked for a
23    plea from -- in that bail hearing, he asked for it, and he has
24    asked for it numerous times since then.
25            THE COURT:  The whole tenor of his comments from day 1
```

is yep, committed trespass, committed civil disorder, I'll
swallow that, but absent from that is any real appreciation on
just how serious what he did was.  Whether it's a felony or
misdemeanor, that's beside the point.

MS. SHERMAN-STOLTZ:  And he's going to have to live
with it for the rest of his life, Your Honor.  He's been
convicted of a felony and four misdemeanors, on his record,
losing his Bar license.

THE COURT:  But instead of sort of owning that this
was conduct --

MS. SHERMAN-STOLTZ:  I don't think he's ever not owned
it.

THE COURT:  I don't call "I'd do it again a hundred
times" owning it.  I don't care who you're talking to and what
provoked it, nor do I think the last most recent comment he
made.  The attitude here is "I'm a victim."  And he put himself
in this situation.

MS. SHERMAN-STOLTZ:  And he's going to have to live
with those consequences the rest of his life.

THE COURT:  And he posted some really offensive things
before and after on the internet.

MS. SHERMAN-STOLTZ:  But that's not what he's being
charged for.

THE COURT:  Absolutely, he's not being charged, but
those are relevant to show what his intent was.  They are

1    relevant to show his knowledge.

2         MS. SHERMAN-STOLTZ:  Yep.

3         THE COURT:  They are relevant to show that he should

4    appreciate the seriousness of what he's done.  And he doesn't

5    seem to do it, whether it's felony or misdemeanor.  There are

6    ways to own what he did.  I'm not seeing any of that.  It's

7    sentencing.  If it hasn't happened by now, I'm not sure it's

8    ever going to happen.

9         MS. SHERMAN-STOLTZ:  And he hasn't been given an

10   opportunity to speak yet.

11        THE COURT:  Well, he spoke -- he made his statement to

12   Probation.  He's now facing the judge.

13        MS. SHERMAN-STOLTZ:  And he accepted responsibility in

14   his statement that's in his presentence report.

15        THE COURT:  All right.  He certainly has a right to

16   address the Court, and I will hear from him.  I'm happy to hear

17   from him.

18        MS. SHERMAN-STOLTZ:  As far as the Court's comparison

19   between Mr. Nalley and Mr. Calhoun and the Court having said

20   that the difference in their acts or conduct boils down to

21   essentially his trial testimony, that the Court found some to be

22   not credible or believable, and then his lack of remorse, and I

23   don't think that that's a fair comparison to draw between the

24   two, because Mr. Nalley was given the opportunity to accept

25   responsibility and show remorse by taking a plea.  He

1    circumvented everything else.

2         THE COURT:  But I can't hypothesize on what he would

3    have done if he had been faced with an obstruction charge,

4    whether he would have taken the stand and sort of shaded his

5    testimony.

6        We are where we are, and I'm just comparing -- you know, to

7    the extent they're similar, I'm looking at the offense related

8    conduct, and --

9         MS. SHERMAN-STOLTZ:  And I believe that that's all

10    that the Court should look at, because anything after that

11    wouldn't be a fair comparison, because they're no longer

12    similarly situated.  One has been given a misdemeanor plea, and

13    one has had to take it to trial and been convicted of a felony

14    and four misdemeanors.

15         THE COURT:  But under that theory, you're sort of

16    arguing the government's position, if I'm supposed to look at

17    the similarity between offenders.  (a)(6) talks about found

18    guilty.  They're not found guilty of the same conduct.  So that

19    does actually make them dissimilar.  But we don't need to

20    resolve that issue here, what exactly 3553(a)(6) means.

21        The point I was just trying to make is they seem to be

22    lockstep before and after, and I think that's a factor among

23    many I should consider.  I think the Court has to look at other

24    January 6 cases.  It has to look at other cases sentenced under

25    this guideline, and the Court is doing that.

1    You've heard my position on the disparity there.  I do

2    think it warrants a variance.  The question I'm struggling with

3    is how far.

4         MS. SHERMAN-STOLTZ:  Well, we outlined in our

5    presentence memorandum cases that were -- where individuals were

6    sentenced to anywhere from -- I think the lowest I went may have

7    been 34 or 36 months and all the way to the extreme of 87

8    months.  But specifically focusing on Hughes, which is Case

9    1:21-cr-106, and he received 38 months of incarceration.  He

10   forced bike rack barriers down, enabling the breach of the

11   police line, climbed through a broken window to get inside,

12   chased a Capitol Police officer while yelling violent and angry

13   threats.

14        And then we have Reid, which is 1:21-cr-316.

15        THE COURT:  That's my case.

16        MS. SHERMAN-STOLTZ:  And he entered the Speaker's

17   Lobby, damaged a television and water cooler.

18        THE COURT:  In a bathroom.

19        MS. SHERMAN-STOLTZ:  Surging through police lines,

20   leading rioters through the building.  And he received 37

21   months.

22        Then we have Tenney, 1:21-cr-640.  And he forced,

23   personally forced open the Rotunda Doors on the east side,

24   allowing rioters to enter.  He grabbed the Sergeant in Arms from

25   behind, pushing him into a door frame, locked armed with a U.S.

Capitol Police officer, and shoved a U.S. Capitol Police

officer.  And he received 36 months.

And then we have Thompson, 1:21-cr-161.  He entered the

building wearing a bulletproof vest, walked into and looted the

Senate Parliamentarian's Office, stealing two bottles of liquor,

went outside and encouraged others to participate in the riot,

specifically his co-defendant, stole a coat rack, an announcer

pager, and picked up someone's cell phone on a staffer's desk.

And he got 36 months.

And then we have Miller, 1:21-cr-75.  He entered the

Capitol grounds draped in a confederate flag, threw a full can

of beer on a law enforcement officer, used a bike rack to scale

the Capitol wall, threw batteries at police officers, and

sprayed the contents of a fire extinguisher on a dozen police

officers.  And he got 33 months of incarceration.

Now, if we look at it from a different angle, those that

were initially charged under the 1512 and then offered a

misdemeanor plea --

THE COURT:  Before you get into those, can I ask you a

question?  The Court's only been able to find -- you're seeking

a time-served sentence here, which I understand would be two

months based on the time he spent in detention before the Court

released him on appeal.

The only -- the lowest sentence I found in a case under

1512(c)(2) is the Wood case, which was a 12-month home detention

case involving a young defendant.  Is that -- have you found any others that are close at all to what you are recommending in terms of -- not ones that have pled down from a felony to a misdemeanor, but just straight 1512(c)(2) charges?

MS. SHERMAN-STOLTZ:  Those that have been convicted of a 1512?  No.

THE COURT:  So the 12 months, that's Wood, 21-223, I understand is one where Judge Mehta sentenced a defendant to 12 months, and in that case, that defendant deleted evidence from the phone, provided falsehoods to the FBI, but age -- I think he was only 23 years old at the time of the offense with no prior criminal history at all.

But aside from that, you don't know of any others?

MS. SHERMAN-STOLTZ:  None of the ones that I have found were -- as far as the sentence is concerned and being convicted of 1512, there was always an act in furtherance of. There was some type of, you know, they brought in a weapon or they stole a weapon or they went into, you know, the Senate room or chambers or they had done some other type of act.

But when it came to an individual having done nothing but walk in and take videos and pictures, all of those type of cases were pled down to misdemeanors or not charged with a 1512 from the get-go.

Mr. Calhoun is the only one that I've been able to find who literally walked through the Capitol filming and taking pictures

and has been convicted of a 1512.  Everyone else that's been

convicted of a 1512 has done some other type of aggravating or

violent or aggressive type of behavior that could absolutely

warrant a 1512 conviction.

So it's very hard to find those that are similarly situated

with Mr. Calhoun.  The best example is his own co-defendant.

But there are others.  Melody Steele-Smith, that's

1:21-cr-77.  She was initially charged with a 1512 felony and

four misdemeanor initial charges just like Mr. Calhoun.  She

pled it down to one misdemeanor, and she received 36 months of

probation.  She went into the Speaker's Office and posted

pictures of Nancy Pelosi's personal items.

Gracyn Courtright, same charges.  She was also given a 1752

plea offer.  She was sentenced to 30 days with 12 months of

supervised release.  She went into the Senate Chamber, broke

into a locked door, and picked up and walked around with

government property.

Then we have -- and I'm probably going to say his last name

wrong -- Schornak, 1:21-cr-278.  He came into the Capitol

building wearing a tactical vest, carrying a helmet and a

bullhorn.  He took a selfie with a person that he had just seen

pepper spray law enforcement officers.  He removed a flag and a

flag pole from a statue in the area of the visitor's center, and

then later posted on social media that he would never apologize

for what he did, specifically said that.  He was also initially

charged with 1512 felony and four misdemeanors, the same ones that Mr. Calhoun now stands convicted of. He was sentenced to 36 months of probation with what they call intermittent confinement, two periods of 14 days, and two months of home detention. And I will note that he had three prior criminal convictions; Mr. Calhoun does not.

Then we have his co-defendant, Herendeen, 1:21-cr-278. And he made a video of himself saying, "They're in the basement. We've got to go there. That's where they're all hiding. That's where they're at. They're in the fucking basement." He arrived in military-style attire with a tactical vest, mask, and carrying bear spray. Same 1512 and four misdemeanors that Mr. Calhoun is facing. He was given a 1752 plea offer. He also had three prior criminal convictions. He was sentenced to pretty much the same thing as his co-defendant, Schornak, but he was only given a total of 14 days of incarceration, being two periods of seven days each.

One that is incredibly close to Mr. Calhoun's case would be Stephen Ayres, 1:21-cr-156. He was charged with four of the same offenses as Mr. Calhoun, one felony 1512 count and three misdemeanors. The only one that he wasn't charged with is the parading, picketing, and demonstrating charge, Mr. Calhoun's Count 5. Though he, by his own testimony before the House Select Committee, indicated that he was in the Capitol for approximately an hour and a half, the majority of his alleged

conduct was social media posts while he was either in the
Capitol building and after he had left.  He received 24 months
of probation.

Now on to Mr. Nalley.  Exact same conduct.  They were
almost side-by-side throughout the entire building.  And we know
that because it's on video.  We know what he did and what he did
not do.  In fact, many times, Mr. Nalley is leading the charge.
He led the charge up the Capitol steps.  You can see when they
enter into the building, Mr. Nalley is first and Mr. Calhoun is
behind him.  Everything from planning the trip, as far as
inviting Mr. Calhoun.  Mr. Nalley drove.  He booked the hotel.
He paid for it.  And then again leading up the steps and inside
the building.

Yet, Mr. Nalley was offered a misdemeanor plea and given a
sentence of only supervised probation, which he's almost done
with.

Regarding Mr. Calhoun's testimony as to Mr. Nalley's
pre-offense social media posts being similar to his, if the
government had disagreed with Mr. Calhoun on that, they had
plenty of time -- disagreed or believed him to be lying, they
had plenty of time.  They could have subpoenaed all of
Mr. Nalley's social media accounts pre-shutdown, because
Mr. Calhoun's social media accounts were also shut down, and the
government very successfully was able to do a subpoena duces
tecum and get all of his pre-shutdown posts.  They could have

done the same thing with Mr. Nalley if they believed Mr. Calhoun
to be lying about the fact that they had similar posts.

We were specifically told that the reason that he was not
offered a misdemeanor plea like Mr. Nalley was due to his social
media posts.  That shows that the government is trying to punish
him for exercising his First Amendment right.  If he broke the
law in those posts versus fulfilling an element of a crime he's
being charged, but if he broke the law, those posts alone, then
they need to act upon it.

THE COURT:  I know.  But you know what their position
is on that.  They say because of those posts they had clear
evidence of intent to interfere with the vote.  That's not --
had he never set foot in the Capitol, those posts wouldn't have
resulted in a felony charge or any charge.  But he took actions
that were consistent with his posts, and that's what he's been
prosecuted for.

So you know that's not a fair argument to make.

MS. SHERMAN-STOLTZ:  He posted a lot of things about
showing up armed at the Capitol, and he absolutely did not show
up armed.  In fact, he did a later post --

THE COURT:  But he acted consistently --

MS. SHERMAN-STOLTZ:  -- that said don't bring guns,
very against the law, warning others don't do this.

A lot of his posts, all of them don't amount to what he
actually did do while he was there.

1          THE COURT:  Wasn't he going to the Capitol because he
2    was exercising, as he says, his right to civil disorder because
3    of the stolen election?  Isn't that what motivated him?
4          MS. SHERMAN-STOLTZ:  He was going to Washington, D.C.,
5    to attend a Trump rally to stop the steal.
6          THE COURT:  And while in Washington, D.C., he went
7    into the Capitol just to sightsee?
8          MS. SHERMAN-STOLTZ:  Correct.  He went in because
9    former President Trump said let's go over to the Capitol.
10          THE COURT:  And he said why.  He told them why at the
11    rally.
12          MS. SHERMAN-STOLTZ:  I'm sorry?
13          THE COURT:  Didn't President Trump talk about what was
14    going on at the Capitol?
15          MS. SHERMAN-STOLTZ:  Correct, yes.
16          THE COURT:  So was there -- he knew why he was going
17    into that building.  And when he testified that he didn't
18    know -- he thought the vote had already occurred, that just
19    doesn't ring true to the Court.
20          MS. SHERMAN-STOLTZ:  And we understand that the Court
21    doesn't believe what he said about that, but I would like to
22    note that at 1:06 p.m. on January 6, Mike Pence released a
23    letter on Twitter, and in that letter he discusses his role in
24    the certification process.  Trump's speech ended shortly after
25    Nancy Pelosi banged the gavel to call the Joint Session of

1    Congress to order at 1:05 p.m.  So right around the same time,

2    Trump's speech at the rally is ending right around 1:05 p.m.,

3    right around the same time that Mike Pence releases the letter

4    on Twitter.

5        Mr. Calhoun testified that on the walk from where the rally

6    was being held, they went first to the Robert Taft Memorial

7    where he and Nalley wanted to sit down and see if they could get

8    Internet connection, because they had not been able to have

9    Internet connection.  So he didn't have access to reading and

10    seeing what was going on.  He's hearing the rumblings of the

11    crowd around him.

12        He testified, and as the Court knows, he had to have

13    surgery on both of his feet within a short period of time after

14    his release from incarceration, that he needed to sit down, that

15    he needed to give his ankles and feet a break.

16        So they went first to the Robert Taft Memorial and sat

17    there for a while while other people are still going on to the

18    Capitol.  And they're just sitting there, resting, trying to see

19    if they can get any cell service, also hearing the rumblings

20    around them.  Right around that time that they're moving over to

21    the memorial is when Mike Pence released his letter on Twitter.

22        Again, we understand that the Court doesn't believe his

23    testimony, but there are things that support his testimony, like

24    that, that he thought from what he was hearing around him that

25    everything had been certified, that it was done.

1    THE COURT:  And despite the fact that he said

2    repeatedly before the trial that he admits that he committed

3    trespass but then in trial waivers on that and suggested that he

4    thought he might be there and then when cross-examined about the

5    broken glass saying he never saw it, even though he took a video

6    of the broken glass.

7    MS. SHERMAN-STOLTZ:  He's walking through, Your Honor,

8    like this (indicating).

9    THE COURT:  We can argue.  There's an excuse for

10   everything, and once he took the stand -- he didn't have to take

11   the stand.  But once he took the stand, he needed to testify

12   truthfully, and that, the Court has found, he did not do.

13   MS. SHERMAN-STOLTZ:  I understand the Court's ruling.

14   THE COURT:  In fact, by, I think, cross-examination,

15   eventually he turns to me and says well, Your Honor, I think I

16   probably did commit trespass.  He knew that he was shading the

17   truth.

18   MS. SHERMAN-STOLTZ:  He said that from the very

19   beginning, though, Your Honor, and he never tried to hide any

20   type of evidence.  He was very open with what he did and his

21   conduct.  He gave interviews, obviously posted it on social

22   media.  He didn't try to hide anything from the public.  It was

23   all very well documented.

24   An interesting case that I would like for the Court to

25   consider when considering sentencing is the two co-defendants,

1    Schornak and Herendeen.  Similarly to Nalley and Mr. Calhoun,

2    charged with the same thing, given the same plea, and sentenced

3    to almost the exact same thing, just a little bit of one had a

4    higher amount of this intermittent sentence than the other one

5    did.  One had 28 days, and one had 14 days.

6        So should Mr. Calhoun and Mr. Nalley, in the case where

7    their conduct is exactly the same.  Mr. Nalley was fortunate

8    enough to have been given a misdemeanor plea; Mr. Calhoun was

9    not.  He spent almost two months incarcerated and much of that

10   time in solitary confinement.  And he's going to lose his Bar

11   license, his livelihood.  That alone is punishment.  He's been

12   threatened.  He had to live outside of his house for a long

13   period of time because it wasn't safe.  He's had to deal with

14   people watching his every move.

15       The only reason that the Court is even aware of when his

16   client was trying to fire him or asking that he be fired is

17   because there were people monitoring him everywhere and were

18   like oh, my gosh, did you hear what he just said, let's get the

19   transcripts for that and get it over to the government.

20           THE COURT:  But you don't question he said it?

21           MS. SHERMAN-STOLTZ:  No, he doesn't question that he

22   said it, absolutely not.  He didn't question it when we spoke

23   about it at his trial and he was confronted with the evidence by

24   the government.

25       The government and Your Honor were speaking earlier about

Mr. Nalley and the ability to be able to prosecute him under the 1512.  As Your Honor is aware, Attorney Rozzoni handled the sentencing hearing for Mr. Nalley and specifically spoke to the fact -- well, I think she was answering your question as far as where is the government drawing the line in the conduct that amounts to the 1512 and then doesn't amount to it.  And her response was essentially, referring to Mr. Nalley, "he was one of the very early defendants charged in this case, and at the very onset, I believe that the 1512 was charged a bit more," pauses, and then leaves it at "a bit more, let's just put it that way.

"And after approximately six to eight months had passed and more people had been charged and more activities and behavior had been looked at, I think there was a group of defendants the government decided were more appropriately charged with 1752.

"And so in this case, that is why Mr. Nalley was offered the misdemeanor charge.  He did have rhetoric online that we have included in the sentencing memo, but the government decided that -- well, it certainly still would have gone to trial on the 1512 in terms of his intent to obstruct, but it felt that a better resolution of the case was to plead him to the 1752, to which he agreed to, obviously."

So if Mr. Nalley's conduct warranted a reduction, why didn't Mr. Calhoun's?  And then in that same token, why would that lack of conduct to support a 1512 conviction or the desire

for the government to pursue trial against him, why would that

lack of conduct then amount to a sentence of 34 months, 34

months for the same conduct that someone else got just probation

for, his own co-defendant?

And in multiple other cases, unless there was a huge

disparity in what one co-defendant did against another

co-defendant, they were all similarly sentenced.  And that's

what we're asking the Court to do with Mr. Calhoun.

We are also asking Your Honor to consider the fact that he

has lost his Bar license or will be losing it.

THE COURT:  And that's significant.

MS. SHERMAN-STOLTZ:  Huge.  And I know he won't be mad

at me for saying this, but he's not a young individual, and it's

going to be very hard for him to start over in a career path.

What is he going to do?  And now he's facing a felony and four

misdemeanor convictions on his record and a tainted reputation.

And not a tainted reputation because he's a bad attorney, but

because people wanted to destroy his reputation as a form of

retaliation by just knocking down his Google reviews.

THE COURT:  By his own admission, he likes to wind

people up on the Internet, and that is getting him in trouble

here.  He's got a big mouth, and he likes to say outrageous

things, and that's getting him not this prosecution but it gave

the government some evidence of intent and knowledge that they

would have perhaps lacked.

1          MS. SHERMAN-STOLTZ:  But not illegal in and of itself.

2          THE COURT:  No, and I don't think anyone's argued

3    that, that his statements are illegal in and of itself.  Those

4    coupled with his actions.  And I get your point that he

5    didn't -- the evidence doesn't convince the Court that he set

6    off from Georgia prepared to go into the Capitol.  So if I've

7    suggested that, I didn't mean that.

8          But he clearly knew what was going on that day, and he went

9    there, and he did clearly trespass.  And I get that he doesn't

10   like the legal theory and all of that, but, you know, he has

11   every First Amendment right to say whatever he wants online, to

12   associate with whomever he wants.

13         It doesn't mean those statements can't be used by the

14   government to prove its case, nor does it mean that the general

15   public doesn't form views about Mr. Calhoun that create some of

16   the problems he's dealing with now that are independent of this

17   prosecution.

18         There are plenty of January 6 offenders who aren't

19   subjected to quite the same degree of visibility that

20   Mr. Calhoun has who weren't active on social media.  I think

21   that's fair to say.

22         MS. SHERMAN-STOLTZ:  Right.

23         THE COURT:  So it's unfortunate, but I hope he's

24   learned a lesson that social media is not good for him.  No

25   one's going to say he can't do it, but it has consequences when

1    you're going to spout off like that.  It's fine in the moment,

2    but it's -- he's created --

3         MS. SHERMAN-STOLTZ:  His approach will be different in

4    the future.  I'm sure it will.  And he has complied with the

5    Court's --

6         THE COURT:  No, and he's been -- to his credit, he has

7    been extraordinarily compliant, and the government sought

8    detention at the outset, and I rejected the claim of

9    dangerousness.  The government remarkably sought to step him

10   back after trial, after he had been on supervision for two years

11   without a single incident or problem.  And I rejected that

12   summarily without even hearing from you.  I thought that was an

13   outrageous request of the Court, that there was clear and

14   convincing evidence that he would be a danger to the community.

15   That was a preposterous argument to make, and I rejected it.

16        So I'm -- he has a lot going for him, and I get the

17   frustration that this is in his mind more worthy of a

18   misdemeanor charge.  I can certainly relate to that.

19        What is troubling is taking the stand and being cute with

20   the testimony in certain ways that we can agree to disagree

21   about, and then also not, you know, recognizing just how out of

22   control this behavior was.  It really -- the whole day, it put a

23   lot of people in danger, and there were a lot of people who were

24   terrified.  And every single person made a difference on that

25   day.

1    So the government's right.  I can't go back and change the

2    charging decisions in either Mr. Nalley's case or Mr. Calhoun's.

3    It's entirely the government's decision.  And yes, I agree with

4    you, can look at how they compare, and I am doing that.  It's

5    just it's one of several factors, and I am going to consider

6    these other factors that do trouble the Court, that a lawyer who

7    is bright and intelligent and knows the consequences of shading

8    testimony and has defended people did what he did.  He could

9    have remained silent and helped himself that way as well.  But

10    those were choices he made.

11    All right.  Anything else you would like to say?

12    MS. SHERMAN-STOLTZ:  No, Your Honor.

13    THE COURT:  And Mr. Calhoun, I take it, would like to

14    address the Court?

15    MS. SHERMAN-STOLTZ:  Yes, Your Honor.

16    THE COURT:  All right.  Is there anything -- I'm going

17    to let Mr. Calhoun do that, but is there anything from the

18    government side on the cases that you want to respond to, on

19    just that limited discussion?

20    MS. MARTIN:  The cases that Ms. Sherman-Stoltz cited

21    to, were some of those cases cited in her brief or --

22    MS. SHERMAN-STOLTZ:  Not all of them.

23    MS. MARTIN:  Your Honor, I would just say that the

24    government didn't have an opportunity to respond.  She brought

25    those cases up at this hearing.

1          THE COURT:  Understood.

2          MS. SHERMAN-STOLTZ:  The government didn't respond to

3     our brief at all, our memorandum at all.  So I don't hold water

4     to that argument.  No disrespect to the government, but they

5     didn't respond at all.

6          THE COURT:  I haven't had a chance to look at them

7     independently either.  I'm trusting as an officer of the court

8     you wouldn't misrepresent the facts.

9       I think the overarching point is one that came through the

10    cases that were in your memo, which is that there are a lot of

11    offenders who are charged with 1512(c)(2) who were allowed to

12    plead down to misdemeanors who demonstrated conduct that in

13    certain ways is more egregious than Mr. Calhoun's and other ways

14    it's not.

15      Is there any particular case that you're concerned about?

16         MS. MARTIN:  Your Honor, I would just say, to the

17    extent the Court is compelled by any of the new cases brought by

18    counsel, we would just ask for the opportunity to get citations

19    and address those if the Court is moved --

20         THE COURT:  It would be helpful for the record -- do

21    you have citations, at least case numbers for those cases?

22         MS. SHERMAN-STOLTZ:  Yes, Your Honor.  I think I cited

23    them, but I can provide them via e-mail or whatnot.

24         THE COURT:  Did the court reporter get case numbers

25    for each of those cases?

1          COURT REPORTER:  She did give case numbers, yes.

2          THE COURT:  And just to hammer the point home,

3    Ms. Sherman-Stoltz, is there any one of those particular cases

4    that you think makes sense for the Court and the government to

5    review that's sufficiently different in nature than the others

6    that were in your brief?  Because I haven't had a chance to

7    review all these either.

8          MS. SHERMAN-STOLTZ:  So I found the two cases of the

9    co-defendants after I had submitted our brief, the Schornak case

10   and the Herendeen case.  I wanted to be able to provide a

11   co-defendant style of case similar to what Mr. Calhoun and

12   Mr. Nalley have and then the similarities between, you know,

13   the -- obviously the offer, which we can't change, but the

14   sentences based on the conduct.

15       So as far as --

16         THE COURT:  And remind me.  So in both of these cases,

17   the misdemeanor plea offer was made?

18         MS. SHERMAN-STOLTZ:  Correct.  They were -- both

19   individuals were initially charged from the outset with the 1512

20   felony and then the four misdemeanors that Mr. Calhoun was.  So

21   all the same charges as Mr. Calhoun and Mr. Nalley.

22         THE COURT:  Okay.

23         MS. SHERMAN-STOLTZ:  And then they were both given the

24   1752 plea offer, and just a very slight variance with their

25   sentence, but I think that was because the Court found

1  Mr. Schornak's conduct was a little more egregious than

2  Mr. Herendeen's.

3           THE COURT:  That case number again?

4           MS. SHERMAN-STOLTZ:  Mr. Schornak was 1:21-cr-278, and

5  then Herendeen is 1:21-cr-278, yeah, same case number.

6      And then the one that I mentioned just kind of at the very

7  end as being an individual that had all the same charges as

8  Mr. Calhoun did minus the parading and picketing, that is

9  Stephen Ayres, and that was 1:21-cr-156.  And he's the one that

10 really his conduct, I would say, would be the most similarly

11 situated to Mr. Calhoun and Mr. Nalley where he was primarily

12 sentenced on his social media posts that he took while in the

13 Capitol building and after he left.  But he was also in the

14 Capitol building for approximately an hour and a half; whereas,

15 Mr. Nalley and Mr. Calhoun were in there for 27 minutes total.

16          THE COURT:  In the future, Ms. Sherman-Stoltz, even if

17 you find one late, you should supplement the record, even if

18 it's the morning of sentencing, so that the Court and the

19 government have a chance to review that.

20     So after I hear from Mr. Calhoun, I am going to take a very

21 brief break to just look at those cases, and the government will

22 have a similar opportunity.

23          MS. SHERMAN-STOLTZ:  Yes, Your Honor.  And I apologize

24 for not asking.  Some judges don't like that.  I should have

25 asked.

1          THE COURT:  No, I definitely want to be prepared.  So
2    I will take a look.

3      But why don't I go ahead and hear from Mr. Calhoun, if he
4    still wants to be heard, and then take a break.  All right?

5          MS. SHERMAN-STOLTZ:  Yes, Your Honor.

6          THE COURT:  Okay.  So, Mr. Calhoun, if you would like
7    to be heard, this is your opportunity to address the Court.

8          THE DEFENDANT:  Thank you, Your Honor.

9      First of all, Your Honor, I would like to apologize to the
10   Court for being in this position and really putting Your Honor
11   in this position of having to deal with an attorney.  I
12   certainly am not happy about being here, and I want the Court to
13   know I apologize for that.

14     Also, I want to thank the Court for your evenhanded
15   demeanor and the way these proceedings have been handled,
16   because I've seen or read about other courts handling these
17   January 6 cases, and not everybody, I don't think, has had that
18   benefit.  I mean, it's made it easier to be in a rather tough
19   situation, and I thank the Court for that.

20     I think as far as the -- I want to address for a minute the
21   testimony at trial, not rehash it, but, Your Honor, I believe
22   there's been a misunderstanding of -- I would never
23   intentionally try to mislead this Court or any other court.  I
24   never -- I have tried to plead guilty and accept responsibility
25   for the misdemeanor or trespassing-type offense since -- from

1    day 1 at my bond hearing, as my attorney said.  I even said in

2    the newspaper that, you know, I freely admit I probably

3    trespassed.

4        THE COURT:  Sorry to interrupt, but I do want to

5    engage with you a little bit there.

6        You might recall before the trial started I asked

7    Ms. Sherman-Stoltz, well, Mr. Calhoun has essentially admitted,

8    I think he said in the detention hearing, I think the press

9    comments had been brought to the Court's attention, I think

10   Ms. Sherman-Stoltz may have said it as well, that you're

11   prepared to plead to trespass and you're prepared to do that

12   tomorrow, or you said it yourself in one of the hearings, so I

13   had asked, are we going to stipulate to some of these things,

14   and the answer was no.

15       And then I was surprised on the stand when you started, you

16   know, flat out -- I don't think lie --

17       THE DEFENDANT:  Equivocating.

18       THE COURT:  I don't think anything you testified to,

19   let me be clear, would be perjurious in the sense that there's a

20   clear false statement.  But there was a lot of dancing around

21   and shading.

22       And at the time, Mr. Calhoun, my thought was, you know --

23   you turned to me at one point in your testimony and said, Your

24   Honor, I've read this opinion several times, and I just don't

25   get it.  And I understand that.  Reasonable legal minds differ

on whether that's a correct decision.  And as I've said, that will be decided on appeal.

But the impression I was left with listening to your testimony was perhaps you're concerned that by owning and being unequivocal about the trespass and the knowing violation of law, that somehow you thought you were trapping yourself into the 1512 conviction.

And that -- you were -- it's been a while since I've reviewed the transcript, but it wasn't until the end of the trial when you came back and kind of looked at me and said -- your complete statement was, "I just want to be clear, I probably did commit trespass."  That was not quite where you had been.  And maybe you weren't even realizing you were doing it.

But my impression was, he's having to walk this back because he's worried that this is going to sink him on the 1512 conviction.

And that's the impression I got, the way in which you were dancing around and not answering questions directly, like the shattered glass.  Maybe you had forgotten that.

THE DEFENDANT:  Your Honor, I thought it was built in and established on the trespass part.  I mean, I had been trying to make that happen.  But what -- see, I'm not frustrated.  I'm distraught.  I mean, my life's destroyed.  Right now, compared to Nalley, I mean, if 10's the maximum punishment and 1 is the minimum, I mean, he's at a 2 and I'm at a 9.5, if nothing

 1    changes, based on Your Honor's earlier remarks.  And the

 2    government has shown that it can swat a fly with a sledgehammer,

 3    but that's what's going on here.

 4        But I wasn't trying to walk back the -- I have never

 5    denied, I admitted before I was charged that I probably

 6    trespassed, and I've never changed that.  I mean, it's -- if I

 7    were guilty, if I thought I had done something seriously wrong,

 8    why would I have made a newspaper interview?  I'm not a kamikaze

 9    or whatever.  I mean, I wouldn't do that.

10            THE COURT:  Sometimes you appear to be.

11            THE DEFENDANT:  But see, what -- an older lawyer once

12    told me that when a court sentences a person to prison, they

13    sentence their entire family.  And it's true.  I mean, looking

14    out here at my family, the looks of concern on their face is

15    pretty concerning to me.

16        And I know that what I did was wrong going into the

17    Capitol.  I know it was.  I know that in my heart I did not

18    interfere with Congress, because I -- in Georgia, you're

19    entitled to a jury trial instruction that says mere presence at

20    the crime is not evidence of guilt in the case that it applies

21    to.

22            THE COURT:  And I don't want to get into --

23            THE DEFENDANT:  I understand.  But from my

24    perspective, I knew that if I went in to the Capitol, that I

25    couldn't be doing anything that wrong if I just behaved.  It may

have been wrong to go in.  But we have to look at what I believed at the time and I still believe today even more so based on what we've seen since January 6, that this election was interfered with.

Now, there is a federal district court judge, Judge Doughty in the District of Louisiana, who has entered an order restraining the Biden Administration from having contact with social media and the FBI, because it appeared to that judge that they did that in 2020 and they're doing it again now or wanting to.  And that -- we were called conspiracy theorists and crazies, but that's a federal district court judge's order.  He even used some of the same language I used, not because he's listening to me but because we were right about that.

The FBI interfered by saying to social media and threatening to hold their Section 230 status what they could allow to be said and not said by conservative -- it was suppression of conservative viewpoints.  And that single fact of that suppression more than anything else is why January 6 happened.

It's the safety valve theory of the First Amendment that Justice Oliver Wendell Holmes, I think, articulated first.  It's more utilitarian for society to allow people to express their political opinions, even angrily, even to the point of breaching the peace, because to suppress that speech increases the chance they're going to replace that political speech with political

violence.

And that eruption on January 6 was because, in large part, we had been suppressed from President Trump on down, and we had watched the summer of love and all these riots where nothing was happening to the people. They were getting bailed out by the vice president and all that stuff. But we saw those things happen.

So, I mean, that in its own way played a part. Well, surely, we can walk through the Capitol if they can lay siege to a federal courthouse without -- I mean, not much happened from that. And it's -- this double standard is going to be the end of this country if we don't get a handle on it and just do the next best -- the right thing in front of us.

I've learned, I'm not going to -- like I said, my life is pretty much destroyed at this point. I'm not --

THE COURT: I know you're -- I can understand why you would say that because of your legal career. The first time I saw you, you said, I'm done with this, I'm going to go play in my band. You're not whetted to that, but you are -- you're a bright, intelligent man, Mr. Calhoun, who can play an important role in this country in terms of rhetoric and impact on lying. You can go one of two ways after this.

It doesn't mean that your views can't be heard, and they should be heard, and you had every right to express your views publicly and protest. But what you did in terms of going in

1    that building on that day with the mayhem all around you was

2    clearly wrong.  And simply saying, yeah, I know I trespassed, I

3    trespassed, that's not really capturing the impact of what that

4    day meant when all of those members of Congress met there to

5    fulfill their constitutional duty.

6        You don't seem to -- can you perceive this other view of

7    how what you did, even though you didn't engage in violence, you

8    didn't engage in property damage, you didn't assault physically

9    or verbally any officers, that that was a level of trespass, if

10   that's what you think you did, that far exceeds the normal First

11   Amendment protest out on, you know, the mall?  Can you see that?

12       Because I'm just worried that you can't see that.

13           THE DEFENDANT:  Believe me, Your Honor, I see it.  But

14   let me just say, I have the highest respect for this Court, and

15   certainly, I don't want to anger the Court.  I'm trying to be

16   honest.  I'm trying to just lay it all out.

17           THE COURT:  No, I know you are.

18           THE DEFENDANT:  I want the Court to understand where

19   I -- the truth.  I don't think these lawyers over here care

20   about the truth.  And I don't think they're -- but they're not

21   paid to think.  They're doing what they're told to do.  Your

22   Honor is on an entirely different level.  You have to think

23   about these higher questions.

24           THE COURT:  I think they're trying to pursue justice.

25   And it doesn't mean I agree with every decision they make, but

1    I'm not going to accept that they're not seeking the truth here.

2    We can have different perspectives.

3        But that's beside the point.  Let's focus on you.

4        THE DEFENDANT:  That's a side issue.  What I meant, it

5    was serious, but it is also not every day, it's not every

6    lifetime that you are in a situation where one side of the

7    political spectrum has -- their supporters have basically said

8    they want to erase western civilization.  That's what they've

9    said.  And they've gone a long way toward accomplishing that.

10   And it's very drastic, and it's -- people just want hope at this

11   point.

12       THE COURT:  Mr. Calhoun, you understand, if bright,

13   educated, educated in the law people like you send the message

14   to all of America that it's okay to take the law in your own

15   hands and storm the Capitol -- I get it you think you were just

16   walking through, but you were with the violent mob.  And the

17   break between the time they ran over the police officers, which

18   I think from your perspective you had to see or come close to

19   seeing it, until the time you entered, there was no chance for

20   those officers to regain control.

21       And for you to say, yeah, I just thought maybe I could

22   enter, that didn't ring true to the Court.  And you have to

23   appreciate that someone in your shoes, as an officer of the

24   court, whether you've got your Bar license or not, you have a

25   duty to demonstrate the right way to fight what you view as

1    unfairness in our system.  And it's not attacking Congress

2    physically.  It's using legal mechanisms.  And if our

3    institutions fall, if our courts fall, then what?  And you

4    contributed to that mayhem that day.

5         THE DEFENDANT:  But did I?  Did I actually commit a

6    felony?  I was in the Capitol for 20 minutes.  Half of that time

7    was spent just trying to get out.

8         THE COURT:  That's a fair debate, and I get -- when I

9    say frustration, I don't mean to comment on anything you've done

10   here in court.  I don't mean that.  I get how someone in your

11   shoes feels so terribly wronged by the felony charge that you

12   didn't see coming.  But --

13        THE DEFENDANT:  I had no idea.  The thing about that

14   is this is the first time 1512(c)(2) has been used --

15        THE COURT:  And it's the first time the Capitol of the

16   United States has been stormed by a violent, violent mob, maybe

17   not you, but the mob was violent, and people were hurt, and it

18   was completely unacceptable conduct, and it attacked a key -- it

19   attacked a branch of the U.S. government.

20        THE DEFENDANT:  The problem here is there's not any

21   criminal statute that fits this.  And they have -- this is in

22   the nature of an ex post facto law because --

23        THE COURT:  It's been on the books.

24        THE DEFENDANT:  It's not an ex post facto law, but

25   there is a statute that was already on the books that had never

```
 1    before been applied under this novel criminal theory of

 2    liability.

 3              THE COURT:  But that happens every time there's a

 4    novel crime.  And you know that, Mr. Calhoun.  You're a lawyer.

 5    You know that.  You know that the prosecutor's job is often to

 6    see, what do we have to charge here.

 7              THE DEFENDANT:  But, Your Honor, that is where it

 8    becomes in the nature of an ex post facto law, because we were

 9    retroactively --

10              THE COURT:  Well, file that motion.

11              THE DEFENDANT:  We didn't know.  Who knew?  We didn't

12    know.

13              THE COURT:  But that's not a defense.  You know that.

14              THE DEFENDANT:  But it had never been done before.

15    And I respect the Court's order.

16              THE COURT:  I fear you're missing my overarching point

17    here, which is, Mr. Calhoun, you are a person who could make a

18    difference in the debate in this country, and it's a divided

19    country, and we need bright minds to argue positions the right

20    way, not the wrong way.  And I'm concerned that you're going to

21    spin out in a direction that's not helpful for our country.

22              THE DEFENDANT:  May I address that?

23              THE COURT:  Yes.

24              THE DEFENDANT:  Because I don't want to offend the

25    Court.  But getting back to -- I mean, people want hope that
```

their lives are going to return to normal because of this

divide, because of the things we're seeing.  And if we were

thinking clearly at the administration, instead of trying to

crush dissent, which is what is happening, we would moderate.

I mean, if someone did something -- if somebody broke

things and attacked people, that's one thing.  But if you were

just there -- I mean, there's evidence coming out now that this

was somehow prompted to happen.  I mean, in other words --

THE COURT:  You're not helping yourself with that.

All right?  Let's not go down that track, because you --

THE DEFENDANT:  The track I want to be on is the

people want hope.  If there's some moderation shown for somebody

who walked through the Capitol -- I mean, the comparability

between me and Nalley is -- what they want and what he got, they

could have done the same thing, I guess, in his case.

Certainly, he had social media posts.

I'm not trying to disparage him.  But I'm just saying that

I've been selected out for this particularly tough punishment

because of what I wrote after the fact.  Ms. Martin said, we're

going on his mere presence and what he said after the fact.

That's what she said in the transcript.  And that means I'm

being punished --

THE COURT:  You mean Ms. Arco?

THE DEFENDANT:  No, Ms. Martin, on the transcript.

She said we're going solely on his mere presence and what -- his

posts after the fact.  That means I'm being punished

substantially more than Nalley because of what I posted, which

is undoubtedly protected political speech.

Now, it may not have been the best idea to say it.  Just

because you can say something, you might not --

THE COURT:  Don't keep persisting with you're being

punished because of your speech.  I mean, there is a sufficiency

of evidence argument -- there's a strength of the evidence

argument that they agree because you had stronger evidence they

brought the case.  But it's what you did that day.  We can't fix

what Nalley got relative to you now.

THE DEFENDANT:  Could we not say -- it's not just

Nalley.  It's hundreds, as the Court noted, maybe thousands of

people who were similarly situated who have not been subjected

to this, this way.  They've been given misdemeanors.  And we did

the exact same thing.

So -- anyway, I think the Court understands.  I just want

to point out that the experience in jail was an eye opener.  I

mean, it got my attention.  I mean, I --

THE COURT:  Well, clearly, the way you've behaved on

supervision has been outstanding, truly outstanding.  You were

under -- you were on home detention with electronic bracelet,

curfew, tight curfew, and not a blip in terms of violation, not

a hint of that.  And then it was relaxed, and still nothing.

You've conducted yourself exactly how a federal defendant

1  should, and the Court is crediting that.

2          THE DEFENDANT:  And the Court will remember, I even

3  had to get permission to go to my office, which was no longer

4  ten minutes away but an hour and a half away.  I mean, it's hard

5  to practice law like that.

6      And I did not misrepresent about my clients, as was said in

7  the sentencing memo.  I had about 42 clients.  Now it's fewer

8  clients than that.  Normally, I would have about 150.  But it's

9  been impossible, you know, to flourish -- I mean, there was

10  initially a little bump after this when I got out of jail,

11  believe it or not, but after that, it's been downhill.  And the

12  closer we've gotten to this, without knowing, having any

13  certainty where it was going to turn, you cannot take retainers

14  or fees from clients when you might not be able to -- next week

15  you might be disbarred or in jail.

16          THE COURT:  You understand you did not help yourself

17  by not completing the releases that Probation wanted from you.

18          THE DEFENDANT:  Most of those releases -- I didn't do

19  any military service.  I don't have any mental health

20  background.

21      The financial part, we contacted Probation because we were

22  confused as to exactly what they wanted, and they said well,

23  just give us the statement, and we did.

24      Now, on the medical stuff, I mean, I'll be glad to sign

25  that now.  The thing is, I have been -- I have been just --  I

1    am in a distraught state.  I have been unable to look at this

2    stuff.  I mean, I spent the first year and a half, I didn't even

3    look at any of this.

4         And then I finally worked up to where I could kind of -- I

5    had to do something because I obviously was going to trial, and

6    I got kind of -- helped some with my attorney.  But I haven't

7    been even reading her e-mails and all that.  I mean, It's just I

8    can't look at it.

9             THE COURT:  Mr. Calhoun, don't take this question the

10   wrong way, but I am going to ask you, given the highly -- this

11   is not what's driving the Court's sentence.  All right?  I want

12   to be clear about that.  In deciding where to punish you, I'm

13   not looking at the rhetoric that you wrote.  But in reading some

14   of these highly offensive, highly inappropriate comments, in the

15   back of my mind, I have your comments about I just try to spin

16   people up on the Internet.

17        You know, that --

18             THE DEFENDANT:  So --

19             THE COURT:  Let me finish.  No one here thinks you

20   have a serious mental health issue, but I do wonder whether,

21   whether it's alcohol or just getting so spun up in a way that is

22   allowing you to react in ways that are not good for you --

23   forget this prosecution.  You've got a lot of people who seem to

24   really not like you based on the Internet stuff alone.  And I'm

25   wondering whether on supervision, which you will most certainly

1  be, whether any sort of assessment for, you know, anxiety or

2  alcohol or anything is appropriate.

3          THE DEFENDANT:  Your Honor, I --

4          THE COURT:  I mean, if you're not open and receptive

5  to it, then I don't even want to impose it as a condition, but I

6  think all of us can benefit from treatment at one time or

7  another, and it's not because I think you have some major mental

8  health issue.  It's just when I look at these statements and I

9  look at the -- and hear the reasonable guy talking to me now,

10  there's a big disconnect.

11          THE DEFENDANT:  Some of these statements, they have

12  been changed.  Some of them have been.  I don't want to get into

13  the specifics unless the Court wants me to.  But I just --

14          THE COURT:  Do you see the disconnect between us

15  having a rational conversation and what -- the perception one

16  might have of you online?

17          THE DEFENDANT:  Well, the things -- of course, I'm

18  responding to a lot of this.

19          THE COURT:  But a lot of people don't take the bait.

20          THE DEFENDANT:  And the -- but they also -- well, if

21  I'm responding -- but Your Honor, the flip side --

22          THE COURT:  There are a lot of crazy people on the

23  Internet.  If you spend your life reading all that, you're going

24  to have a lot to respond to.

25          THE DEFENDANT:  Well, I've learned that.  But I do

1    want to say, I've got a lot of people that do like me very much

2    after this.  It's sort of like a replacement in a sense.  I want

3    to just let the Court know, I have changed.  I mean, when I was

4    in detention in a 5-by-7 cubicle and pretty much in solitary

5    confinement 23 hours a day with nothing to do but think, I

6    started reading the Bible, and I read it from cover to cover.

7    And then I went back and reread five or six books of the Bible,

8    five or six times for each book.  And it just -- I just -- I

9    became a born-again Christian out of that.

10        I mean, it changed my life.  I mean, that -- and I would

11    not be married to my beautiful wife now if I had -- this had not

12    happened.  I mean, we had been married years before.  We got

13    divorced.  But because of this, we ended up reconnecting.  And

14    so we got remarried.

15        I mean, all of that has put me in a different world from

16    what I was in.  I just don't want to be kicked down now that I'm

17    back up after this.  Even if I don't get -- regardless of what

18    happens with the Bar, the Court may remember, there was a game

19    called The Game of Life.  It was a board game back years ago.

20    And it had one square you landed on it said you had to move to

21    the woods and become a philosopher.

22        Well, that's kind of what I'm going to do one way or the

23    other.  I'm not -- I don't have any interest in the Internet.  I

24    don't have any -- I'd like to see this country get its act

25    together, but I don't think that I'm able to really change it.

1    I do think that -- I mean, I do think if I -- I hope the

2    Court doesn't sentence me to be reincarcerated.  I mean, that at

3    some level may amplify my voice 10,000 fold.

4    But other than that, I don't see any benefit to it,

5    because, I mean, I have no plans to come back before this Court

6    or any other court for doing anything.  And I made it 60

7    years -- well, 58 years before this or 57 years without any

8    major problems, and I'm 60 years old, and I need eye surgery on

9    my right eye that's scheduled for August 14th to have cataracts

10   removed.  I have 20/400 vision in my right eye.

11   This is relevant -- I forgot to mention this about the

12   entrance into the Capitol.  I have very little peripheral vision

13   on my right side, and I was walking in with a camera in front of

14   my face.  So I didn't see that.  I honestly did not see those

15   windows broken.  The other window was not really at an angle to

16   see it.  I just -- I didn't see that.

17   And I know that the alarm was going off and all that.

18   Again, I have not denied that.  Just like the smoke or the --

19   the smoke the Court talks about, thought I was evading that, it

20   was never -- there was tear gas everywhere.  It was there.  I

21   did not personally get tear-gassed.  I got no gas in my eyes or

22   on my clothes.  And I think that's -- I wasn't trying to

23   misrepresent that, because it was not -- I mean, why would I?

24   That wasn't really -- I wouldn't misrepresent anyway, but why

25   would I misrepresent that?

1        They're traps that are here.  I just feel like -- it
2    troubles me that the Court found that.  It was not my intention
3    to misrepresent.  The semantics about the police lines, I've
4    consistently said there was the line at the --
5            THE COURT:  I know.  But the "we" versus "a" verus --
6    maybe, Mr. Calhoun, what you were doing was just bound and
7    determined to not give an inch and kind of play cat and mouse
8    with the government.  But in doing that, you presented in a way,
9    if that's what you were doing, that you were being -- you were
10   shading things and you were being a little too cute in a way
11   that made the Court feel like you weren't being fully
12   transparent.
13       And that's something to think about when you're engaging
14   with people on -- in a conversation.
15           THE DEFENDANT:  I think, Your Honor, that I had said
16   the two police lines that we went through -- I mean, the Court
17   noted I was always in the back of it.  And that was inside the
18   Capitol.  And there was no line at the bottom of the steps when
19   I went in.  I described how coming up to that there were --
20   there was the bike fence there and police, and you couldn't see
21   everything.  And I got closer to it, and all of a sudden, there
22   was nobody there.  There was no fence there either, and there
23   were people rushing up the steps.  I testified to that at trial.
24       So I don't know.  I feel like it's just a misunderstanding
25   on that, because I never did -- as my attorney said, I've never

1    tried to hide any of this.  I haven't.

2        I want to ask the Court to, you know -- please don't send

3    me off, and I just -- I have learned my lesson, I guess, is the

4    best way to put it, and I hope -- I don't want the Court to be,

5    by anything I've said -- I'm not trying to argue with the Court.

6    As I said, I respect the Court's order, and --

7        THE COURT:  As you stand here now, do you agree that

8    what happened on January 6 was completely unacceptable, even

9    your admitted trespass, not just wrong but really damaging to

10   the institutions of our government?

11       When someone like you, who has taken an oath to defend the

12   Constitution, decides to go in with a violent crowd who you know

13   is engaged in violence -- you saw blood on people going in.

14   This was -- you have to own that, Mr. Calhoun.

15       THE DEFENDANT:  I saw one person that had a mark --

16       THE COURT:  But you saw toe-to-toe with officers.

17       THE DEFENDANT:  Yeah.

18       THE COURT:  You saw toe-to-toe with officers.  So

19   whether blood was everywhere or not, it was a violent assault on

20   the Capitol.

21       THE DEFENDANT:  Yes.

22       THE COURT:  And walking through there was wrong.  Even

23   if you didn't assault, that was -- your presence there was an

24   assault on the institution.  It was.

25       Do you agree with that?  Can you see that now?  Or do you

1    still feel righteous in what you did?

2              THE DEFENDANT:  I agree with the Court.  I just -- I

3    hate it.  I hate that all this has happened.

4              THE COURT:  And do you see that there are other ways

5    to exercise your First Amendment rights that would have been

6    more appropriate and productive than what you chose to do?

7              THE DEFENDANT:  Yes, Your Honor.  I mean, I'm sorry

8    that this happened.  I shouldn't have done it.  And I don't -- I

9    don't know.  If I could take back going up those steps, I would.

10             THE COURT:  Well, I'm sure you would because of where

11   you stand now, but I want -- it's been hard to kind of see

12   what -- where you stand, given the --

13             THE DEFENDANT:  Some of that --

14             THE COURT:  -- testimony.  Go ahead.

15             THE DEFENDANT:  I'll just -- I'm through, Your Honor.

16   Thank you.

17             THE COURT:  All right.  Thank you, Mr. Calhoun.

18        Ms. Sherman-Stoltz, I just realized that we were going

19   to -- I know it's getting late.  I know it's Friday afternoon.

20   I wish it weren't Friday.  I know we've got court staff that

21   needs to go home.  And I still need to look at these cases you

22   cited.

23        But you had mentioned that some of the family members had

24   things to say, and I never heard what those were.  Is that

25   something you want to put on the record?

1         And I'll just say, look, I'm not -- I know it's difficult

2    to travel from Georgia, and I'm not asking folks to stay, but

3    I'm just -- I'm offering if the defense needs time to do that,

4    given the late hour, if you want to come back on Monday, fine,

5    but I know that there are a lot of people here from far away,

6    and I'm prepared to stay as late as it takes to complete this.

7         But I just want to give you that opportunity, and the

8    government will have an opportunity when I look at these cases

9    to do the same.  I don't want you to think that by agreeing to

10   stay that somehow that's going to dramatically change the

11   sentence in this case.

12        MS. SHERMAN-STOLTZ:  I think that there are a couple

13   that would like to briefly, very briefly say something to the

14   Court.

15        THE COURT:  All right, very briefly.  Is this

16   something you can't do, Ms. Sherman-Stoltz?

17        MS. SHERMAN-STOLTZ:  I would be happy to.  I can read

18   almost all of the handwriting, except for there's one that I

19   can't.

20        THE COURT:  Let's just very briefly have them come up

21   and say what they wanted to say on the record very briefly.

22        MR. ALLEN MEADORS:  Good afternoon, Judge.  My name is

23   Allen Meadors.  My grandmother and one of McCall's grandmothers

24   were sisters.  That's how I know McCall.  And I'm a lawyer in

25   Atlanta.  And I talk to McCall quite a bit, actually.  I have

not seen McCall in a number of years on anything like a regular
basis, not since one of my daughters got married about nine
years ago.

But as lawyers, McCall and I have talked about cases.  I
involved him in a case a number of years ago, and he came to
Atlanta to Fulton County Superior Court.  And through it all,
he's been an exemplary, exemplary lawyer.

And the Court has been asking about McCall's reaction to
the trial.  And all that I can say on that is it is hard for a
lawyer, under whatever circumstances he finds himself, and
addressing this directly to you as a lawyer, to be contrite.
And that's what I find, that McCall was unable, for whatever
reason, to be contrite.  His ego got in the way, you know, of
what he needed to do, what he knew he needed to do but what he
did not do.

And he told me that he tried.  He wanted to tender a guilty
plea to a misdemeanor, but that opportunity did not present
itself, and so it did not happen.

But then his defense mechanism set in as a lawyer.  And his
practice, from what I understand from McCall, is primarily
criminal defense in state courts, in Sumter County.  So that set
in; that defense mechanism set in.  So that was the nature of
his defense.

I didn't hear his testimony, I just came in yesterday, but
in court several months ago, whenever it was.  But that's what

1    he did.  I'm sure the Court is correct, that he tried to hedge

2    or shade --

3                THE COURT:  Be a little cute, yeah.

4                MR. ALLEN MEADORS:  -- his testimony.  But, Your

5    Honor, you have to -- the prosecution did the same thing today,

6    trying to hedge about what Nalley's involvement in the case was.

7                THE COURT:  I agree.

8                MR. ALLEN MEADORS:  Lawyers try to hedge what they're

9    saying.

10        Unfortunately, when McCall was hedging his testimony, he

11   was under oath and on the stand.  But nonetheless, that's the

12   pathology that McCall was -- that was affecting McCall, that

13   defense mechanism plus a bit of ego.

14        And I tell him one thing.  I graduated from UGA Law School,

15   University of Georgia Law School.  You cannot help but be

16   egotistical.  I don't know if you know anything about the school

17   or not, but they cannot help but be egotistical.

18        But for a little bit of background about McCall, his

19   father, who is now deceased, was a physician in south Georgia

20   who was very well thought of, and a local magnate in one of

21   small towns down there recruited him to be the physician for

22   that small town.  South Georgia has very few physicians.

23        And so his father was -- this was well before McCall was

24   born, 1968 or so, was off on a Navy ship somewhere close to

25   Vietnam.  And Carl Vinson, who was a respected Georgia

1    legislator, who was in the Georgia legislature for years,

2    managed to get him off of that ship and get him to Buena Vista,

3    Georgia, somehow or another.  That was almost before my time,

4    too.

5        But, you know, McCall has had a great career in Americus,

6    but it looks like we're more at a -- we're more at a funeral

7    today for that career with a felony conviction, and that's what

8    drove his declination to not plead to a felony, because the

9    Georgia Bar, from what I hear, does not look kindly on felonies.

10       That's all of your time I will take up.  Thank you, Judge.

11           THE COURT:  Thank you.  I appreciate that.

12           MS. TINA CALHOUN:  Thank you, Your Honor, for letting

13   us speak.

14           THE COURT:  Of course.

15           MS. TINA CALHOUN:  I'm Tina.  I'm his wife.  And as he

16   said, I have a little different perspective.  I was an ex-wife

17   for 23 years.  So I knew the man he was before, and I will say

18   you are absolutely right, big mouth, big ego.  But it was always

19   used for what he thought he needed to use it for.  He needed

20   that.  It was kind of like an athlete, had to be so confident in

21   themselves.  But it was a detriment in other areas, I can tell

22   you, because it was 23 years.

23       When he got out of the jail, I think I was one of the first

24   people that he called, and I was shocked.  I absolutely

25   recognized his voice on the phone, but it was a different man

1   that called me.  For McCall to reach out and ask for help is a

2   changed man.  For him to be able to admit that yeah, I went too

3   far or I did something maybe I shouldn't have done without there

4   being a "but, but, but" behind it is a changed man.

5        What I can tell you is he believes so strongly in this

6   profession, in this system, in the Constitution, and in this

7   nation that he has such a passion it's hard for him to control

8   at times.  But it has served him well in court when he has

9   defended his clients.

10       The day I fell in love with him was the day I was working

11  for him, and I was never in this before, and he was going to be

12  representing a child molester.  He was working with the Indigent

13  Defense Panel at the time.  And I asked him specifically, how

14  can you do that?  And he said, I can't get a guilty man off, but

15  what I can do is represent his rights; if we take away the

16  rights from those who commit the most heinous crimes, we all

17  lose them.  And I was really thrown back by that.

18       And he is so devastated that he has let his passion and his

19  situation cost him the ability to continue to do that that I

20  wish you could understand the punishment that that is to him.

21       And I do want to say the same thing he did.  I do

22  appreciate the way that you have conducted this court and

23  allowed us to speak the way that we feel.  And I thank you for

24  that.

25            THE COURT:  Thank you for your comments.

1    All right, anything else, Ms. Sherman-Stoltz?

2        MS. ANNE CALHOUN DAVIS:  Thank you, Your Honor, for

3    letting me say something before the Court.  My name is Anne

4    Calhoun Davis.  I'm McCall's sister.  I'm his younger sister,

5    but the oldest of the sisters.

6        We've always been very close.  I know McCall to be a person

7    of great character.  He has always been known for that.  He is

8    also known for being outspoken and, you know, just very to the

9    point, speaks his mind, that kind of thing.  I think it's pretty

10   clear what kind of person he is, just hearing him talk.

11       I would like to say that when he graduated from law school,

12   he came back to Americus, and I was living there at the time and

13   still live there.  I had moved away, you know -- at some point

14   during his time in Americus, I didn't live there.  But when he

15   got out of law school, he started working as a law clerk for

16   Judge Blanks in the superior court, and the following year, he

17   decided to go into practice for himself.  And so I was a college

18   student then, but I went in and helped him set up his law

19   office, and then I went on about my business, and he hired a

20   different person to work for him, a secretary that could be

21   there full-time.

22       And he did really well in his practice the first year, like

23   really well, so well that he was able to keep moving forward

24   quickly, worked with my uncle Lawton, who was a lawyer and the

25   magistrate judge for a couple of terms in Sumter County during

his lifetime.  He worked with -- not with him, but they shared my granddaddy's law office there in town.

That was really significant for his career, along with the fact that my father knew so many people as a physician.  My grandfather, Lawton LeSeur, Sr., was a civil rights attorney in the '60s.  My family has spent their entire lives as educated people trying to help others.

McCall went on to have his own larger law practice along with Howard McKelvey and Oliver Oxford and was very successful in that.  I worked for him off and on while I was in school through all of this in these different offices.  He was always very well respected by the Court, good friends with everyone on top of that because we know everyone in the community -- not everyone, but a large number of people.

He's really sought after as an attorney in Sumter County and surrounding counties.  He has so many people wanting to hire him right now that there are literally people waiting to find out the outcome of his trial before they hire another lawyer. There are men -- there are three men in Lee County Jail right now who are willing to sit in jail and wait to hear the outcome of this before they hire another lawyer.

Now, you might ask yourself, why would somebody do that? I'll tell you why.  Because he is going to make sure that those people get a fair day in court.  He is not going to just throw them to the wayside.  He's going to stand up for them, and he's

going to make sure that justice is done.  And if they've done
something wrong and they are actually guilty and get a sentence,
he's going to make sure that they're not trampled on.

He's not in business to put criminals back out on the
street, but he is in business to make sure that innocent people
don't go to jail, and he is in business to make sure that
criminals have their rights represented.

He's fair about it to everyone.  He treats everyone with
the same respect.  When people who are poor and uneducated come
into his office, they get the same courtesy and the same service
as, you know, an educated, very wealthy person walking into his
office.

When he goes out to the jail -- this is a known fact in
Americus, Georgia.  When he goes out to the jail to see his
clients, as soon as one of the inmates see him come in,
typically, that person will turn around and yell "Calhoun's
here," and they all come running for his help.  These are people
who are waiting on him because they know they can trust him.
They know he's going to do the right thing.  They know he's not
going to let them get trampled on.  And I think that's worth a
lot.

He has not been -- I know for a fact he has not been able
to continue in his law practice since this trial began.  And
he's -- he has -- he doesn't have the heart to tell someone that
he can't help them, but he did have the courage to tell these

1    clients why he couldn't let them retain him.  He was truthful

2    with them about it, told them what happened, and, you know, they

3    know that he's had to go through this trial.

4        It's been very hard on everybody.  It's been hard on our

5    family.  It's been hard on his clients, people trying to finish

6    adoptions, all kinds of things.  There's even a guy down in --

7    over in Coastal Prison in Savannah that called for several

8    months over this summer.  He and his girlfriend called

9    constantly, constantly wanting to hire him.  And he said, you

10   can't hire me, I can't take your case.  These people are just

11   desperate.  He has people in Atlanta calling him.

12          THE COURT:  You understand this is sentencing.  So he

13   has a conviction.  This is not --

14          MS. ANNE CALHOUN DAVIS:  Yes, ma'am.  I just want you

15   to know his character.

16          THE COURT:  No, I know.  I just wasn't sure whether

17   you appreciated that regardless of what I do here today,

18   regardless of what he is sentenced to, the Georgia Bar is going

19   to do what the Georgia Bar is going to do based on the

20   conviction, the trial that already occurred.

21       But I get your point about his desire to help others no

22   matter where they are in society, and I definitely --

23          MS. ANNE CALHOUN DAVIS:  Well, I mainly --

24          THE COURT:  -- credit that.

25          MS. ANNE CALHOUN DAVIS:  I didn't mean to interrupt

you.  My main point with it was just, like you said, to state
what kind of character he had and for you to know that he's just
a very good person.

THE COURT:  Thank you.  I appreciate it.

MS. ANNE CALHOUN DAVIS:  Thank you.

THE COURT:  All right.  Before I take just a
very brief -- oh, is there someone else?  Very brief, like less
than a minute.

MS. MARY CALHOUN:  Your Honor, my name is Mary
Calhoun, and as you know, my brother lived with me after he left
federal prison.

And you asked a question that you said -- well, your
thought was you wondered what he would do after the fact,
assuming that he wasn't incarcerated.  And I know, I know what
he'll be doing, because I know what he was doing when he was
living with me.  He will be kind.  He will be a very caring
person, not easily upset about anything.  He never raises his
voice.  I know he'll be in his shop working and creating things
that he loves to share with his friends and family.  And I know
that he'll be loving on his dog, Leon.

The picture that everyone has of him is not who he is.  He
was very, I would say, distraught about what all was going on
with our government.  We -- so many people are and have been.

But after he came back from prison, and I had his dog Leon,
we kept him, when McCall came back, he was a different person.

1    He wasn't upset anymore.  He was just very soft-spoken, not

2    nervous or angry or anything.  He was just, you know, asking me

3    questions about the Lord.  And because I love Jesus, I really

4    listened to that, because I wanted -- I had been praying that he

5    would find a connection with God.

6        And what I saw was real.  And I just want you to know that

7    he is a good person.  He's very kind.  And I know that when he

8    says he's through with all of this and that, you know, he just

9    wants to go off to the woods and be a philosopher, I believe

10    that.  I believe that.

11            THE COURT:  Thank you.  I appreciate it.

12            MS. MARY CALHOUN:  Thank you.

13            THE COURT:  Just briefly before I take a brief break,

14    Ms. Sherman-Stoltz, you said that the finances have gone down.

15    So to what?  What is Mr. Calhoun's current financial situation

16    on a month-to-month basis?

17            MS. SHERMAN-STOLTZ:  His income is -- his wife's

18    income is the only income that is coming into their home.

19            THE COURT:  All right.  Understood.

20            MS. SHERMAN-STOLTZ:  And then checking and savings is

21    depleted because he's been living off of that.  They live

22    separately.  She's in Alabama.  As the Court probably saw from

23    our filings, he's had to remain in Georgia.  So they haven't

24    combined households.

25            THE COURT:  All right.  Understood.

1    And what's the government's position on a fine?

2         MS. MARTIN:  Your Honor, we have not requested a fine.

3    I understand that's Probation's request, but --

4         THE COURT:  But the government has a position.  Should

5    the Court impose a fine or not?

6         MS. MARTIN:  Your Honor, if he has an ability to pay,

7    then we would agree with Probation's recommendation.

8         THE COURT:  But given what they've said about his

9    current financial state -- I don't know if Probation changes its

10   opinion, but are you simply deferring to Probation?

11        MS. MARTIN:  We will defer to Probation on that, Your

12   Honor.

13        THE COURT:  Ms. Gavito, in light of what has been said

14   here, what is the Probation Office's position?

15        PROBATION OFFICER:  Based on the defense's position

16   that his finances have decreased, Your Honor, we do not

17   recommend a fine, and we amend our recommendation.

18        THE COURT:  And does the government stand by

19   Probation's recommendation?

20        MS. MARTIN:  Your Honor, I would just seek

21   clarification.  I understand he doesn't have any income coming

22   in, but has there been a representation made about how much in

23   his accounts that he has?  Because it seemed like there was a

24   fairly substantial --

25        THE COURT:  That's in the presentence report.  You've

1    got his summary of his assets that you can take a look at.

2              MS. MARTIN:  I would just ask Probation if their

3    recommendation -- their change to their recommendation stands

4    even if those account balances are the same.

5              THE COURT:  Presumably, it does.  She wrote the

6    report.

7              MR. BRUNWIN:  Just looking, Your Honor, the report

8    indicates a recommended sentence with a fine of $10,000.

9              THE COURT:  Probation -- the government can take a

10   different position.  That's fine.  But Probation knows what

11   Probation put in the report, and Probation is saying no fine.

12       Is that correct, Ms. Gavito?

13             PROBATION OFFICER:  That's correct, Your Honor, based

14   on the representations made just now.  According to them, the

15   spousal salary is $3,100.

16             THE COURT:  The government is asking why not the net

17   worth.  And your position is, in situations like this, you don't

18   recommend a fine when there's not positive income coming in on a

19   monthly basis; is that fair to say?

20             PROBATION OFFICER:  That is fair to say, Your Honor.

21             THE COURT:  So does the government have a different

22   position?

23             MS. MARTIN:  No, Your Honor.  I just wanted to seek

24   clarification --

25             THE COURT:  All right.  So I'm going to literally take

1    a five-minute break to go out and look at these cases, and then

2    I'm going to come back in and give my reasons for sentence.

3          (Recess taken from 4:59 p.m. to 5:07 p.m.)

4          COURTROOM DEPUTY:  Your Honor, recalling Criminal Case

5    21-116-1, United States of America versus William Calhoun, Jr.

6          Mr. Calhoun is present and in the courtroom, Your Honor.

7          THE COURT:  All right.  Just briefly, I do want to

8    note for the record that I did have a chance to review these

9    cases.

10         The Schornak, 21-cr-278, this is the Howell case in which

11    she imposed probation with thirty days' intermittent

12    confinement.  In that case, that defendant cooperated.  Judge

13    Howell said, "I do find Mr. Schornak is in a more troublesome

14    category than some rioters who only briefly wandered into the

15    building without doing anything more, given both his planning

16    for the trip here and the theft of the flag and then using that

17    flag to raise it on scaffolding to continue to incite an already

18    energized crowd of rioters."

19         So that defendant, I think, is different than Mr. Calhoun

20    in several ways.

21         In the Herendeen case, 21-cr-278, again, this is another

22    Howell case -- oh, sorry.  This is the second defendant in the

23    same case.  In that case, Judge Howell imposed probation with 14

24    days' intermittent confinement.  That defendant brought the

25    goggles, wore the jacket and the tactical vest.  He brought to

1    D.C. the bear spray.  It's unclear whether he brought it to the

2    Capitol, but having brought it there, he was prepared for

3    violence.

4        There, the defendant's conduct of not physically engaging

5    in violence, stealing, or destroying items inside the Capitol

6    building put him in a less troublesome category than some other

7    rioters that day.  But the Court does find that coming equipped

8    with -- preplanning with gear to engage in violence confounded

9    by the self-serving video taken while he was inside the Capitol

10   referencing the basement with a clear allusion to the likely

11   hiding places of members of Congress is one that requires

12   significant penalty in that case.

13       There is no transcript of the Ayres case, but in that case,

14   Judge Bates gave probation.

15       Is there anything the government would like to put on the

16   record or remarks that you would like to add to these cases?

17           MS. MARTIN:  Your Honor, we haven't been able to,

18   obviously, in depth go through these cases.  To the extent that

19   the Court is going to consider them comparator cases, which I

20   think that is appropriate, just given the representations from

21   defense, we would just represent that although these cases were

22   originally charged with 1512 and pled down to misdemeanors,

23   those pleas happened very early on in the scope of January 6

24   cases.  And while on the margins maybe we wouldn't have pled

25   those out as our understanding of 1512 developed, our

1    understanding of 1512 has developed as these cases have

2    progressed.

3            THE COURT:  This one was early as well, though.

4            MS. MARTIN:  Your Honor, I understand that, but the

5    cases continued to be pending for two and a half years.  And as

6    the cases continued to be pending, our -- Mr. Calhoun was

7    always --

8            THE COURT:  Your charging thresholds are changing over

9    time?  That's concerning.

10           MS. MARTIN:  Our understanding of 1512 has changed,

11   and I think that certainly would affect some of our charging

12   decisions, and I don't think it would be inappropriate to say

13   that there are cases where maybe we gave a certain plea that,

14   looking back now, we would have been comfortable taking to trial

15   on a 1512.

16           THE COURT:  Based on what?  The Court of Appeals

17   decisions or other judges' decisions or what?

18           MS. MARTIN:  Based on our own understanding of 1512

19   and the courts' understanding of 1512.  It's no secret that the

20   1512 charge was not something that was previously litigated to

21   the extent it's been litigated now and certainly not in this

22   context, because it's unprecedented.

23       That being said, the cases that were pled out, even had the

24   government decided not to plead Mr. Nalley's case down to a

25   misdemeanor, the -- if we had not given that plea and he had

1    been charged with a 1512, that would just weigh in favor of

2    giving Mr. Nalley a higher sentence, not giving Mr. Calhoun a

3    lower one.

4        Mr. Calhoun was not provided the misdemeanor plea because

5    the evidence was so strong in his case.  And that was always

6    going to be the case, regardless of our understanding of 1512.

7        THE COURT:  I'm just curious, to make sure I

8    understand your point about the understanding of 1512(c)(2)

9    changing over time, you don't represent here that you didn't

10   from the outset know that you can prove intent through

11   circumstantial evidence?

12       MS. MARTIN:  I'm not saying that our -- what we

13   thought we could charge it for has changed.  What I'm saying is

14   how we could prove the charge has developed over time.  And I

15   think that was even addressed by Judge McFadden in a certain --

16   in an opinion addressing a vindictive prosecution motion that he

17   denied.  He just discussed how the government and the courts'

18   understanding of the 1512 has changed over time.

19       And I think the government's decisions that were made very

20   early on in the January 6 prosecutions, had we had the

21   understanding of 1512 we do now, we might not have offered those

22   plea agreements.  But the fact that they were offered, even

23   though the Court should appropriately consider conduct in its

24   calculation of Mr. Calhoun's sentence in this case, the use of

25   those cases should weigh in favor of giving those defendants a

1    higher sentence, not giving Mr. Calhoun a lower sentence.

2                THE COURT:  Okay.  All right.

3                MS. MARTIN:  And I apologize.  I might not be saying

4    that very artfully, but --

5                THE COURT:  It's fine.  I don't think they change the

6    landscape dramatically.

7           But, Ms. Sherman-Stoltz, anything more?

8                MS. SHERMAN-STOLTZ:  No, Your Honor.

9                THE COURT:  Okay.  Any reason why the Court should not

10   give its reasons for sentence now?  No?  All right.

11          So I will give my reasons, and then I will announce the

12   formal sentence.  But before I actually impose sentence, I will

13   give each side a chance to raise any objections.

14          In the interest of time, and we're now nearly 5:15, I'm not

15   going to spend a lot of time on the nature of the offense.

16   We're all familiar with the unprecedented nature of this attack

17   on the Capitol of which Mr. Calhoun and Mr. Nalley were a part,

18   although neither of those two men themselves engaged in any

19   violence.

20          And the government, despite -- of course, both of them post

21   highly inappropriate messages online, including about guns and

22   the like and coming back with guns, and we've talked about some

23   of this.  It's important to note at the outset that the

24   government's produced no evidence related to either Mr. Calhoun

25   or Mr. Nalley that they personally engaged in any violence that

day or that either of them came to D.C. prepared to storm the
Capitol or to engage in violence.  And I think the record
clearly supports that.  Neither carried -- wore tactical gear,
verbally or physically assaulted any officers or other
individuals, nor did they steal or damage any property.

Both did talk about, as we've discussed, returning to D.C.
with firearms in the future if necessary, but neither acted on
those statements.

On that date -- well, let me back up.

Mr. Calhoun testified at trial that he was recruited by
Mr. Nalley to travel from Georgia to D.C. to attend the "stop
the steal" rally, not to go into the Capitol.  He also testified
that Mr. Nalley planned the trip.

Regardless whether that's truthful -- and the government
hasn't rebutted that, and there's no question that the two acted
in concert, and they were with each other throughout the day,
and the evidence before the Court reflects that they engaged in
highly similar, if not identical, conduct on January 6.

Prior to January 6, the government has a wealth of posts
written by Mr. Calhoun, none by Mr. Nalley.  Again,
Mr. Calhoun's testimony on this point is that at some point --
the government's not told me when, but at some point, Mr. Nalley
had social media accounts that were taken down.  That's
unrebutted.  In fact, the government says it doesn't argue with
that.

1      But the Court, from the position it sits now, can only

2   presume that there were -- given the later posts by Mr. Nalley,

3   that some of what he posted likely was similar.  But that's not

4   critical to the Court's sentence here.

5      After the two men attended the "stop the steal" rally, they

6   then walked to the Capitol where they, along with a large mob of

7   people, entered restricted Capitol grounds.  The evidence at

8   trial, namely the fencing, rack, signs, tear gas, and as well as

9   Mr. Calhoun's eventual concession at trial, show that he and

10  Mr. Nalley knew they were not authorized to go into the Capitol

11  that day.  They also knew, despite the open doors, they didn't

12  have -- let me back up.

13     They weren't authorized to be on Capitol grounds, nor did

14  they have permission to enter the Capitol building.

15     As we've discussed, there was a large mob who overran

16  officers defending the building.  That's what the evidence at

17  trial showed.  When Mr. Calhoun and Nalley entered the west side

18  entrance of the Capitol, that was just six minutes after the

19  initial breach.  The broken police line had not formed again.

20  Alarms are blaring.  The evidence shows Mr. Calhoun video'ed

21  broken glass that was in plain sight as he entered the Capitol

22  building.  He doesn't recall that apparently, or so he

23  testified, but make no mistake, both defendants clearly knew

24  they had no right to be there.

25     Throughout the day, Mr. Calhoun documented and narrated

their movements with video footage showing them walking through the Capitol building.  Once inside, they walked around the Capitol for about 20 minutes, first through the crypt, then the Rotunda, and at one point they were outside former Speaker Pelosi's office.

The statements that Mr. Calhoun posted before, during, and after January 6, among other things, do demonstrate that he had knowledge of what Congress was doing that day, and those statements, coupled with his actions on January 6, show that he had a clear intent to impede or delay the certification proceedings.  That is why the Court convicted him of the obstruction charge.

Turning to Mr. Calhoun's characteristics, he's a 60-year-old lawyer who has had a impressive career principally as a defense attorney in Georgia.  He is married and has a daughter from a previous marriage.  He's also the oldest of four.  He has sisters and his current wife in the courtroom today, as well as at least a cousin and other friends and supporters here.

Mr. Calhoun has no scorable criminal history.  And as the Court said more than once, he's been exemplary while on supervision for the past two-plus years.

Due to the government's initial request for detention that this Court ultimately reversed, Mr. Calhoun has already served almost two months in prison, most of which, at least according

to the defense, was served in solitary confinement due to

threats to Mr. Calhoun's safety in prison.  He was also on home

detention for an extended period of time, wore an electronic

bracelet for an expended period of time and has remained on a

curfew for most, if not all, of his time on supervision.

Mr. Calhoun exercised his right to a trial, and although he

did not accept responsibility by pleading guilty to all the

offenses with which he was charged, he did save the court

considerable time and resources by electing to have a bench

rather than a jury trial.

Unlike Mr. Nalley, who I understood at the time of sentence

showed some genuine remorse shortly after January 6, until today

Mr. Calhoun has not expressed a great deal of that.  He has

fairly consistently said he's guilty of trespass and of civil

disorder.  He quibbled with the way the Court interpreted his

answers at trial.

And I would like to say, I apologize for forgetting his

name, but his cousin, I think, was spot on in saying that when

it came time to be a defendant in this case, Mr. Calhoun put on

his defenses, and I do think that he testified in a way that it

appeared to the Court at times to be a little too cute and a

little shading of his testimony.  And whether that was simply

his defense mode or his big ego, as his cousin said, or

something else, it certainly left the Court with the impression

in realtime that he was not being fully forthcoming about what

1    he did.  And that's a skill that he developed as a defense

2    attorney that doesn't serve him well when he's trying to

3    convince the Court of his sincerity on the stand.

4        Since the Capitol breach, through posts and other public

5    statements, Mr. Calhoun has made clear that he viewed those who

6    stormed the Capitol, himself presumably included, as heroes and

7    as patriots.  This Court does not.

8        I've mentioned the comments that were made in a unrelated

9    court hearing where he stated he would do it a hundred times

10   again if he were in the same situation.  I appreciate that the

11   context of those remarks may well have had to do with the kind

12   of statements that his client was making and there may have been

13   some frustration.  Nonetheless, he did say it.

14       And in recent Georgia State Bar proceedings, he stated he

15   has no remorse, though Ms. Sherman-Stoltz clarified the context

16   of that remark here today.

17       The Court has expressed the concern it has, given

18   Mr. Calhoun's clearly illegal and highly inappropriate conduct

19   that he has engaged in, and it is particularly disturbing that

20   he did so as a criminal defense lawyer.  The Court is inclined

21   to agree with the government that he should have known better.

22       At the same time, the Court does appreciate that he's on

23   track to lose his Bar license, and that is a very serious

24   consequence that cannot be understated, given Mr. Calhoun's

25   active -- or what was active ongoing legal practice as a

criminal defense attorney.  As a result of his conviction in
this case, it appears he will no longer be able to engage in the
legal profession, except perhaps he can function, continue to
function in a support role so long as a lawyer is also on the
case, the Court would suspect, but this Court, of course, is not
familiar with the Bar rules in Georgia.

This has been his only source of income since he graduated
from law school, so far as the Court is aware.  And at 60 years
of age, his professional career is being ended with this felony
conviction, and the Court can do nothing to change that, given
the charge to which he was convicted in this case.  So unless
his felony obstruction conviction is overturned, he will be
unable to practice law even after he completes any sentence of
imprisonment that the Court might impose in this case.

As I've discussed at length, I do think that the Court is
required, indeed has a duty under Section 3553(a)(6) to ensure
that the sentence imposed does not result in unwarranted
sentencing disparity.

So much focus has been placed on (a)(6) in this hearing.  I
don't want to leave any reviewing court or the public to think
that this Court has not also considered the other 3553(a)
factors.  It has done so, including the guidelines.

And nor does the Court want to leave anyone with the
impression that the Court is looking solely at Mr. Nalley's --
the outcome of his case here.  The Court has focused on

1    Mr. Nalley because the two defendants are so similarly situated,

2    but the Court has certainly looked at the broader set of

3    January 6 defendants as a whole, as well as other offenders who

4    have been sentenced under this guideline.

5        All right. We've -- I'll just summarize. I'm not going to

6    go through all the distinctions. But certainly, the two men

7    engaged in much the same conduct on January 6. We know that

8    Mr. Calhoun's statements ahead of time created a much stronger

9    case of intent for Mr. Calhoun, but having reviewed the

10   sentencing transcript and the plea colloquy with Mister --

11   relating to Mr. Nalley, in the sentencing transcript, it's clear

12   that the government, of course, believed it had the evidence to

13   prove Mr. Nalley guilty of obstruction at trial, or it never

14   would have indicted him before the grand jury. And Ms. Arco

15   confirmed that even though he was offered a chance to plead

16   guilty to a misdemeanor, that the government still believed they

17   could have convicted him. So I don't think that the evidence is

18   such that there wasn't a triable case for Mr. Nalley on this.

19       And to be clear, regardless of the truth of Mr. Calhoun's

20   testimony about Mr. Nalley at trial, it's not disputed that

21   Mr. Nalley knew about the certification. He admitted so under

22   oath, and he, like Mr. Calhoun, made clear after the fact that

23   he intended to return to D.C. with firearms, if necessary.

24   Nonetheless, he was allowed to plead guilty to a misdemeanor

25   offense.

1    I get the fact that that comment made at a plea was not one

2    that the government was in possession of before, but again, for

3    all the reasons I've stated, the government had a triable case

4    to bring.

5    I'm not second-guessing the government's decision.  I'm

6    just explaining that at least on the day of these two defendants

7    were very similarly situated, and yet, one was allowed to plead

8    to a misdemeanor, and Mr. Calhoun stands before the Court having

9    been convicted of a felony offense.

10    The government's recommendation here is that the Court

11    impose a 34-month prison sentence for this offense, which is the

12    mid-range of the guidelines.

13    Before the Court announces its sentence, let me make a

14    couple of remarks.  First, the Court, as it's stated, does agree

15    that Mr. Calhoun deserves a longer sentence than Mr. Nalley, due

16    in large part to Mr. Calhoun's testimony and his minimization to

17    date, and even now, he's reluctantly admitting that what he did

18    was wrong.  But Mr. Calhoun has this deeply held view that still

19    comes out even when he addresses the Court now that his reaction

20    here is warranted in some way.

21    That's not to say that I'm questioning that Mr. Calhoun now

22    does in a way that he's never done before state that he is

23    genuinely remorseful, but as he knows, those statements that

24    come at the time of sentencing don't have as much weight with a

25    judge as those that come earlier in the case.

And that's just a fact as a defendant is standing facing a judge who is about to impose sentence.  Often, the degree of acceptance of responsibility and the degree of remorse increases.  It doesn't mean that I'm not crediting any of what Mr. Calhoun is saying here today.  Its regrettable, however, that he hasn't been more forthcoming before today with some of those sentiments that he expressed here.

And the Court was particularly put off by Mr. Calhoun's statement near the end of our colloquy about sending him to prison will only amplify his voice.  When I hear that, Mr. Calhoun, it makes me really question a lot of what you said to me before that point, which seemed to be of a different nature.  So that leaves me a little bit with a feeling that it's still even today somewhat half-hearted.

I don't question that Mr. Calhoun is a changed man at all. I do hear and credit what his family members have said.  As I've said, I think the cousin nailed it on the head when he said his defenses came up at trial and he was influenced by his ego.  I hear what his sister says about what a great lawyer he is and how he represents all clients no matter where they stand, you know, in the socioeconomic ladder and that he fights hard for them and fights hard for their rights, no matter what crime they've committed.

And I think that -- still, I think he did act a little bit like a defense attorney on the stand, and that's not the role

for a criminal defendant to play if the defendant wants a court
to believe what the defendant is saying completely.  Parsing
words and being cute with testimony left this Court with feeling
like Mr. Calhoun was less than forthcoming.

It doesn't mean -- again I will reemphasize, it doesn't
mean that I think he necessarily perjured himself.  I do think
that he sort of shaded his testimony in ways to benefit him, and
maybe nothing more than to have a sparring match with the
prosecutor.  Whatever it is, it left the Court with the
impression that he's not owning 100 percent what he did.

What his wife said resonates a lot also with the Court,
that his ego has gotten him into trouble in the past and that a
different man called her when he left the jail asking for help
and that he is a changed man.

I also believe her when she says he believes in the system.
But when he disagreed with the charging decision in this case,
he went into full-blown defense mode and, in doing so, has not
presented himself in the best light in front of this Court.  And
the fact that all these folks speak highly of him, again, I
credit what they say 100 percent, that he's a changed man, and I
hope that will continue, regardless of the sentence the Court
imposes.

But as he knows, there are consequences for past behavior,
and it's not simply someone goes to prison for two months and
then comes out and is changed for all time and courts disregard

1  the conduct that happened at the time of the offense.  So

2  Mr. Calhoun will have to suffer the consequences of the poor

3  decisions he made before he was a changed man.  And again, how

4  he came off at trial was not necessarily fully consistent with

5  the man who left prison, although as I've said I'm empathetic to

6  how frustrated he must be.

7      And in many ways, as the Court has made abundantly clear to

8  the Department of Justice, the Court is frustrated being in the

9  position it is now with respect to two very similarly situated

10  defendants.  But that is just one factor, and it is a factor the

11  Court must consider with respect to all defendants, and it's

12  under this guideline.  And so it does not carry the day

13  entirely.

14      So having considered all the provisions of Section 3553, as

15  well as the advisory sentencing guidelines and under the

16  Sentencing Reform Act of 1984, the Court will vary from the

17  guideline range of 30 to 37 months, and it rejects the

18  government's recommendation of a 34 and Probation's

19  recommendation of a 33-month sentence, and the Court will impose

20  a sentence of 18 months in prison.

21      So Mr. William McCall Calhoun, you are hereby committed to

22  the custody of the Bureau of Prisons for a term of 18 months as

23  to Count 1, 12 months as to Counts 2 and 3 each, and one month

24  as to Counts 4 and 5 each, all to be served concurrently.

25      You are further sentenced to serve a 24-month, or two-year,

1    term of supervised release as to Count 1 and a 12-month term of

2    supervised release as to Counts 2 and 3, each to be served

3    concurrently.

4         In addition, you are ordered to pay a special assessment of

5    $170 in accordance with Title 18 United States Code Section

6    3013.

7         While on supervision, you shall abide by the following

8    mandatory conditions, as well as the discretionary conditions

9    recommended by the Probation Office in Part D of the sentencing

10   options of the presentence report.

11        Ms. Sherman-Stoltz, I take it you've reviewed those with

12   Mr. Calhoun in the PSR and he's familiar with those, or do I

13   need to go through them here on the record?

14             MS. SHERMAN-STOLTZ:  No, he's familiar with them.

15             THE COURT:  All right.  The mandatory conditions

16   include not committing another federal, state, or local crime,

17   not unlawfully possessing a controlled substance, refraining

18   from any unlawful use of a controlled substance, submitting to

19   one drug test within 15 days of placement on supervision and at

20   least two periodic drug tests thereafter, cooperating in the

21   collection of DNA as directed by the probation officer, making

22   restitution in the amount of $2,000.

23        And just for the record, to be clear, we didn't discuss

24   restitution very much, but Mr. Calhoun did engage in conduct in

25   tandem with hundreds, if not thousands, of other defendants

1    charged in January 6 cases, and his criminal conduct was a

2    proximate cause of the victim's losses, if not a cause in fact,

3    and so the Court does have discretion to apportion restitution

4    and hold him responsible for his individual contribution.  And

5    I'm citing *Paroline v. United States*, 572 U.S. at 458.

6        And so I am apportioning consistent with other defendants

7    who have been sentenced for similar offenses and imposing the

8    $2,000 restitution order.  And as reflected in the sentencing

9    recommendation, which both parties have, that payment shall be

10   made to the Clerk of Court for the U.S. District Court for

11   disbursement to the Architect of the Capitol.  And the financial

12   obligations are all immediately payable to the Clerk of Court

13   for the U.S. District Court.  Within 30 days of any change of

14   address, you shall notify the Clerk of Court of the change until

15   such time as the financial obligation is paid in full.

16       I will not impose a fine in this case, given Probation's

17   assessment here that he cannot pay a fine, and I determine he

18   doesn't have the ability to pay the fine or interest and waives

19   any interest or penalties that may accrue on the balance.

20       And until the financial obligations are paid, you must

21   provide the probation officer access to any requested financial

22   information and authorize the release of any financial

23   information requested.  The office may share that with the

24   United States Attorney, but again, this condition is only until

25   the payments are made, not thereafter.

1    I don't think that there's a need to release the

2    presentence report to all appropriate agencies in this case.

3        Mr. Calhoun, I've been, in felony cases, retaining

4    jurisdiction of supervision.  So if there's any issue with

5    supervision, you will come back to this court, not go to a

6    Georgia case, to address any violations.

7        Yes, Ms. Gavito?

8            PROBATION OFFICER:  Your Honor, I understand the Court

9    is retaining jurisdiction.  However, supervision --

10            THE COURT:  Yes, transferring supervision to the home

11    district.

12        And there is an issue now with where he's living, and I

13    want him when he's released to be able to live with his wife.

14    They've been living apart.

15        How can we ensure that that occurs?

16            PROBATION OFFICER:  As long as we get him to verify

17    his address where his wife is going to reside and we forward

18    that information to the supervision officers in Georgia, the

19    Middle District of Georgia.

20            THE DEFENDANT:  I've already done that.

21            THE COURT:  All right.  Let's make sure that's all

22    clear, and Mr. Calhoun should return to his residence that he's

23    provided.  And if there's any issue with that,

24    Ms. Sherman-Stoltz, if you're still representing him, and if

25    not, Mr. Calhoun, if you're on your own, let me know, and I will

1    address that.

2              PROBATION OFFICER:  Your Honor, with regards to the

3    Probation Office, because the Middle District of Georgia is in a

4    different district, we do need permission from the Court --

5              THE COURT:  To release the presentence report to them.

6    So you do have permission to release the presentence

7    investigation report to that district, the home district, and

8    that district shall return the presentence report upon the

9    completion of the defendant's termination from treatment.

10         I still need to advise him of his right to appeal,

11   et cetera.  But does the government have any objection to the

12   sentence as announced?

13             MS. MARTIN:  Your Honor, no objection.  There was no

14   dispute as to the guidelines.  So we would have no objection.

15             THE COURT:  What do you mean?  He can appeal a

16   conviction of guilt because he went to trial.

17             MR. BRUNWIN:  All our arguments that we've made, but

18   no objection, Your Honor.

19             THE COURT:  All right.  And any objection from the

20   defense other than you wanted a time-served sentence, but any

21   objection to how I've announced the sentence?

22             MS. SHERMAN-STOLTZ:  Not to how you've announced the

23   sentence, Your Honor, no.

24             THE COURT:  All right.  So, Mr. Calhoun, you do have

25   the right to appeal your conviction of guilt to the U.S. Court

1    of Appeals for the District of Columbia Circuit.  You also have

2    the statutory right, pursuant to 18 U.S.C. Section 3742(a), to

3    appeal your sentence to the circuit under certain circumstances,

4    including if you think the sentence was imposed in violation of

5    law or as a result of an incorrect application of the sentencing

6    guidelines or it was more severe than the maximum established in

7    the guideline range.

8         And this right to appeal your sentence may vary according

9    to the various counts, and I'm not going to review all of that

10   on the record, given the hour, but it's set forth clearly in the

11   recommendation provided by the Probation Office.

12        But you do have the right to appeal.  That's the important

13   thing.  And any notice of appeal must be filed within 14 days of

14   the entry of judgment or within 14 days of the filing of a

15   notice of appeal by the government.

16        If you're unable to afford the cost of an appeal, you may

17   request permission from the Court to file an appeal without cost

18   to you, and on appeal, you may also apply for court-appointed

19   counsel.

20        Are there any objections before I ask that this sentence be

21   imposed?

22             MS. MARTIN:  No, Your Honor.

23             THE COURT:  And is there a recommendation on a

24   facility where Mr. Calhoun would like to be placed?

25             MS. SHERMAN-STOLTZ:  Your Honor, he would like to be

1    as close to his family as he can.

2              THE COURT:  All right.  That makes complete sense, but

3    if there's a particular institution, I wanted to put that in the

4    J&C.  I won't do this order today.  So if you early next week

5    come across a recommendation, specific recommendation you want

6    me to make, I will do that.  It's up to the Bureau of Prisons,

7    but I will certainly add it to the judgment.

8         Ms. Gavito?

9              PROBATION OFFICER:  Your Honor, is the Court inclined

10   to allow Mr. Calhoun to voluntarily surrender?

11             THE COURT:  Absolutely.

12             PROBATION OFFICER:  Thank you, Your Honor.

13             THE COURT:  So I think that's it.  Mr. Calhoun, I know

14   that this is not the outcome that you hoped for.  I continue to

15   believe you could have a bigger voice, a positive voice for

16   change in this country than you seem to think you have.  And I

17   sincerely hope that you don't act on the -- maybe you didn't

18   intend it as a veiled threat, but that you don't simply by

19   virtue of the fact that you do more time in prison end up

20   swinging the other way and coming out -- I hope the lessons

21   you've learned the first around in prison will continue.  And

22   you're clearly living a better life now than you were before,

23   and I hope you will continue on that path, because -- and

24   there's actually a lot of good you can do, as you well know, in

25   prison in helping those who are less fortunate than yourself.

1    It's not where you want to spend your time, but I hope you will

2    make the best of it.

3        Anything else?

4            MR. BRUNWIN:  Is the Court going to set a surrender

5    date for the defendant?

6            THE COURT:  I will order the defendant to surrender

7    when notified by Probation, which will be through -- BOP lets

8    you know, correct, at a future date to be determined by

9    Probation in consultation with the Bureau of Prisons?

10           PROBATION OFFICER:  In consultation with the Bureau of

11   Prisons, Your Honor.  We will provide Mr. Calhoun instructions

12   after the sentencing hearing.

13           THE COURT:  All right.  Thank you, all.

14       (Proceedings adjourned at 5:44 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3         I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    /s/ Sara A. Wick                    October 9, 2023

9    SIGNATURE OF COURT REPORTER         DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25